**IN THE CIRCUIT COURT FOR BALTIMORE CITY**

| | |
|---|---|
| STATE OF MARYLAND,<br>by and through the Maryland Attorney General,<br>200 Saint Paul Place<br>Baltimore, Maryland 21202,<br><br>    Plaintiff,<br><br>    v.<br><br>EXXON MOBIL CORPORATION<br>1251 Avenue of the Americas<br>New York, New York 10020<br><br>Serve on Resident Agent:<br>CSC-Lawyers Incorporating Service Company<br>7 Saint Paul Street, Suite 820<br>Baltimore, Maryland 21202<br><br>    and<br><br>EXXONMOBIL OIL CORPORATION<br>5959 La Colinas Boulevard<br>Irving, Texas 75039<br><br>Serve on Resident Agent:<br>CSC-Lawyers Incorporating Service Company<br>7 Saint Paul Street, Suite 820<br>Baltimore, Maryland 21202<br><br>    and | Civil Action No. _____<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CIRCUIT COURT FOR
BALTIMORE CITY
17 DEC 13 PM 3: 09
CIVIL DIVISION

1

**APEX OIL COMPANY, INC.**                        )
8182 Maryland Avenue                              )
St. Louis, Missouri 63105                         )
                                                  )
  Serve on Resident Agent:              )
  The Corporation Trust, Inc.            )
  2405 York Road, Suite 201              )
  Lutherville Timonium, Maryland 21093-2264 )
                                                  )
       and      )
                                                  )
**ASTRA OIL COMPANY, LLC**                        )
5847 San Felipe, Suite 2850                       )
Houston, Texas 77057                              )
                                                  )
  Serve on Resident Agent:              )
  CSC-Lawyers Incorporating Service Company )
  7 Saint Paul Street, Suite 820         )
  Baltimore, Maryland 21202              )
                                                  )
       and      )
                                                  )
**ATLANTIC RICHFIELD COMPANY**                    )
28100 Torch Parkway                               )
Warrenville, Illinois 60555                       )
                                                  )
  Serve on Resident Agent:              )
  The Corporation Trust, Inc.            )
  2405 York Road, Suite 201              )
  Lutherville Timonium, Maryland 21093-2264 )
                                                  )
       and      )
                                                  )

**BP AMERICA INC.**                                )
200 East Randolph Drive                            )
Chicago, Illinois 60601                            )
                                                   )
  Serve on Resident Agent:               )
  The Corporation Trust, Inc.             )
  300 East Lombard Street                 )
  Baltimore, Maryland 21202               )
                                                   )
      and             )
                                                   )
**BP AMOCO CHEMICAL COMPANY**                      )
150 West Warrenville Road                          )
Naperville, Illinois 60563                         )
                                                   )
  Serve on Resident Agent:               )
  The Corporation Trust, Inc.             )
  2405 York Road, Suite 201               )
  Lutherville Timonium, Maryland 21093-2264 )
                                                   )
      and             )
                                                   )
**BP CORPORATION NORTH**                           )
**AMERICA INC.**                                   )
200 East Randolph Drive                            )
Chicago, Illinois 60601                            )
                                                   )
  Serve on Resident Agent:               )
  The Corporation Trust, Inc.             )
  2405 York Road, Suite 201               )
  Lutherville Timonium, Maryland 21093-2265 )
                                                   )
      and             )
                                                   )

**BP PRODUCTS NORTH AMERICA INC.** )
28100 Torch Parkway )
Warrenville, Illinois 60555 )
)
  Serve on Resident Agent: )
  The Corporation Trust, Inc. )
  2405 York Road, Suite 201 )
  Lutherville Timonium, Maryland 21093-2265 )
)
        and )
)
**CHEVRON CORPORATION** )
6001 Bollinger Canyon Road )
San Ramon, California 94583 )
)
  Serve on Agent: )
  The Prentice-Hall Corporation System, Inc. )
  251 Little Falls Drive )
  Wilmington, Delaware 19808 )
)
        and )
)
**CHEVRON U.S.A. INC.** )
6001 Bollinger Canyon Rd. )
San Ramon, California 94583 )
)
  Serve on Resident Agent: )
  The Prentice-Hall Corporation System, MA )
  7 Saint Paul Street, Suite 820 )
  Baltimore, Maryland 21202 )
)
        and )
)

4

**CITGO PETROLEUM CORPORATION** )
1293 Eldridge Parkway )
Houston, Texas 77077 )
 )
  Serve on Resident Agent: )
  The Corporation Trust, Inc. )
  2405 York Road, Suite 201 )
  Lutherville Timonium, Maryland 21093-2264 )
 )
        and )
 )
**CITGO REFINING AND** )
**CHEMICALS COMPANY L.P.** )
1802 Nueces Bay Boulevard )
Corpus Christi, Texas 78469 )
 )
  Serve on Agent: )
  The Corporation Trust Company )
  Corporation Trust Center )
  1209 Orange Street )
  Wilmington, Delaware 19801 )
 )
        and )
 )
**CONOCOPHILLIPS COMPANY** )
600 North Dairy Ashford )
Houston, Texas 77252 )
 )
  Serve on Resident Agent: )
  The United States Corporation Company )
  7 Saint Paul Street, Suite 820 )
  Baltimore, Maryland 21202 )
 )
        and )
 )

**CONOCOPHILLIPS**                          )
600 North Dairy Ashford                     )
Houston, Texas 77252                        )
                                            )
  Serve on Agent:                 )
  Corporation Service Company      )
  251 Little Falls Drive           )
  Wilmington, Delaware 19808       )
                                            )
      and      )
                                            )
**CUMBERLAND FARMS, INC.**                  )
165 Flanders Road                           )
Westborough, Massachusetts 01581            )
                                            )
  Serve on Resident Agent:         )
  The Corporation Trust, Inc.      )
  32 South Street                  )
  Baltimore, Maryland 21202        )
                                            )
      and      )
                                            )
**DUKE ENERGY MERCHANTS, LLC**              )
5400 Westheimer Court                       )
Houston, Texas 77056                        )
                                            )
  Serve on Resident Agent:         )
  The Corporation Trust, Inc.      )
  300 East Lombard Street          )
  Baltimore, Maryland 21202-3219   )
                                            )
      and      )
                                            )

**EL PASO MERCHANT ENERGY-**
**PETROLEUM COMPANY**
1001 Louisiana Street
Houston, Texas 77002

   Serve on Resident Agent:
   The Corporation Trust, Inc.
   300 East Lombard Street
   Baltimore, Maryland 21202-3219

        and

**ENERGY TRANSFER PARTNERS, L.P.**
3738 Oak Lawn Avenue
Dallas, Texas 75219

   Serve on Agent:
   The Corporation Trust Company
   Corporation Trust Center
   1209 Orange Street
   Wilmington, Delaware 19801

        and

**EQUILON ENTERPRISES LLC**
1209 Orange Street
Wilmington, Delaware 19801

   Serve on Resident Agent:
   The Corporation Trust, Inc.
   2405 York Road, Suite 201
   Lutherville Timonium, Maryland 21093-2265

        and

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ETP HOLDCO CORPORATION**                          )
1001 Louisiana Street                                )
Houston, Texas 77002                                 )
                                                     )
  Serve on Agent:                          )
  Corporation Service Company              )
  251 Little Falls Drive                   )
  Wilmington, Delaware 19808               )
                                                     )
      and               )
                                                     )
**GEORGE E. WARREN CORPORATION**                     )
50 Milk Street                                       )
Boston, Massachusetts 02109                          )
                                                     )
  Serve on Resident Agent:                 )
  The Corporation Trust, Inc.              )
  2405 York Road, Suite 201                )
  Lutherville Timonium, Maryland 21093-2264 )
                                                     )
      and               )
                                                     )
**GETTY PROPERTIES CORPORATION**                     )
125 Jericho Turnpike                                 )
Jericho, New York, 11753                             )
                                                     )
  Serve on Resident Agent:                 )
  The Corporation Trust, Inc.              )
  2405 York Road, Suite 201                )
  Lutherville Timonium, Maryland 21093-2264 )
                                                     )
      and               )
                                                     )

**GETTY PETROLEUM MARKETING INC.** )
1500 Hempstead Turnpike )
East Meadow, New York 11554 )
)
   Serve on: )
   Maryland Department of Assessments )
   & Taxation )
   Attn: Service of Process )
   301 West Preston Street, Room 801 )
   Baltimore, Maryland 21201-2395 )
)
          and )
)
**GULF OIL LIMITED PARTNERSHIP** )
80 Williams Street, Suite 400 )
Wellesley Hills, Massachusetts 02481 )
)
   Serve on Resident Agent: )
   Cogency Global Inc. )
   1519 York Road )
   Lutherville, Maryland 21093 )
)
          and )
)
**GUTTMAN ENERGY, INC.** )
200 Speers Street )
Belle Vernon, Pennsylvania 15012 )
)
   Serve on Resident Agent: )
   CSC-Lawyers Incorporating Service Company)
   7 Saint Paul Street, Suite 820 )
   Baltimore, Maryland 21202 )
)
          and )
)

9

**HARTREE PARTNERS, LP**               )
1185 Avenue of the Americas            )
New York, New York 10036               )
                                       )
  Serve on Resident Agent:   )
  The Corporation Trust, Inc. )
  2405 York Road, Suite 201   )
  Lutherville Timonium, Maryland 21093-2264 )
                                       )
        and   )
                                       )
**HESS CORPORATION**                   )
1185 Avenue of the Americas            )
New York, New York 10036               )
                                       )
  Serve on Resident Agent:   )
  The Corporation Trust, Inc. )
  2405 York Road, Suite 201   )
  Lutherville Timonium, Maryland 21093-2264 )
                                       )
        and   )
                                       )
**HESS OIL VIRGIN ISLANDS**            )
**CORPORATION**                        )
1185 Avenue of the Americas            )
New York, New York 10036               )
                                       )
  Serve on Agent:             )
  Sunshine Benoit             )
  Bryant Barnes & Benoit, LLP )
  1134 King Street, 2nd Floor )
  Christiansted, Virgin Islands 00820 )
                                       )
        and   )
                                       )

**HOLTZMAN OIL CORPORATION**    )
5534 North Main Street    )
Mount Vernon, Virginia 22842    )
    )
   Serve on Resident Agent:    )
   John R. Barr    )
   10500 Little Patuxent Parkway, Number 420   )
   Columbia, Maryland 21044    )
    )
       and    )
    )
**KINDER MORGAN G.P., INC.**    )
Suite 1000, 1001 Louisiana Street    )
Houston, Texas 77002    )
    )
   Serve on Resident Agent:    )
   Capitol Corporate Services, Inc.    )
   4th Floor, 3206 Tower Oaks Boulevard   )
   Rockville, Maryland 20852    )
    )
       and    )
    )
**KINDER MORGAN OPERATING L.P. "A"** )
1301 McKinney, Suite 3450    )
Houston, Texas 77010    )
    )
   Serve on Resident Agent:    )
   The Corporation Trust, Inc.    )
   351 West Camden Street    )
   Baltimore, Maryland 21201-7912    )
    )
       and    )
    )

**KINDER MORGAN TRANSMIX**   )
**COMPANY, LLC**   )
Suite 1000, One Allen Center   )
500 Dallas Street   )
Houston, Texas 77002   )
   )
   Serve on Resident Agent:   )
   Capitol Corporate Service, Inc.   )
   3206 Tower Oaks Boulevard, 4th Floor   )
   Rockville, Maryland 20852   )
   )
        and   )
   )
**LUKOIL NORTH AMERICA LLC**   )
505 Fifth Avenue, 9th Floor   )
New York, New York 11554   )
   )
   Serve on Resident Agent:   )
   The Corporation Trust, Inc.   )
   351 West Camden Street   )
   Baltimore, Maryland 21201-7912   )
   )
        and   )
   )
**LUKOIL AMERICAS CORPORATION**   )
505 Fifth Avenue, 9th Floor   )
New York, New York 11554   )
   )
   Serve on Agent:   )
   The Corporation Trust Company   )
   Corporation Trust Center   )
   1209 Orange Street   )
   Wilmington, Delaware 19801   )
   )
        and   )
   )

**LUKOIL PAN AMERICAS, LLC**                    )
Suite 400, 2711 Centerville Road                )
Wilmington, Delaware 19808                      )
                                                )
  Serve on Resident Agent:                      )
  CSC-Lawyers Incorporating Service Company)
  7 Saint Paul Street, Suite 820                )
  Baltimore, Maryland 21202                     )
                                                )
          and                                   )
                                                )
**MARATHON OIL CORPORATION**                    )
5555 San Felipe Road                            )
Houston, Texas 77056                            )
                                                )
  Serve on Agent:                               )
  The Corporation Trust Company                 )
  Corporation Trust Center                      )
  1209 Orange Street                            )
  Wilmington, Delaware 19801                    )
                                                )
          and                                   )
                                                )
**MARATHON PETROLEUM**                          )
**COMPANY LP**                                  )
539 South Main Street                           )
Findlay, Ohio 45840                             )
                                                )
  Serve on Resident Agent:                      )
  The Corporation Trust, Inc.                   )
  2405 York Road, Suite 201                     )
  Lutherville Timonium, Maryland 21093-2264 )
                                                )
          and                                   )
                                                )

**MARATHON PETROLEUM**                )
**CORPORATION**                       )
539 South Main Street                 )
Findlay, Ohio 45840                   )
                                      )
  Serve on Agent:           )
  The Corporation Trust Company   )
  Corporation Trust Center   )
  1209 Orange Street         )
  Wilmington, Delaware 19801 )
                                      )
      and )
                                      )
**MOBIL CORPORATION**                 )
150 East 42nd Street                  )
New York, New York 10017              )
                                      )
  Serve on Resident Agent:   )
  The Prentice-Hall Corporation System, Inc.   )
  7 Saint Paul Street, Suite 1660   )
  Baltimore, Maryland 21202  )
                                      )
      and )
                                      )
**MOTIVA ENTERPRISES LLC**            )
500 Dallas Street                     )
Houston, Texas, 77002                 )
                                      )
  Serve on Resident Agent:   )
  The Corporation Trust, Inc.   )
  2405 York Road, Suite 201   )
  Lutherville Timonium, Maryland 21093-2264 )
                                      )
      and )
                                      )

14

**NUSTAR TERMINALS OPERATIONS**
**PARTNERSHIP LP**
2400 Lakeside Boulevard, 6th Floor
Richardson, Texas 75082

  Serve on Resident Agent:
  The Corporation Trust Inc.
  2405 York Road, Suite 201
  Lutherville Timonium, Maryland 21093-2264

       and

**PHILLIPS 66 COMPANY**
600 North Dairy Ashland Road
Houston, Texas 77079

  Serve on Resident Agent:
  CSC-Lawyers Incorporating Service Company
  7 Saint Paul Street, Suite 820
  Baltimore, Maryland 21202

       and

**PJSC LUKOIL**
11 Sretensky Boulevard
Moscow, Russia 101000

  Serve on:
  Maryland Department of Assessments
  & Taxation
  Attn: Service of Process
  301 West Preston Street, Room 801
  Baltimore, Maryland 21201-2395

       and

**THE PREMCOR REFINING GROUP INC.** )
One Valero Way )
San Antonio, Texas 79249 )
)
  Serve on Resident Agent: )
  The Corporation Trust, Inc. )
  2405 York Road, Suite 201 )
  Lutherville Timonium, Maryland 21093-2264 )
)
        and )
)
**PREMCOR USA INC.** )
1700 East Putnam Avenue, Suite 500 )
Old Greenwich, Connecticut 06870 )
)
  Serve on Agent: )
  The Corporation Trust Company )
  Corporation Trust Center )
  1209 Orange Street )
  Wilmington, Delaware 19801 )
)
        and )
)
**7-ELEVEN, INC.** )
P.O. Box 219088 )
Dallas, Texas 75221 )
)
  Serve on Resident Agent: )
  Corporate Creations Network Inc. )
  2 Wisconsin Circle, Number 700 )
  Chevy Chase, Maryland 20815 )
)
        and )
)

**SHEETZ, INC.** )
5700 Sixth Avenue )
Altoona, Pennsylvania 16602 )
 )
  Serve on Resident Agent: )
  CSC-Lawyers Incorporating Service Company )
  7 Saint Paul Street, Suite 820 )
  Baltimore, Maryland 21202 )
 )
        and )
 )
**SHELL OIL COMPANY** )
910 Louisiana Street )
Houston, Texas 77002 )
 )
  Serve on Resident Agent: )
  The Corporation Trust, Inc. )
  2405 York Road, Suite 201 )
  Lutherville Timonium, Maryland 21093-2264 )
 )
        and )
 )
**SHELL OIL PRODUCTS COMPANY LLC** )
910 Louisiana Street )
Houston, Texas 77002 )
 )
  Serve on Agent: )
  The Corporation Trust Company )
  Corporation Trust Center )
  1209 Orange Street )
  Wilmington, Delaware 19801 )
 )
        and )
 )

**SHELL TRADING (US) COMPANY**                    )
910 Louisiana Street                              )
Houston, Texas 77002                              )
                                                  )
  Serve on Resident Agent:              )
  The Corporation Trust, Inc.            )
  2405 York Road, Suite 201              )
  Lutherville Timonium, Maryland 21093-2264 )
                                                  )
      and            )
                                                  )
**SUNOCO, INC.**                                  )
3801 West Chester Pike                            )
Newtown Square, Pennsylvania 19073                )
                                                  )
  Serve on Agent:                        )
  Corporation Service Company            )
  251 Little Falls Drive                 )
  Wilmington, Delaware 19808             )
                                                  )
      and            )
                                                  )
**SUNOCO, INC. (R&M)**                            )
1608 Walnut Street                                )
Philadelphia, Pennsylvania 19103                  )
                                                  )
  Serve on Resident Agent:               )
  CSC-Lawyers Incorporating Service Company )
  7 Saint Paul Street, Suite 820         )
  Baltimore, Maryland 21202              )
                                                  )
      and            )
                                                  )

**SUNOCO PARTNERS MARKETING &**    )
**TERMINALS L.P.**    )
3rd Floor, 1801 Market Street    )
Philadelphia, Pennsylvania 19103    )
    )
   Serve on Resident Agent:    )
   CSC-Lawyers Incorporating Service Company)
   7 Saint Paul Street, Suite 820    )
   Baltimore, Maryland 21202    )
    )
        and    )
    )
**SUN COMPANY, INC.**    )
3801 West Chester Pike    )
Newtown Square, Pennsylvania 19073    )
    )
   Serve on Agent:    )
   Corporation Service Company    )
   251 Little Falls Drive    )
   Wilmington, Delaware 19808    )
    )
        and    )
    )
**TEXACO INC.**    )
6001 Bollinger Canyon Road    )
San Ramon, California 94583    )
    )
   Serve on Resident Agent:    )
   CSC-Lawyers Incorporating Service Company)
   7 Saint Paul Street, Suite 1660    )
   Baltimore, Maryland 21202    )
    )
        and    )
    )

**TMR COMPANY**						)
910 Louisiana Street						)
Houston, Texas 77002						)
							)
   Serve on Resident Agent:			)
   The Corporation Trust, Inc.			)
   2405 York Road, Suite 201			)
   Lutherville Timonium, Maryland 21093-2264	)
							)
        and			)
							)
**TRMI-H LLC**						)
6001 Bollinger Canyon Road					)
San Ramon, California 94583					)
							)
   Serve on Agent:				)
   Corporation Service Company			)
   251 Little Falls Drive				)
   Wilmington, Delaware 19808			)
							)
        and			)
							)
**TOTAL PETROCHEMICALS**				)
**& REFINING USA, INC.**				)
P.O. Box 2159						)
Dallas, Texas 75221						)
							)
   Serve on Resident Agent:			)
   The Corporation Trust, Inc.			)
   2405 York Road, Suite 201			)
   Lutherville Timonium, Maryland 21093-2264	)
							)
        and			)
							)

**TRANSMONTAIGNE PRODUCT** )
**SERVICES, LLC** )
Suite 3100, 1670 Broadway )
Denver, Colorado 80202 )
)
   Serve on Resident Agent: )
   The Corporation Trust, Inc. )
   2405 York Road, Suite 201 )
   Lutherville Timonium, Maryland 21093-2264 )
)
        and )
)
**VALERO ENERGY CORPORATION** )
One Valero Way )
San Antonio, Texas 78249 )
)
   Serve on Agent: )
   The Corporation Trust Company )
   Corporation Trust Center )
   1209 Orange Street )
   Wilmington, Delaware 19801 )
)
        and )
)
**VALERO MARKETING AND SUPPLY** )
**COMPANY** )
One Valero Way )
San Antonio, Texas 79249 )
)
   Serve on Resident Agent: )
   The Corporation Trust, Inc. )
   2405 York Road, Suite 201 )
   Lutherville Timonium, Maryland 21093-2264 )
)
        and )
)

**VALERO REFINING AND MARKETING**  )
**COMPANY**                          )
One Valero Way                       )
San Antonio, Texas 79249             )
                                )
  Serve on Agent:          )
  The Corporation Trust Company )
  Corporation Trust Center  )
  1209 Orange Street        )
  Wilmington, Delaware 19801 )
                                )
                                )
    and           )
                                )
**VITOL S.A.**                       )
Boulevard du Pont d'Arve 28          )
Geneva, Switzerland                  )
                                )
  Serve on Resident Agent:  )
  The Corporation Trust      )
  300 East Lombard Street    )
  Baltimore, Maryland 21202  )
                                )
    and           )
                                )
**WAWA, INC.**                       )
260 Baltimore Pike                   )
Wawa, Pennsylvania 19063             )
                                )
  Serve on Resident Agent:  )
  The Corporation Trust, Inc. )
  2405 York Road, Suite 201  )
  Lutherville Timonium, Maryland 21093-2264 )
                                )
    and           )
                                )

**WESTERN REFINING** )
**YORKTOWN, INC.** )
Suite 101, 1250 W. Washington Street )
Tempe, Arizona 85281 )
)
  Serve on Resident Agent: )
  CSC-Lawyers Incorporating Service Company)
  7 Saint Paul Street, Suite 820 )
  Baltimore, Maryland 21202, )
)
          Defendants. )
_____)

## COMPLAINT

Plaintiff State of Maryland ("State"), by and through the Maryland Attorney General on behalf of the Maryland Department of the Environment and the Maryland Department of Health, files this Complaint against the above-named defendants and in support thereof alleges as follows:

## INTRODUCTION

1.    The State of Maryland brings this action against defendants to redress the wide spread contamination caused to the waters of the State by defendants' wrongful conduct in adding methyl tertiary butyl ether ("MTBE") to gasoline that defendants manufactured, refined, marketed, handled, stored, and/or sold in the State. Defendants knew, or should have known, and consciously and willfully disregarded, the fact that MTBE would cause serious groundwater contamination when routinely released

into the environment from leaking underground service station storage tanks and other sources in the State.

2. MTBE is the most dangerous component of gasoline when released into the environment because, unlike other gasoline constituents, MTBE readily dissolves in groundwater, spreads rapidly, does not naturally degrade and resists removal and treatment from groundwater.

3. Defendants' wrongful conduct in adding MTBE to their gasoline, and their marketing, distribution, handling, storage, and sale of MTBE gasoline in the State has created widespread contamination of the waters of the State, including many of the State's over 400,000 public and private drinking water wells.

4. MTBE is a probable human carcinogen, which can cause significant adverse health effects when ingested and, even at very low concentrations, can render drinking water putrid and unfit for human consumption.

5. The injuries to groundwater from MTBE contamination are statewide and negatively affect in a substantial way a significant portion of the State's population.

6. The State has the authority and the duty under its Constitution and laws to protect and seek compensation and other remedies for the injury to the

indivisible natural water resources of the State, and acts here in its own right, in its *parens patriae* capacity, and as trustee of those natural resources and pursuant to the Environmental Standing Act..

7.     Defendants' manufacture, marketing, distribution, handling, and storage and sale of MTBE gasoline in Maryland occurred despite the availability of reasonable safer alternatives, and despite defendants' actual or constructive knowledge that MTBE gasoline was a dangerous product that would be released into the environment from various MTBE gasoline storage and delivery systems and would contaminate the waters of the State.

8.     Defendants are strictly liable to the State for manufacturing and/or supplying a dangerous product in MTBE gasoline and for failing to provide adequate warnings about the risks that MTBE gasoline posed to the waters, property and citizens of the State.  Defendants also are liable for creating a public nuisance by the foreseeable release of MTBE into the waters of the State by their actions, for trespassing thereby upon the waters and property of the State, for negligently causing damage to the waters and property of the State, for conducting abnormally dangerous activities, and for their associated violation of the environmental statutes of Maryland.

9.     As a result of defendants' liability, the State seeks and is entitled to recover from defendants: (a) the costs paid or incurred to date, and to be paid or

incurred in the future, to detect, define the extent of, monitor, treat, abate, remove, remediate, and cleanup MTBE contamination of waters of the State, including the costs to restore all MTBE-contaminated waters of the State to their pre-contaminated condition; (b) the costs paid or incurred to date, and to be paid or incurred in the future, to test, monitor, and treat the water from each and every public and private drinking and irrigation water well in the State so as to remove all MTBE from such water; (c) damages for injury to or destruction of the waters of the State from MTBE contamination, including the loss of use and diminution in value of waters of the State; (d) punitive damages; (e) pre- and post-judgment interest; and (f) attorneys' fees and costs. In addition, the State seeks an injunction requiring the defendants to: (a) test for MTBE in all private and public wells used or to be potentially used for potable and/or irrigation purposes; (b) treat all water from such wells so as to remove all MTBE from such water; (c) investigate and fully delineate horizontally and vertically the full extent of all MTBE plumes in the waters of the State and to ensure the cleanup (as defined in Md. Code Ann., Envir. § 4-401(b)) of such MTBE plumes so that the groundwater is in the same condition it was in prior to the discharges of MTBE. The State also seeks declaratory relief that defendants are liable for the costs of these remedial actions.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter under §§

1-501 and 4-401 of the Courts and Judicial Proceedings Article of the Maryland Code and Maryland Rule 2-305(b) because this civil case seeks and demands money damages in excess of $75,000.00.

11.     This Court has personal jurisdiction over defendants because they either were served with process in Maryland; are organized under the laws of Maryland; maintain their principal place of business in Maryland; transact business in Maryland; perform work in Maryland; contract to supply goods, manufactured products or services in Maryland; caused tortious injury in Maryland; engage in persistent courses of conduct in Maryland; derive substantial revenue from manufactured goods, products or services used or consumed in Maryland; and/or have interests in or use real property in Maryland.

12.     Venue is proper in this Court as to all defendants under §§ 6-201 and 6-202 of the Courts and Judicial Proceedings Article.

### MARYLAND AS PLAINTIFF

13.     It is the State's "public policy to improve, conserve, and manage the quality of the waters of the State and to protect, maintain, and improve the quality of water for public supplies, propagation of wildlife, fish and aquatic life, and domestic, agricultural, industrial, recreational, and other legitimate beneficial uses." Md. Code Ann., Envir. § 4-402.

14. The "quality of the waters of this State is vital to the interests of the citizens of this State . . . ." Md. Code Ann., Envir. § 9-302. "[B]ecause pollution is a menace to public health and welfare, creates public nuisances, harms . . . and impairs domestic, agricultural . . . and other legitimate beneficial uses of water . . . it is the policy of this State: (1) To improve, conserve, and manage the quality of the waters of this State; (2) To protect, maintain, and improve the quality of water for public supplies . . . ; (3) To provide that no waste is discharged into any waters of this State . . . to protect the legitimate beneficial uses of the waters of this State." *Id.*

15. The "waters of the State" include both surface and underground waters within the boundaries of the State or subject to its jurisdiction, as well as all source waters that could impact the quality of groundwaters. For the purposes of this Complaint, "waters of the State" do not include groundwaters underlying or surface waters on federally owned properties located in Maryland.

16. Under the Maryland Environmental Standing Act, the "General Assembly finds and declares that the natural resources . . . of the State of Maryland are in danger of irreparable harm occasioned by the use and exploitation of the physical environment. It further finds that improper use and exploitation constitute an invasion of the *right of every resident of Maryland to an environment free from pollution* to the extent possible. It further finds that the courts of the

28

State of Maryland are an appropriate forum for seeking the protection of the environment and that an unreasonably strict procedural definition of 'standing to sue' in environmental matters is not in the public interest." Md. Code Ann., Nat. Res. § 1-502 (emphasis added).

17. The State of Maryland and its agencies and officers, acting through the Attorney General, have standing to bring actions for equitable and/or declaratory relief pursuant to the Environmental Standing Act. *See* Md. Code Ann., Nat. Res. §§ 1-503, 1-504(c).

18. MTBE contamination has injured and continues to injure, the waters and property of the State, and the property, health, safety, and welfare of Maryland's citizens.

19. The State brings this action (a) directly in its own right, (b) in its parens patriae capacity, (c) as trustee of Maryland's natural resources, and (d) pursuant to the Environmental Standing Act.

20. The State has significant direct property interests in the waters of the State, and it has a quasi-sovereign and a natural-resource-trustee interest in protecting the waters of the State from contamination. The contamination of the waters of the State by MTBE gasoline constitutes injury to the waters of the State which are held in trust by the State on behalf of all its citizens, and to the persons

and property of the State's citizens. The State may for the common good exercise all the authority necessary to protect their interests.

21. The State, as the public trustee, is empowered to bring suit to protect the corpus of the trust—*i.e.,* the waters—for the beneficiaries of the trust—*i.e.,* the public. Protection of the waters of the State is a matter of grave public concern in which the State has an interest apart from that of particular individuals who may be affected. Pollution of the waters of the State with MTBE gasoline has negatively affected in a substantial way a substantial segment of the State's population.

22. The State brings this action pursuant to its police powers, which include but are not limited to, its powers to prevent and abate pollution of the waters of the State, to prevent and abate nuisances, and to prevent and abate hazards to the environment and to the public health, safety, and welfare.

23. The State, through its Attorney General, also brings this action against the defendants pursuant to Titles 4, 7 and 9 of the Environment Article, which empower the Secretary of the Maryland Department of the Environment, through the Attorney General, to bring suit against any person "responsible for the discharge or spillage of any" oil, and to seek from such person "the reasonable cost of rehabilitation and restoration of resources damaged and the cost of eliminating the condition causing the damage, including the environmental

monetary value of such resources," and to obtain against that person an injunction, among other relief. Md. Code Ann., Envir. § 4-405(c).

24.     As a result of defendants' acts and omissions as alleged herein, the State has suffered and will suffer damages to waters of the State, and has incurred and will incur costs to define the extent of MTBE contamination throughout the State, as well as to monitor, treat, remediate, and remove MTBE and to provide oversight of such activities.

25.     The State does not seek to recover from any defendant damages that the State has previously recovered or settled with that defendant based on MTBE releases at particular sites.

## DEFENDANTS

26.     Defendants include MTBE and MTBE gasoline manufacturers, marketers and distributors. At all times relevant, defendants together controlled all, or substantially all, of the market in Maryland for MTBE and MTBE gasoline.

27.     Defendant Exxon Mobil Corporation is a New Jersey corporation qualified to do business in Maryland and its resident agent is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is 1251 Avenue of the Americas, New York, New York 10020. Defendant Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to

ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A, ExxonMobil Refining & Supply Corporation, Exxon Company, U.S.A., Exxon Corporation and Mobil Corporation. The terms "Exxon," ExxonMobil" and "Mobil" as used in this Complaint refer to Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation and Mobil Corporation, and their related entities ExxonMobil Refining and Supply Company, Exxon Corporation, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., and Exxon Company, U.S.A.

28. Defendant ExxonMobil Oil Corporation is a New York corporation qualified to do business in Maryland and its resident agent is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is 5959 Las Colinas Boulevard, Irving, Texas 75039. Defendant ExxonMobil Oil Corporation was formerly known as, did business as, and/or is the successor in liability to Mobil Oil Corporation.

29. Defendant Apex Oil Company, Inc. is qualified to do business in Maryland. Its principal place of business is 8235 Forsyth Boulevard, St. Louis, Missouri 63105 and its resident agent is the Corporation Trust Inc., 351 West

Camden Street, Baltimore, Maryland 21201. The term "Apex" as used in this Complaint refers to Defendant Apex Oil Company, Inc.

30. Defendant Astra Oil Company, LLC is qualified to do business in Maryland. Its principal place of business is 5847 San Felipe Street, Suite Number 2850, Houston, Texas 77057, and its resident agent is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202.

31. Defendant Atlantic Richfield Company is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is at 28100 Torch Parkway, Warrenville, Illinois 60555. Defendant Atlantic Richfield Company was formerly known as, did or does business as, and/or is the successor in liability to Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, and ARCO Chemical Company, a division of Atlantic Richfield Company. The term "ARCO" as used in this Complaint refers to Defendants Atlantic Richfield Company and BP America Inc., and related entities Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, and ARCO Chemical Company, a division of Atlantic Richfield Company.

32.     Defendant BP America Inc. is a Delaware corporation and its principal place of business is 4101 Winfield Road, Warrenville, Illinois 60555. Its resident agent is the Corporation Trust, Inc., 300 East Lombard Street, Baltimore, Maryland. Defendant BP America Inc. was formerly known as, did or does business as, and/or is the successor in liability to Defendant BP Products North America Inc., Defendant Atlantic Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco Plc, BP Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, and ARCO Chemical Company, a division of Atlantic Richfield Company.

33.     Defendant BP Amoco Chemical Company is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust Inc., 351 West Camden Street, Baltimore, Maryland 21201. Its principal place of business is 150 West Warrenville Road, Naperville, Illinois 60563. Defendant BP Amoco Chemical was formerly known as, did or does business as, and/or is the successor in liability to Amoco Chemical Company, Amoco Chemicals Company and Amoco Chemicals Corporation.

34.     Defendant BP Corporation North America Inc. is an Indiana corporation with its principal place of business at 200 East Randolph Drive,

34

Chicago, Illinois 60601 and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Defendant BP Corporation North America Inc. is now known as, was formerly known as, did or does business as, and/or is the successor in liability to Defendant BP Products North America Inc., BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco Plc, BP Oil Inc., BP Oil Company, and BP North America Petroleum, a division of Defendant BP Products North America Inc. The term "BP Amoco" as used in this Complaint refers to Defendants BP America Inc., BP Amoco Chemical Company, BP Corporation North America Inc. and BP Products North America Inc., and their related entities BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco Plc, BP Oil Inc., BP Oil Company, and BP North America Petroleum, a division of BP Products North America Inc.

35. Defendant BP Products North America Inc. is a Maryland corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 28100 Torch Parkway, Warrenville, Illinois 60555. BP Products North America Inc. is a subsidiary of BP

35

America Inc. that manages, owns and operates the refining and retail marketing assets of BP America Inc. in the United States. Defendant BP Products North America Inc. was formerly known as, did or does business as, and/or is the successor in liability to BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, BP Oil Inc., BP Oil Company, and BP North America Petroleum.

36.     Defendant Chevron Corporation is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583. Its agent is the Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, Delaware 19808. The term "Chevron" as used in this Complaint refers to Defendants Chevron Corporation and Chevron U.S.A. Inc., and to related entities Chevron Products Company, Chevron Chemical Company and Gulf Oil Corporation.

37.     Defendant Chevron U.S.A. Inc. is a Pennsylvania corporation qualified to do business in Maryland and its resident agent is the Prentice-Hall Corporation System, MA, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is 6001 Bollinger Canyon Road, San Ramon, California 94583. In approximately 1986, Chevron U.S.A. Inc. sold substantially all of its retail outlets and other marketing assets in the Northeast region of the United States to Defendant Cumberland Farms, Inc. Defendant

Chevron U.S.A. Inc. was formerly known as, did or does business as, and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company and Chevron Chemical Company.

38. Defendant CITGO Petroleum Corporation is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 1293 Eldridge Parkway, Houston, Texas 77077. Defendant CITGO Petroleum Corporation is a wholly-owned subsidiary of PDV America, Inc., an indirect, wholly-owned subsidiary of Petróleos de Venezuela, S.A., the national oil company of the Bolivarian Republic of Venezuela. The term "CITGO" as used in this Complaint refers to Defendants CITGO Petroleum Corporation and CITGO Refining and Chemicals Company L.P. and to their related entities, PDV America, Inc. and Petróleos de Venezuela, S.A.

39. Defendant CITGO Refining and Chemicals Company L.P. is a Delaware limited partnership with its principal place of business at 1802 Nueces Bay Boulevard, Corpus Christi, Texas 78469. Its agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

40. Defendant ConocoPhillips Company is a Delaware corporation qualified to do business in Maryland and its resident agent is the United States Corporation Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is 600 North Dairy Ashford, Houston, Texas 77252. ConocoPhillips Company was formerly known as, did or does business as, and/or is the successor in liability to Defendants ConocoPhillips, Phillips 66 Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation and Tosco Refining Co. The term "ConocoPhillips" as used in this Complaint refers to Defendants ConocoPhillips Company, ConocoPhillips and Phillips 66 Company, and to their related entities Phillips Petroleum Company, Conoco Inc., Tosco Corporation and Tosco Refining Company.

41. Defendant ConocoPhillips is a Delaware corporation with its principal place of business at 600 North Dairy Ashford, Houston, Texas 77252. Its resident agent is the Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Defendant ConocoPhillips was formerly known as, did or does business as, and/or is the successor in liability to Defendants ConocoPhillips Company and Phillips 66 Company, and to their related entities Phillips Petroleum Company, Conoco, Inc., Tosco Corporation and Tosco Refining Co.

42.   Defendant Cumberland Farms, Inc. is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, 32 South Street, Baltimore, Maryland 21202. Its principal place of business is at 100 Crossings Boulevard, Framingham, Massachusetts 01702.   In approximately 1986, Defendant Chevron U.S.A. Inc. sold substantially all of its retail outlets and other marketing assets in the Northeast region of the United States to Defendant Cumberland Farms, Inc. The term "Cumberland Farms" as used in this Complaint refers to Defendant Cumberland Farms, Inc.

43.   Defendant Duke Energy Merchants, LLC is a Delaware limited liability company qualified to do business in Maryland and its resident agent is the Corporation Trust Inc., 300 East Lombard Street, Baltimore, Maryland 21202-3219. Its principal place of business is at 5400 Westheimer Court, Houston, Texas 7705. The term "Duke Energy" as used in this Complaint refers to Defendant Duke Energy Merchants, LLC.

44.   Defendant El Paso Merchant Energy-Petroleum Company is a Delaware limited liability company.   Its principal place of business is 1001 Louisiana Street, Houston, Texas 77002 and its resident agent is the Corporation Trust, Inc., 300 East Lombard Street, Baltimore, Maryland 21202-3219. Defendant El Paso Merchant Energy-Petroleum Company was formerly known as, did or does business as, and/or is the successor in liability to Kinder Morgan, Inc.,

39

Coastal Refining and Marketing, Inc. and Coastal States Trading, Inc. The term "El Paso" as used in this Complaint refers to Kinder Morgan, Inc., Coastal Refining and Marketing, Inc. and El Paso Merchant Energy-Petroleum Company, and their related entity Coastal States Trading, Inc.

45. Defendant Energy Transfer Partners, L.P. is a Delaware limited partnership with its principal place of business at 3738 Oak Lawn Avenue, Dallas, Texas 75219. Its agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. On October 5, 2012, Defendant Energy Transfer Partners, L.P. through its wholly owned subsidiary, Defendant ETP Holdco Corporation, merged with Defendant Sunoco, Inc. Defendant Energy Transfer Partners, L.P. was formerly known as, did or does business as, and/or is the successor in liability to Defendants ETP Holdco Corporation and Sunoco, Inc. and their related entities Sun Oil Company (PA) and Sun Oil Company.

46. Defendant Equilon Enterprises LLC is a Delaware limited liability company qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 1209 Orange Street, Wilmington, Delaware 19801. Defendant Equilon Enterprises LLC was formerly known as, did or does business as, and/or is the successor in liability to Shell Oil

Products US, Shell Oil Products Company LLC, Shell Oil Company and Texaco Refining and Marketing Inc.

47.    Defendant ETP Holdco Corporation is a Delaware corporation with its principal place of business at 1001 Louisiana Street, Houston, Texas 77022. Its agent is the Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. On October 5, 2012, Defendant Energy Transfer Partners, L.P. through its wholly owned subsidiary, Defendant ETP Holdco Corporation, merged with Defendant Sunoco, Inc. Defendant ETP Holdco Corporation was formerly known as, did or does business as, and/or is the successor in liability to Defendant Sunoco, Inc., and its related entities Sun Oil Company (PA) and Sun Oil Company.

48.    Defendant George E. Warren Corporation is a Massachusetts corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 50 Milk Street, Boston, Massachusetts 02109. The term "George E. Warren" as used in this Complaint refers to Defendant George E. Warren Corporation.

49.    Defendant Getty Properties Corporation, a/k/a Getty Realty Corporation, is a Delaware corporation qualified to do business in Maryland and its resident agent in Maryland is the Corporation Trust, Inc., 2405 York Road,

Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 125 Jericho Turnpike, Jericho, New York 11753.

50. Defendant Getty Petroleum Marketing Inc. ("GPMI") is a Maryland corporation with its last principal place of business at 1500 Hempstead Turnpike, East Meadow, New York 11554. During the relevant time period, from 1997 until 2000, GPMI was a wholly-owned subsidiary of Getty Properties Corporation, a/k/a Getty Realty Corporation, and from 2001 until 2011, GPMI was a wholly-owned subsidiary of Defendant Lukoil Americas Corporation. GPMI filed for Chapter 11 bankruptcy in December, 2011. The bankruptcy was closed on Oct 30, 2017. At all times relevant herein, GPMI purchased policies of liability insurance, paid the appropriate premiums, and was and is entitled to a defense and indemnity for the claims brought in this action. This insurance was not part of the bankruptcy estate and remains in force and available. The State's claim against GPMI is limited to the recoverable proceeds of this insurance. GPMI was also known as and did business as OAO Lukoil and Lukoil Americas Corporation, was predecessor in liability to Lukoil North Americas, and successor in liability to Getty Petroleum Marking Inc. and Getty Properties Corporation, also known as Getty Realty Corporation. The terms "GPMI" and "Getty" as used in this Complaint refer to Defendants Getty Petroleum Marketing Inc. and Getty Properties Corporation, as well as their related entity Getty Realty Corporation.

51.     Defendant Gulf Oil Limited Partnership is a Delaware limited partnership qualified to do business in Maryland and its resident agent in Maryland is Cogency Global Inc., 1519 York Road, Lutherville, Maryland 21093. Its principal place of business is 80 Williams Street, Wellsley Hills, Massachusetts 02401. Gulf Oil Limited Partnership is a subsidiary of Defendant Cumberland Farms, Inc. and is controlled by Defendant Cumberland Farms, Inc. The term "GOLP" as used in this Complaint refers to Defendants Gulf Oil Limited Partnership and Cumberland Farms, Inc.

52.     Defendant Guttman Energy, Inc. is a Pennsylvania corporation qualified to do business in Maryland and its resident agent in Maryland is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is 200 Speers Street, Belle Vernon, Pennsylvania, 15012.

53.     Defendant Hartree Partners, LP is a Delaware limited partnership qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business at 1185 Avenue of the Americas, New York, New York 10036.

54.     Defendant Hess Corporation is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust Inc., 2405

York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 1185 Avenue of the Americas, New York, New York 10036. Defendant Hess Corporation was formerly known as, did or does business as, and/or is the successor in liability to Amerada Hess Corporation, WilcoHess LLC, Defendant Hess Oil Virgin Islands Corporation, Hess Energy Trading Company, LLC, Defendant Hartree Partners, LP and Amerada Hess Corporation. The term "Hess" as used in this Complaint refers to Defendant Hess Corporation and its related entities WilcoHess LLC, Defendant Hess Oil Virgin Islands Corporation, Hess Energy Trading Company, LLC, Defendant Hartree Partners, LP and Amerada Hess Corporation.

55.     Defendant Hess Oil Virgin Islands Corporation ("HOVIC") is a wholly owned subsidiary of Defendant Hess Corporation that supplied MTBE gasoline to the Maryland market. HOVIC is a United States Virgin Islands corporation with its principal place of business located at 1185 Avenue of the Americas, New York, New York 10036. Its agent is Britain H. Bryan, Esq., Bryant Barnes & Benoit, LLP, 1134 King Street, 2nd Floor, Christiansted, VI 00820.

56.     Defendant Holtzman Oil Corporation is a Virginia corporation qualified to do business in Maryland and its resident agent is John R. Barr, 10500 Little Patuxent Parkway, Suite 420, Columbia, Maryland 21044. Its principal

place of business is 5534 North Main Street, Mount Vernon, Virginia 22842. Holtzman Oil Corporation supplied and delivered significant amounts of MTBE gasoline into and within Maryland. The term "Holtzman" as used in this Complaint means Defendant Holtzman Oil Corporation.

57.    Defendant Kinder Morgan G.P., Inc. is a Delaware corporation qualified to do business in Maryland and its resident agent is Capitol Corporate Services, Inc., 4th Floor, 3206 Tower Oaks Boulevard, Rockville, Maryland 20852.    Its principal place of business is Suite 1000, 1001 Louisiana Street, Houston, Texas 77002. Upon information and belief, Defendant Kinder Morgan G.P., Inc. is a general partner of Defendant Kinder Morgan Operating L.P. "A."

58.    Defendant Kinder Morgan Operating L.P. "A" is a Delaware limited partnership and its resident agent is the Corporation Trust, Inc., 351 West Camden Street, Baltimore, Maryland 21201-7912.    Its last known principal place of business is 1301 McKinney, Suite 3450, Houston, Texas 77010.    Upon information and belief, Defendant Kinder Morgan G.P., Inc. is a general partner, and Kinder Morgan Energy Partners, L.P. is a limited partner, of Defendant Kinder Morgan Operating L.P. "A."

59.    Defendant Kinder Morgan Transmix Company, LLC is a Delaware limited liability company qualified to do business in Maryland and its resident agent is Capitol Corporate Service, Inc., 3206 Tower Oaks Bloulevard. 4th Floor,

Rockville, Maryland 20852. Its principal place of business is Suite 1000, One Allen Center, 500 Dallas Street, Houston, Texas 77002. Defendant Kinder Morgan Transmix Company, LLC was formerly known as, did business as, and/or is the successor in liability to Buckeye Refining Company, LLC. The term "KM Transmix," as used in this Complaint, refers to Defendant Kinder Morgan Transmix Company, LLC and to Buckeye Refining Company, LLC.

60. Defendant Lukoil North America LLC ("LNA") is a Delaware corporation with its principal place of business at 505 Fifth Avenue, 9th floor, New York, New York 11554. Its resident agent is the Corporation Trust Company, Inc., 351 West Camden Street, Baltimore, Maryland 21201-7912. LNA is a wholly-owned subsidiary of defendant Lukoil Americas Corporation and an indirect subsidiary of OAO Lukoil. LNA was formerly known as, did business as and/or is the successor in liability to Defendants Getty Petroleum Marketing Inc., Lukoil Americas Corporation and/or OAO Lukoil. LNA is the successor-in-interest to certain assets of GPMI. LNA owns property in the State of Maryland and operates service stations in Maryland.

61. Defendant Lukoil Americas Corporation ("LAC") is a Delaware corporation with its principal place of business at 505 Fifth Avenue, 9th floor, New York, New York 11554. Its agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

LAC is an indirect subsidiary of OAO Lukoil. Defendant Lukoil Americas Corporation was formerly known as, did or does business as, and/or is the successor in liability to Defendants Getty Petroleum Marketing, Inc., Lukoil North America LLC, OAO Lukoil and Lukoil Oil Company. LAC was a controlling parent of GPMI from January, 2001 until February, 2011.

62. Defendant Lukoil Pan Americas, LLC is a Delaware corporation qualified to do business in Maryland and its resident agent is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is Suite 400, 2711 Centerville Road, Wilmington, Delaware 19808. Defendant Lukoil Pan Americas, LLC, is, *inter alia*, a successor in interest to relevant assets of GPMI. The term "Lukoil" as used in this Complaint refers to Defendants Lukoil Americas Corporation, Lukoil North America LLC, Lukoil Pan Americas, LLC, PJSC Lukoil, Lukoil Oil Company, OAO Lukoil and Getty Petroleum Marketing, Inc.

63. Defendant Marathon Oil Corporation is a Delaware corporation with its principal place of business at 5555 San Felipe Road, Houston, Texas 77056. Its agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Defendant Marathon Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Defendant Marathon Petroleum Company LP, Defendant Marathon Petroleum

47

Corporation, Marathon Oil Company, Marathon DE, Marathon PC, Marathon Holdings and Marathon Pipeline. The term "Marathon" as used in this Complaint refers to Defendants Marathon Oil Corporation, Marathon Petroleum Company LP and Marathon Petroleum Corporation, and their related entities Marathon Ashland Petroleum LLC, Marathon Petroleum Company LLC, Marathon Oil Co., Marathon DE, Marathon PC, Speedway LLC, Hess Retail Holdings LLC, Marathon Holdings and Marathon Pipeline.

64. Defendant Marathon Petroleum Company LP is a Delaware limited partnership qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 539 South Main Street, Findlay, Ohio 45840. Defendant Marathon Petroleum Company LP was formerly known as, did or does business as, and/or is the successor in liability to Marathon Petroleum Company LLC and Marathon Ashland Petroleum Company LLC.

65. Defendant Marathon Petroleum Corporation is a Delaware limited liability company with its principal place of business at 539 South Main Street, Findlay, Ohio 45840. Its agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Defendant Marathon Petroleum Corporation is the successor in liability to Speedway LLC and Hess Retail Holdings LLC.

66. Defendant Mobil Corporation is a Delaware corporation with its principal place of business at 150 East 42nd Street, New York, New York 10017. Its resident agent is the Prentice-Hall Corporation System, Inc., 7 Saint Paul Street, Suite 1660, Baltimore, Maryland 21202. Defendant Mobil Corporation is now known as, was formerly known as, did or does business as, and/or is the predecessor or successor in liability to ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A, ExxonMobil Refining & Supply Corporation, Exxon Company, U.S.A., Exxon Corporation, and Defendant Exxon Mobil Corporation.

67. Defendant Motiva Enterprises LLC is a Delaware limited liability company qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 500 Dallas Street, Houston, Texas 77002. Defendant Motiva Enterprises LLC was formerly known as, did or does business as, and/or is the successor in liability to Defendant Shell Oil Products Company, LLC, Star Enterprise, Star Enterprise, LLC, and Texaco Refining and Marketing, Inc. East (a/k/a TRMI East). The term "Motiva" as used in this Complaint refers to Defendant Motiva Enterprises LLC, Defendant Shell

49

Oil Products Company, LLC, Star Enterprise, and Texaco Refining and Marketing, Inc. East (a/k/a TRMI East).

68.     Defendant NuStar Terminals Operations Partnership LP is a Delaware limited partnership qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264.   Its principal place of business is 2400 Lakeside Bouldevard., 6th Floor, Richardson, Texas 75082.  Defendant NuStar Terminals Operations Partnership LP was formerly known as, did or does business as, and/or is the successor in liability to Support Terminals Operating Partnership, LP and ST Services, Inc.  The term "NuStar" as used in this Complaint refers to Defendant NuStar Terminals Operations Partnership LP and its related entities Support Terminals Operating Partnership, LP and ST Services, Inc.

69.     Defendant Phillips 66 Company is a Delaware corporation qualified to do business in Maryland and its resident agent is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202.  Its principal place of business is 600 N. Dairy Ashland Road, Houston, Texas 77079. Defendant Phillips 66 Company was formerly known as, did or does business as, and/or is the successor in liability to Defendant ConocoPhillips Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.

70.     Defendant PJSC Lukoil ("OAO Lukoil"), a/k/a Lukoil Oil Company, OAO Lukoil, PAO Lukoil, Public Joint Stock Company Oil Company Lukoil, Lukoil Holding Co and PJSC Oil Company Lukoil, is an Open Joint Stock Company domiciled in Russia with its address at 11 Sretensky Boulevard, Moscow Russia 101000.    OAO Lukoil is publicly traded on global stock exchanges, including the NASDAQ, under the name of Lukoil (OAO) a/k/a Lukoil Holding Co.  OAO Lukoil sells depository receipts through the Bank of New York Mellon which allows investors in the United States to invest in OAO Lukoil. OAO Lukoil is the parent corporation of a vertically integrated company and Defendants LAC and LNA are subsidiaries of OAO Lukoil.  OAO Lukoil was the indirect parent of GPMI between 2000 and 2011.  OAO Lukoil itself and through its subsidiaries engages in the production of crude oil and operates refineries and storage terminals in several countries.

71.     Defendant The Premcor Refining Group Inc. is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264.  Its principal place of business is One Valero Way, San Antonio, Texas 79249. Defendant The Premcor Refining Group Inc. is a wholly-owned subsidiary of and is controlled by Defendant Valero Energy Corporation.

51

The term "Premcor" as used in this Complaint refers to Defendants The Premcor Refining Group Inc. and Premcor USA Inc.

72.     Defendant Premcor USA Inc. is a Delaware corporation with its principal place of business at 1700 East Putnam Avenue, Old Greenwich, Connecticut 06870. Its agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Defendant Premcor USA Inc. is a wholly-owned subsidiary of and is controlled by Defendant Valero Energy Corporation.

73.     Defendant 7-Eleven, Inc. is a Texas corporation qualified to do business in Maryland and its resident agent is Corporate Creations Network Inc., 2 Wisconsin Circle, Number 700, Chevy Chase, Maryland 20815. Its principal place of business is P.O. Box 219088, Dallas, Texas 75221.

74.     Defendant Sheetz, Inc. is a Pennsylvania corporation qualified to do business in Maryland and its resident agent is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is 5700 Sixth Avenue, Altoona, Pennsylvania 16602.

75.     Defendant Shell Oil Company is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 910 Louisiana Street, Houston, Texas 77002. Defendant Shell

Oil Company is a wholly-owned subsidiary of Royal Dutch Shell PLC. Defendant Shell Oil Company was formerly known as, did or does business as, and/or is the successor in liability to Deer Park Refining LP, Shell Oil, Shell Oil Products, Shell Chemical, Shell Trading US, Defendant Shell Trading (US) Company, Shell Energy Services, Texaco Inc., The Pennzoil Company, Defendant Shell Oil Products Company LLC, Shell Oil Products Company, Star Enterprise, LLC, Star Enterprise LLC, and Pennzoil-Quaker State Company. The term "Shell" as used in this Complaint refers to Defendants Shell Oil Company and Shell Trading (US) Company, and their related entities Deer Park Refining LP, Shell Oil, Shell Oil Products, Shell Chemical, Shell Trading US, Defendant Shell Trading (US) Company, Shell Energy Services, Texaco Inc., The Pennzoil Company, Defendant Shell Oil Products Company LLC, Shell Oil Products Company, Star Enterprise, LLC, Star Enterprise LLC, and Pennzoil-Quaker State Company.

76. Defendant Shell Oil Products Company LLC is a Delaware corporation with its principal place of business at 910 Louisiana Street, Houston, Texas 77002. Its agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Shell Oil Products Company LLC was formerly known as, did or does business as, and/or is the successor in liability to Shell Oil Products Company.

77. Defendant Shell Trading (US) Company is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 910 Louisiana Street, Houston, Texas 77002.

78. Defendant Sunoco, Inc. is a Pennsylvania corporation with its principal place of business at 3801 West Chester Pike, Newton Square, Pennsylvania 19703. Its agent is the Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Defendant Sunoco, Inc. was formerly known as, did or does business as, and/or is the successor in liability to Sun Oil Company (PA) and Sun Oil Company.

79. Defendant Sunoco, Inc. (R&M) is a Pennsylvania corporation qualified to do business in Maryland and its resident agent is the CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is 1608 Walnut Street, Philadelphia, Pennsylvania 19103. Defendant Sunoco, Inc. (R&M) was formerly known as, did or does business as, and/or is the successor in liability to Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania.

80.    Defendant Sunoco Partners Marketing & Terminals L.P. is a Texas limited partnership qualified to do business in Maryland and its resident agent is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 820, Baltimore, Maryland 21202. Its principal place of business is 3rd Floor, 1801 Market Street, Philadelphia, Pennsylvania 19103.

81.    Defendant Sun Company, Inc. is a Pennsylvania corporation with its principal place of business at 3801 West Chester Pike, Newton Square, Pennsylvania 19073. Its resident agent is the Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Defendant Sun Company, Inc. was formerly known as, did or does business as, and/or is the successor in liability to Sunoco, Inc. The term "Sunoco" as used in this Complaint refers to Defendants Energy Transfer Partners, L.P., ETP Holdco Corporation, Sun Company, Inc., Sunoco, Inc., and Sunoco, Inc. (R&M), and their related entities Sunoco Inc., Sun Company, Inc. (R&M), Sun Refining and Marketing Company, Sun Oil Company of Pennsylvania, Sun Oil Company (PA), and Sun Oil Company.

82.    Defendant Texaco Inc. is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583. Its resident agent is CSC-Lawyers Incorporating Service Company, 7 Saint Paul Street, Suite 1660, Baltimore, Maryland 21202. Defendant Texaco Inc. was formerly known as, did or does business as, and/or is the successor in liability to

The Texaco Corporation and Texaco Refining and Marketing Inc. The term "Texaco" as used in this Complaint refers to Defendant Texaco Inc., Texaco Refining and Marketing, Inc. and The Texaco Corporation

83. Defendant TMR Company is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 910 Louisiana, Houston, Texas 77002. Defendant TMR Company was formerly known as, did or does business as and/or is the successor in liability to Texaco Refining and Marketing Inc. and TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.).

84. Defendant TRMI-H LLC is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583. Its resident agent is the Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Defendant TRMI-H LLC was formerly known as, did or does business as and/or is the successor in liability to TRMI Holdings Inc., Texaco Refining and Marketing Inc., Getty Refining and Marketing Company, and Getty Oil Company (Eastern Operations), Inc.

85. Defendant Total Petrochemicals & Refining USA, Inc. is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium,

Maryland 21093-2264. Its principal place of business is P.O. Box 2159, Dallas, Texas 75221. The term "Total" as used in this Complaint refers to Defendant Total Petrochemicals & Refining USA, Inc.

86. Defendant TransMontaigne Product Services, LLC ("TransMontaigne") is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 1670 Broadway, Suite 3100, Denver, Colorado 80202.

87. Defendant Valero Energy Corporation is a Delaware corporation with its principal place of business at One Valero Way, San Antonio, Texas 78249. Its resident agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Defendant Valero Energy Corporation was formerly known as, did or does business as, and/or is the successor in liability to Defendant Valero Marketing and Supply Company, Valero Refining Company–New Jersey, Defendant Valero Refining and Marketing Company, Ultramar Diamond Shamrock Corporation, Premcor Inc., Premcor Refining, Premcor Pipeline and Valero PA. The term "Valero" as used in this Complaint refers to Valero Refining Company–New Jersey and Defendants Valero Energy Corporation, Valero Marketing and Supply Company, and Valero Refining and Marketing Company, and their related entities Ultramar Diamond

Shamrock Corporation, Premcor Inc., Premcor Refining, Premcor Pipeline, and Valero PA.

88.     Defendant Valero Marketing and Supply Company is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is One Valero Way, San Antonio, Texas 78249.

89.     Defendant Valero Refining and Marketing Company is a Delaware corporation with its principal place of business at One Valero Way, San Antonio, Texas, 79249. Its agent is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

90.     Defendant Vitol S.A., a/k/a Vitol S.A., Inc., is a Swiss corporation with its principal place of business at Boulevard du Pont d'Arve 28, Geneva, Switzerland and its resident agent is the Corporation Trust, 300 East Lombard Street, Baltimore, Maryland 21202. Defendant Vitol S.A. also does business as Vitol S.A., Inc. The term "Vitol" as used in this Complaint refers to Defendant Vitol S.A. and its related entity Vitol S.A., Inc.

91.     Defendant Wawa, Inc. is a New Jersey corporation qualified to do business in Maryland and its resident agent is the Corporation Trust, Inc., 2405

York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Its principal place of business is 260 West Baltimore Pike, Wawa, Pennsylvania, 19063.

92.     Defendant Western Refining Yorktown, Inc. is a Delaware corporation qualified to do business in Maryland and its resident agent is the Corporation Trust Inc., 351 West Camden Street, Baltimore, Maryland 21201. Its principal place of business is 1250 West Washington Street, Suite 101, Tempe, Arizona 85281. Defendant Western Refining Yorktown, Inc. was formerly known as, did or does business as, and/or is the successor in liability to Giant Yorktown, Inc. The term "Western Refining" as used in this Complaint refers to Defendant Western Refining Yorktown, Inc. and its related entity Giant Yorktown, Inc.

93.     For purposes of this Complaint, "defendants" shall mean and refer to all of the defendants named herein.

94.     Any and all references to defendant, defendants, or a particular defendant by name in this Complaint include all predecessors, successors, parents, subsidiaries, affiliates, divisions, and agents of the referenced defendants.

95.     In committing the acts alleged in this Complaint, defendants acted in their own right and/or in the capacity of joint venturers, partners, agents, principals, successors-in-interest, surviving corporations, transferees, transferors, controllers, alter-egos, licensees, licensors, patent holders, and/or indemnitors of each of the other defendants.

96.     To the extent any act or omission of any of the defendants is alleged in this Complaint, the officers, directors, agents, employees, or representatives of each such defendant committed or authorized each such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of such defendants, and did so while acting within the scope of their duties, employment, or agency.

97.     Without limiting the State's rights—including its rights to pursue theories of liability other than those enumerated below in the claims set forth in this Complaint—each of the defendants is jointly and severally liable to the State. In addition to joint and several liability, the State may prove causation and liability through one or more of the following legal doctrines:   market-share liability, concert of action liability, enterprise liability, concurrent liability and/or commingled-product liability.

## MTBE GENERALLY

98.     At all times relevant hereto, defendants manufactured, distributed, sold, stored or controlled MTBE gasoline in Maryland.   Defendants represent substantially all of the Maryland market for MTBE gasoline.

99. MTBE gasoline is a fungible product and lacks traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular defendant.

100. At all times relevant hereto, defendants routinely commingled their MTBE gasoline with the MTBE gasoline of one or more of the other defendants, and defendants produced, distributed, or sold such commingled MTBE gasoline in Maryland.

101. As a result of product fungibility and the commingling by defendants, in certain instances of contamination—such as where releases of MTBE gasoline have occurred at sites not branded by particular defendants or where there are no records tracing the products from particular defendants to the sites –it may not be possible to identify the original manufacturer of the MTBE gasoline.

102. Any inability of the State to identify the original manufacturer of the MTBE gasoline released into the groundwater in particular instances at particular sites is a result of the fungibility of the products, defendants' actions in commingling their products and/or the foreseeable actions of others, and not as a result of any action or inaction by the State.

## MTBE AS A GASOLINE ADDITIVE

103. MTBE is a chemical compound produced by combining methanol, a derivative of natural gas, and isobutylene, a byproduct of the gasoline-refining process. Because methanol and isobutylene are readily available compounds, MTBE was inexpensive to manufacture. As used in this Complaint, MTBE means not only methyl tertiary butyl ether, but also the degradation byproducts of, and contaminants in, commercial-grade MTBE, including tertiary butyl alcohol ("TBA").

104. TBA is used as a raw material in the production of isobutylene. It also is an intermediate product of MTBE biodegradation. As a result, TBA often appears in groundwater where MTBE contamination is present.

105. Crude oil is converted to petroleum products, including gasoline, at refineries. Many of the defendants have owned and operated petroleum refineries. At the refinery, MTBE—which may have been manufactured by a separate defendant and purchased by a refinery defendant or which may have been manufactured by a defendant at the refinery itself—was blended into gasoline as an octane enhancer and/or as an oxygenate for use in areas of the United States, including Maryland, where oxygenated gasoline was sold. MTBE was also splash blended into gasoline at terminals by adding it to truck tanks after those tanks were filled with gasoline from the terminal.

## THE ROUTINE SALE OF COMMINGLED GASOLINE IN MARYLAND

106.    The gasoline sold at a gas station in Maryland (and elsewhere across the nation) generally is not the product of just one manufacturer. The gasoline present in any particular station's underground storage tanks, whether a branded or non-branded station, is often a commingled product because of how gasoline, after it is manufactured, is transported, stored, and distributed prior to reaching a particular gas station for retail sale. Once manufactured by a refiner to certain industry standards, a batch of gasoline is then transported for marketing in different regions of the United States via a network of national and regional pipelines, tank ships and barges. Through these pipelines and other bulk-transport means, the gasoline is sent to common storage tanks located at terminals throughout the country. As the gasoline is piped into storage tanks at these terminals, it often becomes mixed or blended together. From the terminals, it is then further transshipped in bulk by pipeline or other transportation means to secondary terminals or depots, where again it is commingled with other refiners' gasoline. From these secondary terminals or depots, gasoline is then taken by truck to gas stations for retail sale.

## MTBE IS A PERSISTENT ENVIRONMENTAL CONTAMINANT

107. Defendants added MTBE to their gasoline products both as an oxygenate and as an octane enhancer. Oxygenated fuel is very similar to normal gasoline except that it contains an oxygenate intended to reduce tailpipe emissions of carbon monoxide.

108. MTBE does not occur naturally in the environment and is introduced into the environment solely by the actions of humans.

109. MTBE enters the environment through disposals, deposits, releases, leaks, overfills, spills, discharges and evaporative releases (collectively "releases") from a variety of sources, principally releases from MTBE gasoline storage and delivery systems.

110. When released into the environment, MTBE behaves differently than other constituents of gasoline such as benzene, toluene, ethylbenzene, and xylene (collectively, "BTEX Compounds"). MTBE separates from other gasoline constituents in the presence of moisture. In contrast to the BTEX Compounds, MTBE has a strong affinity for water, it is easily dissolved and it does not readily adhere to soil particles, making it more mobile and able to migrate great distances from the source of the release. MTBE is more than 30 times more soluble in water than BTEX Compounds.

111. In groundwater, MTBE moves freely at approximately the rate of the water's movement, unlike BTEX Compounds, which tend to adhere to soil and/or float on the surface of water. This renders MTBE more difficult to locate and remediate than BTEX Compounds.

112. MTBE can also migrate into subsurface-soil regions, from where it may leach into nearby groundwater for many years following the initial release.

113. MTBE also is more persistent than BTEX Compounds because it does not readily biodegrade in groundwater. If and when MTBE does degrade in the environment, the process creates other contaminants, including TBA, which are similarly problematic in groundwater.

114. Because of its chemical and physical characteristics, when MTBE gasoline is released into the environment, it migrates farther and faster through soil and water than gasoline without MTBE, it penetrates deeply into aquifers, it resists biodegradation, and it results in persistent contamination. As a result, MTBE is and has been more difficult and more expensive to remove from groundwater than other contaminants. TBA also increases the risks of adverse health and environmental harms, as well as the costs to fully remediate contaminated sites.

115. MTBE has widely contaminated and continues to contaminate the waters of the State throughout the State.

116. The widespread MTBE contamination of groundwater in the State as a result of defendants adding MTBE to gasoline was substantially certain and foreseeable by defendants.

## DEFENDANTS' PRODUCTION AND USE OF MTBE AS A CHEAP AND PROFITABLE GASOLINE ADDITIVE

117. In the late 1970s, pursuant to section 211 of the Clean Air Act, 42 U.S.C.A. § 7545 ("CAA"), the United States Environmental Protection Agency ("EPA") registered MTBE as a fuel additive that did not cause or contribute to the failure of any emission control device or system. ARCO began commercial production of MTBE in April 1979, less than two months after the EPA approved MTBE as a blending component of unleaded gasoline. ARCO sold MTBE to other oil refiners to be blended into gasoline as an octane enhancer.

118. As the market for MTBE grew, other oil refiners also began producing MTBE for blending into gasoline. In 1979, MTBE production was estimated at approximately 75 million gallons.

119. After 1979, defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations typically at less than 1% by volume in regular gasoline and 2-8% by volume in premium to replace lead and boost the octane level in higher grades of gasoline.

120. By 1985, MTBE production in the United States was estimated at 420 million gallons per year. In terms of weight, MTBE ranked 44th among the

top 50 chemicals produced in the United States. Virtually all of this MTBE was blended into gasoline in concentrations of up to 11% by volume, making MTBE among the largest components of a typical gallon of gasoline. Overall, MTBE was present in about 10% of the nation's gasoline, though it was more common in the eastern United States than in the western United States.

121. When, prior to 1990, the EPA began considering options to reduce air pollution, the petroleum industry, including some of the defendants, lobbied Congress to adopt the Reformulated Gasoline Program ("RFG Program") as part of the 1990 Clean Air Act Amendments. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the EPA or other parts of the federal government."

122. In the 1990 Clean Air Act Amendments, Congress established the RFG Program in Section 211(k) of the CAA, 42 U.S.C.A. § 7545(k). The RFG program mandated the use of reformulated gasoline containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. Portions of Maryland were subject to the RFG program. If a particular area of the country, such as a large metropolitan area, was designated as a "non-attainment area" for carbon monoxide, the EPA was authorized to direct the area to participate in the RFG Program.

123. In 1992, in conjunction with the CAA Amendments, the EPA initiated the Oxygenated Fuel Program, which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide during the fall and winter months.

124. Much of the gasoline sold in non-attainment areas under the RFG and Oxygenated Fuel Program exceeded the minimum 2% or 2.7% oxygenate requirements of those programs. MTBE comprised up to 15% of every gallon of gasoline used in those areas. MTBE gasoline also comprised a significant amount of the gasoline used in areas that were not participating in the RFG Program.

125. Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas, including in Maryland, in 1992 as part of the Oxygenated Fuel Program. In or around January 1995, defendants introduced into the stream of commerce in Maryland MTBE gasoline containing even higher levels of MTBE.

126. At its peak, most, if not all, gasoline supplied to the Maryland RFG areas had high concentrations of MTBE. In addition, MTBE gasoline containing elevated concentrations of MTBE was often sold at locations throughout Maryland outside of RFG areas at the discretion of defendants.

127. MTBE was not the only viable option available to defendants to meet RFG requirements. The CAA Amendments require the use of some

oxygenate, but they do not require that oxygenate to be MTBE. MTBE became defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered defendants the highest profit margin. Defendants could manufacture MTBE from their already available refinery byproducts and could therefore reduce the costs of treating their waste stream and at the same time avoid purchasing a different viable oxygenate, such as ethanol, from a third party.

128. The 1992 CAA Amendments gave defendants four years to build the supply chains and infrastructure necessary to meet RFG requirements. Defendants chose, for economic reasons, to invest in MTBE, rather than in safer alternative oxygenates, such as ethanol. Defendants chose to construct MTBE storage and delivery systems that Defendant Exxon has described as "incompatible" with the distribution of ethanol gasoline in the northeast United States. Defendants' choice to lock themselves into the use of MTBE was not technically or financially necessary—defendants switched to ethanol when it ultimately was in their financial interest to do so.

129. Before the 1980s, production and sales totals for MTBE were negligible, but by 1996, MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

130. The United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected volatile organic chemical in groundwater in the United States. MTBE-contaminated wells have been found throughout the United States. The USGS tests groundwater annually and has detected MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline was used.

## DEFENDANTS KNEW THAT MTBE WAS GOING TO CONTAMINATE GROUNDWATER AND WAS MORE DIFFICULT TO REMEDIATE THAN BTEX

131. At all times relevant hereto, defendants recognized the need to assess and study the long-term risks of MTBE contamination, including the potential health effects of low-level ingestion of MTBE, as well as the difficulties associated with remediating MTBE releases. Defendants' communications with each other, as well as their internal documents, evidence defendants' awareness of the likelihood that MTBE would cause widespread contamination of groundwater.

132. By virtue of their economic power and analytical resources, including their employment of hydrogeologists, chemists, engineers, and toxicologists, defendants have at all times relevant known or been in a position to know the threats which MTBE poses to the environment in Maryland, including to groundwater, and to human health.

133. Defendants had a duty to disclose what they knew about the risks posed by MTBE and to act in accordance with the truth about MTBE and its ability to contaminate the environment.

134. Defendants knew at least as early as 1980 of the harmful impact of MTBE and its propensity to contaminate groundwater.

135. Shell was aware of MTBE's propensity to contaminate groundwater by the early 1980's when Shell responded to MTBE contamination caused by a release at a Shell station in Rockaway, New Jersey.

136. The American Petroleum Institute ("API") formed a Toxicology Committee in or around 1980. The API is a trade association that represents the domestic petroleum industry, including many of the defendants, on a broad range of topics. The Toxicology Committee included representatives of various defendants, including Exxon, Mobil, Shell, ARCO, Tosco, and Chevron.

137. API's Toxicology Committee pursued a specific program to study MTBE. Meeting minutes reveal that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater, and due to the likelihood that MTBE would contaminate public and private drinking water sources. Neither the Committee nor defendants, however, followed through with

any of the necessary studies. All independent studies that have been performed on the carcinogenicity of MTBE have found a correlation between exposure to MTBE and cancer, across all species and genders tested. Defendants, rather than encouraging additional toxicology studies, improperly encouraged EPA to question existing studies that concluded MTBE was a probable carcinogen.

138. When three defendants (ExxonMobil, Shell and Chevron) finally decided in 2010 to fund a study on the carcinogenicity of MTBE, they employed the Hamner Institute (formerly known as the Chemical Industry Institute of Toxicology) to conduct the study. ExxonMobil, Chevron and Shell paid each person who participated in the conduct of the Hamner study, including the study's "advisory board" members. An attorney for Shell from the MTBE multidistrict litigation proceedings participated in initial meetings to structure the Hamner study. That attorney's name, however, was removed from the official minutes of the study meetings. When the study still showed a statistically significant increase in astrocytomas, a rare brain cancer, the authors of the study chose to compare the results to an outdated and outlier control group in order to minimize the statistical importance of the results.

139. In April 1984, an internal Exxon memorandum raised concerns about manufacturing MTBE gasoline, stating there are "ethical and environmental concerns that are not too well defined at this point." Among these concerns was

the "possible leakage of s/s [service station] tanks into underground water systems of a gasoline component [MTBE] that is soluble in water to a much greater extent [than other components of gasoline]." The memorandum proposed that a study be undertaken to thoroughly review the issue with management, including a suggested proviso that any decision to manufacture MTBE gasoline should be reviewed by E. J. Hess, then the "Executive in Charge" of Exxon.

140. A second internal Exxon memorandum in April 1984 contained another evaluation of the consequences of MTBE use. The memorandum noted that MTBE had much higher solubility than other gasoline components and this could lead to "higher levels of soluble organic contamination when [MTBE] gasoline comes in contact with water."

141. A third internal Exxon memorandum, prepared in June 1984, reported field information concerning groundwater contamination with MTBE. The memorandum reveals that Exxon personnel had communications with Shell personnel who had found that MTBE had a very low odor threshold of about 5 parts per billion ("ppb"), a much lower odor threshold when compared to other constituents of gasoline. This finding, the memorandum observed, is consistent with the recognized characteristics of ethers which "generally have a more objectionable odor than the alcohols or aromatic hydrocarbons." A lower odor threshold requires very high levels of cleanup efficiency to remove a contaminant,

in this case MTBE, from groundwater to the point where it no longer can be detected.

142. An internal ARCO memorandum, dated June 14, 1984, summarized a meeting of the API's "Ad Hoc Committee" on MTBE, which included representatives from Shell, Texaco, Phillips, and ARCO. While this committee focused primarily on toxicological issues involving MTBE, the memorandum noted that "MTBE is a possible contaminant of groundwater, especially in association with leaking gasoline storage tanks." The committee members decided to distribute funds to a sister API committee—the Environmental Biology and Community Health Committee—for the purpose of studying taste and odor issues associated with MTBE.

143. In August 1984, an internal Exxon memorandum evaluated the consequences of adding MTBE to Exxon's gasoline. The memorandum cautioned that a large-scale addition of MTBE to Exxon's gasoline would likely increase the number of well-contamination incidents by a factor of three and increase the cost of cleaning up these incidents by a factor of five. The memorandum cited a number of reasons supporting this conclusion, including:

a. MTBE would travel farther than the other constituents of gasoline, creating the need to clean up larger plumes;

b.    MTBE's low odor and taste thresholds would force the need to cleanup to more stringent levels; and

c.    the ineffectiveness of carbon-adsorption clean-up techniques would force greater use of more expensive air-stripping technologies to remediate a MTBE release.

144.    According to the results of a 1981 API Tank and Piping Leak Survey, an estimated 90% of steel underground tanks failed due to corrosion.

145.    An internal Chevron memorandum, dated May 23, 1986, recognized MTBE's propensity to contaminate groundwater and soil. The memorandum recognized: (a) the relatively high water solubility of MTBE, the impracticality of removing it from water with activated carbon; (b) the fact that using air stripping to remove it from water would be difficult; and (c) the fact "that MTBE will migrate more rapidly with the groundwater in the soil." The memorandum recommended that additional testing of MTBE should be conducted.

146.    An internal Chevron memorandum entitled "Marketing Environmental Concerns Regarding the Use of MTBE in Mogas [Motor Gasoline]," dated June 11, 1986, identified a number of concerns by Chevron employees about the potential increased use of MTBE by Chevron. Referencing a cleanup in Maryland where MTBE was a contaminant, as well as an API study of MTBE, the memorandum stated MTBE had "several disturbing properties,"

75

including: (a) a relatively high solubility and mobility; (b) low odor and taste thresholds; (c) a low rate of biodegradation; and (d) a high degree of difficulty for removing it from water. The memorandum noted concern over the expected increased utilization of MTBE in Chevron gasoline because, "MTBE utilization could increase the cost to clean up leaks at service stations and terminals."

147. In December 1986, an internal Amoco memorandum addressing potential groundwater research proposals stated that groundwater contamination was the "environmental issue of the decade" and one that had the potential to cost Amoco millions of dollars. One of the proposed research projects discussed was to examine the propensity for MTBE to be absorbed into monitoring-well-casing materials, thus compromising the possibility of an early detection of a gasoline release and the opportunity to minimize remediation costs that early detection provides.

148. In May 1987, an internal Exxon memorandum analyzed data on MTBE groundwater contamination in New York State and elsewhere in the region, including laboratory analyses verifying MTBE in water samples from three wells in Harrison, New York, and from four wells in Port Jefferson, New York. In this report, Exxon stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even

when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE. From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

149. An internal 1987 Chevron memorandum raised concerns about the dangers of MTBE gasoline released into the environment:

> Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).

> MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of its constituents.

> Further compounding the problem of increased solubility, MTBE is more difficult to remove from groundwater using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double the air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

150. Amoco prepared an internal document, dated July 1, 1992, concerning MTBE, entitled "Guideline for Handling & Storage of Ethers Used in Gasoline." The document stated, "Our new blended gasoline products containing ethers will also require increased levels of attention, exceeding that associated with our storage and handling of traditional gasoline products." The warnings contained in the document were intended for Amoco personnel. No warnings

were provided by Amoco, however, to marketers, customers, others handling MTBE gasoline, or regulators informing them of the extra care required when handling this product.

151. Amoco further emphasized in its July 1, 1992, document that MTBE gasoline required greater care in handling: "The avoidance of environmental incidences and serious environmental damage will require a greater vigilance than might be common practice for non-oxygenated gasolines." The guidelines also recommended the use of double-walled storage tanks with leak detection systems. The information and analysis contained in this document were based, in part, on Amoco's knowledge of MTBE's negative properties (flammability, solubility, low rate of biodegradation) and Amoco's experience cleaning up an MTBE release at one of its terminals.

152. In 1992, an internal Shell white paper described the dangers of MTBE once released into the environment. The document stated that MTBE is nearly 25 times more soluble than benzene and, therefore, an MTBE plume emanating from a gasoline spill was expected to move faster and farther than a benzene plume. The white paper indicated that MTBE does not biodegrade in the subsurface environment. It further indicated that MTBE has a low odor and taste threshold, and that "at many locations odor and taste criteria may determine clean-up levels." The white paper stated:

> MTBE has had impact on groundwater management at only a
> few Shell marketing terminals and service stations to date.
> However, as the usage of this oxygenate begins to increase, a
> stringent clean-up criteria for MTBE will become adopted in more
> states [and] we should anticipate increased concerns over how its
> release to groundwater is managed.

153. In 1994, Amoco determined to utilize MTBE rather than ethanol as its oxygenate in the U.S. east and south. Amoco elected to do so despite the information in its internal memoranda that MTBE was highly water soluble, extremely mobile in groundwater, would migrate quickly off site from service-station-release sites, was not biodegradable under natural conditions and, as a result, would foreseeably cause significant environmental contamination at hundreds of its service stations. Amoco noted in its memoranda that its own studies showed "MTBE has nil biodegradability and moves with groundwater quickly," and that MTBE "poses major estimated costs for accidental discharges of gasoline with MTBE." On the other hand, ethanol, a competitor oxygenate, was found by Amoco to be "easily biodegraded" and to "present no more estimated costs [to remediate] than gasoline itself."

154. In 1994, Amoco estimated that the annual environmental remediation costs for service stations alone (specifically not including the potential costs of remediation for refineries, pipelines, and terminals) that would result from the use of MTBE in its gasoline would be, as of 2002, $183 million to $211 million per year compared with $33 million if non-oxygenated gasoline was used.

However, in apparent reference to indemnification programs like the State's Oil Control Program and Maryland Oil Disaster, Containment, Clean-Up and Contingency Fund, Amoco noted that "state reimbursements will reduce remediation costs by 10%." Accordingly, despite recognizing internally and knowing the harmful effects of MTBE on the environment and concluding that using ethanol would have no more impact on the environment than conventional gasoline, Amoco chose MTBE as its gasoline additive to meet its oxygenate requirements for RFG in the east and south, including Maryland.

155. In January 1996, a CITGO memorandum summarized a conference call on MTBE among members of the API's Soil and Groundwater Technical Task Force. It reported that "[t]he consensus of the API member company remediation experts is that MTBE poses a serious future remediation concern." This consensus was based, in part, on the fact that MTBE did not naturally biodegrade, and on the fact that as of 1996, MTBE already in the ground had occurred as a result of gasoline spills which were 1-2% MTBE, but that by 1996, MTBE concentrations in 1996 had substantially increased to the range of 12-16%.

156. An internal Shell document prepared in June 1997 shows that Shell was aware that remediating a MTBE spill would be difficult:

> MTBE is relatively quite soluble in water (compared to other components in gasoline, like BTEX), and it moves essentially with the groundwater, thus MTBE tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also has a very low

biodegradation potential, which makes it more difficult to remove from groundwater than other gasoline components such as BTEX.

157. Hess discussed in a 1998 internal document the reasons that MTBE created environmental risks and then stated "Releases involving gasoline which contains MTBE pose a significantly greater cost to remediate and have greater potential for offsite migration. As such, these facts underscore the importance of release prevention and rapid leak detection programs."

158. Similarly, Texaco in a 1998 document specifically discussed the need to handle MTBE gasoline differently at service stations.

159. A February 2002 Shell "MtBE Policy Review" document noted with respect to warnings regarding MTBE: "At present little, if any, information is supplied to our customers on the environmental aspects of storing gasoline that contains MtBE . . . . Some customers could claim that, in the absence of such information or vetting, we are responsible for their remediation costs . . . ."

160. At all times relevant to this litigation, defendants knew or should have known of the substantial harm caused by expected MTBE gasoline releases and the substantial difficulty of remediating groundwater and soil contaminated by MTBE.

**DEFENDANTS PUBLICLY DEFENDED AND PROMOTED
MTBE DESPITE THEIR KNOWLEDGE OF THE
ENVIRONMENTAL RISKS POSED BY MTBE RELEASES**

161. Defendants distributed, defended, and promoted the use of MTBE and/or MTBE gasoline in Maryland when they knew or should have known that MTBE releases from various MTBE gasoline storage and delivery systems were likely, and that such releases could and would pollute the large quantities of the waters of the State.

162. Defendants defended and promoted the use, marketing and distribution of MTBE and/or MTBE gasoline when they knew or should have known about the unique and difficult problems to remediate MTBE contamination from groundwater and soil, which problems could and would increase the costs and time associated with such remediation.

163. In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection authored a paper titled "Methyl Tertiary Butyl Ether as a Groundwater Contaminant" ("Garrett-Moreau Report"). Based upon the authors' analysis of approximately 30 Maine wells contaminated with MTBE, the report stated that: (a) groundwater contaminated with MTBE is difficult to remediate; (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components; and (c) MTBE has a distressing "terpene-like"

odor in low concentrations. The Garrett-Moreau Report's authors recommended that MTBE be banned as a gasoline additive, or, at least, be stored in double-contained facilities.

164. The Garrett-Moreau Report authors planned to present their report at the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference," in November 1986. This conference was jointly sponsored by the National Well Water Association and the API.

165. Before its publication and public presentation, a draft of the Garrett-Moreau Report was widely circulated in the oil industry. Oil industry representatives, including many of the defendants, joined forces to pressure the authors to radically revise their negative conclusions and recommendations about MTBE, and/or to discredit the report in order to protect and maintain MTBE's competitive advantage as a gasoline additive.

166. On or about December 23, 1986, a staff member of the API's Groundwater Technical Task Force ("GTTF") forwarded the Garrett-Moreau Report to other GTTF members, including representatives of Shell and Exxon. Comments from GTTF members concerning the report culminated in a letter from the API to the National Well Water Association. The letter attacked the Garrett-Moreau Report:

> The [Garrett-Moreau Report] authors' "recommendations" that MTBE . . . be either banned as gasoline additives or require

> double-lined storage is clearly a policy statement and not an objective credible scientific conclusion. Further, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted, and counterproductive.

167. Amongst themselves, however, defendants knew their criticisms of the Garrett-Moreau Report were inaccurate and misleading. For example, ARCO, in a communication to others within the oil industry stated in a letter dated February 4, 1987, "we don't have any data to refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

168. In 1986, the federal Interagency Testing-Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks. The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not "to be readily biodegradable." The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also recommended additional medical testing of MTBE and invited written comments. The oil industry, including defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

169. On or about December 12, 1986, ARCO, on behalf of and/or with the approval of defendants, responded to the 1986 ITC Notice in an effort to derail further testing of MTBE. ARCO's comments included a critique of the information review of MTBE on which the ITC had relied. ARCO's submission stated that its "critique of the report revealed that some erroneous assumptions had been made that cause the hazards of MTBE to be seriously overestimated." In further comments to the EPA, ARCO also stated:

> Characteristics - Moderate water solubility is reported. However, an ARCO Technical Bulletin states that "MTBE is only slightly soluble in water. . . ."

* * *

> The . . . report states that potential environmental exposure is "high." This conclusion is not supported by the available information.

* * *

> Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility. The closed nature of the manufacturing and transportation process reduces worker exposure and product loss. Training and safety programs also lower the possibility of accidental spills. Many current programs at EPA and industry are underway to monitor and reduce the possibility of gasoline loss from leaking underground storage tanks . . . . MTBE losses would be extremely small from this source.

* * *

VI. Environmental Information

> As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain . . . . Environmental entry of MTBE from this course would be considerably less than the report indicates.

> MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

170. ARCO's comments to EPA in December 1986 in response to the ITC Notice, which were made with other defendants' explicit or implicit approval, were intentionally false and misleading when made, improperly downplayed the risks of MTBE contamination of groundwater, and omitted material facts known to ARCO and other defendants at the time.

171. On or about December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. ARCO and Exxon made a presentation supporting the industry position that additional medical testing of MTBE was unnecessary.

172. In or around early 1987, a multi-company task group was formed by defendants, known as the "MTBE Committee." This committee's express purpose, as set forth in a written agreement, was "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." Defendants' MTBE Committee included representatives of defendants ARCO, BP Amoco, Chevron,

CITGO, Exxon, Shell and Sunoco, among others industry companies. Neither EPA nor any government entities were included in the Committee.

173. On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of defendants' MTBE Committee, held its first meeting to coordinate their "plan of attack" on the 1986 ITC recommendations.

174. Although defendants were aware that EPA was interested in obtaining more information about MTBE in groundwater, defendants were not forthcoming in their responses to EPA, and defendants failed to fully and fairly disclose what they knew about MTBE's environmental and health hazards.

175. On or about February 12, 1987, ARCO responded to the EPA's request for information about "data gaps" concerning MTBE's environmental and health effects, stating:

> Item D requests more information on the presence and persistence of MTBE in groundwater. We are not aware of any incidents where MTBE contaminated groundwater at manufacturing facilities. Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydrocarbon-only gasoline.

176. ARCO knew at the time these statements were false and misleading.

177. On or about February 27, 1987, defendants' MTBE Committee submitted written comments to the EPA in an effort to deter EPA from requiring additional health and environmental testing of MTBE. The information provided

to EPA by defendants was misleading and false. Defendants falsely represented, *inter alia*, that MTBE is only slightly soluble in water, that potential environmental exposure is not high, and that MTBE has excellent biodegradation characteristics. The defendants' MTBE Committee's statement to EPA further falsely stated,

> [T]here is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

178. Defendants knowingly and consistently understated or concealed the serious environmental hazards of MTBE when communicating with EPA. By such actions, defendants intended: (a) to forestall public scrutiny of their decision to increase concentrations of MTBE in gasoline, and; (b) at the same time, to avoid or obstruct health and environmental-safety research that would have revealed what defendants already knew about MTBE's harmful effects on groundwater.

179. In April 1987, George Dominguez, a member of defendants' MTBE Committee, gave a presentation at an oil industry event, the "Conference on Alcohols and Octane." Mr. Dominguez represented during his presentation that

"MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." These statements were false and misleading in light of what the MTBE Committee members knew or had reason to know about MTBE.

180. Although defendants' MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by (a) collecting data from member companies and other sources, and (b) sponsoring programs to develop data unavailable from other sources," the Committee did no such thing. The Committee disbanded approximately one year after achieving its goal of limiting testing.

181. In April 1987, ARCO, a major manufacturer of MTBE at the time, published a bulletin describing the "proper" handling of MTBE during storage and shipping, including material compatibility and safety information. The document stated that "[g]asoline containing MTBE is handled in the same manner as hydrocarbon-only gasoline. There are no extraordinary handling or safety precautions." These statements were false and misleading when made, and ARCO knew they were false.

182. As widespread MTBE groundwater contamination began to appear, defendants continued to conceal or obfuscate the true facts of the dangers that MTBE posed to the environment.

183. In April 1996, the Oxygenated Fuels Association ("OFA"), published and distributed a pamphlet entitled "Public Health Issues and Answers." The pamphlet falsely stated: "On rare occasions, MTBE has been discovered in private drinking-water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA's pamphlet further expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. These statements were false and misleading when made and OFA and its defendant members knew or had reason to know they were false.

184. Apart from misleading users, consumers, and the general public, the OFA also presented deceptive information to the Maryland "Task Force on the Environmental Effects of Methyl Tertiary Butyl Ether (MTBE)" ("MTBE Task Force") about the risks and utility associated with MTBE and its continued usage. The MTBE task force, was created by Maryland to inter alia: "(1) Determine and assess the environmental and health risks associated with ground and surface water contamination from MTBE; . . . (3) Recommend a plan to minimize and counteract the environmental and health risks associated with ground and surface water contamination from MTBE; and (4) Explore alternatives to MTBE[.]"

185. In a presentation to the MTBE Task Force on November 30, 2000, OFA misrepresented that "MTBE Does Not Pose A Health Risk" and that the "Environmental Presence of MTBE Can be Managed[.]" Additionally, in a follow-up letter sent on January 17, 2001 following a draft report by the MTBE Task Force, OFA advised that "curtailing MTBE use is not an appropriate response to groundwater protection concerns."

186. Through these kinds of misleading communications, defendants failed to properly, adequately and timely alert, inform and warn persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline and/or persons who own, operate, or are in charge of oil storage facilities (as defined in Title 4, Subtitle 4 of the Environment Article) (collectively, "Downstream Handlers"), intended users and consumers, regulators and the general public to the environmental hazards and dangers posed by MTBE. Defendants intentionally omitted and concealed information that would have reduced the risks posed by MTBE had it been properly communicated to relevant audiences.

187. A September 15, 1999, report by a special EPA Blue Ribbon Panel stated that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas, that MTBE "has caused widespread and serious contamination," and EPA's review of existing information on contamination of

drinking-water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

188. In its September 15, 1999, report, the EPA Blue Ribbon Panel recommended substantial reductions in the use of MTBE—some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating assessments of drinking-water-protection areas required under the Safe Drinking Water Act, particularly in those areas where high MTBE-content gasoline was used. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."

189. In making MTBE their oxygenate of choice, defendants decided to forego safer available oxygenates, such as ethanol. In fact, only after massive MTBE environmental harm had already occurred did some gasoline sellers publicly acknowledge that MTBE is neither environmentally safe nor necessary. Getty Petroleum Marketing Inc., for example, placed full page advertisements in the New York Times on October 13, 1999, that stated,

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with ethanol in our gasoline because it helps clean the air without harming our drinking water.

## DEFENDANTS BREACHED THEIR DUTIES TO
## PLAINTIFF AND THE GENERAL PUBLIC

190. Defendants, who promoted the use of MTBE gasoline for its purported environmental benefits, knew or reasonably should have known about the grave harm and threat to Maryland's environment, and to its public's health, safety, property, and welfare represented by the proliferating use of MTBE, including, but not limited to: (a) widespread contamination of surface water and groundwater with MTBE; (b) the rendering of groundwater unfit, unpalatable, and unusable for consumption; and (c) the increased costs to the State and to others in addressing MTBE contamination of waters of the State.

191. Defendants knew or reasonably should have known that MTBE gasoline would be stored in underground storage tanks with a propensity to leak their contents into waters of the State. Defendants were aware or reasonably should have been aware of the peculiar environmental risks involved in such use of MTBE. Defendants had a non-delegable duty and breached their duty to inform and warn all Downstream Handlers of MTBE gasoline of the peculiar risks and necessary precautions associated with MTBE and MTBE gasoline.

192. Defendants—as the manufacturers and suppliers of MTBE gasoline—had a duty and breached their duty to the State to evaluate and test MTBE and MTBE gasoline adequately and thoroughly to determine the environmental, health, and welfare impacts and transport characteristics—

93

including the potential harm to the public's health, comfort, safety, property, and welfare—before they produced and sold MTBE gasoline.

193. Defendants had a duty and breached their duty to minimize the environmental harm caused by MTBE and MTBE gasoline.

194. Defendants had a duty and breached their duty to take precautions, including providing warnings and/or instructions necessary to ensure that MTBE gasoline was properly and safely used, transported, stored, and dispensed, and that all necessary measures to promptly detect, contain, abate, and respond to spills and leaks were instituted.

195. Defendants failed to adequately evaluate, test, store, warn, mitigate, or otherwise ensure that MTBE gasoline would not contaminate waters of the State.

196. As a direct, indirect, and proximate result of defendants' failures and breaches of duties, MTBE was released into the environment, causing widespread contamination of the waters of the State.

197. In addition to their negligent and/or reckless conduct alleged herein, defendants intentionally failed to warn Downstream Handlers, intended users and consumers, and regulators about the danger that defendants knew MTBE presented to the environment and to the public's health, safety, property, and welfare, and which dangers were not known and/or readily apparent to the general

94

public. Defendants also engaged in separate and joint activities to mislead the public regarding these same dangers.

### DEFENDANTS KNEW THAT MTBE RELEASES WOULD OCCUR IN MARYLAND

198.  The widespread problems of gasoline releases from leaking MTBE gasoline storage and delivery systems were well known to defendants prior to the introduction of MTBE and MTBE gasoline into Maryland.

199.  At all times relevant hereto, defendants knew, or reasonably should have known, that MTBE gasoline storage and delivery systems in Maryland and elsewhere: (a) suffered significant and widespread leaks and/or failures; and (b) released gasoline products into the environment, including into groundwater.

200.  Certain defendants obtained first-hand knowledge and experience of these leaks and releases because they owned and operated individual gasoline stations, including stations in Maryland, with leaking MTBE gasoline storage and delivery systems and/or exercised control over such gasoline stations through a variety of means, including written agreements, training, inspection rights, prescribing certain procedures and operating practices, prescribing specifications for products, prescribing conditions on sale of branded goods, and requiring agreements obligating such stations to acquire, store, and sell MTBE gasoline.

201.  For most of the 20th century, the petroleum industry had an indifferent attitude towards small-volume gasoline leaks and spills.  The

components of traditional gasoline are relatively insoluble and biodegrade fairly readily. Because of these characteristics, they rarely caused significant health, financial, and/or remediation problems to defendants and low-level gasoline (without MTBE) releases were tolerated and accepted as part of normal business practices. Delivery spills were thus common; maintenance activities frequently involved spilling fuel; and basic inventory control, which defendants knew or had reason to know could not detect small leaks, was generally considered to be adequate for leak and release detection. Because the solubility of conventional gasoline was quite low generally, relatively few traditional gasoline contaminants made their way into the groundwater.

202. The introduction of MTBE into gasoline changed things dramatically and meant that small or minor leaks and spills could, and did, significantly impact large volumes of groundwater. Even a small release of MTBE gasoline could result in MTBE concentrations in groundwater that were above taste and odor threshold levels, rendering the water unusable without expensive treatment.

203. Downstream Handlers and intended users and consumers had been releasing gasoline into the environment for decades. These people continued to routinely spill or release gasoline after MTBE was added to gasoline as an additive because they did not know and were not told by defendants that they needed to do

anything different than they did when handling non-MTBE gasoline. Protection of groundwater, property, and human health, however, required that Downstream Handlers and intended users and consumers receive instructions and information alerting them that routine behavior was not suitable for handling MTBE gasoline and that even very small releases of MTBE or MTBE gasoline could lead to harmful consequences to the environment, to property, and to human health.

204. Among other things, defendants knew, or reasonably should have known, at the time they were utilizing and promoting MTBE as a gasoline additive, that:

    a.    the MTBE gasoline distribution and retail system throughout Maryland included leaking storage and delivery systems;

    b.    large areas of Maryland were and are highly dependent upon groundwater for domestic water; and

    c.    the release of MTBE into the Maryland environment would be an expected consequence of marketing and placing MTBE gasoline into the stream of commerce in Maryland, particularly in the absence of precautionary measures necessary to prevent or mitigate such releases, which measures defendants failed to take.

205. Defendants also knew, or reasonably should have known, that, to a greater extent than the other constituents of gasoline, MTBE, when released into

the environment, would mix easily with water, would move great distances, would resist biodegradation, would render drinking water unpalatable and non-potable, and would require significant expenditures to define the extent of, to monitor, to treat, and to remediate the contamination.

206. Despite knowing the risk of groundwater contamination posed by MTBE, and despite the availability of reasonable safe alternatives and precautionary measures, including adequate warnings or instructions, defendants failed to warn or instruct retailers, customers, other Downstream Handlers, intended users and consumers, and the public on the dangers of and/or the proper handling of MTBE and MTBE gasoline. Defendants further failed to take appropriate precautionary measures to prevent or mitigate MTBE contamination. Instead, defendants falsely promoted MTBE gasoline as environmentally sound products suitable for widespread use that could be handled in the same manner as gasoline without MTBE.

207. To the extent defendants were also Downstream Handlers, defendants continued to place MTBE gasoline into their underground storage tank systems in Maryland knowing that:

    a.    gasoline distribution and retail systems throughout Maryland contained leaking storage and delivery systems;

b.     large areas of Maryland were and are highly dependent upon groundwater for domestic water; and

c.     the release of MTBE into the environment in Maryland would be an expected consequence of marketing and placing MTBE gasoline into their leaking storage and delivery systems, especially in the absence of precautionary measures necessary to prevent or mitigate such releases, which measures defendants failed to take.

208.   Among other things, defendants' false and inadequate representations provided their MTBE gasoline with an unfair competitive advantage, and with greater profit margins over other gasolines in the Maryland marketplace utilizing available alternative safer, but more expensive, octane and oxygenation additives.

209.   Defendants also engaged in separate and/or joint activities to suppress, conceal, downplay, and/or discredit studies and other information regarding the hazards of MTBE. Defendants' wrongful conduct in this regard, among other things, proximately caused:

a.     a dramatic increase in the use and corresponding presence of MTBE gasoline in Maryland;

b.     the consequent contamination and damage to the waters of the State as and when inevitable releases of MTBE gasoline occurred;

c. substantial economic losses and damages incurred by the State in its efforts to define the extent of, to monitor, to treat, and to remediate MTBE contamination; and

d. negative impacts upon competitive, safer alternative oxygenate additives such as ethanol.

210. Defendants knew at all material times that it was substantially certain that their acts and omissions as set forth herein would threaten the Maryland public's health, would cause extensive contamination of groundwater and drinking-water supplies, and would otherwise cause the injuries described herein.

211. Defendants acted or failed to act knowingly, willfully and deceptively, with gross negligence, maliciously, and/or wantonly with conscious disregard of plaintiff's rights, the environment, and the public's health, property, safety, and welfare.

212. Defendants acted with actual malice and are liable for punitive damages by ignoring their actual knowledge (or deliberately avoiding learning the truth) as to the propensity of underground storage tanks to leak and as to the defective nature of MTBE as a dangerous persistent environmental contaminant. By ignoring their actual knowledge, and in fact working to conceal the defective nature of their product, defendants showed a conscious and deliberate disregard of

the foreseeable harm, including the damage to environment, the health consequences, and the difficulty to remediate MTBE.

## THE IMPACT OF MTBE AND MTBE GASOLINE ON THE WATERS OF THE STATE

213. At all times relevant hereto, despite their knowledge that contamination of waters of the State with MTBE was the inevitable result of their conduct, defendants continued to refine, market, promote, and supply MTBE gasoline in the State.

214. Reformulated gasoline containing significant quantities of MTBE was sold on a virtually universal basis throughout Maryland beginning in the 1990s as a result of defendants' efforts. According to the Federal Energy Information Administration, the volume of MTBE contained in reformulated gasoline sold in Maryland between 1995 and 2001 amounted to 1.2 billion gallons of pure ("neat") MTBE.

215. MTBE contamination is associated with all transportation, storage, and use of MTBE gasoline.

216. MTBE contamination has injured, and continues to injure and threaten, the waters of the State, and the health, property, safety, and welfare of the citizens of Maryland on a wide-spread and substantial basis throughout the State.

217. Since its introduction into gasoline, MTBE has been found in groundwater throughout Maryland.

218. Maryland relies on groundwater for public drinking water supplies. There are approximately 400,000 households that rely on private drinking-water wells in the State, and nearly 3,250 public water systems that rely exclusively on groundwater. MTBE has been found throughout the State in varying concentrations and at varying times, both in public water supplies and in private domestic wells.

219. The State is entitled under law to clean groundwater uncontaminated by MTBE.

220. Defendants are responsible for MTBE gasoline that was released, directly or indirectly, into the waters of the State from hundreds of release sites in the State. A small sample of MTBE release sites for which defendants are responsible include:

| Defendant | Location | City | County | MTBE Concentrations found in Site Groundwater |
|-----------|----------|------|--------|-----------------------------------------------|
| BP Amoco | 1910 Rockville Pike | Rockville, MD 20852 | Montgomery | 613,000 ppb |
| BP Amoco | 920 East West Hwy. | Takoma Park, MD 20912 | Montgomery | 2860 ppb |
| Apex | 3507 Enterprise Rd. | Michellville, MD 20721 | Prince Georges | 1700 ppb |
| Apex | 16640 Crabbs Branch Way | Rockville, MD 20855 | Montgomery | 138 ppb |
| BP Amoco | 4607 Lander Rd. | Jefferson, MD | Frederick | 1744 ppb |

| Defendant | Location | City | County | MTBE Concentrations found in Site Groundwater |
|---|---|---|---|---|
|  |  | 21755 |  |  |
| BP Amoco | 12301 Darnestown Rd. | Gaithersburg, MD 20878 | Montgomery | 2730 ppb |
| Chevron | 10550 Connecticut Ave. | Kensington, MD 20895 | Montgomery | 4500 ppb |
| Chevron | 925 East University Blvd. | Silver Spring, MD 20903 | Montgomery | 28,000 ppb |
| Citgo | 1020 Francis Scott Key Hwy. | Keymar, MD 21757 | Carroll | 8,600 ppb |
| Citgo | 9824 Liberty Rd. | Frederick, MD 21707 | Frederick | 84,000 ppb |
| Citgo | 3308 Bladensburg Rd. | Brentwood, MD 20722 | Prince Georges | 21,000 ppb |
| Exxon | 9827 Hansonville Rd. | Frederick, MD 21702 | Frederick | 375 ppb |
| Exxon | 2800 Fallston Rd. | Fallston, MD 21047 | Hartford | 30,700 ppb |
| Exxon | 2010 St. Thomas Dr. | Waldorf, MD 20602 | Charles | 2900 ppb. |
| Exxon | 4040 Powder Mill Rd. | Beltsville, MD 20705 | Prince Georges | 1,400 ppb |
| Exxon | 1204 Reisterstown Rd. | Baltimore, MD 21208 | Baltimore | 450 ppb |
| Getty | 20012 Fisher Ave. | Poolesville, MD 20837 | Montgomery | 3800 ppb |
| Hess | 9715 York Rd. | Cockeysville, MD 21030 | Baltimore | 32,800 ppb |
| Holtzman | 6500 Suitland Rd. | Morningside, MD 20746 | Prince Georges | 5940 ppb. |
| Marathon | 6715 Pulaski Hwy. | Baltimore, MD 21237 | Baltimore City | 500 ppb |
| Mobil | 2210 Conowingo Rd. | Bel Air, MD 21014 | Harford | 1,805 ppb |
| Mobil | 161 Crescent Rd/ 159 Centerway Dr. | Greenbelt, MD 20770 | Prince Georges | 2800 ppb |
| NuStar | 1134 Marine Rd. | Salisbury, MD 21801 | Wicomico | 4800 ppb |
| 7-Eleven, Inc. | 11922 Main St. | Libertytown, MD | Frederick | 197,980 ppb |

| Defendant | Location | City | County | MTBE Concentrations found in Site Groundwater |
|---|---|---|---|---|
| | | 21762 | | |
| Sheetz, Inc. | 226 East Baltimore St. | Taneytown, MD 21787 | Carroll | 490,000 ppb |
| Sheetz, Inc. | 429 Virginia Ave. | Cumberland, MD 21502 | Allegany | 196 ppb |
| Shell | 2284 Baltimore Blvd. | Finksburg, MD 21048 | Carroll | 520 ppb |
| Shell | 5550 Greenbelt Rd. | College Park, MD 20740 | Prince Georges | 30,000 ppb |
| Shell | 703 Washington Blvd. | Laurel, MD 20707 | Prince Georges | 42,500 ppb |
| Shell | 5398 Queens Chapel Rd. | Hyattsville, MD 20782 | Prince Georges | 49,800 ppb |
| Shell | 1001 Beards Hill Rd. | Aberdeen, MD 21001 | Harford | 4300 ppb |
| Sunoco | 13714 National Pike | Clear Spring, MD 21722 | Washington | 5153 ppb |
| Sunoco | 100 W. Cedar Lane & Rt. 13 | Fruitland, MD 21826 | Wicomico | 430,000 ppb |
| Sunoco/ ConocoPhillips | 3410 Fairfield Rd. | Baltimore, MD 21226 | Baltimore City | 4900 ppb |
| Texaco | 6190 Waldorf-Leonardtown Rd. | Mechanicsville, MD 20659 | St. Mary's | 1000 ppb |
| Texaco | 6180 Shady Side Rd. | Shady Side, MD 20764 | Anne Arundel | 37 ppb |
| Texaco | 7035 Indian Head Hwy. | Bryans Road, MD 20616 | Charles | 160 ppb |
| Texaco | 14806 Crain Hwy. | Brandywine, MD 20613 | Prince Georges | 2800 ppb |
| Texaco | 21730 Great Mills Rd. | Lexington Park, MD 20653 | St. Mary's | 11,000 ppb |
| Valero | 17877 Piney Point Rd. | Piney Point, MD 20690 | St. Mary's | 350 ppb |
| Wawa, Inc. | 4029 North Point Blvd. | Dundalk, MD 21222 | Baltimore | 5400 ppb |

221.  As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred and will incur significant costs and expenses

to determine the extent of, to monitor, to treat, to remediate, and to otherwise address, releases of MTBE into groundwater.

222. As a result of defendants' acts and omissions as alleged herein, the State is entitled to recover from the defendants all of the monies and the value of the staff time expended by the State to date and into the future to define the extent of, to monitor, to treat, and to cleanup MTBE-contaminated groundwater.

223. The State is entitled to recover from defendants the future costs to define the extent of, to monitor, to treat and to restore MTBE-contaminated groundwater.

224. In its *parens patriae* as well as its public trustee capacities, the State also is entitled to full compensation and other remedies for all harm that defendants' MTBE-related acts and omissions have caused to the State's *parens patriae* and public trust interests.

### DEFENDANTS' DECEPTIVE PROMOTION OF MTBE GASOLINE AS CLEANER OR ENVIRONMENTALLY FRIENDLY GASOLINE

225. Commencing in or about 1987 and continuing to 1995, federal and state governments—including the State of Maryland—promulgated and enacted laws and regulations addressing automotive emissions. These included State Implementation Plans prepared in response to the 1990 amendments to the CAA. These efforts involved, inter alia, provisions promoting development and use of alternative fuels to gasoline, such as ethanol. Defendants during this time were

aware of the potential negative impact that these government-sponsored alternative-fuel initiatives would have on their revenues and profits from the manufacture, distribution, and/or sale of MTBE gasoline.

226. Defendants' response to the promotion of alternative fuels to gasoline were twofold: (a) they recast the marketing image and public perception of MTBE gasoline as clean-burning and environmentally friendly gasoline; and (b) they disparaged ethanol-oxygenated gasoline (as well as other alternative fuels under consideration), claiming that it was more costly and less effective than MTBE gasoline. In their responses to government initiatives, defendants failed to disclose the significant environmental dangers that MTBE and MTBE gasoline posed to the public and private water supplies in the event of a spill or leak of MTBE gasoline, the frequent occurrence of which defendants, and their trade groups as set out above, were well aware.

227. In or about September 1989, ARCO began selling a claimed low-emissions unleaded regular gasoline product containing MTBE named "EC-1," ("EC" standing for "Emission Control"). ARCO was followed closely by Conoco, Valero, Exxon, Marathon, Phillips, Shell and Sunoco, who likewise began offering gasoline formulations with higher percentages of MTBE as an ingredient and marketing them as cleaner-burning gasoline under various brand names.

228. In or about April 1990, Shell began marketing and promoting its own so-called cleaner gasoline named "SU2000E." Like ARCO's EC-1 product, this Shell gasoline was formulated with higher percentages of MTBE. One of the markets targeted by Shell in SU200E's widely publicized launch was Baltimore. The launch's public-relations campaign generated press articles published April 12, 1990, in the New York Times and in the Chicago Tribune, and on April 23, 1990, in the Oil & Gas Journal. The New York Times quotes Shell's president, Frank H. Richardson, describing Shell's new SU2000E gasoline blend as "an important step in the right direction for cleaner air." The Oil & Gas Journal article further quotes him as saying, "This new gasoline reflects Shell's commitment to make environmental considerations a priority in development of our new products and processes."

229. As of at least 1981, Shell was aware of the hazards of MTBE gasoline, including having been advised by one of its hydrogeologists, Curt Stanley, that the MTBE in its gasoline could contaminate and create taste and odor problems in public drinking-water supplies.

230. Shell's public statements concerning its SU2000E MTBE gasoline omitted these and other material facts of which Shell was aware concerning the risks and hazards of MTBE gasoline to water supplies; these omitted facts were

essential and necessary to present a fair and accurate description and assessment of MTBE gasoline's environmental characteristics.

231. Shell's misleading and deceptive claims to the public about MTBE and its purported cleaner gasoline materially harmed the citizens of Maryland. Shell's claims: (a) interfered with legitimate trade and commerce by Shell's competitors, including those in the ethanol and alternative-fuels industries, thereby adversely affecting directly or indirectly the citizens of this State; and (b) caused and facilitated the widespread introduction, acceptance, distribution, and sale of MTBE gasoline throughout the State and thereby misled, misinformed, and deceived Downstream Handlers and customers, including distributors, retailers, and the motoring public throughout the State, resulting in the leaking and spilling of MTBE gasoline causing widespread injury to the waters of the State from MTBE contamination.

232. At the same time that ARCO, Conoco, Phillips, Exxon, Marathon, Shell and Sunoco (or their predecessors or successors) were offering MTBE gasoline to the public as a cleaner gasoline, these defendants, through API, were financing a public relations campaign to discredit ethanol oxygenated gasoline.

**THE DEFENDANTS' FAILURE TO DISCLOSE MTBE GASOLINE'S
ENVIRONMENTAL SAFETY HAZARDS IN THEIR
MATERIAL SAFETY DATA SHEETS**

233. Manufacturers of hazardous substances address Occupational Safety and Health Administration hazard-communication requirements by providing material safety data sheets ("MSDSs") to their customers. Defendants in this case falsely or inadequately addressed MTBE in their MSDSs. The public position of defendants and in their MSDSs was that MTBE gasoline could be handled just like traditional gasoline, and that the traditional standard-of-care for gasoline without MTBE was adequate for MTBE gasoline.

234. Defendants prepared and distributed MSDSs in connection with their marketing, distribution, and sale of their products. Defendants asked customers who resold or distributed MTBE and MTBE gasoline to furnish copies of the MSDSs to their respective Downstream Handlers and customers.

235. In preparing and distributing MSDSs, defendants omitted material facts about what they knew or should have known concerning the risks and hazards of MTBE and MTBE gasoline.

236. Defendants' intended purpose and use of MSDSs during this time is explained in an October 4, 1994, Mobil (now ExxonMobil) publication titled: "Material Safety Data Bulletin: An Explanation of Terms," which bears copyright dates of 1987, 1990 and 1994:

A Mobil Material Safety Data Bulletin (MSDB), commonly referred to as a Material Safety Data Sheet (MSDS), is a compilation of health-related information, procedures for emergency situations, physical properties, and recommendations to help assure the safe handling of a particular Mobil product.

237.  An MSDS is typically divided into sections that address specific safety, handling, and hazards issues. Two important sections commonly found in MSDSs during the relevant times herein are "Accidental Releases" and "Handling and Storage."

238.  Defendants at all times relevant hereto knew the nature and magnitude of environmental risks and hazards when MTBE is added to a gasoline product are different and greater than those associated with conventional gasoline. The deleterious nature and magnitude of MTBE's risks and hazards require that those who are handling and storing MTBE gasoline exercise greater and more costly safety, storage, handling and remedial-response precautions and measures compared to conventional gasoline.

239.  The material differences between MTBE gasoline and conventional gasoline are described in a July 1, 1992, Amoco Oil Company (now BP) internal document—not disclosed or circulated to its distributors, gas stations, or customers—entitled: "Guideline for Handling & Storage of Ethers Used in Gasoline" ("Amoco Guideline"):

Amoco oil plans to meet the new [CAA Amendments] requirements by marketing gasolines blended with ethers starting in 1992. Most Amoco oil facilities will be required to handle and store

the new oxygenated gasolines containing up to 20 percent ether by volume. Amoco refineries, certain bulk terminals and the associated shipping and receiving facilities will also handle ethers in the "neat" form (100 percent concentration).

The chemical and physical properties of ethers differ from those of non-oxygenated gasolines, potentially causing new problems for Amoco facilities. *Most significantly, ethers are much more water soluble than hydrocarbons and will have a tendency to dissolve in—ground water* if allowed to leak or spill. *Ethers are not readily biodegradable*, making cleanup of spills and separation from wastewater much more difficult than for non-oxygenated gasoline. In addition, ethers are incompatible with some elastomer seals, linings, and equipment commonly used in Amoco storage and distribution facilities, increasing the likelihood of leaks if these materials are not modified for ether use.

If allowed to occur, the contamination of groundwater and surface water with ethers will have a tremendous cost, both to Amoco's reputation as an environmentally responsible company, and as a major financial cost for cleanup. Cleanup costs for ethers are tremendously higher than for non-oxygenated gasolines. To avoid these costs, facilities handling ethers and ether/gasoline blends must be designed and operated to insure: (1) a low likelihood for spills and leaks, (2) early detection of leaks when they occur, and (3) rapid repair and cleanup when leaks are found.

(Emphasis in original).

240. Shell knew by 1998 (at the latest) that MTBE gasoline should not be used in areas where groundwater was a potential drinking-water source or supply, or, if MTBE gasoline was used in such areas, that special handling, storage, and monitoring was required to avoid groundwater contamination.

111

241. Specifically, Shell was informed by its hydrologist, Curt Stanley, in an email sent on November 3, 1998, with respect to "MTBE IN GROUNDWATER—ISSUES BRIEF" that:

(1) Very small releases of MTBE (even small overfills seeping into cracks in the pavement) have the potential to adversely impact groundwater.

(2) Based on engineering reliability studies, it is likely that a high percentage of sites using MTBE, have a soil and/or groundwater problem. This problem is not just the result of leaking tanks, lines, fills and dispensers, but is also a result of certain operations.

(3) Due to MTBE's high solubility and low attenuation rates, it has the potential to migrate large distances relative to benzene. . . .

(4) Those sites which are located over potable groundwater are potentially very high risk sites.

(5) Odor and taste will drive the cleanup goals rather than risk. We are currently looking at clean up goals between 5-15ppb.

(6) Once in groundwater, MTBE is extremely difficult to remediate. It's [sic] Henry's Law coefficient is very low which means that MTBE prefers to stay in the aqueous phase rather than being sorbed or stripped out of water. Air sparging will be relatively ineffective. We are currently evaluating biological and oxidation remediation techniques.

(7) A simple risk assessment for all sites (like we are in the process of developing) will greatly help focus future resources.

242. In the same email on November 3, 1998, Mr. Stanley stated:

My professional opinion is that MTBE and similar oxygenates should not be used at all in areas where groundwater is a potential drinking water supply. If it is used, engineering design and

112

site operations (including active subsurface monitoring) should be carefully developed to minimize the potential for a release.

243. Defendants did not disclose in their MSDSs MTBE gasoline's greater, longer-lived, and more costly risks and hazards, or the additional measures they themselves internally recommended for minimizing those risks, such as were referenced in the Amoco Guideline or otherwise known to Shell and other defendants.

244. The MSDSs published by the defendants wrongly and deceptively stated or implied that MTBE gasoline could be handled just like traditional conventional gasoline, and that the traditional standard of care for gasoline without MTBE was adequate for MTBE gasoline.

245. Amoco and its successor BP Amoco, for example, published MSDSs for MTBE gasoline on or about April 28, 1993, January 19, 1995, January 5, 1998, December 28, 1998, and July 16, 1999. Each of these MSDSs identically stated under the sections for "Accidental Release Measures" and "Handling and Storage"—with no distinction between gasoline with and without MTBE—the following warnings and precautions:

### 6.0 ACCIDENTAL RELEASE MEASURES

Remove or shut off all sources of ignition. Wear respirator and spray with water to disperse vapors. Increase ventilation if possible. Remove mechanically or contain on an absorbent material such as dry sand or earth. Keep out of sewers and waterways.

### 7.0 HANDLING AND STORAGE

HANDLING: Use with adequate ventilation. Ground and bond containers when transferring materials. Wash thoroughly after handling.

STORAGE: Store in flammable liquids storage area. Keep container closed. Store away from heat, ignition sources, and open flame in accordance with applicable regulations –

SPECIAL PRECAUTIONS: Keep out of sewers and waterways. Avoid strong oxidizers. Report spills to appropriate authorities. USE AS MOTOR FUEL ONLY."

246. The foregoing statements are materially different from what Amoco's management was internally advising its operations personnel in the Amoco Guideline as to the need for heightened (and more costly) precautions and measures regarding handling, storage and cleanups of MTBE gasoline in view of MTBE's greater risks to groundwater and surface water, and in view of the larger costs associated with addressing MTBE contamination of water and the environment. Amoco's (and BP's) MSDSs contained no warning or information regarding these foreseeable enhanced risks and costs. Nor did Amoco's MSDSs inform its distributors, gas stations, or customers that in order to avoid materially increased environmental harm and associated cleanup and remediation costs, all facilities handling MTBE gasoline must be designed and operated to insure: (a) a low likelihood for spills and leaks; (b) early detection of leaks when they occur, including the need to test and monitor for MTBE; and (c) rapid repair and cleanup when leaks are found. Rather MTBE gasoline was wrongfully and deceptively

114

equated by defendants with conventional gasoline with regard to handling, storage, and cleanup.

247. Shell's MTBE-gasoline MSDSs also omitted material information known to Shell—but not known to Downstream Handlers, to customers of the products, or to the public generally—on the greater magnitude of environmental risks and hazards associated with MTBE gasoline and the correspondingly heightened precautions and responses required to prevent or respond to a release of MTBE gasoline.

248. Shell's MTBE gasoline MSDS statements are materially different from Shell's statements and precautions contained in its August 4, 2005, MSDS for its Ethanol Light Ends Coproduct Mixture-PDO-Geismar product.

249. Each of the following defendants listed in the table below (who together with Amoco and Shell are collectively referred to herein as "MTBE MSDS Defendants"), acting with knowledge regarding MTBE's enhanced environmental risks and hazards to groundwater and surface water, issued MSDSs on the dates indicated that omitted material information on the nature and magnitude of environmental hazards associated with their MTBE gasoline and the heightened necessary precautions and responses required to prevent or adequately respond to a release over those associated with conventional gasoline:

| Defendant | Dates MSDS issued or revised |
|---|---|
| Exxon | 10/16/1994 (Exxon Company); 10/17/1994 (Exxon Company); 07/14/1997 (Exxon Company); 08/10/1999 (Exxon Company); 05/12/2000; 03/01/2002; 03/29/2006 |
| BP Amoco | 04/28/1993; 06/08/1994; 01/19/1995; 05/03/1995; 05/03/1995; 01/05/1998; 12/28/1998 (BP Amoco); 07/16/1999; 07/16/1999 |
| Chevron | 02/10/1986; 03/24/1990; 03/26/1990; 03/07/1991; 02/03/1993; 03/12/1993; 03/19/1993; 06/10/1994; 01/24/1995; 11/15/1995; 04/16/1998; 07/31/1999; 01/09/2001; 11/28/2001 |
| Citgo | 07/10/1987; 10/24/1988; 02/10/1989; 06/13/1989; 04/30/1990; 10/01/1990; 03/27/1991; 06/30/1992; 09/09/1992; 12/18/1992; 03/23/1993; 03/24/1993; 10/21/1994; 11/09/1994; 11/10/1994; 01/30/1995; 10/06/1995; 12/31/1996; 08/15/1997; 03/15/2001 |
| El Paso | 11/02/1989; 03/28/1990; 04/30/1990; 02/26/1992; 03/05/1992; 08/04/1994; 11/15/1995; 03/28/1996; 04/03/1998; 04/04/1998; 05/19/1998; 03/05/1999; 03/11/1999; 06/22/2000; 10/17/2002 (El Paso Corp.) |
| ConocoPhillips | 12/01/1994 (Bayway Refining); 07/12/1995 (Tosco); 09/29/1995 (Phillips 66); 11/24/1995 (Conoco); 05/13/1996 (Tosco); 10/02/1996 (Tosco); 10/13/1997 (Tosco); 03/29/1999 (Tosco); 01/01/2002 (Phillips Petroleum); 05/07/2002 (Conoco); 01/01/2003; 02/13/2003 (Phillips 66) |
| Cumberland Farms/GOLP | 10/15/1986 (Gulf); 05/25/1989 (Gulf); 03/01/1995 (Gulf); 04/26/1995 (GOLP); 04/10/1996 (Gulf); 02/25/2004 (GOLP); 02/26/2004 (GOLP) |
| Equilon Enterprises LLC | 01/04/1999; 04/26/1999; 01/10/2000; 01/13/2000; 09/28/2000; 10/13/2000; 03/23/2001; 07/19/2001 |
| Hess | 08/31/1989; 12/22/1994; 9/16/1996; 12/30/1997; 09/24/1999; 01/08/2004 |
| Marathon | 12/29/1992; 05/22/1995; 09/30/1998; 09/12/2005 |
| Motiva | 01/04/1999; 06/10/1999; 01/10/2000; 01/13/2000; 03/23/2001; 03/13/2003 |
| Premcor | 05/12/1999; 11/19/2000; 12/21/2000; 08/1/2005 |

| Defendant | Dates MSDS issued or revised |
|---|---|
| Shell Oil Company | 09/18/1986; 09/02/1987 (from Champlin); 02/18/1988; 10/26/1988; 11/03/1988; 02/02/1989; 04/11/1990; 03/04/1992; 04/19/1992; 10/28/1992; 10/29/1992; 11/10/1992; 03/17/1993; 03/27/1993; 04/16/1993; 04/30/1993; 06/30/1994; 08/19/1994; 10/7/1994; 05/04/1995; 09/13/1995; 09/27/1995; 09/29/1995; 01/05/1996 (from ARCO); 01/25/1996; 02/29/1996; 06/06/1996; 08/06/1996; 08/13/1996; 09/18/1996; 08/19/1997; 03/31/1998; 04/06/1998; 04/23/1998; 09/23/1998; 01/4/1999; 04/26/1999; 01/10/2000; 01/13/2000; 06/28/2000; 10/13/2000; 03/23/2001; 07/10/2001; 10/24/2001; 08/07/2002; 03/14/2003; 06/06/2003; 09/03/2003; 09/06/2006 |
| Sun Company, Inc. | 3/20/1998 |
| Sunoco, Inc. (R&M) | 02/28/2000; 02/29/2000; 03/04/2002; 04/05/2002; 04/11/2002; 05/02/2002; 08/20/2002; 08/21/2002; 08/26/2002; 09/06/2002; 01/17/2003; 05/02/2003; 09/18/2003; 10/06/2003; 11/03/2003; 12/24/2003; 04/30/2004; 08/09/2004; 08/20/2004; 08/27/2004; 08/30/2004; 09/01/2004; 09/02/2004; 09/03/2004; 09/09/2004; 12/10/2004; 03/07/2005; 04/08/2005; 04/11/2005; 04/12/2005; 04/13/2005; 04/19/2005; 07/29/2005; 08/01/2005; 08/02/2005; 12/19/2005 |
| Texaco | 05/02/1991; 08/11/1993; 05/12/1994; 01/04/1995; 07/17/1996; 05/19/1997; 11/12/1997; 01/06/1998; 01/04/2000 |
| Valero Energy Corporation | 01/15/1998; 12/17/1998 (Diamond Shamrock Refining); 01/01/1999 (Diamond Shamrock Refining); 06/16/2000; 06/19/2000; 01/01/2001 (Diamond Shamrock Refining); 01/17/2001 |
| Valero Refining and Marketing Company | 01/15/1992; 08/19/1998 |

250. The MTBE MSDS Defendants' deceptive and misleading descriptions and misrepresentations gave their MTBE-gasoline products an unfair competitive advantage and greater profit margins over other viable gasolines in the marketplace. Defendants also thereby gave MTBE gasoline an unfair competitive advantage over ethanol and other alternative fuels.

251. The material facts omitted by the MTBE MSDS Defendants in their respective MSDSs concerning MTBE gasoline's peculiar and heightened risks and hazards to the environment were essential and necessary for a fair and not misleading description and assessment of MTBE gasoline's environmental characteristics.

252. The MTBE MSDS Defendants' misleading and deceptive statements in their MSDSs for MTBE gasoline omitted material storage, handling, and environmental information concerning MTBE which was known to them at the time that their respective MSDSs were issued and disseminated which, among other things, was relevant to and affected the determination of MTBE's true economic costs.

253. The misleading and deceptive claims to the public about MTBE gasoline in the above MSDSs harmed the citizens of Maryland in that they: (a) interfered with legitimate trade and commerce by the defendants' competitors, including those in the ethanol and alternative-fuels industries, negatively affecting directly or indirectly the people of the State; and (b) caused and facilitated the widespread introduction, acceptance, distribution, and sale of MTBE gasoline, and misled, misinformed, and deceived Downstream Handlers and customers, including distributors, retailers, and the motoring public throughout the State, all of which resulted in or contributed to the widespread damage to the waters of the

State from MTBE contamination, and which damaged the trust resources and property of the State as well as the health, property, safety, and welfare of a substantial segment of the State's citizens.

## MTBE POSES A SUBSTANTIAL HEALTH RISK TO THE CITIZENS OF MARYLAND

254.    Because of MTBE's potential for causing cancer, it is currently classified by the EPA as a "possible carcinogen" and an EPA draft risk assessment has recommended reclassifying MTBE as a "probable carcinogen." The State of California has classified MTBE as a probable carcinogen. Two recently released chronic study reports of MTBE in rats sponsored by the petroleum industry found carcinogenic impacts associated with exposure to MTBE.

255.    The State established a state action level for MTBE of 20 ppb for groundwater. The Maryland Department of the Environment opens a case for investigation when it receives reports of MTBE contamination at 10 ppb or higher. These levels were set prior to the State's receipt of new data regarding the probable carcinogenicity of MTBE and the International Agency for Research on Cancer's decision to treat MTBE as a high priority agent for further evaluation.

## THE LUKOIL DEFENDANTS ARE DIRECTLY AND VICARIOUSLY LIABLE FOR GPMI'S ENVIRONMENTAL LIABILITIES

256.    Defendants OAO Lukoil, LNA, LAC and GPMI directly, indirectly, and through agents and/or officers, transacted business in the State of Maryland.

257. From 1998 forward, OAO Lukoil registered several trademarks for "Lukoil" with the U.S. Patent and Trademark Office. OAO Lukoil used those trademarks to conduct business related to the sale of motor fuel in Maryland and elsewhere through subsidiaries that held themselves out as Lukoil, including GPMI, LAC, and LNA.

258. In October 2000, OAO Lukoil created LAC.

259. In November 2000, OAO Lukoil moved into the United States gasoline market by acquiring GPMI, heralding the acquisition as the first by a Russian company of a publicly held U.S. company. The Agreement and Plan of Merger to acquire was between GPMI and OAO Lukoil and OAO Lukoil subsidiaries Lukoil International GmbH, Lukoil Americas Corporation and Mikecon Corporation. The Agreement and Plan of Merger designated Lukoil Americas Corporation to receive all notices and communications on behalf of "any Lukoil entity."

260. After LAC acquired GPMI in 2001, GPMI became a wholly owned subsidiary of LAC and an indirect wholly owned subsidiary of OAO Lukoil. OAO Lukoil and LAC took GPMI private and no longer filed reports with the U.S. Securities and Exchange Commission. GPMI was incorporated in Maryland and registered and authorized to do business in Maryland.

261. As part of the acquisition and merger transaction, GPMI, at the direction of LAC and OAO Lukoil, entered into an Amended Master Lease for service stations in Maryland and elsewhere and an environmental indemnity agreement with Getty Property Corporation for the lease of hundreds of service stations and a petroleum storage and distribution network in the United States, including in Maryland. In these transactions GPMI acted as agent for, and at the direction of, OAO Lukoil and LAC.

262. At the time GPMI and Getty Property Corporation executed the Amended Master Lease, OAO Lukoil guaranteed GPMI's financial obligations under the Amended Master Lease for three years. The "Guaranty of Lease" executed by OAO Lukoil provides that the "Guarantor [OAO Lukoil] will derive substantial direct and indirect benefits from Tenant's [GPMI's] entering into the [Amended Master] Lease." OAO Lukoil affirmatively promised that it "absolutely, unconditionally, irrevocably, jointly and severally guarantees, as principal and not as indemnitor to Landlord [Getty Property Corporation], in accordance with and pursuant to this Guaranty, Tenant's full and punctual payment of all Guaranteed Obligations . . . . Guarantor's liability under this Guaranty shall be primary and not secondary and Landlord may, at Landlord's option . . . join Guarantor in any action or Proceeding commenced by Landlord against Tenant in connection with the Guarantied [sic.] Obligations."

263. OAO Lukoil put the Lukoil trademarks on service stations in Maryland, on GPMI letterhead, on credit cards offered to and used by Maryland customers of Lukoil service stations, and in public sponsorships.

264. At all relevant times, GPMI, LAC, OAO Lukoil and LNA held themselves out as "Lukoil" in signage, advertising, contracts, sponsorships, and other business activities.

265. LAC owned 100% of the stock of GPMI from January 25, 2001 until February 28, 2011, with the exception of two weeks in November 2009, when OAO Lukoil, LAC and LNA coordinated a stripping of the only profitable assets of GPMI to evade GPMI's obligations to creditors, including the State of Maryland. At all relevant times, GPMI, LAC and LNA acted as agents for OAO Lukoil with respect to operation of GPMI leased service stations in Maryland.

266. In 2004, with the approval and at the direction of OAO Lukoil and LAC, GPMI obtained a loan and line of credit for $360 million. The purpose of the loan and line of credit was to finance the acquisition of service stations from ConocoPhilips and to provide working capital associated with the acquisition. The Executive Summary of the transaction documents stated, "Lukoil [OAO Lukoil] has acquired downstream assets in Europe and the U.S. (including the $73 million acquisition of Getty [Property Corporation] announced in November 2000). This Acquisition [to buy the ConocoPhillips stations with the loan proceeds] is the next

step in Lukoil's strategy to aggressively expand its U.S. Downstream operations." The loan documents referred to GPMI as "the foundation of Lukoil's [OAO Lukoil's] U.S. downstream operations—a presence that Lukoil anticipates will expand dramatically in the next few years." The loan and line of credit also stated, "The Acquisition represents more than a financial investment for Lukoil, it is the foundation of a strategy to dramatically expand Lukoil's presence in the U.S."

267. The 2004 loan and line of credit were guaranteed by LAC. Vincent De Laurentis, president of both LAC and GPMI, signed for the loan and line of credit on behalf of GPMI, and signed the guarantee on behalf of LAC. OAO Lukoil made a $50 million capital contribution to LAC to fund the acquisition and another $10 million as a "structural measure to provide near term financing liquidity."

268. In May 2004, OAO Lukoil, through GPMI, used funds from the loan and line of credit to acquire 767 Mobil-branded stations from ConocoPhillips for $269.5 million. The title of the purchase agreement is "OAO Lukoil Getty Petroleum Marketing Inc. Purchase of Marketing Assets from Conoco Phillips Company and Related Financings." OAO Lukoil and LAC directed and participated in the acquisition of service stations from ConocoPhillips. OAO Lukoil and LAC guaranteed loans for the purpose of purchasing stations and

property, expanding their market share, and bringing the Lukoil name to Maryland and rebranding Maryland service stations as Lukoil stations.

269. In 2005, GPMI obtained a loan and line of credit for $475 million to replace the 2004 loan and to finance additional expansion efforts and to rebrand the acquired stations to Lukoil stations. The 2005 loan and line of credit were guaranteed by OAO Lukoil. The loan documents stated, "Expanding into the U.S. has also been a strategic objective of Lukoil . . . . Sales of Lukoil petroleum products in the U.S. reached a record level of 1.9 billion gallons (8.64 billion liters). Revenue from sales (without excise) was $2.6 billion and net profit was $11.7 million." Distributions for that loan and line of credit went directly to LAC, not GPMI.

270. The 2005 "Guaranty" signed and agreed to by OAO Lukoil stated that OAO Lukoil's "obligations hereunder are primary, not secondary . . . the obligations of the Guarantor . . . are independent of the Obligations, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce such obligations, irrespective of whether any action is brought against the Borrower or any other Person . . . ." The Guaranty also included "Affirmative Covenants" which described not only OAO Lukoil's financial obligations, but also significant commitments to the operation of its subsidiaries, including commitments that OAO Lukoil would cause each subsidiary to "do, or cause to be

done all things necessary to (a) preserve, renew and keep in full force and effect its legal existence and (b) the rights, licenses, permits, privileges and franchises material to the conduct of its business . . . ." OAO Lukoil also committed to cause each subsidiary to "keep and maintain all property material to the conduct of its business in good working order and condition . . . ."

271. As part of its effort to increase the Lukoil brand awareness and increase its profits, OAO Lukoil directly funded a rebranding effort with a $10 million per year marketing and advertising campaign directed at customers.

272. OAO Lukoil regularly transferred millions of dollars through its intermediate subsidiaries to LAC, who then funneled those dollars to GPMI. For example, in 2005 and 2006, LAC received $2.5 million dollars quarterly from one or more of the OAO Lukoil subsidiaries, including Lukoil Americas LLC (which merged with LAC in 2006), and Lukoil Europe Holdings B.V. LAC would then immediately transfer that money to GPMI.

273. By 2005, GPMI was losing vast sums of money because the GPMI legacy stations bound by the Amended Master Lease were losing money and GPMI could not pay the rent owed to Getty Realty Corporation. At a number of these stations GPMI was exposed to environmental liability, including liability to the State for MTBE contamination. By 2006, GPMI was operating at a loss and it would never again be solvent.

274. In 2007, the C.E.O. of LAC, GPMI and LNA, Vadim Gluzman, on behalf of and as agent for OAO Lukoil, told the owner of Getty Realty Corporation that if Getty Property Corporation did not renegotiate the Amended Master Lease, GPMI would sell off assets to a sister company, hold GPMI for one-year and then sell GPMI to anyone who would take it.

275. In 2007, OAO Lukoil directed LAC to create LNA for the purpose of obtaining GPMI's only profitable assets (the ConocoPhillips stations not bound by the Amended Master Lease) in a future transaction that would keep those ConocoPhillips stations within the Lukoil family and drive the remainder of GPMI into bankruptcy.

276. LAC created LNA in June 2007 as directed by OAO Lukoil and has always owned 100% of LNA's stock.

277. Environmental and property risks associated with the gasoline stations in the United States were assessed and considered by OAO Lukoil, including risks associated with stations in Maryland, when OAO Lukoil directed the restructuring of LAC and its subsidiaries and the fraudulent transfer of assets from GPMI to LNA. By 2008, GPMI's total liabilities exceeded its total assets resulting in an accumulated deficit of $248 million. GPMI was dependent on money from OAO Lukoil to survive.

278. In 2009, OAO Lukoil directed LAC, LNA and GPMI to transfer GPMI's only profitable assets to the newly created LNA.

279. In November 2009, LAC and LNA, acting at the direction of OAO Lukoil, undertook a three-step process to effectuate that transfer.

280. On November 13, 2009, LAC transferred 100% of its GPMI stock to LNA. Upon information and belief, LNA did not give adequate consideration for the transfer of GPMI stock from LAC. The transfer of GPMI stock to LNA had no legitimate business purpose for GPMI.

281. On November 16, 2009, while under LNA ownership, GPMI transferred stations to LNA. OAO Lukoil, LAC and LNA are successors in liability for the MTBE contamination at these stations. This transfer was fraudulent and to the detriment of GPMI.

282. The GPMI and LNA documents affecting the transfer of the ConocoPhillips stations from GPMI to LNA were all signed by the same person, the president of both GPMI and LNA, Vincent De Laurentis, on behalf of GPMI and LNA.

283. The price LNA paid for GPMI's profitable assets was a fraction of the fair market value of those assets and was inadequate for GPMI's creditors.

284. On November 27, 2009, two weeks after LAC transferred GPMI's stock to LNA, LNA transferred all of its GPMI stock back to LAC as a dividend.

By this time, however, GPMI no longer owned the profitable former ConocoPhillips stations, which LNA kept. The result was a GPMI that was hemorrhaging cash and had rent obligations to Getty Property Corporation that it could not afford (and that were no longer subject to OAO Lukoil's 2000 Guaranty of Lease). LNA continued, without interruption, the operations of the former stations, including management, personnel, physical locations, and sale of motor fuel.

285. OAO Lukoil, LAC and LNA controlled the transfer of the ConocoPhillips stations from GPMI to LNA, and ignored the corporate formalities that would ordinarily accompany such a transfer. There was no legitimate business reason for GPMI to transfer these stations to LNA. In transferring the stations, GPMI acted as an agent of OAO Lukoil, LAC and LNA, and not in the interests of GPMI.

286. OAO Lukoil and LAC directed gasoline blending operations in which GPMI, acting as an agent for OAO Lukoil and LAC, blended MTBE gasoline for sale in Maryland and elsewhere.

287. In 2011, OAO Lukoil directed LAC to sell GPMI to Cambridge Holdings Petroleum for one dollar. At that time, OAO Lukoil also agreed to provide millions of dollars as a cash infusion to Cambridge in order to keep GPMI temporarily afloat.

288. No officer of GPMI knew of or participated in the sale of GPMI to Cambridge. Upon the sale, OAO Lukoil ordered all GPMI officers to resign their positions with GPMI.

289. GPMI owned gasoline underground storage tanks in Maryland at the time of the sale to Cambridge.

290. OAO Lukoil, LAC, and LNA filed claims in the bankruptcy proceeding of GPMI for indemnity by GPMI for "damages relating to purchase and sale agreement" (e.g., the November, 2009 sale of assets from GPMI to LNA). In re GPMI Bankruptcy, No. 11-15606-SCC (S.D.N.Y.). LNA also filed claims relating to stations covered by the Amended Master Lease and the Purchase and Sale Agreement between LNA and GPMI including stations in Maryland.

291. The GPMI bankruptcy trustee filed an adversary proceeding against OAO Lukoil, LAC and LNA, for the fraudulent transfer of assets between GPMI and LNA. OAO Lukoil, LAC and LNA settled the bankruptcy trustee's fraudulent transfer claim for $93 million in cash to be paid to the GPMI Trust.

292. LNA owns underground storage tanks and service stations in Maryland, some or all of which are sources of ongoing MTBE contamination.

293. Every corporate officer of GPMI held the same position with LAC and LNA, indicative of the fact that these entities were operating as a single entity.

294. Vadim Gluzman was the Chairman of the Board and Chief Executive Officer of GPMI, LAC, and LNA. Mr. Gluzman reported to the Chief Executive Officer of OAO Lukoil and was a vice-president of OAO Lukoil from 2007 to 2009.

295. Vincent De Laurentis was the President and Chief Operating Officer of GPMI, LAC, and LNA.

296. Michael Hantman was the Senior Vice President and Chief Financial Officer of GPMI, LAC, and LNA.

297. Semyon Logovinsky, was the Vice-President for Wholesale and New Business Development of GPMI, LAC, and LNA.

298. GPMI, LAC, and LNA had the same principal place of business: Lukoil Plaza, 1500 Hempstead Turnpike, East Meadow, New York 11554.

299. OAO Lukoil, LAC, LNA, and GPMI failed to observe corporate separateness and acted as alter-egos and/or as if GPMI was a department of OAO Lukoil and LAC and not a separate entity. OAO Lukoil, LAC, and LNA wholly ignored the separate status of GPMI and controlled and dominated its affairs such that its separate existence was a sham and façade.

300. Throughout the ten years that LAC owned GPMI, neither LAC nor GPMI observed corporate formalities, held regular board meetings, or prepared or maintained regular board minutes. Business decisions of GPMI and LAC were

made through "written consents" signed by three board members, including a designated board member from OAO Lukoil.

301. OAO Lukoil prevented GPMI from obtaining financing without its approval.

302. OAO Lukoil and LAC required GPMI to submit financial reports to OAO Lukoil.

303. OAO Lukoil regularly called Vadim Gluzman and other GPMI, LAC and LNA officers to the headquarters of OAO Lukoil in Moscow so OAO Lukoil could tell them how to manage GPMI, LAC, and LNA. By their actions as aforesaid and otherwise, the defendants OAO Lukoil, LAC and LNA, failed to observe GPMI's separate corporate entity, operated GPMI and/or dealt with GPMI's property as if it were their own, used GPMI as a mere shield to escape liability to the State and otherwise to evade legal obligations to the State of Maryland.

304. As described above, OAO Lukoil, LAC, LNA and GPMI had a unity of ownership, a unified administrative and financial control, and similar or supplementary business functions, and OAO Lukoil, LAC, LNA so dominated GPMI that GPMI did not have a true separate existence.

305. As described above, OAO Lukoil, LAC and LNA are directly, indirectly, and through agents and/or officers, or alter-egos, successors in liability

for MTBE contamination which was the result of releases that occurred at GPMI-lease sites prior to January 25, 2001.

306. As described above, OAO Lukoil, LAC and LNA are directly, indirectly, and through agents and/or officers, or alter-egos, liable for MTBE contamination which was the result of releases at GPMI-lease sites that occurred on or after January 25, 2001.

307. Under the totality of the circumstances, as described above, a paramount injustice would occur if LAC, OAO Lukoil, and LNA were allowed to escape liability for their and GPMI's environmental liabilities. In addition, under the totality of the circumstances, public policy demands that OAO Lukoil, LAC and LNA not be permitted to avoid their and GPMI's legitimate legal obligations to the State of Maryland. No innocent parties will be prejudiced by holding LAC, OAO Lukoil, and LNA liable for their and GPMI's environmental liabilities.

## COUNT I

## STRICT PRODUCT LIABILITY BASED ON DEFECTIVE DESIGN

308. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

309. Defendants manufactured and/or sold MTBE gasoline. Defendants designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed, and/or otherwise supplied (directly or indirectly) MTBE

132

gasoline that was delivered into Maryland, or into areas outside Maryland affecting the waters of the State.

310. Defendants' MTBE gasoline was made as designed by the defendants, but these products' designs were unreasonably dangerous in ways not contemplated by the ultimate user. MTBE is not safe for its intended use by its intended consumers, especially in light of the availability of reasonably safer and available alternatives. At the time that it left the defendants' possession or control, and at all other times relevant to this action, MTBE gasoline was defective and unreasonably dangerous to users and to users' property because, among other things:

a. MTBE is released more readily from gasoline transportation, storage and delivery systems or facilities than are the other constituents of gasoline and other available and viable alternative-gasoline additives that can be substituted for MTBE;

b. MTBE gasoline, when used in its intended manner, causes extensive groundwater contamination that is difficult, time consuming and expensive to respond to and remediate;

c. even at extremely low concentrations, MTBE renders groundwater putrid, foul, and unfit for use by humans;

d. MTBE and MTBE gasoline pose significant threats to the public health, comfort, safety and welfare and the environment;

e. at all times relevant to this action, feasible alternatives to MTBE in gasoline were available to the defendants which could have achieved required efficiencies, octane levels and/or oxygenation and would have eliminated the unreasonable dangers and hazards posed by MTBE gasoline;

f. MTBE and MTBE gasoline are defectively manufactured when they contain and/or degrade into unnecessary and environmentally harmful impurities such as TBA; and

g. any utility allegedly provided by the use of MTBE gasoline is greatly outweighed by the risks and dangers associated with MTBE gasoline.

311. MTBE gasoline's design defects caused injuries and property damage to the State.

312. Defendants' MTBE gasoline reached the ultimate users without substantial change in their condition.

313. Defendants knew of MTBE gasoline's design defects. Defendants at all times knew of the defective and unreasonably dangerous nature of MTBE gasoline, yet still manufactured, sold and/or distributed the product without any regard for its defective characteristics.

314.  Defendants consciously and deliberately disregarded a foreseeable harm that might result from MTBE gasoline's defective designs.  Defendants represented and claimed that MTBE gasoline could be handled and used in the same manner as gasoline not containing MTBE, and/or otherwise did not require any different or special handling or precautions.  Despite prior knowledge of potential carcinogenic or other health effects, defendants failed to conduct reasonable, appropriate, or adequate scientific studies to evaluate the potential human health effects of MTBE.

315.  The State and its citizens did not actually know or appreciate the particular risk of damages created by MTBE gasoline's defective design.  Defendants knew that MTBE gasoline would be handled, purchased, and used without inspection for defects, and/or defendants knew that Downstream Handlers and intended users and consumers did not have the wherewithal to inspect or test for defects.

316.  The State and its citizens did not voluntarily expose themselves to the risk posed by MTBE or MTBE gasoline while realizing the danger.

317.  The State and its citizens did not unreasonably or knowingly expose themselves to the risk posed by MTBE or MTBE gasoline.

318.  At all times relevant to this action, MTBE gasoline was unreasonably dangerous for sale to or for use by the intended user or consumer,

and/or the great risk of harm to the public's health, property, safety, and welfare and to the environment posed by MTBE gasoline outweighed the cost to defendants of reducing or eliminating such risk. Defendants were able to convert to a different, safe gasoline formulation without MTBE, and still profit from their gasoline sales.

319. At all times relevant to this action, the distribution, storage, and/or use of MTBE gasoline and the risks and dangers associated therewith—including the risk of harm to the public's health, property, safety, and welfare, and to the environment—outweighed any limited utility provided by MTBE gasoline.

320. At all times relevant to this action, the defendants expected their MTBE gasoline to be used by the intended users and/or consumers of MTBE gasoline without substantial change in condition, and said intended users and/or consumers did in fact use MTBE gasoline without substantial change in condition. As a proximate result of the defects previously described, MTBE and MTBE gasoline caused the injuries and damages set forth in this Complaint.

321. As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred and suffered and will continue to incur and suffer substantial costs and damages for which defendants are strictly, jointly and severally liable.

## COUNT II

## STRICT PRODUCT LIABILITY BASED ON FAILURE TO WARN

322. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

323. MTBE gasoline was designed, manufactured, formulated, marketed, promoted, supplied, and/or sold in a defective condition that made it unsafe for its foreseeable uses in that it posed unreasonable risks to users and to users' property, to the State's groundwater, and to the health, safety, property, and well-being of persons that rely on the State's groundwater for drinking-water supplies. Defendants' MTBE gasoline was defective when it left defendants' possession or control. Defendants expected their MTBE gasoline to reach their foreseeable users in Maryland without substantial change in its condition, and defendants' MTBE gasoline did in fact reach its foreseeable users in Maryland without substantial change in its condition.

324. The aforesaid dangers posed by MTBE gasoline were not obvious to a reasonable user.

325. Defendants knew or should have known of the aforesaid dangers posed by the foreseeable uses of MTBE gasoline. Yet defendants consciously and deliberately disregarded foreseeable harms that MTBE gasoline might cause.

326. Defendants had a duty to provide foreseeable users with adequate warnings of the aforesaid dangers posed by MTBE and MTBE gasoline.

327. Defendants did not adequately warn or instruct Downstream Handlers or the intended users or consumers as to the dangers of MTBE gasoline. Despite their knowledge that ground and surface water contamination with MTBE was the inevitable consequence of their conduct, defendants failed to provide adequate warnings or instructions on the proper and safe use of MTBE gasoline. Defendants did not take any other precautionary measures to prevent or mitigate their MTBE gasoline from contaminating the waters of the State, from damaging the property of the State and from injuring the health, safety, property, and welfare of a substantial segment of the State's citizens.

328. Defendants' failure to provide the adequate warnings or instructions on the use of or dangers presented by MTBE gasoline rendered this product defective and unreasonably dangerous. The absence of adequate warnings or instructions for the safe use of MTBE gasoline were a direct and proximate cause of the aforesaid injuries to the waters of the State, to the property of the State and to the health, safety, property, and welfare of a substantial segment of the State's citizens.

329. The State and its citizens have suffered and will suffer compensable injuries and property damage as a result of defendants' breach of their duty to

provide adequate warnings of the aforesaid dangers posed by foreseeable uses of MTBE gasoline. Had the Downstream Handlers and intended users and consumers of MTBE gasoline received adequate warnings or instructions concerning the safe use of MTBE gasoline, they would have, or were substantially likely to have, avoided the risks or dangers attendant to the use of MTBE gasoline, including avoiding MTBE gasoline altogether.

330. The State and its citizens did not know about, appreciate, or voluntarily expose themselves to the dangers posed by foreseeable uses of MTBE gasoline.

331. As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred and suffered and will continue to incur and suffer substantial costs and damages for which defendants are strictly, jointly and severally liable.

## COUNT III

### STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITY

332. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

333. Downstream Handler defendants' storage of large quantities of MTBE gasoline in underground storage tanks in the vicinity of waters of the State used as drinking and/or irrigation water and/or near population centers with

drinking water wells is an abnormally dangerous activity. That activity has resulted in the release of MTBE gasoline into the waters of the State that supply the public with fresh water for human consumption and irrigation. Such releases of MTBE gasoline have resulted in injury to and/or destruction of those water resources.

334. Downstream Handler defendants' conduct constitutes a non-natural use of their premises and an abnormally dangerous activity. Their conduct is characterized by a high degree of risk of harm to the State's waters and its citizens. There is a great likelihood that such harm will result. Given the fact that the State's precious and limited drinking and irrigation water resources are located directly beneath and adjacent to these defendants' places of business, defendants' polluting activities have not been a matter of common usage.

335. Additionally, defendants' unpermitted polluting activities have been an inappropriate use of land in such close proximity to population centers. Releases of MTBE into the waters of the State that are used or may be used in the future for potable or irrigation purposes or that are near population centers or the residences of the State's citizens causes the citizens of the State grave and serious harm.

336. The State's and its citizens' interest in a clean water supply and undamaged natural resources far outweighs the value of the improperly conducted

activities by Downstream Handler defendants on their premises or premises under their direct or indirect control.

337. The Downstream Handler defendants are strictly liable to the State for harm to the waters of the State resulting from such defendants' abnormally dangerous activities. Each Downstream Handler defendant is liable for damages, must cease causing further injuries to the waters of the State, and must restore such waters to their pre-contaminated state.

## COUNT IV

## PUBLIC NUISANCE

338. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

339. The Secretary of the Maryland Department of the Environment is empowered to investigate nuisances that affect public health and "devise means for the control of these nuisances," "may enter on and inspect any private property to determine if a nuisance exists," and "may bring an action to enjoin any person from committing any nuisance that may injure public health. Md. Code Ann., Envir. §§ 10-102, 10-104, 10-105.

340. Similarly, the Secretary of the Maryland Department of Health may bring an action to enjoin any person from committing any nuisance. Md. Code Ann., Health-Gen. § 20-305.

341. Defendants' unreasonable conduct has resulted in water contamination that is a public nuisance because it causes real, substantial, and unreasonable damage to and/or interference with rights common to the State's communities and general public, including the right to clean, unadulterated water.

342. Defendants' actions and omissions in causing MTBE gasoline to enter and pollute the waters of the State violate, *inter alia*, § 4-410(a) of the Environment Article and Code of Maryland Regulations ("COMAR") 26.10.02.01A, and constitute unreasonable conduct and a public nuisance per se under Maryland law.

343. Likewise, the discharge of MTBE into drinking water of the state also constitutes a public nuisance because such discharge creates a "condition that is dangerous to health or safety," including a "contaminated water supply" and "inadequately protected water supply . . . ." Md. Code Ann., Health-Gen. § 20-301(a).

344. The public nuisance caused by defendants has substantially and unreasonably interfered with, obstructed, and/or threatened, among other things, the State's and the general public's interests in the waters of the State, as well as the State's ability to protect, conserve, and manage the waters of the State.

345. The public nuisance caused by defendants is of a continuing nature and has produced long-lasting negative effects upon the waters of the State, and

upon the health, property, safety, and welfare of the general public, as defendants knew or had reason to know at all times relevant hereto. In addition to the defendants' actions and omissions with respect to the distribution, handling, and storage of MTBE gasoline that has resulted in pollution of the waters of the State, defendants' decision to continue delivery of MTBE gasoline to underground storage tanks in the State and their continuing failure to investigate and abate the nuisance also constitutes continuing conduct.

346. Defendants intentionally and deceptively promoted MTBE for use as an additive in gasoline despite knowing that it had latent and far-reaching adverse environmental consequences, and defendants refined, compounded, formulated, marketed, distributed, and/or otherwise supplied and controlled MTBE gasoline in Maryland (and areas outside Maryland affecting the waters of the State) when, at all times relevant hereto, defendants knew, or reasonably should have known, that: (a) MTBE gasoline would be placed into leaking gasoline storage and delivery systems; and (b) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater—including drinking-water supplies—and, ultimately, be difficult and costly to remove from the water.

347. Based on their conduct as aforesaid, defendants have, at all times relevant to this action, caused, maintained, substantially participated in,

substantially contributed to, and/or assisted in the creation of a public nuisance and must abate the nuisance by, among other methods, investigating and fully delineating horizontally and vertically the full extent of all MTBE plumes for which the defendants are persons responsible and ensuring the cleanup (as defined in Md. Code Ann., Envir. § 4-401(b)) of such MTBE plumes so that the groundwater is in the same state it was in prior to the discharges of MTBE.

348. As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred and suffered and will continue to incur and suffer substantial costs and damages for which defendants are jointly and severally liable.

**COUNT V**

**TRESPASS**

349. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

350. Defendants' intentional and/or negligent conduct caused MTBE to enter, invade, intrude upon, injure, trespass, and threaten to trespass upon the State's possessory interest in properties it owns, the possessory interest of its citizens in properties they own which the State asserts here on their behalf in its *parens patriae* capacity, and the State's possessory interest as the trustee of the State's natural water resources.

351. Defendants did not and do not have authority, privilege, or permission to trespass upon the aforesaid possessory property interests.

352. The State and its citizens have never consented to the trespasses alleged herein.

353. Defendants have refused and failed to terminate their trespasses, despite being put on notice to do so by the State through its policies, statutes, regulations, orders, and other means.

354. Defendants' trespass is of a continuing nature and has produced a long-lasting negative effect upon the property of the State and its citizens, as defendants knew or had reason to know at all times relevant hereto.

355. Defendants intentionally and deceptively promoted MTBE for use as an additive in gasoline despite knowing it had latent and far-reaching adverse environmental consequences, and defendants refined, compounded, formulated, marketed, distributed, and/or otherwise supplied and controlled MTBE gasoline in Maryland (and areas outside of Maryland affecting waters of, and property within, the State) when, at all times material hereto, defendants knew, or reasonably should have known, that: (a) MTBE gasoline would be placed into leaking gasoline storage and delivery systems; and (b) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, substantially and unreasonably invade possessory interests in

property, contaminate groundwater—including drinking-water supplies—and, ultimately, be difficult and costly to remove from the water.

356. Based on their conduct, defendants have, at all times relevant to this action, created, caused, maintained, continued, substantially contributed to, substantially participated in, and/or assisted in the creation of such trespass. Based on their knowledge of the properties and manner of distribution and storage of MTBE gasoline as alleged herein, defendants were or should have been aware that as a result of their conduct MTBE contamination of Maryland's groundwater as alleged was inevitable or substantially certain to result.

357. As a direct and proximate result of defendants' acts and omissions, the State and a substantial segment of the citizens of the State have incurred and suffered, and will continue to incur and suffer, substantial costs and damages for which defendants are jointly and severally liable.

## COUNT VI

## NEGLIGENCE

358. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

359. Defendants owed a duty or obligation, recognized by law, requiring conformance to a certain standard of conduct for the protection of others against unreasonable risks. Defendants had a duty to the State to exercise due care in the

design, manufacture, formulation, handling, storage, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of MTBE gasoline.

360. Defendants breached their duty by failing to conform to the requisite standard of care. Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, stored, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold, and/or otherwise distributed MTBE gasoline that they breached their duties and directly and proximately caused MTBE to contaminate and threaten the waters of the State, resulting in the injuries alleged in this Complaint.

361. There is a proximate casual connection between defendants' breach of their duty of care and the resulting actual harm to the State.

362. Defendants failed to conduct reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport characteristics of MTBE, and/or the likelihood that use of MTBE as a component of gasoline would pollute public and private water supplies, render drinking water unusable and unsafe, and injure and threaten to injure the environment, and the public's health, property, safety, and welfare.

363. Defendants that manufactured, promoted and/or otherwise supplied MTBE to the defendants that refined gasoline knew or reasonably should have known that:

a.      defendants that refined gasoline would in turn blend the MTBE into gasoline;

b.      such MTBE gasoline would then be placed into MTBE storage and delivery systems, including those in Maryland, with a known propensity and/or potential to leak; and

c.      when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, injure and threaten to injure persons and property interests, contaminate waters of the State—including drinking water supplies—and, ultimately, be difficult and costly to find and remove from the water.

364.    Defendants that refined, marketed, and/or otherwise supplied MTBE gasoline that was delivered, stored and sold in Maryland and/or in areas affecting waters of the State knew, or reasonably should have known, that:

a.      such gasoline would be placed into MTBE storage and delivery systems with a known propensity and/or potential to leak;

b.      MTBE would be released even more readily than the constituents of gasoline not containing MTBE from MTBE storage and delivery systems; and

c.      when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, injure and

threaten to injure persons and property interests, contaminate waters of the State, including drinking-water supplies, and, ultimately, be difficult and costly to remove from the water.

365. Defendants manufactured, refined, marketed, promoted, and/or otherwise supplied MTBE gasoline to Downstream Handlers and intended users and consumers when they knew, or reasonably should have known, that MTBE would be released into the environment from commercial and consumer uses and sources in Maryland and would contaminate the waters of the State.

366. Despite their knowledge that water contamination with MTBE was a probable consequence of their conduct and omissions as alleged herein, defendants failed to provide reasonable warnings or special instructions, to take any other reasonable precautionary measures to prevent or mitigate such contamination, or to undertake and perform appropriate and necessary response or remediation activities.

367. Defendants that are Downstream Handlers and that handled and/or stored MTBE gasoline within the State breached their duty of care to properly install, maintain and/or operate their underground storage tanks storing MTBE gasoline or to handle MTBE gasoline so as to avoid releases of MTBE into the waters of the State or into adjacent soils so as to threaten the waters of the State.

368. In light of the facts alleged herein, defendants breached their duty to use due care in the design, manufacture, formulation, handling, storage, control, marketing, sale, testing, labeling, use, and instructions for use of MTBE gasoline.

369. As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred and suffered and will continue to incur and suffer substantial costs and damages for which defendants are jointly and severally liable.

**COUNT VII**

**ENVIRONMENT ARTICLE, TITLE 4, SUBTITLE 4 CLAIM**

370. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

371. "[I]t is State public policy to improve, conserve, and manage the quality of the waters of the State and protect, maintain, and improve the quality of water for public supplies, propagation of wildlife, fish and aquatic life, and domestic, agricultural, industrial, recreational, and other legitimate beneficial uses." Md. Code Ann., Envir. § 4-402. The Maryland Department of the Environment may "[e]xercise every incidental power necessary to carry out the purposes of this subtitle." Md. Code Ann., Envir. § 4-405(a)(9).

372. Pursuant to § 4-410 of the Environment Article, "it is unlawful for any person to discharge or permit the discharge of oil in any manner into or on

waters of this State" "[e]xcept in case of emergency imperiling life or property, unavoidable accident, collision, or stranding, or as authorized by a permit . . . ."

373. A "person responsible for the discharge as defined in § 4-401(j) of this subtitle is liable for any containment, cleanup, and removal costs or damages . . . ." Md. Code Ann., Envir. § 4-419(c) (emphasis added); *see also id.* at § 4-419(a).

374. A "[p]erson responsible for the discharge" includes "the owner of the discharged oil," the "owner, operator, or person in charge of the oil storage facility . . . involved in the discharge at the time of or immediately before the discharge," and "[a]ny other person who through act or omission causes the discharge." Md. Code Ann., Envir. § 4-401(j)(1) (emphasis added).

375. "'Cleanup' means abatement, containment, removal, and disposal of oil and the restoration of the environment to its existing state prior to a discharge." Md. Code Ann., Envir. § 4-401(b) (emphasis added).

376. "'Removal costs' means the costs of removal that are incurred after a discharge of oil has occurred or, in any case where there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident." Md. Code Ann., Envir. § 4-401(k).

377. "'Damages' means any damages for which liability exists under the laws of this State resulting from, arising out of, or related to the discharge or threatened discharge of oil." Md. Code Ann., Envir. § 4-401(c)(1).

378. "Damages" also include the "cost of assessing the damages," "[d]amages for injury to, destruction of, loss of, or loss of use of natural resources, including the reasonable costs of assessing the damage," "[d]amages for injury to or economic losses from the destruction of real or personal property," "[d]amages for loss of subsistence use of natural resources," "damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources," and "net costs of providing increased or additional public services during or after removal activities including protection from fire, safety, or health hazards cause by a discharge of oil," among other things. Md. Code Ann., Envir. § 4-401(c)(2).

379. Md. Code Ann., Envir. § 4-405 provides that any person causing any "condition [in waters of the State] indicative of damages to aquatic resources" is also "jointly and severally liable for the reasonable cost of rehabilitation and restoration of the resources damaged and the cost of eliminating the condition causing the damage, including the environmental monetary value of such resources . . . ." Moreover, any "person who is determined to be responsible for the discharge or spillage of any such substance shall be personally and/or severally

responsible to immediately clean up and abate the effects of the spillage and restore the natural resources of the State."

380.    Upon a showing that any person is violating or about to violate Title 4, Subtitle 4 of the Environment Article, or violating or about to violate any valid order or permit issued by the Department, an injunction shall be granted without the necessity of showing a lack of adequate remedy at law. Md. Code Ann., Envir. § 4-416.

381.    Defendants are responsible for discharges of MTBE gasoline into the waters of the State. As the defendants are persons responsible for the discharges of MTBE gasoline throughout the State in violation of the prohibition against discharges set forth in § 4-410 of the Environment Article, the Attorney General is empowered to seek an injunction ordering defendants to investigate and fully delineate horizontally and vertically the full extent of all MTBE plumes for which they are responsible and to ensure the cleanup of such MTBE so that the groundwater is in the same state it was in prior to the discharges of MTBE. Md. Code Ann., Envir. §§ 4-416, 4-401(b).

382.    Defendants are responsible for discharging and spilling MTBE gasoline into the waters of the State. Each defendant's acts and/or omissions caused one or more discharges of MTBE gasoline into waters of the State.

383. Defendants are jointly and severally liable for all costs of "cleanup," "removal costs," and "damages," as those terms are defined in § 4-401, including the costs to restore the waters of the State to the state they were in prior to the discharge of MTBE by eliminating all MTBE from those waters, and for the environmental monetary value of the water damaged, and all other categories of "damages."

384. Those defendants that manufactured, promoted and supplied neat MTBE to other defendants that refined gasoline did so even though they knew or reasonably should have known that:

a. defendants that refined gasoline would in turn blend the MTBE into gasoline;

b. such MTBE gasoline would then be placed into MTBE storage and delivery systems, including those in Maryland, with a known propensity and/or potential to leak; and

c. when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, injure and threaten to injure persons and property, contaminate waters of the State—including drinking water supplies—and, ultimately, be difficult and costly to find and remove from the water.

385. Defendants acted to manufacture, market, and/or otherwise supply MTBE gasoline to Downstream Handlers and users when defendants knew, or reasonably should have known, that MTBE would be released into the environment from commercial and consumer uses and sources in Maryland other than MTBE storage and delivery systems, thereby contaminating waters of the State.

386. Despite their knowledge that water contaminated with MTBE was a probable consequence of their acts and omissions as alleged herein, defendants failed to provide any warnings or special instructions, to take any other precautionary measures to prevent or mitigate such contamination, or to undertake and perform appropriate and necessary response or remediation activities.

387. In addition to defendants that are responsible for putting MTBE gasoline into the stream of commerce and thereby responsible for discharges of MTBE and/or MTBE gasoline, defendants that are Downstream Handlers at oil storage facilities at which there has been a discharge are persons responsible for the discharge.

388. Defendants are responsible for causing discharges and spills of MTBE gasoline into the State's waters because they breached their duty to use due care in the design, manufacture, formulation, handling, storage, control,

155

marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or MTBE gasoline.

389.    As a direct and proximate result of defendants' acts and omissions as alleged herein, the State has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which defendants are jointly and severally liable.

390.    As a direct and proximate result of defendants' acts and omissions as alleged herein, the State seeks damages, costs of cleanup, removal costs, site rehabilitation costs, and an injunction against each defendant in an amount to be proved at trial.

## COUNT VIII

### ENVIRONMENT ARTICLE, TITLE 4, SUBTITLE 7 CLAIM

391.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

392.    The Maryland General Assembly has found that:

a.      "The storage of oil in underground oil storage tanks is a major cause of groundwater contamination in this State;

b.      Groundwater resources are vital to the population and economy of this State; and

c.     The preservation of the State's groundwater resources is in the public interest."

393.    The Maryland General Assembly has further found that: "where contamination of groundwater has occurred due to leaking underground oil storage tanks, remedial measures have often been delayed for long periods due to high costs of such remedial measures. These delays result in the continuation and intensification of the threat to the public health, safety, and welfare, in greater damages to the environment, and in significantly higher costs to clean up the contamination and rehabilitate the site." Md. Code Ann., Envir. § 4-702.

394.    Based upon these findings, the General Assembly passed Subtitle 7 of the Environmental Article entitled the "Oil Contaminated Site Environmental Cleanup Fund" "to provide to provide adequate financial resources and incentives for the expeditious cleanup and rehabilitation of contaminated sites without delay."

395.    Where the Maryland Department of the Environment has assumed control of an oil spill involving an underground oil storage tank or heating oil tank under Subtitle 7 and the Department has obtained reimbursement of site rehabilitation costs from the Oil Contaminated Site Environmental Cleanup Fund, such rehabilitation costs, including attorneys' fees and litigation costs, are recoverable from the responsible party.   Md. Code Ann., Envir. § 4-706.

396. Under Subtitle 7, "Cleanup" means "abatement, containment, removal, and disposal of oil and the restoration of the environment." Md. Code Ann., Envir. § 4-701(b).

397. Under Subtitle 7, "Site rehabilitation" means "cleanup actions taken in response to a release from an underground oil storage tank." "'Site rehabilitation' includes investigation, evaluation, planning, design, engineering, construction, or other services undertaken and expenses incurred to investigate or clean up affected soils, groundwater, or surface water." Md. Code Ann., Envir. § 4-701(e).

398. For the reasons outlined in ¶¶ 386, 388-391, *supra*, defendants are jointly and severally responsible for releases from underground storage tanks for purposes this subtitle.

399. The Department has spent Cleanup Fund monies with respect to addressing MTBE pollution caused by defendants and seeks the recovery of such costs from defendants.

## COUNT IX

## ENVIRONMENT ARTICLE, TITLE 9, SUBTITLE 3 CLAIM

400. The State incorporates by reference the preceding paragraphs as though set forth at length herein.

401. The Secretary of the Maryland Department of the Environment "[h]as supervision and control over the sanitary and physical condition of the waters of this State to protect public health and comfort. . ." Md. Code Ann., Envir. § 9-252(b).

402. Pursuant to § 9-322 of the Environment Article, "a person may not discharge any pollutant into the waters of this State" except to the extent permitted in Title 4, Subtitle 4.

403. "'Discharge' means: (1) The addition, introduction, leaking, spilling, or emitting of a pollutant into the waters of this State; or (2) The placing of a pollutant in a location where the pollutant is likely to pollute." Md. Code Ann., Envir. § 9-101(b).

404. "Pollutant" includes "[a]ny . . . liquid, gaseous, solid, or other substance that will pollute any waters of this State." Md. Code Ann., Envir. § 9-101(g). "'Pollution' means any contamination or other alteration of the physical, chemical, or biological properties of any waters of this State, including a change in . . . taste, color, turbidity, or odor of the waters or the discharge or deposit of any . . . liquid. . . or other substance into any waters of this State that will render the waters harmful or detrimental to: (1) Public health, safety, or welfare; (2) Domestic, commercial, industrial, agricultural, recreational, or other legitimate

beneficial uses; (3) Livestock, wild animals, or birds; or (4) Fish or other aquatic life." Md. Code Ann., Envir. § 9-101(h).

405.   The "Department may bring an action for an injunction against any person who violates any provision of [Subtitle 3] or any rule, regulation, order, or permit adopted or issued by the Department under [Subtitle 3]." Md. Code Ann., Envir. § 9-339(a).   The "court shall grant an injunction without requiring a showing of a lack of an adequate remedy at law." Md. Code Ann., Envir. § 9-339(c).

406.   Defendants are responsible for discharges of MTBE gasoline into the waters of the State.  Each defendant's acts and/or omissions caused one or more discharges of MTBE gasoline into waters of the State.  As the defendants are persons responsible for the discharges of MTBE throughout the State in violation of the prohibition against discharges, the Department is empowered to seek an injunction ordering defendants to investigate and fully delineate horizontally and vertically the full extent of all MTBE plumes for which the defendants are persons responsible and to ensure the cleanup (as defined in § 4-401(b) of the Environment Article) of such MTBE plumes so that the groundwater is in the same state it was in prior to the discharges of MTBE. Md. Code, Envir. § 9-339(c).

407.   Because defendants discharged MTBE gasoline into the waters of this State, they "shall reimburse the Department for the reasonable costs incurred

by the Department in conducting environmental health monitoring or testing, including the costs of collecting and analyzing soil samples, surface water samples, or groundwater samples for the purpose of assessing the effect on public health and the environment of the [defendants'] discharge[s]." Md. Code Ann., Envir. § 9-342.2; *see* COMAR 26.14.01.04.

## COUNT X

## ENVIRONMENT ARTICLE, TITLE 9, SUBTITLE 4 CLAIM

408. The State incorporates by reference the preceding paragraphs as though set forth at length herein.

409. MTBE gasoline and MTBE are "dangerous contaminant[s]" because when MTBE gasoline or MTBE are "present in a public water system, they present an imminent and substantial danger to the health of individuals." Md. Code Ann., Envir. § 9-405(a).

410. MDE requires that "[e]ach nontransient noncommunity water system, including those that primarily provide bottled water shall . . .(i) . . . test the water provided by the system for the presence of [MTBE], and (ii) [r]eport the test results to the Department" and provide notice to the persons regularly served by the system if the State's action level is exceeded. Md. Code Ann., Envir. § 9-410(f).

411. Upon receipt of information that MTBE gasoline or MTBE "is present in or likely to enter a public water system," the Secretary of the Maryland Department of Environment "may take any action necessary to protect the health of the individuals whose health is or would be endangered" by the MTBE gasoline or MTBE. Md. Code Ann., Envir. § 9-405(b)(1). The Secretary may sue "for injunctive or other appropriate relief." Md. Code Ann., Envir. § 9-405(b)(2)(ii).

412. In order to stop MTBE gasoline and/or MTBE from entering public water systems, the Secretary may seek an injunction that orders defendants to investigate and fully delineate horizontally and vertically the full extent of all MTBE plumes for which the defendants are persons responsible and to ensure the cleanup (as defined in § 4-401(b) of the Environment Article) of such MTBE plumes so that the groundwater is in the same state it was in prior to the discharges of MTBE. *Id.*

## COUNT XI

## ENVIRONMENT ARTICLE, TITLE 7, SUBTITLE 2 CLAIM

413. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

414. The purpose of Title 7, Subtitle 2 "is to provide additional and cumulative remedies to prevent, abate, and control pollution of the waters of this State." Md. Code Ann., Envir. § 7-203.

415.  The Department may exercise "every incidental power necessary to carry out the purposes of this subtitle." Md. Code Ann., Envir. § 7-207(a)(7).

416.  The Department may seek an injunction ordering defendants to investigate and fully delineate horizontally and vertically the full extent of all MTBE plumes for which the defendants are persons responsible and to ensure the cleanup (as defined in § 4-401(b) of the Environment Article) of MTBE plumes so that the groundwater is in the same state as it was prior to the discharges of MTBE. *Id.*

417.  In the alternative, the Department seeks the costs necessary for the Department to investigate and fully delineate horizontally and vertically the full extent of all MTBE plumes for which the defendants are persons responsible and to ensure the cleanup (as defined in § 4-401(b) of the Environment Article) of such MTBE plumes so that the groundwater is in the same state it was in prior to the discharges of MTBE.

## PRAYER FOR RELIEF

WHEREFORE, the State respectfully requests that this Court:

a.  Enter judgment against defendants—jointly and severally—for all costs to investigate and define the full horizontal and vertical extent of all MTBE plumes, to remediate, to remove, to restore, to treat, to monitor, and otherwise to respond to MTBE gasoline in the waters of the State so that there is a cleanup of

such waters restoring them to their original condition, and for all damages to compensate the State for the lost interim value and benefits of water resources during all times and as to all instances of injury caused by MTBE gasoline, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

    i.    past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking-water wells; and

    ii.    past and future treatment and restoration of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking-water wells;

    b.    Enter judgment against defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the State with MTBE gasoline;

    c.    Enter judgment against defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the State to their original condition prior to the contamination of such waters with MTBE;

d.   Enter judgment against defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the State as a result of the contamination of such waters with MTBE;

e.   Enter judgment against defendants, jointly and severally, for all other damages sustained by the State as a direct and proximate result of defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal fees and expenses and compensation for damage to waters of the State;

f.   Enter an order against defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the State so as to fully delineate all MTBE contamination and remove such contamination so as to restore such waters to their original pre-contaminated condition as well as to test all private and public wells in the State for MTBE and treat all wells with any detections of MTBE so as to restore such well water to its pre-contaminated condition;

g.   Enter a declaratory judgment against defendants holding them jointly and severally liable for all future costs incurred by the State to abate or mitigate the MTBE contamination of waters of the State so as to fully delineate all MTBE contamination and remove such contamination so as to restore such waters to their original pre-contaminated condition as well as to test all private and public

165

wells in the State for MTBE and treat all wells with any detections of MTBE so as to restore such well water to its pre-contaminated condition;

h.     Enter an order against each defendant for the full amount of damages (including those provided by § 4-401 of the Environment Article) allowable under Maryland's Environment Article and its implementing regulations;

i.     Enter an order assessing defendants for punitive damages in an amount to be determined;

j.     Award the State legal fees and costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

k.     Award the State such other relief as this Court deems appropriate.


### JURY DEMAND

PLAINTIFF STATE OF MARYLAND DEMANDS A TRIAL BY JURY.

Date: December 13, 2017

BRIAN E. FROSH
Attorney General of Maryland

ADAM D. SNYDER
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
asnyder@oag.state.md.us
Phone: (410) 576-6398
Fax: (410) 576-6955

MATTHEW ZIMMERMAN
STEPHANIE COBB WILLIAMS
SARI LEVIN
Assistant Attorneys General
1800 Washington Blvd., Suite 6048
Baltimore, Maryland 21230
matthew.zimmerman@maryland.gov
Phone: (410) 537-3452
Fax: (410) 537-3943

NATHAN SHORT
SCOTT E. KAUFF
Special Counsel for the Attorney General
Law Offices of John K. Dema, P.C.
One Central Plaza
11300 Rockville Pike, Suite 112
Rockville, Maryland 20852
skauff@demalaw.com
Phone: (301) 881-5900
Fax: (240) 536-9108

DANIEL BERGER (*Motion for Special Admission Pro Hac Vice Pending*)
TYLER E. WREN (*Motion for Special Admission Pro Hac Vice Pending*)
Special Counsel for the Attorney General
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Phone: (215) 875-3000

DUANE MILLER (*Motion for Special Admission Pro Hac Vice Pending*)
MICHAEL AXLINE (*Motion for Special Admission Pro Hac Vice Pending*)
Special Counsel for the Attorney General
Miller & Axline, P.C.
1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4225
Phone: (916) 488-6688