IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND                    *

        Plaintiff,              *

   vs.                                *      CIVIL ACTION NO. ELH-18-0459

EXXON MOBIL CORPORATION, *et al.*,   *

        Defendants              *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM OPINION

The State of Maryland ("State" or "Maryland") filed a 168-page Complaint in the Circuit Court for Baltimore City against approximately sixty-five defendants, seeking to redress the alleged contamination of the State's waters with methyl tertiary butyl ether ("MTBE"), an oxygenate additive that was commonly blended into gasoline in the 1980s and 1990s. ECF 2 (Complaint). Defendant Atlantic Richfield Company ("ARCO") removed this case to federal court. ECF 1. Thereafter, the State filed a Motion to Remand (ECF 283), supported by a memorandum (ECF 283-1) (collectively, "Remand Motion"), and many exhibits. Defendants have filed an opposition to the Remand Motion (ECF 299), along with numerous exhibits.[1] The State has replied. ECF 303.[2]

No hearing is necessary to resolve the Remand Motion. *See* Local Rule 105-6. For the reasons that follow, I shall deny the Remand Motion.

---

[1] Although only ARCO filed the Notice of Removal, the opposition to the Remand Motion was filed on behalf of all defendants. Several motions to dismiss have also been filed. Those motions are not addressed in this Memorandum Opinion.

[2] This case was initially assigned to Judge Marvin Garbis. It was reassigned to me in July 2018. *See* Docket. By Order of July 30, 2018 (ECF 323), I granted the motion of the United States to intervene (ECF 320). However, the United States has not addressed the Remand Motion.

# I.  BACKGROUND

A.  MTBE and Water Contamination

MTBE is a chemical compound made by combining methanol (a derivative of natural gas) and isobutylene (a by-product of the gasoline-refining process).  ECF 2, ¶ 103.  It was commonly blended into gasoline in the 1980s and 1990s as an "oxygenate" and "octane enhancer" to reduce carbon monoxide tailpipe emissions.  *Id.* ¶¶ 107, 117–129.  Compared with other oxygenates like ethanol, MTBE was inexpensive to manufacture because it was made from readily available refinery byproducts.  *Id.* ¶¶ 103, 127.

Gasoline is made by processing crude oil at a refinery.  *Id.* ¶ 105.  It is then transported through pipelines, tank ships, and barges to "common storage tanks" located at terminals around the country.  *Id.* ¶ 106.  From there, it is further "transshipped" by pipeline or other means to "secondary terminals" or "depots," and then taken by trucks to gas stations for retail sale.  *Id.* MTBE was blended into the gasoline at the refinery itself, or "splash blended" at terminals by adding it to truck tanks after those tanks were filled with gasoline from the terminal.  *Id.* ¶ 105.  Because MTBE-enhanced gasoline is fungible, batches were frequently comingled from different sources during the production and distribution process.  *Id.* ¶¶ 99–100.

MTBE allegedly enters the environment "through disposals, deposits, releases, leaks, overfills, spills, discharges and evaporative releases," and is "principally release[d]" while in underground storage tanks or during delivery.  *Id.* ¶¶ 1, 109.  When released, MTBE is highly soluble in groundwater, spreads rapidly, does not naturally degrade, resists removal and treatment from groundwater, and is difficult to locate.  *Id.* ¶¶ 2, 110–11, 113.  It can also migrate into subsurface-soil regions and penetrate into aquifers.  *Id.* ¶¶ 112, 114.  For these reasons, the

State claims that MTBE "is and has been more difficult and more expensive to remove from groundwater than other contaminants." *Id.* ¶ 114.

The United States Geological Survey has reported that MTBE is the "second most frequently detected volatile organic chemical in groundwater in the United States." *Id.* ¶ 130. Around the United States, MTBE has been detected in "over 20% of aquifers tested in places where high MTBE-content gasoline was used." *Id.* MTBE has also been found in "varying concentrations and at varying times" in public water systems and private drinking-water wells in Maryland. *Id.* ¶¶ 218, 220. Studies allegedly show that MTBE "is a probable human carcinogen," can cause "significant adverse health effects when ingested," and "can render drinking water putrid and unfit for human consumption." *Id.* ¶¶ 4, 137.

B. <u>History of MTBE Use and Legislative Background</u>

In 1979, before defendants allegedly knew the harmful effects of MTBE, the Administrator of the United States Environmental Protection Agency ("EPA") granted a waiver for the use of 7% MTBE in unleaded gasoline, finding that MTBE as a fuel additive did not cause or contribute to the failure of any emission control device or system. *Id.* ¶¶ 117, 134; Application for Methyl Tertiary Butyl Ether, Decision of the Administrator, 44 Fed. Reg. 12,242, 12,243 (Mar. 6, 1979). The market demand for MTBE and MTBE-blended gasoline began around the same time and grew rapidly, continuing well into the 1990s. ECF 2, ¶¶ 117, 125. By 1996, MTBE "ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline." *Id.* ¶ 129.

Growth in the MTBE market was encouraged by the 1990 Clean Air Act Amendments, which established the Reformulated Gasoline Program ("RFG Program"). Clean Air Act Amendments of 1990, Pub. L. No. 101–549, 104 Stat. 2399 (1990) ("CAA"), § 219(k). The

RFG Program required the use of reformulated gasoline containing at least 2.0% oxygen by weight in designated ozone "non-attainment" areas of the country, meaning areas that do not meet the national ambient air quality standards ("NAAQS") for ozone. *Id.* § 219(k)(2)(B). Subsequent EPA regulations included MTBE as one of several oxygenates to be used in the testing of reformulated gasoline. *See, e.g.*, Use of Alternative Analytical Test Methods in the Reformulated Gasoline Program, 40 C.F.R. § 80.46(g), 61 Fed. Reg. 58304, 58306 (Nov. 13, 1996). Portions of Maryland were subject to the RFG Program. ECF 2, ¶ 122.

The 1990 Amendments also authorized EPA's initiation of the Oxygenated Fuel Program ("OF Program"), which required gasoline in some metropolitan regions to contain at least 2.7% oxygen by weight to reduce carbon monoxide during the fall and winter months. CAA, § 219(m). The State alleges that MTBE-blended gasoline sold in non-attainment areas often exceeded the minimum oxygenate requirements in the RFG and OF programs, and was even used in the regions that were *not* participating in the RFG program. ECF 2, ¶ 124.

By 2000, the federal government recognized the dangers of the release of MTBE into groundwater and took initial steps to consider eliminating it as a fuel additive. *See* Methyl Tertiary Butyl Ether (MTBE); Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline, 65 Fed. Reg. 16,094 (Mar. 24, 2000). Around this time, several states had "taken actions designed to limit the use of MTBE in gasoline." *Id.* at 16,097. Many lawsuits alleging MTBE contamination were filed and consolidated before the United States District Court for the Southern District of New York. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. v. Atlantic Richfield Co.*, MDL No. 1358, 2000 U.S. Dist. LEXIS 14901, at *4 (J.P.M.L. Oct. 10, 2000).

In 2005, Congress passed the Energy Policy Act ("EPACT"), which phased out the RFG oxygenate requirement and established the Renewable Fuel Program in its place. *See* Energy Policy Act of 2005, Pub. L. No. 109–58, §§ 1501, 1504, 119 Stat. 594 (2005). The new program requires gasoline suppliers to blend their product with renewable fuels, such as cellulosic biomass ethanol, waste derived ethanol, and biodiesel. *Id.*

The EPACT also directly addressed the status of MTBE as an additive to gasoline. Congress made the following findings, *id.* § 1502:

> (1)　since 1979, methyl tertiary butyl ether (hereinafter in this section referred to as "MTBE") has been used nationwide at low levels in gasoline to replace lead as an octane booster or anti-knocking agent;
>
> (2)　Public Law 101–549 (commonly known as the "Clean Air Act Amendments of 1990") (42 U.S.C. 7401 et seq.) established a fuel oxygenate standard under which reformulated gasoline must contain at least 2 percent oxygen by weight; and
>
> (3)　the fuel industry responded to the fuel oxygenate standard established by Public Law 101–549 by making substantial investments in—
>
>> (A) MTBE production capacity; and
>>
>> (B) systems to deliver MTBE-containing gasoline to the marketplace.

Section 1503 of EPACT, the removal statute at issue in this case, provides:

> Claims and legal actions filed after the date of enactment of this Act related to allegations involving actual or threatened contamination of [MTBE] may be removed to the appropriate United States district court.

C.　Claims and Procedural History

Maryland filed suit in the Circuit Court for Baltimore City on December 13, 2017. ECF 2. In its capacity as *parens patriae*, as trustee of the State's natural resources, and under the Maryland Environmental Standing Act (*id.* ¶ 6), Maryland has sued approximately sixty-five defendant manufacturers, marketers, and distributors of gasoline that together "controlled all, or

substantially all, of the market in Maryland for MTBE and MTBE gasoline" for the relevant period. ECF 2, ¶ 26. Between 1995 and 2001, about 1.2 billion gallons of pure (or "neat") MTBE was included in the reformulated gasoline sold in Maryland. ECF 2, ¶ 214.

Maryland alleges that defendants knew as early as 1980 that MTBE was harmful and could contaminate groundwater, ECF 2, ¶ 134, but refused to warn the public or to use safer alternatives like ethanol. *Id.* ¶ 206. The State asserts that defendants "knew, or reasonably should have known," that the MTBE gasoline distribution and retail system throughout Maryland contained leaks. *Id.* ¶ 204. Even so, defendants allegedly defended and promoted MTBE, despite knowledge of its risks, and engaged in deceptive marketing of MTBE as a clean or environmentally friendly gasoline. *Id.* ¶¶ 161–189, 225–232. According to the State, defendants "falsely or inadequately addressed MTBE" in their material safety data sheets provided to customers. *Id.* ¶ 233.

Plaintiff's suit includes claims for strict liability (defective design, failure to warn, abnormally dangerous activity); public nuisance; trespass; negligence; and violations of various State environmental statutes. Plaintiff seeks compensatory and punitive damages and costs for testing, cleanup, monitoring, and restoration of State waters, as well as an injunction requiring defendants to test and treat drinking water wells containing MTBE. *Id.* at 163–166.

Defendant Atlantic Richfield Company removed the case to federal court on February 14, 2018. *See* Notice of Removal, ECF 1. The Notice stated that the case was removed under Section 1503 of the Energy Policy Act of 2005, 42 U.S.C. § 7545, and that jurisdiction is proper in federal court because the case is within the court's Article III judicial powers. *Id.* ¶¶ 2, 5. Specifically, ARCO claimed that the allegations of MTBE contamination raise questions of federal law under the CAA and EPACT, which "together are part of a comprehensive federal

scheme," *id.* ¶ 5, and that plaintiff's claims conflict with, and are preempted by, federal law. ECF 1, ¶¶ 5, 6. The Notice of Removal also raised other potential defenses under federal water quality standards and the Due Process and Excessive Fines Clause of the United States Constitution. *Id.* Moreover, ARCO asserted that "all defendants properly joined and served in this action have consented to this removal." *Id.* ¶ 8.

## II.   LEGAL STANDARD

Federal courts are courts of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). Further, a federal court must presume that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper. *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)).

A civil action filed in state court may be removed to federal court if it is one over which the district court has original jurisdiction. 28 U.S.C. § 1441(a). The burden of demonstrating jurisdiction and the propriety of removal rests with the removing party. *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010); *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004). Therefore, "[i]f a plaintiff files suit in state court and the defendant seeks to adjudicate the matter in federal court through removal, it is the defendant who carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter." *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008).

Courts are required to construe removal statutes narrowly. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108–09 (1941). This is because "the removal of cases from state to federal court raises significant federalism concerns." *Barbour v. Int'l Union,* 640 F.3d 599, 605 (4th Cir.

2011) (abrogated in part on other grounds by the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112–63, 125 Stat. 758 (Dec. 7, 2011)). *See also Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994) ("Because removal jurisdiction raises significant federalism concerns, [courts] must strictly construe removal jurisdiction.") (citing *Shamrock*, 313 U.S. at 108–09). Indeed, a federal court "should construe removal statutes narrowly, [with] any doubts . . . resolved in favor of state court jurisdiction." *Barbour*, 640 F.3d at 617; *see also Cohn v. Charles*, 857 F.Supp.2d 544, 547 (D. Md. 2012) ("Doubts about the propriety of removal are to be resolved in favor of remanding the case to state court.").

### III.   DISCUSSION

Defendants oppose remand on four grounds, arguing:

(1)    Section 1503 of EPACT provides Article III "arising under" jurisdiction on its own or as part of a "comprehensive federal scheme";

(2)    Section 1503 falls within Article III jurisdiction because defendants have identified a colorable federal defense;

(3)    Section 1503 confers jurisdiction in this case based on "minimal diversity"; and

(4)    Although defendants Vitol S.A. and Gerry Petroleum Marketing Inc. ("GPMI") did not consent to removal, Section 1503 does not require unanimous consent (and alternatively, Vitol S.A. and GPMI were either improperly served or could not be served).

For the reasons that follow, I conclude that Section 1503 does not provide Article III "arising under" jurisdiction on its own or as part of a comprehensive federal scheme involving either the Clean Air Act or the EPACT. However, defendants have identified a colorable federal defense of conflict preemption with the Clean Air Act that justifies removal. I decline to reach defendant's "minimal diversity" theory because defendants failed to plead it in the Notice of

Removal and concede that this legal theory has not been fully tested. Finally, although it is unclear whether unanimous consent is required for removal under Section 1503, all defendants that were properly served have consented to removal.

## A. Article III "Arising Under" Jurisdiction and "Comprehensive Federal Scheme"

Maryland argues that Section 1503 is a "pure jurisdictional" statute that does not convey Article III jurisdiction by itself. ECF 283-1 at 8.[3] Rather, it contends that Section 1503 must be paired with a separate, independent basis for Article III jurisdiction to be constitutional. *Id.* Defendants argue that the statute provides Article III "arising under" jurisdiction either (1) on its own terms under the theory of "protective jurisdiction," ECF 299 at 16–17, or (2) as part of a "comprehensive federal scheme," *id.* at 17–23.

Article III of the United States Constitution provides: "The judicial Power shall extend to all Cases, in Law and Equity, arising under . . . the Laws of the United States." U.S. CONST. art. III, § 2, cl. 1. "Article III 'arising under' jurisdiction is broader than federal question jurisdiction under [28 U.S.C. § 1331]." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 495 (1983). Although Congress has the power to prescribe the jurisdiction of federal courts under U.S. CONST. art. I, § 8, cl. 9, it "may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Verlinden*, 461 U.S. at 491.

In particular, a statutory grant of authority cannot support Article III "arising under" jurisdiction if it "[seeks] to do nothing more than grant jurisdiction over a particular class of cases," or "merely concern[s] access to the federal courts." *Id.* at 496; *see also Mesa v. California*, 489 U.S. 121, 136 (1989) ("Section 1442(a) . . . is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal

_____

[3] All page references correspond to the Court's CM/ECF electronic pagination.

officer is a defendant," so it "cannot independently support Art. III 'arising under' jurisdiction"); *Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 655 (2d Cir. 1996) (statutes that "'do nothing more than grant jurisdiction over a particular class of cases' cannot support Art. III "arising under" jurisdiction'") (quoting *Mesa*, 489 U.S. at 136).

### 1. "Protective Jurisdiction" Theory

Defendants contend that Section 1503 is not a "pure jurisdiction" statute, but confers Article III jurisdiction on its own because "Congress has full authority under Article III to grant federal courts jurisdiction as Congress sees fit to protect any federal interest." ECF 299 at 16.

"'Protective jurisdiction' is a generic term for theories that attempt to justify Congress' use of federal question jurisdiction to vest in federal courts the authority to hear cases involving issues of state law." 13D C. Wright & A. Miller, Federal Practice and Procedure § 3565 (3d ed. 2008) ("Wright & Miller"). This "protective jurisdiction" theory is unsupported by case law and is largely a matter of academic interest. *See Mesa*, 489 U.S. at 137–38 ("We have, in the past, not found the need to adopt a theory of 'protective jurisdiction'" and "we do not see any need for doing so here because we do not recognize any federal interests that are not protected by limiting removal to situations in which a federal defense is alleged."); *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1461 (D.C. Cir. 1995) ("As *Mesa* illustrates, the Court has rejected the notion of a 'protective jurisdiction' that goes beyond the reach of any substantive federal law."); 13D C. Wright & A. Miller, Federal Practice and Procedure § 3565 (3d ed. 2008) (the protective jurisdiction doctrine "remains in the realm of speculation. Most of the speculation has been academic, but Congress does from time to time consider laws that would give federal courts jurisdiction over classes of cases to be governed by state law.").

Defendants rely on *Osborn v. Bank of United States*, 22 U.S. 738 (1824), to support this theory. However, the Supreme Court has questioned some of the broad language in that decision. *See Verlinden*, 461 U.S. at 492 ("*Osborn* thus reflects a broad conception of 'arising under' jurisdiction, according to which Congress may confer on the federal courts jurisdiction over any case or controversy that might call for the application of federal law. The breadth of that conclusion has been questioned."). Even if such a theory could apply, defendants have not stated what federal interest would be protected "by limiting removal to situations in which a federal defense is alleged." *Mesa*, 489 U.S. at 137.

Accordingly, I decline to find federal jurisdiction on the basis that Section 1503 confers Article III "arising under jurisdiction" on its own terms.

### 2. Comprehensive Federal Scheme

Nevertheless, Section 1503 could still provide Article III jurisdiction if it is part of a comprehensive federal scheme. *See Mesa*, 489 U.S. at 136 (stating that a "'comprehensive scheme' compris[es] both pure jurisdictional provisions and federal law capable of supporting Art. III 'arising under' jurisdiction") (citing *Verlinden*, 461 U.S. at 496); *Mizuna*, 90 F.3d at 655–56 ("where the removal jurisdiction is part of 'a comprehensive scheme comprising both pure jurisdictional provisions *and* federal law capable of supporting Art. III arising under jurisdiction,' the jurisdictional grant is effective") (internal quotations omitted) (emphasis in original) (quoting *Mesa*, 489 U.S. at 136); *Simmtech Co. v. Citibank, N.A.*, No. 13 CIV. 6768 KBF, 2013 WL 6334367, at *5 (S.D.N.Y. Dec. 4, 2013) (finding a jurisdictional statute "constitutional simply by virtue of its comprising part of a comprehensive federal scheme, rather than its relation to any particular federal rule of decision.").

Three Supreme Court and Court of Appeals cases, *Verlinden*, *Mizuna*, and *A.I. Trade Fin., Inc.*, 62 F.3d at 1461, are instructive for what constitutes a "comprehensive federal scheme." The Supreme Court in *Verlinden* upheld the constitutionality of the Foreign Sovereign Immunities Act ("FSIA"), which allows a foreign plaintiff to sue a foreign state in federal district court on a nonfederal cause of action if one of several conditions applied. *Verlinden*, 461 U.S. at 489–90. The Court noted that FSIA "comprehensively regulat[es] the amenability of foreign nations to suit in the United States," and the specifically enumerated conditions required the district court, as a "threshold" matter, to "apply the detailed federal law standards set forth in the Act." *Id.* at 493–94. The Court considered the legislative history of FSIA and decided that "the jurisdictional provisions of the Act are simply one part of this comprehensive scheme" to confer or withhold foreign sovereign immunity. *Id.* at 496. Indeed, FSIA "codifies the standards governing foreign sovereign immunity as an aspect of substantive federal law, and applying those standards will generally require interpretation of numerous points of federal law." *Id.* at 497 (citations omitted). This "broad statutory framework" was created by Congress "deliberately . . . to channel cases against foreign sovereigns away from the state courts and into federal courts, thereby reducing the potential for a multiplicity of conflicting results among the courts of the 50 states." *Id.*

Similarly, the Second Circuit in *Mizuna* found that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") constituted a comprehensive federal scheme. *Mizuna*, 90 F.3d at 656–57. Even though the case before the court "raise[d] no federal issue of any kind," and even though not every action under FIRREA necessarily involves the application of a body of federal law, the court explained, *id.* at 656:

> [T]his particular jurisdictional grant is part of a comprehensive scheme enacted by
> Congress to serve and promote incontestably federal goals on a comprehensive

basis. FIRREA makes major administrative and structural changes in the FDIC and, even more broadly, in the reform of the thrift industry and federal deposit insurance.

Therefore, the jurisdictional grant in FIRREA "enhances the effectiveness and uniformity of proceedings in which the FDIC exercises the sweeping powers conferred on it by the Act." *Id.* at 657.

Likewise, in *A.I. Trade Fin., Inc*., 62 F.3d at 1460, the D.C. Circuit found that 12 U.S.C. § 632 properly conveyed Article III jurisdiction over a suit "to hold an Edge Act corporation liable upon the controlling bank's guaranty of negotiable instruments," because "there is enough substantive federal law underlying the grant of jurisdiction in § 632 to render it constitutional." *Id.* at 1463. *See also Simmtech Co., Ltd.*, 2013 WL 6334367, at *4 (discussing the comprehensive federal scheme doctrine and agreeing with the court's conclusion in *A.I. Trade Fin., Inc*. that jurisdictional grants under § 632 are constitutional).

Specifically, the substantive federal law was the Edge Act, which "was added to the Federal Reserve Act in 1919 to provide for '[c]orporations to be organized for the purpose of engaging in international or foreign banking or other international or foreign financial operations.'" *A.I. Trade Fin., Inc.*, 62 F.3d at 1462. Even though § 632 was added to the Federal Reserve Act fourteen years after the fact, the court inferred from the historical setting that § 632 provided the "supervision" that these financial institutions needed. *Id.* It said, *id.*:

> Crafted in the wake of the turmoil that the World War had caused in international financial markets, the Edge Act called forth a new type of federally controlled institution intended to increase the stability of, and the public's confidence in, international markets. . . . Federal supervision of these financial institutions was seen as essential if they were ever to succeed in the international marketplace.

Therefore, the Court reasoned that Section 632 oversight of the Edge Act "regime" was "intended to facilitate and stimulate international trade by providing the uniformity of federal law." *Id.*

In this case, defendants argue that the MTBE is part of two comprehensive federal schemes: the CAA and the EPACT. *See* ECF 299 at 18–23. Plaintiff argues that Section 1503 is not an "integral"[4] part of either comprehensive federal scheme because it is a freestanding provision in the EPACT that is isolated from another federal regulatory or enforcement program. *See* ECF 283-1 at 10; ECF 303 at 9.

The CAA was enacted in 1963. Clean Air Act, Pub. L. No. 88–206, 77 Stat. 392–401 (1963). Among other purposes, the CAA aims "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population[.]" 42 U.S.C. § 7401(b)(1). It is an expansive statute separated into six Titles. It addresses pollution from stationary sources (Title I, 42 U.S.C. §§ 7401–7431, 7470–7479, 7491–7492, 7501–7515); pollution from moving sources (Title II, 42 U.S.C. §§ 7521–7554, 7571–7574, 7581–7590); noise pollution and acid rain control (Title IV, 42 U.S.C. §§ 7641–7642 and 7651–7651o); and stratospheric ozone protection (Title VI, 42 U.S.C. §§ 7671–7671q). Title III contains general provisions, including definitions, citizen suits, and other administrative matters, and Title V governs permits. As noted, the 1990 CCA Amendments established the RFG and OF Programs, which address pollution from motor vehicles, enacted under Title II. Pub. L. No. 101–549, 104 Stat. 2399 (1990).

---

[4] It is unclear whether this doctrine requires that the grant of jurisdiction be "integral" to the comprehensive federal scheme. *Mizuna* found that FIRREA "is an integral part of a 'comprehensive scheme,'" 90 F.3d at 656, but I have not found authority treating the word "integral" as creating a separate requirement in the analysis.

The EPACT aimed to "ensure jobs for our future with secure, affordable, and reliable energy." Pub. L.109–58, 119 Stat 594 (2005). It was also a broad and comprehensive statute at the time, including sections on energy efficiency, renewable energy, oil and gas, coal, Native American tribal energy, nuclear energy, vehicles and motor fuels, hydrogen, research and development, Department of Energy management matters, personnel and training, electricity, energy tax incentives, hydropower and geothermal energy, climate change technology, and other issues. *Id.* The jurisdictional grant in Section 1503 was passed as part of the Title XV "ethanol and motor fuels" section of the statute. *Id.* § 1503.

In my view, defendants have not met their burden to show that Section 1503 is part of the CAA's comprehensive scheme "to protect and enhance the quality of the Nation's air resources" for jurisdictional purposes. 42 U.S.C. § 7401(b)(1).[5] The RFG and OF Programs are part of the CAA's comprehensive scheme because they seek to reduce certain types of air pollution by requiring oxygenated fuel additives. However, defendants' argument that the RFG Program included an "explicit balancing test" (ECF 299 at 19) merely shows that the RFG Program is part of the comprehensive federal scheme of the CAA, *not* that Section 1503 is a part of that same comprehensive scheme. Instead, Section 1503 provides the option of a federal forum for actions relating to the contamination of one type of fuel additive that could qualify under these programs. Section 1503 became effective 15 years after the 1990 CAA Amendments and 42 years after the CAA was initially passed. By that point, MTBE production was decreasing. *See*

---

[5] Plaintiff contends that the CAA is not a comprehensive federal scheme itself because it does not foreclose state action. ECF 303 at 9. It is true that federal statutes like the CAA sometimes allow for cooperative federalism. *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (CAA "employs a 'cooperative federalism' structure under which the federal government develops baseline standards that the states individually implement and enforce."). However, I have not found authority supporting the conclusion that a federal statute is not a "comprehensive federal scheme" for jurisdictional purposes if it allows states to administer some portions of the statute. I decline to adopt plaintiff's expansive position.

*New Jersey Dep't of Envtl. Prot. v. Amerada Hess Corp.*, 323 F.R.D. 213, 216 (D.N.J. 2017) ("Until the mid-2000s, MTBE was widely used in certain regions of the United States"). So, it is reasonable to conclude that Section 1503's impact was limited to litigation, not air pollution.

I also decline to find that Section 1503 is part of the comprehensive federal scheme of the EPACT. The fact that Section 1503 is contained within the EPACT does not necessarily mean that it fulfills the goal to "ensure jobs . . . with secure, affordable, and reliable energy." Pub. L.109–58, 119 Stat 594 (2005). Moreover, the congressional "findings" about MTBE in Section 1502 may indicate why Section 1503 was passed, but do not advance defendants' argument that Section 1503 was part of a comprehensive federal *energy* policy. Indeed, the findings do the opposite, by reinforcing the notion that MTBE production increased in response to the 1990 CAA Amendments. *See* Pub. L. 109–58, § 1502, 119 Stat 594 (2005) ("[T]he 'Clean Air Act Amendments of 1990' . . . established a fuel oxygenate standard . . . and . . . the fuel industry responded to the fuel oxygenate standard established by [the CAA] by making substantial investments in . . . MTBE production capacity.").

Again, manufacturers were no longer widely using MTBE by this point, *Amerada Hess Corp.*, 323 F.R.D at 216. Section 1503 would have had little bearing on energy reliability and security in 2005, except to the extent that the petroleum industry was facing many MTBE-related lawsuits at the time.

In fact, legislative history shows that Section 1503 was passed to give petroleum companies a *choice* of a federal forum, but it was not meant to create or alter any substantive federal law. Earlier versions of the bill introduced in the House offered retroactive immunity to MTBE producers, *see, e.g.*, Energy Policy Act of 2005, H.R. 6, 109th Cong. § 1502 (2005):

**Sec. 1502. Fuels Safe Harbor.**

(a) IN GENERAL.—Notwithstanding any other provision of Federal or State law, no renewable fuel . . . or [MTBE] . . . nor any motor vehicle fuel containing such renewable fuel or MTBE, shall be deemed a defective product by virtue of the fact that it is, or contains, such a renewable fuel or MTBE. . . .

The immunity provision faced opposition. *See, e.g.*, 151 Cong. Rec. H2192, H2194 (daily ed. Apr. 20, 2005) (statement of Sen. Markey) ("[T]his is truly a bad bill . . . This bill contains a liability waiver for the big oil companies that would force cities and States to spend billions to clean up drinking water supplies that have been contaminated with . . . MTBE which is known to cause cancer."); 151 Cong. Rec. H2399, H2423 (daily ed. Apr. 21, 2005) (statement of Rep. Solis) ("I will submit for the RECORD a list of 10 of those major organizations in opposition to the MTBE liability waiver. The U.S. Conference of Mayors, National League of Cities, National Association of Counties, and the National Association of Towns and Townships are all opposed to shielding these folks.").

Ultimately, the immunity provision was replaced by Section 1503. *See* 151 Cong. Rec. H6949, H6952 (daily ed. July 28, 2005) (statement of Rep. Stupak) ("I am happy that the 'safe harbor' provisions for manufacturers of MTBE that were in the House bill were dropped. Instead, there is a provision allowing lawsuits to be sent to Federal court if a defendant wants to make a request to do so."). Representative Stupak also expected that Section 1503 would not confer new substantive or subject matter jurisdiction over MTBE cases. He said, *id.*:

During the conference, I asked Chairman BARTON about the MTBE provisions in the bill and whether the claims filed after the date of enactment would require a case to be sent to Federal court. The chairman indicated that it did not require a case to be sent to Federal court, but gave defendants in prospective suits the right to ask that the case be sent to Federal courts. I wanted to be sure that we were not conferring any new substantive or subject matter jurisdiction over MTBE cases and I was pleased to hear from Chairman BARTON that to his knowledge, the legislation was not doing so.

The following colloquy between Reps. Stupak and Barton is found at 151 Cong. Rec. 59255, 59259 (daily ed. July 28, 2005):

> Mr. STUPAK. So Section 1504, then, is it fair to say, gives those involved in future MTBE litigation or disputes, the discretionary ability to remove their case to Federal court?
>
> Chairman BARTON. No, it gives them the right to request it.
>
> Mr. STUPAK. Okay.
>
> Chairman BARTON. That's all.
>
> Mr. STUPAK. Discretionary. They don't have to. It is within their discretion to go to Federal court, if the defendants so choose.
>
> Chairman BARTON. That's correct.
>
> Mr. STUPAK. And then it is up to the judge whether or not the case is properly there or remanded back to State court?
>
> Chairman BARTON. That's my understanding.
>
> Mr. STUPAK. So we are not conferring a new substantive or subject matter jurisdiction over these cases?
>
> Chairman BARTON. Not to my knowledge.

In fact, Representative Stupak had intended to introduce an amendment to clarify this section but was satisfied by the colloquy that Section 1503 would not create new substantive federal law. *See* 151 Cong. Rec. S9335, S9339–40 (daily ed. July 29, 2005) (statement of Sen. Leahy) (explaining that Rep. Stupak did not offer his amendment "because it was clear . . . that the relevant language adopted does not change the substantive law that applies and it does not change the current law that applies in consideration of removal petitions."); *id.* at S9339 ("While I was concerned about any effort to alter the subject matter jurisdiction of these cases, I am relieved to learn that they did not do so in conference. I understand that nothing in the current

language will alter the substantive law that courts currently apply in these cases and that they will apply to future claims.").

Section 1503 was passed as a compromise to offer petroleum companies an opportunity to request a federal forum for these types of cases, instead of immunity. Therefore, I reject defendants' contentions that it is part of either the CAA or EPACT comprehensive federal schemes. The legislative history shows that lawmakers did not intend to alter the subject matter jurisdiction of MTBE cases and that a district court judge would have to decide whether to remand a particular case to state court. To find that Section 1503 is part of a comprehensive federal scheme would allow *all* MTBE cases to be removed to federal court on this basis. Such an interpretation would be inconsistent with the legislative history.

Case law is consistent with this interpretation of the legislative history. *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 674 F. Supp. 2d 494, 498 (S.D.N.Y. 2009) ("Originally, the Energy Policy Act also included a safe harbor provision retroactively limiting or even eliminating liability for MTBE producers and distributors. However, due to widespread objections by members of Congress, the provision was removed. As a compromise, section 1503 was added in its place."); *Alban v. Exxon Mobil Corp.*, No. CIV A MJG-06-3098, 2006 WL 6161862, at *3 (D. Md. Dec. 27, 2006) ("defendants (but not plaintiffs) have the ability to keep an MTBE case in state court despite the desire of plaintiffs to obtain federal jurisdiction and carry out the purported Congressional purpose.").[6]

Finally, Section 1503 is not analogous to the jurisdictional grants in *Verlinden*, *Mizuna*, and *A.I. Trade Fin., Inc.*, which were found to be parts of comprehensive federal schemes.

---

[6] The district court in *Alban* remanded the case to state court for lack of unanimous consent to removal. I address that issue, *infra*.

Unlike the enumerated conditions in FSIA, Section 1503 does not require a court to satisfy a similar kind of threshold inquiry before proceeding with an MTBE contamination action. *Verlinden*, 461 U.S. at 493–94 (FSIA requires the district court, as a "threshold" matter, to "apply the detailed federal law standards set forth in the Act."). Whereas FSIA "codifies the standards governing foreign sovereign immunity as an aspect of substantive federal law," *id.* at 497, Section 1503 merely provides a federal forum for MTBE claims, without establishing substantive federal law on its own. The FSIA scheme "necessarily involves application of a body of substantive federal law," *id.*, but not every MTBE contamination action is "necessarily" based in substantive federal law.[7] And, although FSIA granted "original jurisdiction" over foreign sovereign immunity cases, *id.* at 483 n.4, Section 1503 does not grant original jurisdiction. *See Alban*, 2006 WL 6161862, at *3 ("Congress did not give federal courts original jurisdiction of MTBE cases.").

Furthermore, unlike the FIRREA at issue in *Mizuna*, Section 1503 does not necessarily "enhance[] the effectiveness and uniformity of proceedings" involving MTBE contamination. *Mizuna*, 90 F.3d at 657. Indeed, MTBE contamination cases brought around the country are based in tort law and are likely to involve different findings of fact even if they are brought in the federal court system. *See also Alban*, 2006 WL 6161862, at *3 (finding that Exxon's argument that Section 1503 was created to prevent inconsistent results "is contradicted by the fact that Congress did not give federal courts original jurisdiction of MTBE cases.").

Finally, unlike 12 U.S.C. § 632, Section 1503 does not serve a similar congressional interest in providing federal oversight of federally-created entities. *A.I. Trade Fin., Inc.*, 62 F.3d at 1462 (reasoning that Section 632 oversight of the Edge Act "regime" was "intended to

---

[7] An MTBE action's jurisdiction in federal court may depend on the existence of a colorable federal defense, which is a separate issue that I address, *infra*.

facilitate and stimulate international trade by providing the uniformity of federal law"); *id.* at 1463 ("[A]n issue of federal law might well arise in a suit involving a foreign or international banking transaction of an Edge Act corporation.").

Accordingly, I conclude that defendants have not carried their burden to show that Section 1503 conveys Article III jurisdiction based on a comprehensive federal scheme.

## B. Existence of A Colorable Federal Defense

Because Section 1503 is not part of a comprehensive federal scheme, defendants must show that there is a colorable federal defense in order to remain in federal court.[8]

Although the requirement of a colorable federal defense is not explicitly stated in Section 1503, it is fairly possible to read in the requirement to avoid constitutional doubt. *Virginia Soc. for Human Life, Inc. v. Caldwell*, 152 F.3d 268, 270 (4th Cir. 1998) ("Federal courts have the power and the duty to adopt narrowing constructions of federal statutes to avoid constitutional difficulties 'if such a construction is fairly possible[.]'"). For example, the Supreme Court in *Mesa* ruled that the federal officer removal statute is a pure jurisdiction statute and must be "predicated upon averment of a federal defense." 489 U.S. at 139. Based on this reasoning, post-*Mesa* cases treat the federal officer removal statute differently from federal question removal statute and require the defendant to plead a colorable federal defense. *See, e.g.*, *Jamison v. Wiley*, 14 F.3d 222, 239 (4th Cir. 1994) ("By raising a colorable federal defense in his removal

---

[8] The assertion of a federal defense is insufficient to confer jurisdiction under the federal question removal statute in 28 U.S.C. § 1331 (2012) because of the well-pleaded complaint rule. *Harless v. CSX Hotels, Inc.*, 389 F.3d 444, 450 (4th Cir. 2004) ("[T]he presence or absence of federal question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint without consideration of any potential defenses."). The well-pleaded complaint analysis does not apply here because this case was removed under Section 1503 and Article III's "arising under" jurisdiction. As a constitutional matter, Article III jurisdiction is broader than the contours of 28 U.S.C. § 1331. *Verlinden*, 461 U.S. at 495.

petition, the defendant-official transforms the otherwise nonremovable state-law action into one that falls within the federal court's 'arising under' jurisdiction.").

The same logic applies to Section 1503, a congressional grant of federal jurisdiction over MTBE cases. *See Hunter v. United Van Lines*, 746 F.2d 635, 639 (9th Cir. 1984) ("Congress plainly has the power to confer removal jurisdiction over cases in which only the defense is based on federal law."). In such cases, "it is the raising of the federal question in the [defendant's] removal petition that constitutes the federal law under which the action against the [defendant] arises for Art. III purposes." *Mesa*, 489 U.S. at 136.

The "colorable" federal defense threshold is not high. It only requires the defendant "to raise a claim that is 'defensive' and 'based in federal law.'" *Mason v. KBR, Inc.*, No. RWT 09-2083, 2012 WL 12517199, at *3 (D. Md. Jan. 12, 2012) (quoting *Mesa,* 489 U.S. at 129–30). Indeed, "[p]roof of a 'colorable' federal defense [] does not require the defendant to 'win his case before he can have it removed' nor even establish that the defense is 'clearly sustainable.'" *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016). Rather, the purpose is to require the defendant to show entitlement to a federal forum to adjudicate his federal defense. *See Jamison*, 14 F.3d at 238 ("The defendant need not prove that he will actually prevail on his federal immunity defense in order to obtain removal; indeed, 'one of the most important reasons for removal is to have the validity of the [federal] defense of official immunity tried in a federal court.'") (alteration in original); *id.* at 238 n. 17 (there is no colorable federal defense if it is "clear" that defendant "cannot possibly make out a colorable federal defense."). But, a defendant fails to raise a colorable federal defense if it is "'immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'" *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006).

This threshold may not be satisfied "by some talismanic invocation" of a federal defense, meaning that it is not enough for the removal petition to simply "track[] the . . . language of the statute." *State v. Ivory*, 906 F.2d 999, 1001 n.4 (4th Cir. 1990). The pleading standard is similar to what is required for a complaint to survive the motion to dismiss stage; the defendant "must allege facts that would support a colorable immunity defense if those facts were true." *Id.* at 1002; *see Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 781–82 (D. Md. 2016) ("A defendant need not prove his entitlement to the defense in order to remove the case to federal court; he need only make a plausible showing of it."). At this stage, "no determination of fact is required but it must fairly appear from the showing made that petitioner's claim is not without foundation and is made in good faith." *State of Colorado v. Symes*, 286 U.S. 510, 519 (1932).

Plaintiff argues that defendants have no available colorable federal defense as a matter of law, or that they did not sufficiently plead any colorable federal defense in their Notice of Removal. ECF 283-1 at 21–32. Defendants contend that the Notice of Removal properly pleads federal defenses, including conflict preemption. ECF 299 at 23–27. The United States agrees that defendants have sufficiently pleaded a colorable federal defense of conflict preemption, ECF 320-1 at 2, but the government "takes no position at this juncture on the merits of the [] preemption defense." *Id.* at 11 n.2.

### 1. Clean Air Act Conflict Preemption

The Notice of Removal states that the action was removed under Section 1503 and that removal is appropriate under the statute because plaintiff's claims relate to allegations of MTBE contamination of groundwater, wells, and drinking water in the State. ECF 1, ¶¶ 2-3. The Notice references specific allegations in the Complaint, including the allegation that defendants' "wrongful conduct in adding MTBE to their gasoline, and their marketing, distribution, handling,

storage, and sale of MTBE gasoline in the State has created widespread contamination of the waters of the State, including many of the State's over 400,000 public and private drinking water wells." *Id.* ¶ 4 (citing Compl. ¶¶ 3, 5, 116, 190, 216). And, although I have rejected this argument, the Notice argues that jurisdiction is proper because Section 1503 is part of a comprehensive federal scheme. *Id.* ¶ 5.

Regarding conflict preemption, the Notice of Removal states, ECF 1, ¶¶ 5-6:

. . . Plaintiff's allegations attack the broad federal system that regulates the content of gasoline, a system that expressly authorized and effectively required the conduct that Plaintiff seeks to prohibit based on state common and statutory law.

Specifically, Plaintiff alleges that Defendant is liable for acts that complied with Environmental Protection Agency ("EPA") regulations and guidelines. Plaintiff seeks to hold Defendant liable for conduct directed by the EPA under the CAA: the addition of oxygenates such as MTBE to gasoline. Thus, Plaintiff's claims conflict with, and are preempted by, federal law. . . .

### a. Adequacy of the Notice of Removal

The State's first argument is that the Notice of Removal contains nothing more than conclusory statements with no specific facts and falls short of the required pleading standard. ECF 283-1 at 23–24. The State argues that defendant does not specify whether it "is asserting that it was physically impossible to comply with the Clean Air Act without using MTBE or whether Maryland law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress under the Act." *Id.*

Courts have declined to engage in a searching analysis of the removal petition. *Rhodes*, 210 F. Supp. 3d at 782 ("Cases dwelling on the exactness of 'proof' or 'evidence' to support the defense are not persuasive."). The factual pleading standard for a colorable federal defense is not burdensome. For example, in *Jamison*, 14 F.3d 222, the Fourth Circuit found that allegations in two paragraphs of the removal petition were sufficient to give rise to a colorable claim of

absolute immunity under the Westfall Act: "that Jamison's charges were based on 'acts allegedly done by [Wiley] under the color of his office as an employee of [the] United States,' while he was 'acting within the scope of his employment' as a 'Supervisory Coal Mine Safety and Health Inspector for the United States Department of Labor.'" *Id.* at 238 (citation omitted).

In my view, the Notice of Removal adequately stated the basis for the federal defense of conflict preemption. ARCO did not merely make a "talismanic invocation" of a federal defense. *Ivory*, 906 F.2d at 1001 n.4. Rather, the Notice stated the basis for removal (ECF 1 ¶¶ 2–3), articulated several theories for Article III jurisdiction (*id.* ¶¶ 5–6), and the basis for the claim that the action falls within Section 1503's purview. *Id.* ¶¶ 3–4. Defendant noted that the allegations challenge "the broad federal system that regulates the content of gasoline" that "expressly authorized and effectively required the conduct that Plaintiff seeks to prohibit based on state common and statutory law," and that its actions were in compliance with EPA regulations and guidelines, specifically, "with addition of oxygenates such as MTBE to gasoline." *Id.* ¶ 5. Moreover, the Notice specifically identified the law that allegedly preempts the state action: the Clean Air Act. *Id.* As a result, defendant concludes: "Plaintiff's claims conflict with, and are preempted by, federal law." *Id.* ¶ 6.

In my view, these allegations are sufficient to state the basis for the federal defense. *Mason*, 2012 WL 12517199, at *3 (defendant must "raise a claim that is 'defensive' and 'based in federal law.'").

### b. Conflict Preemption

Plaintiff's second argument is that the conflict preemption defense "does not have a valid basis in law." ECF 283-1 at 24. In other words, plaintiff argues that the defense is not colorable.

Preemption has been recognized as a colorable federal defense that supports removal. *See, e.g.*, *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1146 (11th Cir. 2017) ("CAEC's preemption defense is plausible and satisfies the lenient colorable federal defense requirement for removal under § 1442(a)(1)."); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1235 (8th Cir. 2012) (removal based on the federal officer statute was allowed because defendant "has a colorable defense that Jacks' claims are preempted by FEHBA's express preemption provision"); *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007) ("[E]ven if a colorable federal defense were required, RUS fulfilled this requirement by asserting the defense of preemption.").

"Federal law may preempt state law under the Supremacy Clause in three ways-by 'express preemption,' by 'field preemption,' or by 'conflict preemption.'" *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007). Although there are different types of "conflict preemption," the applicable theory here is "obstacle" preemption, which applies "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829–30 (4th Cir. 2010) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). Courts sometimes describe this branch of the preemption doctrine as "frustration of federal purpose." *Abbot by Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1113 (4th Cir. 1988).

Obstacle preemption "occurs where state law 'interferes with the *methods* by which the federal statute was designed to reach [its] goal.'" *Columbia Venture*, 604 F.3d at 830 (emphasis in original). It applies "not only to positive enactments of state law but also to state tort claims alleging violation of a common law duty." *Id.* Notably, "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying

its purpose and intended effects." *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 478 (4th Cir. 2014), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, ___ U.S. ___, 136 S. Ct. 1288 (2016). For example, "[a] state law may pose an obstacle to federal purposes by interfering with the accomplishment of Congress's actual objectives, or by interfering with the methods that Congress selected for meeting those legislative goals." *Id.*

The Fourth Circuit explained in *Abbot by Abbot*, 844 F.2d at 1113, that courts should consider the interests of the national and state policies when analyzing obstacle preemption:

> A decision about [obstacle preemption] requires the court independently to consider national interests and their putative conflict with state interests. While preemption under a theory of express or implied preemption is essentially a matter of statutory construction, preemption under [obstacle preemption] theory is more an exercise of policy choices by a court than strict statutory construction. An independent judgment that federal purposes require preemption comes in the face of congressional silence, both express and implied, on the subject.

In my view, obstacle preemption is a colorable federal defense in this case. The state law claims here could plausibly interfere with the methods by which the Clean Air Act Amendments of 1990 were designed to reach the goal of reduced emissions in motor fuel use. Although the RFG and OF Programs did not require the use of any specific oxygenate in fuel, legislative history shows that lawmakers understood that both MTBE and ethanol would be used to meet the demand. *See, e.g.*:

- S. REP. No. 101–228, at 119 (1989) (Comm. on Environment and Public Works Report) ("Currently several basic fuel blends are in use as oxygenated fuels. These include gasoline/ethanol, gasoline/methanol and gasoline/methyl tertiary butyl ether (MTBE).");

- *Id.* at 409 (additional views of Sen. Lautenberg) ("Much of this problem could be alleviated by allowing other carbon monoxide-reducing fuels to be used by non-attainment areas. That was the intent of an amendment I offered during Committee consideration. By setting a minimum oxygen content of fuels during winter months at 2.7%, other fuels, such as [MTBE], could be used in non-attainment areas.");

- *Air Pollution and Alternative Fuels: Before the S. Comm. On Energy and Natural Resources*, 101st Cong. 11 (1989) (statement of Richard D. Wilson, Director of the

Office of Mobile Sources at the EPA) ("The alternative fuels that are being considered fall into basically two groups. One group includes the fuels that are primarily composed of gasoline and low levels of additives that can reduce vehicle emissions. The three gasoline additives generating the most interest are ethanol, methanol, and methyl tertiary butyl ether called MTBE.").

- S. Rep. No. 101–952, at 337 (1990) (Conf. Report) ("The agreement establishes an oxygen content level of 2.7 percent in 44 cities with carbon monoxide pollution, starting in 1992. These provisions will encourage the use of oxygen-containing additives like ethanol and MTBE, a natural gas derivative.").

- 136 Cong. Rec. S3504, S3511 (daily ed. March 29, 1990) (statement of Sen. Daschle) ("One of the most important attributes of a clean octane program is that it can be implemented immediately.  In fact, there are 11 EPA-approved octane-enhancers that can be used to replace aromatics, including MTBE, ETBE, ethanol and other oxygenates. The ethers, especially MTBE and ETBE, are expected to be major components of meeting a clean octane program.").

- 136 Cong. Rec. H2511, H3531 (daily ed. May 21, 1990) (from the Clean Air Facts prepared by Rep. Waxman and his staff) ("[MTBE] is currently the most widely used oxygenated blend.").

- 136 Cong. Rec. H2756, H2764 (daily ed. May 23, 1990) (statement of Rep. Alexander) ("Big oil says that oxygenated reformulated gasoline will require a $1 billion-a-year subsidy.  Presumably they refer to the 6-cent-per-gallon ethanol exemption from the Federal gasoline excise tax.  That's a sham argument, Madam Speaker.  For one thing, you don't have to use ethanol to meet the requirements. You can use other additives like MTBE.").

- *Potential Alternative Transportation Fuels Other Than Methanol: Hearing on S. 1630 Before the S. Comm. On Energy and Natural Resources*, 101st Cong. 14 (1990) (opening statement of Sen. McClure) ("Several other alternatives offer immediate potential environmental benefits.  Among these are certain fuel additives, in particular oxygen enhancers such as [MTBE] . . . . Such oxygenated additives not only reduce atmospheric emissions but they improve automobile fuel economy as well.");

- *Id.* at 45 (testimony of William Rosenberg, Assistant EPA Administrator for Air and Radiation) ("The gasoline additives that have generated the most interest are ethanol and methanol and the corresponding ethers, ethyl tertiary butyl ether (ETBE) and methyl tertiary butyl ether (MTBE).  The latter is used widely throughout the U.S.");

Implementing regulations and agency guidance following the CAA Amendments carried

the same expectations for MTBE use.  *See, e.g.*:

- Approval and Promulgation of Implementation Plans; Arizona – Maricopa and Pima Nonattainment Areas, 56 Fed. Reg. 5458, 5465 (Feb. 11, 1991) ("The Agency recognizes that by setting the minimum oxygen content at 2.7 percent, it is in effect setting the minimum requirement at the highest legally-permissible concentration allowed in unleaded gasoline for the most common oxygenating compound, MTBE.");

- Regulation of Fuel and Fuel Additives; Administrator's Finding That No Control or Prohibition on Maximum Oxygen Content of a Winter Oxygenated Gasoline Program is Necessary Under Section 211(c)(4)(A) of the Clean Air Act as Amended by the Clean Air Act Amendments of 1990, 57 Fed. Reg. 47,849, 47,852 (Oct. 20, 1992) ("The legislative history reflects Congress' intent to preserve a role for the two major oxygenates—MTBE and ethanol—in the oxygenated gasoline program").

- *Regulation of Fuels and Fuel Additives: Renewable Oxygenate Requirement for Reformulated Gasoline*, 59 Fed. Reg. 39258, 39259 (Aug. 2, 1994) ("To meet the oxygen content requirement, oxygenates must be added to gasoline. The two most common oxygenates used today are methyl tertiary-butyl ether (MTBE) and ethanol.")

- 40 C.F.R. § 80.46(g), 61 Fed. Reg. 58304, 58306 (Nov. 13, 1996) (allowing any "refiner, importer, or oxygenate blender" to determine oxygen content using the ASTM standard method to meet testing requirements if the oxygenates present were limited to "MTBE, ETBE, TAME, DIPE, tertiary-amyl alcohol, and $C_1$ to $C_4$ alcohols.").

Furthermore, as discussed above in Section III.A.2, the legislative history of EPACT shows that policymakers considered a provision that would have insulated companies from certain MTBE claims, but ultimately rejected it in favor of Section 1503. Under Section 1503, Congress intended MTBE to be used to meet the reformulated gasoline demand but later became concerned about the liability that these previous CAA programs may have created for MTBE manufacturers. Because MTBE was the most commonly used oxygenated fuel blend when the CAA Amendments were considered, 136 Cong. Rec. H2511, H3531 (daily ed. May 21, 1990), state law claims that challenge MTBE's widespread use in Maryland could plausibly interfere with Congress's objectives as well as methods to reduce certain tailpipe emissions in Maryland.

Plaintiff argues that State tort law does not threaten Congress's purposes or methods here because CAA does not *require* the use of MTBE, but allowed its use as one of several oxygenates, including ethanol. ECF 283-1 at 25. However, the legislative history clearly shows

that the petroleum industry relied on MTBE at the time of the 1990 CAA Amendments and expected to continue its use under the RPG and OF programs. If MTBE had been entirely unavailable to the industry, Congress might have reconsidered the feasibility of these programs, even if ethanol was available as a substitute. Indeed, competition among the various oxygenates was an essential consideration in Congress's crafting of the oxygenate requirements. *See Regulation of Fuels and Fuel Additives: Renewable Oxygenate Requirement for Reformulated Gasoline*, 59 Fed. Reg. 39258, 39259 (Aug. 2, 1994) ("Representatives Sharp and Simpson noted that the 2.7% oxygen by weight level 'was chosen in part to provide more even opportunities for competition between the two major oxygenates, and should encourage fair competition among them.'").

Case law presents no clear answer. Courts have disagreed about whether the CAA preempts state law claims about MTBE contamination. Several courts have found that the CAA preempts state law claims restricting or banning MTBE use. *See Molloy v. Amerada Hess Corp.*, No. 2001/3996 slip op. at 5 (N.Y. Sup. Ct. Aug. 1, 2002) (Isbister Decl. Ex. 2, ECF 299-3 at 6) ("Since the CAA mandates the use of oxygenates and the use of MTBE is expressly permitted by EPA regulations, plaintiffs' claims which are premised solely on the defendants' use of MTBE conflict with the objective of the CAA and are, therefore, preempted"); *Coppola v. Amerada Hess Corp*, No. 2001/3995, slip op. at 5 (N.Y. Sup. Ct. July 31, 2002) (Isbister Decl. Ex. 3, ECF 299-3 at 6) (same); *Holten v. Chevron U.S.A.*, 2001 U.S. Dist. LEXIS 17599, *10–11 (D.N.J. July 10, 2001) (granting summary judgment for defendants on MTBE strict liability claims because "the legislative history of the Clean Air Act Amendments . . . is replete with references to MTBE and its usefulness. . . . Thus, because Congress required that gasoline include an oxygenate and specifically designated that MTBE would be one of the most common and

effective oxygenates, this Court concludes that gasoline containing MTBE cannot be deemed a defective product.");[9] *Kubas v. Unocal Corp.*, No. BC191876, 2001 WL 1940938, at *10 (Cal. Super. Ct. Aug. 23, 2001) ("Removing MTBE, which the EPA Administrator-in implementing the Clean Air Act Amendments of 1990-referred to as 'the most commonly used oxygenating compound,' from the refiners' compliance arsenal would present 'an obstacle to the accomplishment and execution of' the important objectives of the federal reformulated gasoline and oxygenated fuels program.").

Other courts, particularly in the Second and Ninth Circuits, have found that the CAA does not preempt state laws that restrict or ban MTBE use. *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 103 (2d Cir. 2013) ("Exxon has not established Congressional objectives sufficiently at odds with state law to require that state law be set aside under the doctrine of conflict preemption."); *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 457 F. Supp. 2d 324, 343 (S.D.N.Y. 2006) (finding plaintiff's tort law claims based on MTBE contamination are not preempted by CCA Amendments), *aff'd*, 725 F.3d 65 (2d Cir. 2013); *see also Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 673 (9th Cir. 2003) ("California's ban on MTBE is . . . not preempted, either expressly or impliedly, by the [Clean Air] Act."); *Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1256 (9th Cir. 2000) (EPA's approval of Nevada's revised state implementation plan, which would curtail MBTE use, "does not conflict with, and is not preempted by any provision of the Clean Air Act."); *Abundiz v. Explorer Pipeline Co.*, No. CIV.3:00-CV-2029-H, 2002 WL 1592604, at *5 (N.D. Tex. July 17,

---

[9] Upon reconsideration, the *Holten* Court reinstated the strict liability failure to warn claims but did not disturb the strict liability design defect grant of summary judgment. *Holten v. Chevron, U.S.A., Inc.*, No. 00-CV-4703, 2002 WL 32173074, at *3 (D.N.J. Apr. 11, 2002). Although the court did not revisit its legislative history analysis, the reconsideration warrants caution when relying on this case.

2002) (denying a motion to dismiss state tort claims based on MTBE because they "would not conflict with the Congressional clean air objectives"); *State v. Exxon Mobil Corp.*, 168 N.H. 211, 233, 126 A.3d 266, 285 (2015) ("We hold as a matter of law that the State's [MTBE tort] claims are not preempted by federal law.").

I conclude that State law claims concerning MTBE plausibly present an obstacle to Congress's purposes or methods. It is plausible that Congress wanted to promote competition in the oxygenate market and did not want ethanol to be the sole oxygenate that was used. In other words, it is not "wholly insubstantial and frivolous" for defendants to argue that Congress's intent to provide competition would be frustrated by State law claims that effectively ban MTBE use in favor of ethanol, when both oxygenates were meant to compete with each other in the market. *Arbaugh*, 546 U.S. at 513 n.10.

Moreover, most of the cases have considered the preemption defense at the dismissal or the summary judgment stage. Here, I am only required to determine whether the defense is "colorable" for purposes of the Remand Motion. Some courts could only make this decision after further factual finding. *See, e.g., Oxygenated Fuels Ass'n, Inc. v. Pataki*, 158 F. Supp. 2d 248, 260 (N.D.N.Y. 2001) (denying summary judgment on conflict preemption because "[o]n this record the Court is unable to determine whether N.Y. MTBE Law stands as an obstacle to the accomplishment and execution of the goals of the RFG program."). After a bench trial, the court decided that the evidence did not support the defense. *See Oxygenated Fuels Ass'n, Inc. v. Pataki*, 293 F. Supp. 2d 170, 183 (N.D.N.Y. 2003) (concluding after a bench trial that plaintiff "has not demonstrated that [the] N.Y. MTBE [ban] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting CAA.").

The Supreme Court has rejected a "narrow, grudging interpretation" of the requirement to plead a colorable federal defense. *Jefferson City v. Acker*, 527 U.S. 423, 431 (1999). Considering (1) the significant legislative history of MTBE's role in the RFG and OF programs and (2) conflicting case law about whether the CAA preempts MTBE-related state stuits, I conclude that preemption is not foreclosed as a defense in this case and that defendants are at least entitled to a federal forum to adjudicate the defense. There is no binding Fourth Circuit precedent to the contrary, and further fact-finding may alter the viability of the defense. As to the Remand Motion, however, defendants need only plead a colorable federal defense of conflict preemption with the CAA. *C.f. Stephenson v. Nassif*, 160 F. Supp. 3d 884, 891 (E.D. Va. 2015) ("[I]t may not be clear whether defendant . . . qualifies for an immunity defense until further factual development or briefing occurs, but for purposes of the motion to remand his federal defense is at least colorable.").

In sum, the legislative history of the CAA Amendments envisioned the widespread use of MTBE to meet the requirements of the RFG and OF programs. It is at least plausible that State law claims as to the use of MTBE would present an obstacle to its purpose in Maryland.

I make no finding, however, about the merits of the preemption defense. "Proof of a 'colorable' federal defense [] does not require the defendant to 'win his case before he can have it removed' nor even establish that the defense is 'clearly sustainable.'" *Ripley*, 841 F.3d at 210. I agree with the United States that fact-finding may be needed to resolve the preemption defense. ECF 320-1 at 13 ("Evidence suggesting that alternatives to MTBE were not readily available in Maryland or would require additional cost may lend support to defendants' claim."). *See also Oxygenated Fuels Ass'n, Inc.*, 158 F. Supp. 2d at 260 (the parties "dispute the overall cost of substituting ethanol for MTBE, the volume of ethanol per year which would be needed to replace

MTBE in the northeast, whether ethanol production capacity would be sufficient to meet the additional demand created by replacing MTBE with ethanol in the northeast and/or national market, and whether other oxygenates are or will be available."). After further factual development, I could ultimately reject the defense. *Jefferson City*, 527 U.S. at 431 (the argument that Jefferson County's tax interferes with the operation of the federal judiciary "presents a colorable federal defense" even though the Court "ultimately rejects it.").

### 2. Other Federal Defenses

The Notice of Removal also includes several other federal defenses (ECF 1 ¶ 6) that defendants allege should prevent removal:

> . . . Plaintiff also contends that Defendant had a duty to disclose certain information concerning MTBE to federal agencies. Such a duty, if any, can only be created by federal statute and regulation and, therefore, Plaintiff's claims implicate a substantial federal question. . . . Plaintiff's claims are barred because Defendant added MTBE to comply with federal laws, orders, duties and standards; the MTBE levels in some or all cases are within federal water quality standards; and Plaintiff's claims for punitive damages are barred by the Due Process and Excessive Fines clauses of the United States Constitution.

The first defense is that there is no federal "duty to disclose" MTBE information to federal agencies. *Id.* Plaintiff argues that the Complaint does not allege such a duty and their "failure to warn" claim only alleges a duty to warn users, consumers, and downstream handlers, not any federal agency. ECF 283-1 at 27. I agree with plaintiff that any allegations in the Complaint implying that there is such a duty (*see, e.g.*, ECF 2 ¶¶ 168–81) only constitute background information for plaintiff's other claims, but are not asserted as claims or causes of actions on their own. It follows that there cannot be a colorable federal defense to a claim that plaintiff has not asserted.

Next, the Notice of Removal contends that some MTBE levels are "within federal water quality standards," ECF 1, ¶ 6, presumably meaning the Clean Water Act ("CWA").[10]  The CWA typically governs water quality standards for surface water and navigable waters, not groundwater.[11]  *Rapanos v. United States*, 547 U.S. 715, 722 (2006) (discussing the history of Clean Water Act's jurisdiction over navigable waters).  Moreover, states are permitted to set more stringent standards for water quality than the federal government, so any argument that MTBE contamination levels meet the federal government standards does not necessarily mean that it would meet the relevant state standard.  *See* 33 U.S.C. § 1370 (2012) ("nothing in this chapter shall . . . preclude or deny the right of any State . . . to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution" as long as it is not "less stringent" than the applicable federal standard); *Menzel v. Cty. Utilities Corp.*, 712 F.2d 91, 93 n.3 (4th Cir. 1983) (the CWA "vests the states with authority to impose more stringent effluent limitations than are required by federal standards.").  Defendants have not carried their burden to show that CWA is a colorable federal defense in this case.

Finally, the Notice of Removal contends that punitive damages are barred by the Due Process and Excessive Fines Clauses of the United States Constitution.  ECF 1, ¶ 6; ECF 299 at 23–24 n.5.  The Fourth Circuit does not categorically foreclose punitive damages in federal

---

[10] Defendants do not rely on this defense in the opposition to the Remand Motion, and it is unclear whether they have abandoned the argument.  *See* ECF 299 at 23–24 n.5.

[11] Recent case law allows CWA jurisdiction over polluted groundwater that eventually migrates into navigable waters, but that specific fact pattern has not been alleged in this case. *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 651 (4th Cir. 2018) ("[W]e hold that a plaintiff must allege a direct hydrological connection between ground water and navigable waters in order to state a claim under the CWA for a discharge of a pollutant that passes through ground water.").

cases.  *See U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) (although the Supreme Court "has been reluctant to fix a bright-line ratio that punitive damages cannot exceed for purposes of the Due Process Clause, it has suggested that 'an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.'"). Moreover, even if this defense were colorable, it is speculative, and I decline to categorize it as the type of defense that would give rise to Article III jurisdiction.  It is not raised as a defense to any claim or cause of action in the Complaint, and the cases that allow Article III jurisdiction based on a colorable federal defense have not extended their reasoning to include federal defenses to damages or damages awards.  *See, e.g.*, *Jamison*, 14 F.3d at 238 ("The Supreme Court has interpreted § 1442(a)(1) as guaranteeing a federal officer the right to remove an action commenced against him in state court when he can allege a 'colorable' federal defense to that *action* 'arising out of [his] duty to enforce federal law.'") (emphasis added) (quoting *Mesa*, 489 U.S. at 133).

In the absence of precedent, I decline to extend the reasoning of cases like *Mesa* to include federal defenses to damages.  However, because I have already found that conflict preemption is a colorable federal defense in this case, the fact that defendants do not prevail on these arguments is ultimately inconsequential.

### C.  Minimal Diversity Theory

Defendants argue that Article III "minimal diversity" jurisdiction is sufficient to sustain removal, *i.e.*, that at least one plaintiff must be diverse from at least one defendant.  ECF 299 at 28–30.  *See State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 531 (1967) ("Article III poses no obstacle to the legislative extension of federal jurisdiction, founded on diversity, so long as any two adverse parties are not co-citizens."); *In re Methyl Tertiary Butyl Ether (MTBE) Prod.*

*Liab. Litig.*, 674 F. Supp. 2d 494, 504 (S.D.N.Y. 2009) (denying a motion to remand because "defendants have asserted federal defenses and the parties are minimally diverse"). *But see State of California v. Southern Pacific Company*, 157 U.S. 229, 262 (1895) (declining to extend Article III judicial power "between a state and citizens of another State" to include "a suit between a state and citizens of another state *and of the same state*.") (Emphasis added).

Defendants concede that the contours of this theory have not been thoroughly tested. ECF 299 at 28-29. Nor did they plead this theory in their Notice of Removal (ECF 1) or their response to the Standing Order of Removal. ECF 256. However, because I have found that the Notice of Removal alleged a colorable federal defense, I need not resolve the contention.

D. **Consent of Vitol S.A. and Getty Petroleum Marketing Inc.**

The State argues that unanimous consent was required for removal, and it points out that two defendants, Vitol S.A. ("Vitol") and Gerry Petroleum Marketing Inc. ("GPMI"), did not consent to removal. ECF 283-1 at 32–39. Defendants contend that unanimous consent is not required and that even if it was, Vitol was not properly served and GPMI is a defunct entity that cannot consent to removal. ECF 299 at 30-38.

In 2011, Congress passed the Federal Courts Jurisdiction and Venue Clarification Act of 2011 ("JVCA"), Pub. L. 112–63, 125 Stat 758 (2011). It included the following language, codified at 28 U.S.C. § 1446(b)(2)(A)(2012): "When a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action."

Defendants argue that this MTBE contamination action is not "solely" removed under section 1441(a), but was removed under Section 1503, so this unanimity of consent requirement does not apply. ECF 299 at 30-32.

At least one court in this district has found that unanimous consent is required for removal of MTBE actions. *Alban*, 2006 WL 6161862, at *3 ("Section 1503 serves to place otherwise unremovable state court cases involving MTBE dilution in the category of cases that may be removed. The statute does not, however, provide each defendant in such a case with an exception from compliance with the generally applicable removal requirements, including the obligation to obtain the consent of all defendants."). However, *Alban* was decided in 2006, before the JVCA was passed, and it is unclear whether its discussion on unanimity of consent remains good law.

On the one hand, it appears reasonable that the word "solely" must be afforded some meaning in the statute based upon its plain meaning. When the words of the statute are "sufficient in and of themselves to determine the purpose of the legislation" and do not produce unreasonable results "plainly at variance with the policy of the legislation as a whole," courts must follow their plain meaning. *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (quoting *Ozawa v. United States*, 260 U.S. 178, 194 (1922)); *see United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (holding that "the plain meaning of the legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters'") (alteration in original) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)). Indeed, "[t]here is . . . no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *Am. Trucking Ass'ns*, 310 U.S. at 543.

The legislative history of 28 U.S.C. § 1446(b)(2)(A) is sparse but shows that the statute was only meant to apply to cases removed "solely" under §1441(a). *See* H.R. Rep. No. 112-10, at 13 (2011) (emphasis added):

New subparagraph (b)(2)(A) codifies the well-established ''rule of unanimity'' for cases involving multiple defendants. Under that rule, which is generally traced to the Supreme Court decision in *Chicago, Rock Island & Pac. Ry. v. Martin*, 178 U.S. 245, 251 (1900), all defendants who have been properly joined and served must join in or consent to removal. *Like current law, the new provision is limited to cases removed solely under section 1441(a); it has no application to other statutes under which removal is authorized.*

Defendants' position also appears to be supported by some case law. *See Preston v. Nagel*, 166 F. Supp. 3d 92, 98 (D. Mass. 2016) ("Section 1446 imposes no 'unanimity' requirement when an action is removed under Section 1454."), *appeal dismissed*, 857 F.3d 1382 (Fed. Cir. 2017); *Fenicle v. Boise Cascade Co.*, No. 15-CV-02398-TEH, 2015 WL 5948168, at *4 (N.D. Cal. Oct. 13, 2015) (considering the legislative history of 28 U.S.C. § 1446(b)(2)(A) and holding "that the rule of unanimity does not apply to cases removed under § 1452"); *Martin v. Medtronic, Inc.*, No. 213CV02644JTFCGC, 2013 WL 12149653, at *3 (W.D. Tenn. Nov. 21, 2013) ("[B]ecause this case is not based solely on a federal question jurisdiction question, Defendant MSD was not required to join in the Defendant's Notice of Removal."); *Margetta v. Medtronic, Inc.*, No. 213CV02645JTFCGC, 2013 WL 12149654, at *3 (W.D. Tenn. Nov. 21, 2013) (same); *Penson Fin. Servs., Inc. v. Golden Summit Inv'rs Grp., Ltd.*, No. 3:12-CV-300-B, 2012 WL 2680667, at *5 (N.D. Tex. July 5, 2012) ("It logically follows from the statutory language of § 1446(b)(2)(A) that when Congress expressed that the consent requirement shall apply to civil actions 'removed solely under section 1441(a)' it sought to include only those categories of cases where removal was authorized by § 1441(a) and exclude cases where removal was authorized by other removal statutes.").

On the other hand, plaintiff argues that 28 U.S.C. § 1446(b)(2)(A) merely codified the existing law on unanimous consent of defendants for cases removed under §1441(a) and did not abrogate the general judicial rule of unanimity for other cases. ECF 283-1 at 37. It is reasonable to interpret 28 U.S.C. § 1446(b)(2)(A) as codifying the rule of unanimity for Section 1441(a)

cases, but also allowing Congress the flexibility to create new consent rules for other specialized removal statutes. For example, 28 U.S.C. § 1453 (2012) is a specialized removal statute that allows removal of class actions by "any defendant without the consent of all defendants." It specifically intended to displace the judicial rule of unanimity of consent for defendants. *See Palisades Collections LLC v. Shorts*, 552 F.3d 327, 335 (4th Cir. 2008) (explaining that the phrase "'any defendant' . . . eliminates the judicially-recognized rule of unanimous consent for removal" but does not grant removal power to counter-defendants).

Section 1503 is a specialized removal statute that does not contain any particular consent requirement. However, that does not necessarily mean that the pre-JVCA judicial rule of unanimous consent has been abrogated as to Section 1503, or for any other specialized removal statute that is silent on consent. *See, e.g.*, *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 620 (2002) (citing *Chicago, R.I. & P.R. Co. v. Martin*, 178 U.S. 245, 248 (1900) for the proposition that "removal requires the consent of all defendants."); *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 393 (1998) (Kennedy, J., concurring) ("Removal requires the consent of all of the defendants."); *Palisades Collections LLC*, 552 F.3d at 331 (explaining that unanimous consent is a "traditional limitation[]" on removal); *Doe v. Kerwood*, 969 F.2d 165, 168 (5th Cir. 1992) ("[T]he ability of federal officers to remove without the consent of co-defendants is based on the language of the statute that gives them the right to remove.").

To my knowledge, the Fourth Circuit has not examined the extent to which the JVCA displaces the judicially created rule of unanimity, if at all. Therefore, I decline to resolve the Remand Motion on this basis.

Instead, I shall assume, *arguendo*, that unanimity of consent is required, and address plaintiff's argument that Vitol and GPMI have not consented to removal. For this issue, both

parties have submitted affidavits and materials outside of the pleadings, which I will consider because they are essential to the jurisdictional analysis. *See Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010) (explaining that materials outside of the pleadings essential to the court's jurisdictional analysis may be considered on a motion to remand for lack of subject matter jurisdiction). "Such materials can include documents appended to a notice of removal or a motion to remand that convey information essential to the court's jurisdictional analysis." *Id. See also Oglesby v. RCA Corp.*, 752 F.2d 272, 278 (7th Cir. 1985) (finding it was proper for the district court to consider the removal petition, the collective bargaining agreement, and the motion to remand to ascertain facts relevant to removal); *BGC Partners Inc. v. Avison Young (Canada) Inc.*, No. 2:15-CV-02057-DCN, 2015 WL 7458593, at *1 n.2 (D.S.C. Nov. 24, 2015).

Although this unanimity of consent issue concerns a potential procedural defect and not subject matter jurisdiction, plaintiff has challenged the court's jurisdiction over the case. And, neither side objects to the reliance on extrinsic materials to ascertain facts relevant to removal. *C.f. Oglesby*, 752 F.2d at 278; *see also Johnson v. Nutrex Research, Inc.*, 429 F. Supp. 2d 723, 727 (D. Md. 2006) (remanding the case for lack of unanimous consent and stating that "GNC fails to provide an affidavit or other information from which the Court might conclude that it was not properly served.").

### 1. Vitol S.A.

Plaintiff argues that Vitol was served but chose to withhold consent. ECF 283-1 at 33–35. Defendants contend that Vitol S.A. was never properly served. ECF 299 at 33–35.

Foreign corporations like Vitol are required to have a resident agent for service if it "has registered or qualified to do business" in Maryland. MD. CODE, CORPS. & ASS'NS, § 7-205.

Vitol qualified as a foreign corporation in Maryland in 1996, requalified in 2005, and applied to terminate its qualification in September 2008. ECF 283-5; ECF 283-7.

On January 17, 2018, plaintiff attempted service on The Corporation Trust ("CT Corporation"), Vitol S.A.'s former agent for service of process in Maryland. ECF 299-5 (Aff. of Meghana D. Shah, ¶ 4). Because CT Corporation was no longer Vitol's agent for service of process at the time of service, it rejected the service and notified counsel for plaintiff. *Id.;* ECF 299-6 (Aff. Of Brian Hickman) ¶ 4. The letter notification, dated January 24, 2018, explained, ECF 299-6 at 5:

> VITOL S.A. withdrew to do business in the State of MD on 12/31/2008. When an entity withdraws, the designation of the registered agent is revoked. Service can no longer be taken on behalf of this entity. CT was unable to forward.

CT Corporation also sent a copy of this letter by UPS overnight delivery on February 7, 2018, and the letter was received the next day. ECF 299-6, ¶ 6. However, on February 9, 2018, Kimberly Baggett, a CT Corporation Senior Service Manager, wrote a somewhat confused email to plaintiff's counsel, Nathan Short, ECF 299-6 ("Baggett email"). Baggett said, *id.* at 7-8:

> Per request of Noemi Montejo at Vitol, she has requested that we send service of process via email and hard copy. Please find attached for your review and handling CT Log #[]. By now you should have received hard copy [sic].

Four days later, Brian Hickman, a CT Corporation Representation Services Advisor, sent an email to plaintiff's counsel, Nathan Short, from the same email thread and explained that the Baggett email was sent in error, and asked counsel to disregard the email. ECF 299-6 at 7.[12] He reattached the letter notification from January 24, 2018, which explained that CT could not accept service on behalf of Vitol. *Id.*

---

[12] As discussed, *infra*, the State's version of these exhibits omits Mr. Hickman's email, which indicated that the Baggett email was sent in error. ECF 283-10. Curiously, the State only attaches the Baggett email and relies on it to argue that Vitol was served.

According to Vitol's counsel, Noemi Montejo is not an employee of Vitol S.A., but an employee of "Vitol Inc.," a different entity that is not a defendant in this action. ECF 299-5, Aff. Of Meghana D. Shah, ¶ 6. Ms. Montejo is not authorized to accept service on behalf of Vitol S.A. *Id.* On February 8, 2018, Vitol S.A. was asked by liaison counsel for the defendants in this case whether it would consent to removal. *Id.* ¶ 7. Vitol stated that it did not wish to consent because it had not been served with process, and did not want its consent to be construed as a waiver of service defects. *Id.* ¶ 8. However, Vitol explains that it "has always supported the Removal and has never had, and does not now have, any objection to the Removal." *Id.* ¶ 12. In fact, Vitol "intends to immediately join in the Removal" if and when it is properly served. *Id.* ¶¶ 12–13.

The State's representation that Vitol has been served is unsupported by the record. The materials presented show that Vitol S.A. is a different entity than Vitol, Inc. and that CT Corporation has twice rejected attempted service on Vitol S.A., the relevant defendant in this case. Plaintiff represented that CT Corporation "communicated with Vitol regarding [CT Corporation]'s receipt of process in a manner that indicates that Vitol not only was legally served through its agent, but has itself actually received the Complaint," ECF 283-1 at 35 (citing Ms. Baggett's email on February 9, 2018). However, the State omitted the next email from Mr. Hickman, indicating that the Baggett's email was sent in error and that CT Corporation could not accept service of process. ECF 283-10. A candid presentation of the facts would indicate that the Baggett email was later withdrawn. Instead, plaintiff incorrectly represented that service was effective based on an email misunderstanding.

Moreover, the record supports a finding that plaintiff received Mr. Hickman's letter rejecting service. On February 6, 2018, plaintiff requested that the State court reissue the

summons for Vitol S.A., to be served on the Maryland Department of Assessments & Taxation ("SDAT"), instead of CT Corporation. ECF 157.

Nor may plaintiff argue that service is effective because Vitol received actual notice by some other means. "[T]here is nothing in Maryland law that suggests that the rules of service may be liberally construed." *Samuels v. Two Farms, Inc.*, No. CIV A. DKC10-2480, 2010 WL 4103670, at *2 (D. Md. Oct. 18, 2010). Indeed, "Maryland courts seem to take a strict, narrow approach to service; they treat 'defective service of process [as] a jurisdictional defect and actual knowledge of the proceedings on the part of the defendant will not cure that defect.'" *Id.* (quoting *Lohman v. Lohman,* 331 Md. 113, 130, 626 A.2d 384, 392 (1993)). *See also Sheehy v. Sheehy*, 250 Md. 181, 185, 242 A.2d 153, 155 (1968) ("[T]he fact that the defendant may have had actual knowledge of the suit against him would not cure a defective service.").

Accordingly, assuming the rule of unanimity applies to actions removed under Section 1503, Vitol S.A. has not been properly served. Therefore, its lack of consent to removal does not justify remand.

### 2. Getty Petroleum Marketing Inc.

Maryland argues that Getty Petroleum Marketing Inc. was properly served but did not timely consent. ECF 283-1 at 35–37. Defendants contend that GPMI could not consent because it is a defunct entity that has not existed for many years and its consent is not required because it is a nominal party. ECF 299 at 35–38.

### a. GPMI as a Defunct Corporation

Plaintiff's Notice of Filing Proof of Service for GPMI (ECF 289) appears to show that the summons was served on SDAT. ECF 289-1 at 6–7. In Maryland, service may be made upon a corporation through its resident agent or "upon the State Department of Assessments and

Taxation if (i) the entity has no resident agent . . ." Md. Rules 2-124(o). Service can be effectuated on a "technically defunct, but winding up corporation." *Thomas v. Rowhouses, Inc.*, 206 Md. App. 72, 86, 47 A.3d 625, 633 (2012); *id.* ("[W]hen a technically defunct, but winding up corporation, has no resident agent, service on [SDAT] is entirely appropriate and consistent with Rule 2–124(o).").

However, "[u]nder Maryland law, once a corporation's charter is revoked and forfeited, the corporation ceases to exist as a legal entity." *Scott v. Seek Lane Venture, Inc.*, 91 Md. App. 668, 685–86, 605 A.2d 942, 950 (1992); *see Stein v. Smith*, 358 Md. 670, 684, 751 A.2d 504, 511-512 (2000) (recognizing that complaint of a defunct corporation whose charter had been forfeited is a nullity). For example, "'forfeiture for non-payment of taxes puts an end to the corporate existence.'" *Scott*, 91 Md. App. at 686, 605 A.2d at 951 (quoting *Cloverfield Imp. Ass'n., Inc. v. Seabreeze Properties, Inc.*, 32 Md. App. 421, 425, 362 A.2d 675, 678 (1976), *modified in part and aff'd*, 280 Md. 382, 373 A.2d 935 (1977)). And, "[o]nce a corporation's existence has been terminated, the defunct corporation can neither sue, nor be sued, either *in rem* or *in personam*." *Scott*, 91 Md. App. at 686, 605 A.2d at 951. *See also Slattery v. Friedman*, 99 Md. App. 106, 117, 636 A.2d 1, 6 (1994) ("We explained that once a corporation has forfeited its charter, it is no longer in existence and can no longer be sued."). In such a case, "the assets of a defunct corporation are automatically transferred to the corporation's directors as trustees for the purpose of liquidation" and the corporation's "directors-trustees" are the appropriate defendants. *Id.* "Although a complaint may be filed against the directors-trustees in the name of the defunct corporation the directors-trustees must be given notice." *Id.*

The parties agree that GPMI cannot be served through a local Maryland resident agent because it does not have one. ECF 283-1 at 35; ECF 299 at 35. The parties also agree that

GPMI failed to file a personal property tax return, so its corporate charter has been revoked. *See* ECF 283-2 (Decl. Nathan Short, ¶ 14) (Attached hereto as Exhibit L is a true and correct copy of a Screen Shot of SDAT's website regarding [GPMI] . . . that reflects the revocation of GPMI's corporate charter by SDAT for failure to file a 2012 property return."); ECF 283-14; ECF 299 at 35. Although plaintiff attempted to serve GPMI through SDAT, defendants argue that service could not be made because GPMI has been completely liquidated and is no longer in the winding up process. ECF 299 at 35-38.

Even though Maryland allows suit against a corporation that is "technically defunct, but winding up," *Thomas*, 206 Md. App. at 86, 47 A.3d at 633, GPMI is no longer in the winding up process. GPMI filed for bankruptcy in the Southern District of New York on December 5, 2011. ECF 299-7 at 1. On August 24, 2012, the U.S. Bankruptcy Court issued its Findings of Fact and Conclusions of Law and Order Confirming the Plan of Liquidation. *Id.* GPMI's liquidation plan became effective on September 24, 2012, which established a Liquidating Trust for distribution of assets. ECF 299-11 at 2-4. The Bankruptcy Court issued its Final Decree closing the Chapter 11 bankruptcy case on October 19, 2015. ECF 299-12 at 6. The Decree stated that the final distribution of claims would be made on or before November 4, 2015. *Id.* ¶ 3. Since that time, there has only been a supplemental distribution of claims made on April 21, 2016. ECF 299-13 at 2-3.

As noted, suit was filed in State court on December 13, 2017, which is at least five years after GPMI failed to file any property tax return in Maryland, two years after the final distribution of claims, and a year and a half since any supplemental distribution. The winding up is complete. Moreover, there is no indication that plaintiff attempted service on GPMI's directors or trustees. *Slattery*, 99 Md. App. at 116–17, 636 A.2d at 6 (explaining that the

corporations directors-trustees are the appropriate defendants during the liquidation process). Nor has plaintiff alleged that any of the director-trustees have been given notice. *See id.* ("Although a complaint may be filed against the directors-trustees in the name of the defunct corporation the directors-trustees must be given notice.").

Given that the parties agree that GPMI's charter has been revoked and forfeited for failure to pay taxes, it is not a legal entity. *Scott*, 91 Md. App. at 685–86 ("Under Maryland law, once a corporation's charter is revoked and forfeited, the corporation ceases to exist as a legal entity."). Because GPMI is no longer a legal entity in Maryland, GPMI may not be sued. *Id.* at 686, 605 A.2d at 951 ("Once a corporation's existence has been terminated, the defunct corporation can neither sue, nor be sued, either *in rem* or *in personam.*"); *Slattery*, 99 Md. App. at 116–17, 636 A.2d at 6 ("We explained that once a corporation has forfeited its charter, it is no longer in existence and can no longer be sued."). Therefore, it was not possible for GPMI to give its consent to removal. It follows that its failure to do so does not justify remand.

### b.    GPMI as a Nominal Party

Even if GPMI could give consent, defendants also argue that GPMI is a nominal party because it is defunct, so that consent is not required. ECF 299 at 37–38. Although the Fourth Circuit has not made a clear statement of this rule, district courts in this circuit have found that a defunct corporation is a nominal party for purposes of removal consent. *Creed v. Virginia*, 596 F. Supp. 2d 930, 934 (E.D. Va. 2009) ("Examples of a nominal party include a party with no assets or one that does not actively engage in business . . . ") (citing *Egle Nursing Home, Inc.*, 981 F. Supp. at 933); *Egle Nursing Home, Inc. v. Erie Ins. Grp.*, 981 F. Supp. 932, 933 (D. Md. 1997) (describing a "nominal or formal" party as "generally, a party with no assets or one that does not

actively engage in business."); *Cain v. Dennis*, No. CIV.WMN-09-756, 2009 WL 2602344, at *1 (D. Md. Aug. 20, 2009) (same).

Other courts hold the same view. *Prop. Choice Grp., Inc. v. LaSalle Bank Nat. Ass'n*, No. 8:12-CV-1042-T-23MAP, 2012 WL 2568138, at *1 (M.D. Fla. July 2, 2012) ("A defunct entity with no interest in the mortgage at issue, LaSalle qualifies as a nominal party."); *Mieschberger v. Dana Corp.*, No. 11-CV-0776 JS WDW, 2011 WL 4916926, at *2 (E.D.N.Y. Oct. 11, 2011) ("The Court agrees that Dana Corporation is a nominal party as it was defunct at the time of removal."); *Michigan Dep't of Transp. v. Allstate Painting & Contracting Co.*, No. 2:08-CV-286, 2009 WL 891702, at *1 (W.D. Mich. Mar. 31, 2009) (finding remand was not justified because Allstate was a defunct corporation not capable of concurring in the removal of the action).

Fourth Circuit precedent also does not foreclose the possibility that GPMI is a nominal party because it is defunct. "The 'nominal party exception' ensures that only those parties with a palpable interest in the outcome of a case, and not those without any real stake, determine whether a federal court can hear a case." *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 259 (4th Cir. 2013). In *Hartford Fire Ins. Co*, the Fourth Circuit considered the various "tests" that other circuits have used to define a "nominal party" for purposes of the unanimity of consent requirement. *Id.* Ultimately, the Court rejected the application of any specific test and explained that "[a]ll these different tests aside, the word nominal should be taken to mean what a good dictionary says it should mean: 'trifling' or '[e]xisting in name only.'" *Id.* at 260 (quoting *Black's Law Dictionary*). The inquiry is a "practical" one, "focused on the particular facts and circumstances of a case." *Id.*

The facts in this case justify a finding that GPMI is a nominal party. GPMI's registration in Maryland has been revoked since 2012 because of its failure to pay taxes. Because its

registration has been revoked, it is no longer a legal entity in the State. The corporation filed for bankruptcy in 2011, and the materials presented by the parties show that its liquidation process began in 2012 and was completed by 2015, with only a supplemental distribution occurring in 2016.

Under the circumstances presented, I conclude that GPMI was a nominal party not capable of concurring in removal. Again, its lack of consent does not justify remand.

### c. Notice of Removal & Response to Standing Order

Plaintiff also argues the defendants have not met their burden of pleading the precise reasons why Vitol S.A. and GPMI did not consent in their Notice of Removal. ECF 283-1 at 36. *See, e.g.*, *Covert v. Auto. Credit Corp.*, 968 F. Supp. 2d 746, 748 (D. Md. 2013) ("If a plaintiff files suit in state court and the defendant seeks to adjudicate the matter in federal court, through removal, it is the defendant who carries the burden of alleging in his notice of removal, and if challenged, demonstrating the court's jurisdiction over the matter."); *Egle Nursing Home, Inc.*, 981 F. Supp. at 934–35 (remanding because defendant had not carried the pleading burden).

I disagree. Even assuming unanimous consent is required, the Notice of Removal states that "all defendants properly joined and served in this action have consented to removal," and attaches both a list of all defendants (including Vitol and GPMI) and all defendants who had consented, which did not include Vitol and GPMI. ECF 1, ¶ 8; ECF 1-1 at 3-4, ECF 1-2 at 2-3. The response to the Standing Order on Removal, filed two weeks after the Notice of Removal, states: "There is no defendant that was served in the state court action prior to the time of removal that did not formally join in or consent to the notice of removal." And, it attaches a list of joining defendants and respective dates of service, which does not contain Vitol or GPMI.

ECF 256, ¶ 5; ECF 256-1.  Under the facts of this case, these allegations are sufficient to overcome any pleading defect of the kind that the court found in *Egle*.

## IV.  CONCLUSION

For the reasons set forth in this Memorandum Opinion, I shall deny the State's Remand Motion (ECF 283).  An Order follows.


Date:  October 24, 2018             _____/s/_____
                                    Hon. Ellen L. Hollander
                                    United States District Judge