IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND,
*Plaintiff*,

v.                                              Civil Action No. ELH-18-0459

EXXON MOBIL CORPORATION, et al.,
*Defendants.*

**MEMORANDUM OPINION**

This Memorandum Opinion resolves numerous motions to dismiss a 168-page Complaint filed by the State of Maryland ("State" or "Maryland") against approximately sixty-five defendants.[1] The State seeks to redress the alleged contamination of its waters with methyl tertiary butyl ether ("MTBE"), an oxygenate additive that was commonly blended into gasoline in the 1980s and 1990s. ECF 2 (Complaint).[2]

The Complaint contains eleven counts. ECF 2, ¶¶ 308, 417. The first six counts allege common law tort claims: Strict Product Liability Based on Defective Design (Count I); Strict Product Liability Based on Failure to Warn (Count II); Strict Liability for Abnormally Dangerous Activity (Count III); Public Nuisance (Count IV); Trespass (Count V); and Negligence (Count VI). The remaining counts seek to impose liability under various provisions of the Environment Article

---

[1] The case was initially assigned to Judge Marvin J. Garbis. In July 2018, it was reassigned to me, due to the retirement of Judge Garbis. *See* Docket.

[2] Defendant Atlantic Richfield Company removed the case from the Circuit Court for Baltimore City to federal court, pursuant to 28 U.S.C. § 1331 and Section 1503 of the Energy Policy Act of 2005, 42 U.S.C. § 7545. ECF 1 (Notice of Removal). As discussed, *infra*, the State moved to remand. ECF 283. I denied the motion in a Memorandum Opinion and Order of October 24, 2018. *See* ECF 346; ECF 347.

("E.A.") of the Maryland Code (2013 Repl. Vol., 2019 Supp.): E.A. § 4–401 *et seq*. (Count VII); E.A. § 4–701 *et seq*. (Count VIII); E.A. § 9–301 *et seq*. (Count IX); E.A. § 9–401 *et seq*. (Count X); and E.A. § 7–201 *et seq*. (Count XI).

Several motions are now pending. Defendant Total Petrochemicals & Refining USA, Inc. ("TPRI")[3] moved to dismiss the Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2), and for failure to state a claim, under Fed. R. Civ. P. 12(b)(6). ECF 333. The motion is supported by a memorandum of law (ECF 333-1) (collectively, "TPRI Motion") and two exhibits. ECF 333-2; ECF 333-3. The State opposes the TPRI Motion (ECF 357), supported by two exhibits. ECF 357-1; ECF 357-2. TPRI has replied (ECF 377), with an exhibit. ECF 377-1.

Defendants Duke Energy Merchants, LLC ("Duke Energy"), George E. Warren Corporation ("Warren"), and Guttman Energy, Inc. ("Guttman Energy"), joined by TPRI and Hartree Partners, LP ("Hartree"), also moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim. ECF 334; *see also* ECF 338 (Hartree Joinder). The motion is supported by a memorandum of law. ECF 334-1 (collectively, "Warren Motion"). The State opposes the Warren Motion (ECF 358), supported by an exhibit. ECF 358-1. Defendants filed a reply (ECF 378), as well as two exhibits. ECF 378-1; ECF 378-2.

In addition, sixty-two defendants, including Exxon Mobil Corporation ("Exxon"), TPRI, Duke Energy, Warren, and Guttman Energy, jointly moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6). ECF 335. It is supported by a memorandum of law (ECF 335-1) (collectively, the "Joint Motion") and an exhibit. ECF 335-3. The State opposes the Joint Motion. ECF 359. Defendants have replied (ECF 381), and submitted two exhibits. ECF 381-1; ECF 381-2.

---

[3] TPRI was formerly named "Fina Oil and Chemical Company." *See* ECF 357-1 at 31; ECF 357-2, ¶ 27.

In a separate motion, defendant 7-Eleven, Inc. ("7-Eleven") joins the Joint Motion (ECF 336), supported by a memorandum of law. ECF 336-1 (collectively, "7-Eleven Motion"). It moves to dismiss the Complaint for failure to state a claim. ECF 336 at 1. Alternatively, it seeks "a more definite statement of [the] claims against 7-Eleven," pursuant to Fed. R. Civ. P. 12(e). *Id.* The State opposes the 7-Eleven Motion (ECF 355), supported by an exhibit. ECF 355-1. 7-Eleven has replied. ECF 379.

In addition, defendant Lukoil Pan Americas LLC ("LPA") moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction, and under Fed. R. Civ. P. 12(b)(6), for failure to state a claim. ECF 342. The motion is supported by a memorandum of law (ECF 342-1) (collectively, "LPA Motion") and an exhibit. ECF 342-2. The State has filed an opposition. ECF 368. LPA replied (ECF 387), with an exhibit. ECF 387-1.

Defendant PJSC Lukoil ("PJSC")[4] also moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction. ECF 343. It is supported by a memorandum of law (ECF 343-1) (collectively, the "PJSC Motion") and an exhibit. ECF 343-2. The State opposes the PJSC Motion (ECF 366), with exhibits. ECF 366-1; ECF 366-2; ECF 366-3. PJSC has replied. ECF 388.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons stated below, I shall grant the PJSC Motion, and grant in part and deny in the part the Joint Motion. I shall deny the remaining motions.

---

[4] PJSC was previously known as "OAO Lukoil." ECF 139 at 1 n.1 (Disclosure of Corporate Interest Statement filed by PJSC on Feb. 22, 2018).

# I.    Background[5]

## A.    MTBE and Water Contamination

MTBE is a chemical compound made by combining methanol (a derivative of natural gas) and isobutylene (a by-product of the gasoline-refining process). ECF 2, ¶ 103. It was commonly blended into gasoline in the 1980s and 1990s as an "oxygenate" and "octane enhancer" to reduce carbon monoxide tailpipe emissions. *Id.* ¶¶ 107, 117–129. Compared with other oxygenates like ethanol, MTBE was inexpensive to manufacture because it was made from readily available refinery byproducts. *Id.* ¶¶ 103, 127.

Gasoline is made by processing crude oil at a refinery. *Id.* ¶ 105. It is then transported through pipelines, tank ships, and barges to "common storage tanks" located at terminals around the country. *Id.* ¶ 106. From there, it is "transshipped" by pipeline or other means to "secondary terminals" or "depots," and then taken by trucks to gas stations for retail sale. *Id.* MTBE was blended into the gasoline at the refinery itself, or "splash blended" at terminals by adding it to truck tanks after those tanks were filled with gasoline from the terminal. *Id.* ¶ 105. Because MTBE-enhanced gasoline is fungible, batches were frequently comingled from different sources during the production and distribution process. *Id.* ¶¶ 99–100.

MTBE allegedly enters the environment "through disposals, deposits, releases, leaks, overfills, spills, discharges and evaporative releases," and is "principally release[d]" while in underground storage tanks or during delivery. *Id.* ¶¶ 1, 109. When released, MTBE is highly soluble in groundwater, spreads rapidly, does not naturally degrade, resists removal and treatment from groundwater, and is difficult to locate. *Id.* ¶¶ 2, 110–11, 113. It can also migrate into

---

[5] Given the procedural posture of this case, I must assume the truth of all factual allegations in the Complaint. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

subsurface-soil regions and penetrate into aquifers. *Id.* ¶¶ 112, 114. For these reasons, the State claims that MTBE "is and has been more difficult and more expensive to remove from groundwater than other contaminants." *Id.* ¶ 114.

The United States Geological Survey has reported that MTBE is the "second most frequently detected volatile organic chemical in groundwater in the United States." *Id.* ¶ 130. Around the United States, MTBE has been detected in "over 20% of aquifers tested in places where high MTBE-content gasoline was used." *Id.* MTBE has also been found in "varying concentrations and at varying times" in public water systems and private drinking-water wells in Maryland. *Id.* ¶¶ 218, 220. According to the State, studies have shown that MTBE "is a probable human carcinogen," can cause "significant adverse health effects when ingested," and "can render drinking water putrid and unfit for human consumption." *Id.* ¶¶ 4, 137.

## B. The History of MTBE Use and Legislative Background

In 1979, before defendants allegedly knew the harmful effects of MTBE, the Administrator of the United States Environmental Protection Agency ("EPA") granted a waiver for the use of 7% MTBE in unleaded gasoline, finding that MTBE as a fuel additive did not cause or contribute to the failure of any emission control device or system. *Id.* ¶¶ 117, 134; Application for Methyl Tertiary Butyl Ether, Decision of the Administrator, 44 Fed. Reg. 12,242, 12,243 (Mar. 6, 1979). The market demand for MTBE and MTBE-blended gasoline began around the same time and grew rapidly, continuing well into the 1990s. ECF 2, ¶¶ 117, 125. By 1996, MTBE "ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline." *Id.* ¶ 129.

Growth in the MTBE market was encouraged by the 1990 Clean Air Act Amendments, which established the Reformulated Gasoline Program ("RFG Program"). Clean Air Act

Amendments of 1990, Pub. L. No. 101–549, 104 Stat. 2399 (1990) ("CAA"), § 219(k). The RFG Program required the use of reformulated gasoline containing at least 2.0% oxygen by weight in designated ozone "non-attainment" areas of the country, meaning areas that do not meet the national ambient air quality standards ("NAAQS") for ozone. *Id.* § 219(k)(2)(B). Subsequent EPA regulations included MTBE as one of several oxygenates to be used in the testing of reformulated gasoline. *See, e.g.*, Use of Alternative Analytical Test Methods in the Reformulated Gasoline Program, 40 C.F.R. § 80.46(g), 61 Fed. Reg. 58304, 58306 (Nov. 13, 1996). Portions of Maryland were subject to the RFG Program. ECF 2, ¶ 122.

The 1990 Amendments also authorized EPA's initiation of the Oxygenated Fuel Program ("OF Program"), which required gasoline in some metropolitan regions to contain at least 2.7% oxygen by weight to reduce carbon monoxide during the fall and winter months. CAA, § 219(m). The State alleges that MTBE-blended gasoline sold in non-attainment areas often exceeded the minimum oxygenate requirements in the RFG and OF programs, and was even used in the regions that were *not* participating in the RFG program. ECF 2, ¶ 124.

By 2000, the federal government recognized the dangers of the release of MTBE into groundwater and took initial steps to consider eliminating it as a fuel additive. *See* Methyl Tertiary Butyl Ether (MTBE); Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline, 65 Fed. Reg. 16,094 (Mar. 24, 2000). Around this time, several states had "taken actions designed to limit the use of MTBE in gasoline." *Id.* at 16,097. Many lawsuits alleging MTBE contamination were filed and consolidated before the United States District Court for the Southern District of New York. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. v. Atl. Richfield Co.* (*In re MTBE*), MDL No. 1358, 2000 U.S. Dist. LEXIS 14901, at *4 (J.P.M.L. Oct. 10, 2000).

In 2005, Congress passed the Energy Policy Act ("EPACT"), which phased out the RFG oxygenate requirement and established the Renewable Fuel Program in its place. *See* Energy Policy Act of 2005, Pub. L. No. 109–58, §§ 1501, 1504, 119 Stat. 594 (2005), codified in part at 42 U.S.C. § 7545 *et seq.*[6] The new program requires gasoline suppliers to blend their product with renewable fuels, such as cellulosic biomass ethanol, waste derived ethanol, and biodiesel. *Id.*

The EPACT also directly addressed the status of MTBE as an additive to gasoline. Congress made the following findings, *id.* § 1502, 42 U.S.C. § 7545:

> (1)      since 1979, methyl tertiary butyl ether (hereinafter in this section referred to as "MTBE") has been used nationwide at low levels in gasoline to replace lead as an octane booster or anti-knocking agent;

> (2)      Public Law 101–549 (commonly known as the "Clean Air Act Amendments of 1990") (42 U.S.C. [§] 7401 et seq.) established a fuel oxygenate standard under which reformulated gasoline must contain at least 2 percent oxygen by weight; and

> (3)      the fuel industry responded to the fuel oxygenate standard established by Public Law 101–549 by making substantial investments in—

>> (A)  MTBE production capacity; and

>> (B)  systems to deliver MTBE-containing gasoline to the marketplace.

### C.      Claims and Procedural History

The State initially filed suit in the Circuit Court for Baltimore City on December 13, 2017, in its capacity as *parens patriae*; as trustee of the State's natural resources; and under the Maryland Environmental Standing Act, Md. Code (2013 Repl. Vol., 2019 Supp.), § 1–501 *et seq.* of the Natural Resources Article ("N.R."). ECF 2, ¶ 6. The suit named approximately sixty-five

---

[6] The EPACT is codified in various titles of the U.S. Code, including 16 U.S.C. and 42 U.S.C.

defendant manufacturers, marketers, and distributors of gasoline that together "controlled all, or substantially all, of the market in Maryland for MTBE and MTBE gasoline" for the relevant period. ECF 2, ¶ 26. Between 1995 and 2001, about 1.2 billion gallons of pure (or "neat") MTBE was included in the reformulated gasoline sold in Maryland. *Id.* ¶ 214.

Maryland alleges that defendants knew as early as 1980 that MTBE was harmful and could contaminate groundwater (*id.* ¶ 134), but refused to warn the public or to use safer alternatives like ethanol. *Id.* ¶ 206. According to Maryland, defendants "knew, or reasonably should have known," that the MTBE gasoline distribution and retail system throughout Maryland contained leaks. *Id.* ¶ 204. Even so, defendants allegedly defended and promoted MTBE, despite knowledge of its risks, and engaged in deceptive marketing of MTBE as a clean or environmentally friendly gasoline. *Id.* ¶¶ 161–189, 225–232. Maryland asserts that defendants "falsely or inadequately addressed MTBE" in their material safety data sheets provided to customers. *Id.* ¶ 233.

As indicated, the Complaint includes claims for strict liability (defective design, failure to warn, abnormally dangerous activity); public nuisance; trespass; negligence; and violations of various State environmental statutes. The State seeks compensatory and punitive damages and costs for testing, cleanup, monitoring, and restoration of State waters, as well as an injunction requiring defendants to test and treat drinking water wells containing MTBE. *Id.* at 163–66.

Defendant Atlantic Richfield Company ("ARCO") removed the case to federal court under Section 1503 of the EPACT, 42 U.S.C. § 7545. *See* ECF 1. ARCO asserted that jurisdiction is proper in federal court because the case is within the court's Article III judicial powers. *Id.* ¶¶ 2, 5. Specifically, ARCO claimed that the allegations of MTBE contamination raise questions of federal law under the CAA and EPACT, which "together are part of a comprehensive federal scheme" (*id.* ¶ 5), and that plaintiff's claims conflict with, and are preempted by, federal law. ECF

1, ¶¶ 5–6.  The Notice of Removal also raised other potential defenses under federal water quality standards and the Due Process and Excessive Fines Clause of the United States Constitution.  *Id.*  Moreover, ARCO asserted that "all defendants properly joined and served in this action have consented to this removal."  *Id.* ¶ 8.

Thereafter, the State moved to remand.  ECF 283.[7]  In a Memorandum Opinion (ECF 346) and Order (ECF 347) of October 24, 2018, I denied the State's motion.  I concluded that removal was proper under Section 1503 of the EPACT because the Notice of Removal identified a colorable federal defense of preemption under the Clean Air Act.  ECF 346 at 21–33.[8]

As noted, TPRI, LPA, and PJSC have each moved to dismiss the Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2).  ECF 333 (TPRI); ECF 342 (LPA); ECF 343 (PJSC).  Sixty-two defendants, including TPRI, LPA, and PJSC, have moved for dismissal for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6).  *See* ECF 335 (Joint Motion).  And, a few defendants have presented additional arguments for dismissal.  *See* ECF 334 (Duke Energy, Warren, Guttman Energy, TPRI Supplemental Motion to Dismiss); ECF 336 (7-Eleven Joinder and Supplemental Motion to Dismiss); ECF 338 (Hartree Joinder); ECF 342 (LPA Motion to Dismiss).

---

[7] Pursuant to Fed. R. Civ. P. 5.1(a), the State also filed a Notice of Constitutional Question (ECF 284), which was served on the Attorney General of the United States.  *Id.* at 2.  On July 13, 2018, the United States filed a Motion to Intervene for the Limited Purpose of Supporting the Constitutionality of Section 1503 of the Energy Policy Act.  ECF 320 ("Motion to Intervene").  In a Memorandum (ECF 322) and Order (ECF 323) of July 30, 2018, I granted the government's Motion to Intervene.

[8] Section 1503 of EPACT provides:

Claims and legal actions filed after the date of enactment of this Act related to allegations involving actual or threatened contamination of [MTBE] may be removed to the appropriate United States district court.

I begin by addressing the motions to dismiss for lack of personal jurisdiction. Then, I will turn to the remaining motions.

## II. Motions to Dismiss for Lack of Personal Jurisdiction

### A. Legal Standard

Defendants TPRI, LPA, and PJSC have each moved to dismiss the Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2). ECF 333 (TPRI); ECF 342 (LPA); ECF 343 (PJSC). "[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Under Rule 12(b)(2), the burden is "on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctr's, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993)).

When the existence of jurisdiction "turns on disputed factual questions the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs*, 886 F.2d at 676. In its discretion, a court may permit discovery as to the jurisdictional issue. *See Mylan Labs*, 2 F.3d at 64. Or, the court may rule solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the complaint. *Grayson*, 816 F.3d at 268; *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009). In that circumstance, the "plaintiff need only make 'a prima facie showing of personal jurisdiction to survive the jurisdictional challenge.'" *Grayson*, 816 F.3d at 268 (quoting *Combs*, 886 F.2d at 676); *see also Universal Leather*, 773 F.3d at 558, 560–61. However, "'[a] threshold prima facie finding that

personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'" *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 n.5 (4th Cir. 2005) (emphasis in original) (citation omitted); *see Universal Leather*, 773 F.3d at 558; *Combs*, 886 F.2d at 676.

"In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Carefirst of Md*., 334 F.3d at 396. But, the court is "not required to look solely to the plaintiff's proof in drawing those inferences." *Mylan Labs*, 2 F.3d at 62.

## B.    Discussion

The State alleges that defendants are "MTBE and MTBE gasoline manufacturers, marketers and distributors" that "together controlled all, or substantially all, of the market in Maryland for MTBE and MTBE gasoline" at all relevant times. ECF 2, ¶ 26; *see also id*. ¶ 125 ("In or around January 1995, defendants introduced into the stream of commerce in Maryland MTBE gasoline …"). As outlined, some of the defendants contend that this Court lacks personal jurisdiction as to them.

Fed. R. Civ. P. 4(k)(1)(A) authorizes a federal district court to exercise personal jurisdiction over a defendant in accordance with the law of the state in which the district court is located. *Carefirst of Md.*, 334 F.3d at 396. Therefore, in Maryland, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Id.*; *accord Carbone v.*

*Deutsche Bank Nat'l Tr. Co.*, No. RDB-15-1963, 2016 WL 4158354, at *5 (D. Md. Aug. 5, 2016);

*Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6, 892 A.2d 479, 493 n.6 (2006).

Maryland's long-arm statute is codified at Md. Code (2013 Repl. Vol., 2019 Supp.), § 6-103(b) of the Courts & Judicial Proceedings Article ("C.J."). It authorizes "personal jurisdiction over a person, who directly or by an agent," *id.*:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

When interpreting the reach of Maryland's long-arm statute, a federal district court is bound by the interpretations of the Maryland Court of Appeals. *See Carbone*, 2016 WL 4158354, at *5; *Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130, 135–36 (D. Md. 1981), *aff'd*, 758 F.2d 649 (4th Cir. 1985); *see also Mylan Labs*, 2 F.3d at 61. The Maryland Court of Appeals has "consistently held that the reach of the long arm statute is coextensive with the limits of personal jurisdiction delineated under the due process clause of the Federal Constitution" and that the "statutory inquiry merges with [the] constitutional examination." *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 22, 878 A.2d 567, 580 (2005) (citing *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977)); *see also Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132,

135–36 (4th Cir. 1996) (stating that "the two inquiries essentially become one"); *accord ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).

To be sure, "the reach of the [long-arm] statute is as far as due process permits . . ." *Mackey*, 391 Md. at 140 n.5, 892 A.2d at 492 n.5. However, the Maryland Court of Appeals has clarified that the statutory analysis remains a requirement of the personal jurisdiction analysis. In *Mackey*, the Maryland Court of Appeals said, 391 Md. at 141 n.6, 892 A.2d at 493 n.6 (citations omitted):

> We stated recently in *Beyond v. Realtime* . . . that "the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." We did not, of course, mean by this that it is now permissible to simply dispense with analysis under the long-arm statute . . . Rather, . . . we interpret the long-arm statute to the limits permitted by the Due Process Clause when we can do so consistently with the canons of statutory construction.

Since *Mackey*, the Maryland Court of Appeals has repeatedly affirmed that "determining whether a Maryland court may exercise personal jurisdiction over a foreign defendant requires a two-step analysis." *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006); *see also CSR, Ltd. v. Taylor*, 411 Md. 457, 472, 983 A.2d 492, 501 (2009) (stating that personal jurisdiction analysis "entails dual considerations"). First, the court considers "whether the requirements of Maryland's long-arm statute[ ] are satisfied." *CSR*, 411 Md. at 472, 983 A.2d at 501 (citing *Bond*, 391 Md. at 721, 895 A.2d at 999; *Mackey*, 391 Md. at 129, 892 A.2d at 486; and *Beyond*, 388 Md. at 14, 878 A.2d at 576). Second, it considers "whether the exercise of personal jurisdiction comports with the requirements imposed by the Due Process Clause of the Fourteenth Amendment.[ ]" *CSR*, 411 Md. at 473, 983 A.2d at 501 (citing *Bond*, 391 Md. at 721, 895 A.2d at 999; and *Beyond*, 388 Md. at 15, 878 A.2d at 575). Nevertheless, the Maryland Court of Appeals has, in some situations, declined to consider the first step where the analysis of the second step

demonstrates conclusively that personal jurisdiction over the defendant would violate due process. *See, e.g.*, *Bond*, 391 Md. at 722, 895 A.2d at 1000.

Due process jurisprudence recognizes "two types of personal jurisdiction: general and specific." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). The Fourth Circuit has explained:

> General personal jurisdiction, on the one hand, requires "continuous and systematic" contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred. Specific personal jurisdiction, on the other hand, requires only that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend itself in that state.

*Id.* (citing, *inter alia*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984)) (internal citations omitted).

A court may exercise general jurisdiction over foreign corporations to hear "any and all claims" against the corporations "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 314 (1945)). In contrast, specific jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy . . .'" *Id.* (citation omitted) (alteration in *Goodyear*).

The United States Supreme Court has long held that personal jurisdiction over a nonresident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Courts have separated this test into individual "prongs," first ascertaining whether the threshold of "minimum contacts" is met, and then considering whether

the exercise of jurisdiction on the basis of those contacts is "constitutionally reasonable." *ALS Scan*, 293 F.3d at 712.

The "minimum contacts" test is met where the defendant has "purposefully avail[ed] himself of the privilege of conducting business under the laws of the forum state." *Consulting Eng'rs*, 561 F.3d at 278. A determination that the defendant has established minimum contacts with the forum state amounts to a conclusion that "'it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

Generally, the court must consider the prong of constitutional reasonableness "[i]f, and only if" the minimum contacts test is met. *Consulting Eng'rs*, 561 F.3d at 278. The constitutional reasonableness inquiry permits a defendant "who purposefully has directed his activities at forum residents" to defeat jurisdiction, if he can "present a compelling case that the presence of some other considerations would render jurisdiction unconstitutional." *Burger King*, 471 U.S. at 477. However, in some cases, the constitutional reasonableness analysis can "serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.*

As indicated, general jurisdiction allows a plaintiff to bring "any and all claims" against a party in that jurisdiction. *Goodyear*, 564 U.S. at 919. But, "the threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." *ALS Scan*, 293 F.3d at 715 (internal quotation marks omitted); *accord Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005). And, the Fourth Circuit has long held that "broad constructions of general jurisdiction" are "generally disfavored." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993).

To determine whether there is specific jurisdiction over a defendant, courts consider several factors. These include: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs*, 561 F.3d at 278 (citing *ALS Scan*, 293 F.3d at 715); *accord Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 328 (4th Cir. 2013); *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 392 (4th Cir. 2012); *Carefirst of Md.*, 334 F.3d at 397.

### 1. TPRI

TPRI argues that it is not properly subject either to general or specific personal jurisdiction in this Court because it has never manufactured, marketed, distributed, or sold MTBE gasoline in Maryland. ECF 333-1 at 1–5. Indeed, it asserts "there is no evidence indicating that a drop of TPRI gasoline containing MTBE is actually in Maryland, let alone evidence that TPRI specifically directed gasoline containing MTBE to the State." *Id.* at 5.

The Complaint contains minimal allegations specific to TPRI. It states only that TPRI is a Delaware corporation with its principal place of business in Texas, that TPRI is qualified to do business in Maryland, and that TPRI has a resident agent in Maryland. ECF 2, ¶ 85. However, the exhibits submitted by the State and TPRI shed further light on TPRI's role in the MTBE supply chain.

The exhibits show the following. TPRI is a Delaware corporation that refines and manufactures gasoline. ECF 333-2 (Kim Arterburn Decl.), ¶ 2. It does not have any facilities in Maryland and has never manufactured, sold, or contracted for the delivery of MTBE products in Maryland. *Id.* ¶¶ 2, 11. However, TPRI availed itself of a distribution system for MTBE products whose network included Maryland. That is, TPRI sold and shipped approximately 1.5 million

barrels of its MTBE gasoline to third parties via the Colonial Pipeline, a pipeline system that is dedicated to the delivery of gasoline to Maryland, Delaware, New Jersey, Pennsylvania, and New York. ECF 357-2 (Bruce Burke Decl.), ¶¶ 16, 27; *see also* ECF 333-2, ¶ 9. Because most of the MTBE gasoline shipped on the Colonial Pipeline was fungible and commingled with the products of other suppliers, it is impossible to determine where TPRI's MTBE gasoline was delivered. ECF 357-2, ¶¶ 22–23. However, the State's expert, Bruce Burke, reviewed TPRI's shipment data and the number of delivery points on the Colonial Pipeline in Maryland, and posits that 83.7 percent of the MTBE gasoline that TPRI shipped on the Colonial Pipeline can be tied to distribution centers that supplied MTBE gasoline to the State. *Id*. ¶ 27.

TPRI's participation in the MTBE supply chain does not end there. It also sold over three million barrels of MTBE gasoline from a facility in New Jersey during the relevant time. ECF 357-2, ¶ 30; ECF 333-3 (Craig Watel Decl.), ¶ 3. More than half of this gasoline was shipped to third parties, including Shell Oil and Mobil Oil, via barge. ECF 357-2, ¶ 30; ECF 333-3 at 4–13. And, records show that Maryland received barge shipments of gasoline from New Jersey during this time. ECF 357-2, ¶ 31. Finally, along with its manufacture and sale of MTBE gasoline, TPRI also sold neat MTBE to numerous nationwide distributors of gasoline, many of which supply gasoline to Maryland. *Id*. ¶ 29.

Viewing the facts and allegations in the light most favorable to Maryland, the State has made a prima facie showing that this Court has personal jurisdiction over TPRI under Maryland's long-arm statute. In relevant part, that statute permits the exercise of personal jurisdiction over one who "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products

used or consumed in the State." C.J. § 6–103(b)(4). The exhibits demonstrate that TPRI deliberately participated in the regional distribution of MTBE gasoline and that such conduct plausibly resulted in the regular introduction of TPRI's products into Maryland. These acts and omissions allegedly caused the State's tortious injury—*i.e.*, the contamination of its waters. Accordingly, personal jurisdiction is proper under C.J. § 6–103(b)(4).

In addition, the State has made a prima facie showing that personal jurisdiction over TPRI comports with due process. In *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), the Supreme Court stated, *id*. at 297:

> [I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.

This is precisely the conduct that is plausibly shown here. TPRI sold and shipped large volumes of its MTBE gasoline to third parties via a pipeline dedicated to the delivery of gasoline to Maryland and the surrounding four states. ECF 357-2, ¶¶ 16, 27. It also sold neat MTBE to nationwide distributors—some of whom are also defendants in this case—whose networks included Maryland. *Id*. ¶ 29. Although the fungible nature of MTBE gasoline and the complex gasoline supply chain make it impossible to say where exactly TPRI's MTBE gasoline ended up, TPRI's placement of its MTBE gasoline into the stream of commerce plausibly resulted in the regular and anticipated—rather than the random or fortuitous—introduction of its products in Maryland. This constitutes purposeful availment. *See In re MTBE*, 399 F. Supp. 2d 325, 332 (S.D.N.Y. 2005) (finding defendant purposefully availed itself of the privilege of doing business in the forum states by selling large volumes of MTBE-containing gasoline to a nationwide distributor); *see also Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 179 (5th Cir. 2013) (finding

personal jurisdiction over nonresident defendant who sold 203 forklifts to customers in the forum state through a national distributor, consisting of approximately 1.55% of defendant's sales during that period); *Hart v. Bed Bath & Beyond, Inc*., 48 F. Supp. 3d 837, 843 (D. Md. 2014) (finding personal jurisdiction over nonresident manufacturer who sold its "fuel gel" to national retailer with stores in Maryland and retailer in fact sold 1,992 bottles of the gel in Maryland). *Cf. J. McIntyre Mach. Ltd. v. Nicastro*, 564 U.S. 873, 885–86 (2011) (Breyer, J., concurring) (finding no personal jurisdiction over a British company that directed marketing and sales efforts at the United States through a distributor, but whose only contact with the forum state was the sale of one of its machines to a resident of that state); *see also Hart*, 48 F. Supp. 3d at 842 (noting that Justice Breyer's concurrence in *J. McIntyre* is controlling).

Indeed, courts in MTBE cases brought in other states have found personal jurisdiction over TPRI based on the kind of conduct shown here. *See Rhode Island v. Atl. Richfield Co*. (*Rhode Island MTBE*), 357 F. Supp. 3d 129, 146–47 (D.R.I. 2018) (finding that jurisdiction over TPRI was proper in Rhode Island where state alleged that TPRI introduced MTBE "into the sequence of pipelines and storage tanks dedicated to the delivery of gasoline to Rhode Island"); *State v. Atl. Richfield Co*. (*Vermont MTBE*), 142 A.3d 215, 224 (Vt. 2016) (finding plaintiff plausibly alleged that TPRI was subject to personal jurisdiction in Vermont based on its supply of MTBE gasoline to the nationwide distribution system).

Moreover, the State's claims arise out of TPRI's contacts with Maryland, as required for specific personal jurisdiction. *See Goodyear*, 564 U.S. at 919. The State brings this suit for the tortious manufacture, marketing, sale, and distribution of MTBE that caused the contamination of its waters, and TPRI's contacts with Maryland arise from its manufacture and nationwide distribution of MTBE products.

Finally, the exercise of specific personal jurisdiction over TPRI is constitutionally reasonable. TPRI is a national corporation and has not shown that it would bear any unique burden litigating this case in Maryland; it says only that it has no presence here and is defending similar litigation in other states. ECF 333-1 at 17. By contrast, the State has a strong interest in trying its case against TPRI in Maryland, alongside the other alleged tortfeasors, and where evidence concerning its MTBE contamination will be located.

Accordingly, I shall deny TPRI's motion to dismiss for lack of personal jurisdiction.

## 2.    LPA & PJSC

Defendants LPA and PJSC[9] are corporate affiliates, and both move to dismiss the Complaint for lack of personal jurisdiction. ECF 342 (LPA); ECF 343 (PJSC); *see also* ECF 140 (Disclosure of Corporate Interest Statement of Feb. 22, 2018 filed by LPA stating that it is an indirect, wholly owned subsidiary of PJSC). They argue that they are not properly subject to this Court's personal jurisdiction because they never sold or delivered MTBE gasoline in Maryland, nor do they have any presence in Maryland. ECF 342-1 at 1; ECF 343-1 at 1–2.

The State argues that LPA and PJSC have waived their right to challenge personal jurisdiction. ECF 365 at 9–11; ECF 367 at 16–17. It points out that LPA and PJSC did not file their motions to dismiss for lack of personal jurisdiction until October 5, 2018, weeks after they joined in the submission of the motion to dismiss for failure to state a claim, filed by sixty-two defendants on September 13, 2018. *See* ECF 335-1. Because that initial motion to dismiss did not raise the defense of personal jurisdiction, the State argues that LPA and PJSC have waived this defense.

---

[9] During the time relevant to this litigation, PJSC Lukoil was known by its former name, "OAO Lukoil." ECF 139 at 1 n.1. However, for clarity, I shall refer to the entity as PJSC.

A defendant may waive the defense of personal jurisdiction by failing to timely raise it in the time prescribed by Fed. R. Civ. P. 12. Rule 12(g)(2) provides that "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Rule 12(h)(1)(A) further clarifies that a "party waives any defense listed in Rule 12(b)(2)–(5) [including defense of lack of personal jurisdiction] by . . . omitting it from a motion in the circumstances described in Rule 12(g)."

It is true, as the State asserts, that LPA and PJSC filed their motions to dismiss for lack of personal jurisdiction after the submission of the joint motion to dismiss for failure to state a claim filed by them and sixty other defendants. However, two days before the joint motion was filed, the defendants submitted a proposed briefing schedule to the Court. ECF 331 (Letter to Court of Sept. 11, 2018). That letter stated that LPA and PJSC "will join in the consolidated motion to dismiss," which was due on September 13, 2018, *and* that "they will also file a separate motion to dismiss based on individualized defenses, to be due on September 27, 2018." *Id.* at 3–4. Further, it provided that the State consented to the briefing schedule. *Id.* at 4.[10]

Accordingly, the State was aware of the intention of LPA and PJSC to raise individualized defenses before the defendants submitted the joint motion to dismiss on September 13, 2018. In light of this advance notice to the State, and particularly because of the early stage of this litigation, as well as the size and complexity of the case, I conclude that LPA and PJSC did not waive the defense of personal jurisdiction by failing to raise it in the joint motion filed by them and sixty other defendants. *See Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 60–61 (2d Cir. 1999) (observing

---

[10] On September 26, 2018, LPA and PJSC filed a request for an extension of time to file their motions until October 5, 2018. ECF 339. This Court granted their request that same day. ECF 340.

that in determining whether waiver or forfeiture of objections to personal jurisdiction has occurred, "we consider all of the relevant circumstances").

The State argues that the motions of LPA and PJSC should nonetheless be denied because they are properly subject to specific personal jurisdiction in this Court. ECF 365 at 13; ECF 367 at 22. I address each motion in turn.

### a. LPA

LPA argues that this Court lacks personal jurisdiction because the Complaint is devoid of "a single allegation against [it]." ECF 342-1 at 3. Further, it asserts that it is a "trading entity" that "simply has nothing to do with the MTBE dispute." *Id*. at 5.

In fact, the Complaint contains few allegations specific to LPA. It alleges only that LPA is a Delaware corporation, is qualified to do business in Maryland, has a resident agent in Maryland, and is "a successor in interest to relevant assets of GPMI." ECF 2, ¶ 62. However, the Complaint alleges that defendants together "represent substantially all of the Maryland market for MTBE gasoline." *Id*. ¶ 98. And, the evidence submitted by the State and LPA shows the following: LPA is a "trading company whose core business is buying and selling crude oil and petroleum products such as . . . gasoline, and gasoline components." ECF 342-2 (Simon Fenner Decl.), ¶ 4; ECF 365-1 (Bruce Burke Decl.), ¶ 27. It "essentially acts as a middleman." ECF 342-2, ¶ 5. LPA never bought, sold, blended, or delivered MTBE products in Maryland. ECF 387-1 (Simon Fenner Supp. Decl.), ¶¶ 2–6. In 2003 and 2004, however, LPA sold large volumes of MTBE gasoline to several national and regional distributors, including BP, Chevron, Hess, Shell, and Valero. ECF 365-1, ¶¶ 28–29. Most of these transactions involved delivery of gasoline to the Colonial Pipeline, which is dedicated to the supply of gasoline to Maryland, Delaware, New

Jersey, Pennsylvania, and New York. *Id.* ¶¶ 28, 30. Based on this information, the State's expert concluded that LPA supplied MTBE gasoline to Maryland during the relevant period. *Id.* ¶ 30.

This evidence plausibly demonstrates that LPA's contacts with Maryland are similar to those of TPRI. That is, LPA sold and shipped MTBE gasoline to national and regional distributors via the Colonial Pipeline, a pipeline system dedicated to the supply of gasoline in Maryland and the surrounding four states. For similar reasons, therefore, the State has made a prima facie showing that LPA is properly subject to this Court's specific personal jurisdiction. *See supra*, Section II.B.1. In particular, personal jurisdiction is permitted under Maryland's long-arm statute, which authorizes personal jurisdiction over any person who "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State." C.J. § 6–103(b)(4).

The exercise of specific personal jurisdiction over LPA also comports with due process. LPA sold and delivered MTBE gasoline to large distributors along the Colonial Pipeline. This conduct shows purposeful availment. *See Vermont MTBE*, 142 A.3d at 225 (finding specific personal jurisdiction over defendant who supplied MTBE gasoline to distribution system whose network included the forum state); *In re MTBE*, 399 F. Supp. 2d at 332 (stating that defendant "is subject to personal jurisdiction in each of the forum states because it supplies MTBE-containing gasoline to the national market."). The State's claims arise out of LPA's contacts with Maryland, as required for specific personal jurisdiction. *See Goodyear*, 564 U.S. at 919. And, LPA has not shown that this Court's exercise of specific personal jurisdiction over it would be unreasonable.

Accordingly, I shall deny LPA's motion to dismiss the Complaint for lack of personal jurisdiction.

### b. PJSC

PJSC contends that this Court lacks personal jurisdiction over it because it is a Russian holding company that has never been directly involved in the supply chain for MTBE gasoline in the United States. ECF 343-1 at 2–3. The State argues, however, that PJSC is properly subject to specific personal jurisdiction in this Court based on its own activities and the activities of its indirect subsidiary, GPMI. ECF 367 at 2–3.

The exhibits submitted by the State and PJSC show the following. PJSC is a Russian company that has hundreds of subsidiaries. ECF 343-2 (Anatoly Martynov Decl.), ¶¶ 7–8. It owns 100 percent of Lukoil Americas Corporation ("LAC"), which in turn owned 100 percent of GPMI, a Maryland corporation, from 2000 to 2011. *Id.* ¶¶ 5, 14; ECF 367-2 at 67–74 (Merger Agreement of Nov. 2, 2000); *see also* ECF 367-3 at 72 (stating that "Getty is a wholly-owned subsidiary of [LAC], which is in turn owned by [PJSC], Russia's largest vertically integrated oil company."). PJSC served as a guarantor for GPMI on multiple contracts, including: (1) a multi-year gasoline supply agreement between GPMI and BP North America, another Maryland corporation, ECF 367-2 at 93–98 (Guaranty Agreement of Oct. 2, 2000); (2) GPMI's lease agreement for hundreds of gas stations, including stations in Maryland, *id.* at 158–77 (Guaranty Agreement of Nov. 2, 2000); and (3) a $475 million loan GPMI obtained in 2005, ECF 367-3 at 70, 86–112 (Guaranty Agreement of Sept. 19, 2005). PJSC made significant other capital contributions to GPMI. ECF 367-3 at 76 ("Furthermore, to date [PJSC] has made over $50 million in capital contributions to GPMI] and plans for additional contributions going forward."); ECF 2, ¶ 272.

PJSC also entered into a licensing agreement with GPMI to use the Lukoil brand throughout the United States, and funded a campaign for the rebranding of GPMI's gas stations. ECF 367-3 at 56–67 (License Agreement of Aug. 21, 2003); ECF 367-3 at 74 (Confidential Memorandum sent by PJSC and GPMI in Aug. 2005 re $475 million loan, stating: "The rebranding will be supported by a significant marketing and advertising campaign (approximately $10MM per year) to be funded by [PJSC], which should increase brand awareness as a tier one brand and position Lukoil gasoline as a non-Middle Eastern gasoline alternative."). And, when GPMI became unprofitable, PJSC allegedly orchestrated and carried out a scheme to transfer all of GPMI's profitable assets to another subsidiary and drive GPMI into bankruptcy. ECF 367 at 12–16; ECF 2, ¶¶ 287–91.

Notably, however, the declaration submitted by PJSC states that PJSC has never manufactured, distributed, sold, or purchased MTBE in the United States (ECF 343-2, ¶ 12); never sold gasoline in the United States, including gasoline containing MTBE (*id.* ¶ 11); never owned or operated a refinery, a petroleum product terminal, or service station in the United States (*id.* ¶ 10); has no employees and conducts no operations in the United States (*id.* ¶ 13); maintained its own books and records (*id.* ¶ 20); and never controlled the day-to-day operations of GPMI, including its budgeting, marketing, operating, personnel, or sales. *Id.* ¶ 22.

As a threshold matter, I conclude that the State has not made a prima facie showing that PJSC is subject to specific personal jurisdiction in this Court based on its own conduct. It has not shown that PJSC purposefully availed itself of doing business in Maryland in any way, apart from its role as the indirect corporate parent of GPMI, a Maryland corporation. That alone is not enough. *See Debt Relief Network, Inc. v. Fewster*, 367 F. Supp. 2d 827, 830 (D. Md. 2005) ("… it is also true that 'a foreign parent corporation is not subject to the jurisdiction of a forum state merely

because its subsidiary is present or doing business there'") (quoting *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 218 (5th Cir. 2000)); *see also Vitro Elec. v. Milgray Elec., Inc.*, 255 Md. 498, 502, 258 A.2d 749, 751 (1969) ("[A] forum corporation is not construed as doing business within a state merely because of its ownership of all of the shares of stock of another corporation doing business in the state."). Moreover, PJSC's contacts with Maryland as the indirect corporate parent of GPMI—serving as a guarantor on GPMI's major contracts and providing capital to GPMI—do not provide the basis for this suit. *See Saudi*, 427 F.3d at 276.

Therefore, the question is whether PJSC is subject to personal jurisdiction in this Court because of the activities of its subsidiary, GPMI. It is well settled that "[a] corporation exists as a legal entity separate and distinct from its corporate shareholders." *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044, 1047 (4th Cir. 1988); *see United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries.") (citation omitted). Thus, "it is generally the case that the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity." *Saudi*, 427 F.3d at 276.

However, the Fourth Circuit has observed: "'[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual . . . that would not ordinarily be subject to personal jurisdiction in that court when the individual . . . is an alter ego . . . of a corporation that would be subject to personal jurisdiction in that court.'" *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433 (4th Cir. 2011) (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 n.18 (5th Cir. 2002)) (alterations in original). So, "[t]o assert jurisdiction over a parent company based on the conduct of a subsidiary, the court must find circumstances warranting it to pierce the

corporate veil." *Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 722–23 (D. Md. 2000). The law of the forum state determines whether the corporate veil should be pierced to exercise personal jurisdiction over a nonresident defendant. *Burns & Russell Co. v. Oldcastle, Inc.*, 198 F. Supp. 2d 687, 697 (D. Md. 2002).

Notably, "Maryland generally is more restrictive than other jurisdictions in allowing a plaintiff to pierce the corporate veil." *Harte–Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp.*, 299 F. Supp. 2d 505, 514 (D. Md. 2004) (citing *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 728 A.2d 783, 790–91 (1999)). The Maryland Court of Appeals has adopted the so called "agency" test in deciding whether to pierce the veil separating parent corporations from their subsidiaries for jurisdictional purposes. *Mylan Labs*, 2 F.3d at 61 (citing *Vitro Elec.*, 255 Md. at 501–03, 258 A.2d at 751–52); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 775 F. Supp. 2d 790, 797 (D. Md. 2011). Under the agency test, the court may attribute the actions of a subsidiary corporation to the parent corporation only if the parent exerts considerable control over the activities of the subsidiary. *Mylan Labs*, 2 F.3d at 61 (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335–38 (1925)); *see Fin. Co. of Am. v. Bank of Am. Corp.*, 493 F. Supp. 895, 903–08 (D. Md. 1980). The central inquiry is "whether significant decisions of the subsidiary must be approved by the parent." *Mylan Labs*, 2 F.3d at 61.

Courts consider various factors in determining whether the requisite level of control exists, such as "whether the parent and subsidiary maintain separate books and records, employ separate accounting procedures, and hold separate directors' meetings." *Id.* In addition, courts consider "the level of interdependence between parent and subsidiary." *Id.* (citing *Harris v. Arlen Props., Inc.*, 256 Md. 185, 200, 260 A.2d 22, 29 (1969)). "Finally, the court must find that [the parent]

knew, or should have known, that its conduct would have some impact in Maryland." *Mylan Labs*, 2 F.3d at 61–62.

The exhibits demonstrate that PJSC exercised some control over GPMI. PJSC contributed capital to GPMI, served as a guarantor on GPMI's major contracts, oversaw GPMI's budget, and shared its brand name with GPMI. But, the exhibits also show that PJSC and GPMI existed largely as separate entities; they maintained their own books and records, had their own boards of directors, and did not comingle their accounts. ECF 343-2, ¶¶ 18, 20. Moreover, in the declaration submitted by PJSC in support of its motion, its corporate representative asserts that PJSC never exercised control over the day-to-day operations of GPMI. *Id.* ¶ 22.

On these facts, the State has not sustained its burden of showing that PJSC exerted a degree of control over GPMI greater than that of a typical parent company and, thus, that GPMI's contacts with Maryland may be imputed to PJSC for jurisdictional purposes. *See Haley Paint Co. v. E.I. Dupont de Nemours & Co.*, No. RDB-10-0318, 2012 WL 1145027, at *4 (D. Md. Apr. 3, 2012) (finding insufficient control where evidence showed that parent company was required to "approve the most significant contracts entered into by [the subsidiary]" but that subsidiary had significant autonomy in its day-to-day operations); *Newman*, 125 F. Supp. 2d at 723 (declining to pierce the corporate veil where the parent and subsidiary used consolidated financial statements and the parent had to approve major decisions of the subsidiary because the subsidiary was a separate corporate entity with its own financial records and there was no allegation that subsidiary was merely a sham company); *see also Call Carl, Inc. v. BP Oil Corp.*, 391 F. Supp. 367, 371 (D. Md. 1975) ("Notwithstanding the fact that the parent may own all of a subsidiary's stock, and interlocking directorships may exist between the two corporations, it is axiomatic that if a

subsidiary maintains its own books and accounts, and makes its own marketing, purchasing, management and other policy decisions, it cannot be held to be acting as an agent of the parent.").

Viewing the facts in the light most favorable to the State, I conclude that the State has not made a prima facie case for personal jurisdiction over PJSC. The record is devoid of facts from which sufficient minimum contacts with Maryland may be reasonably inferred. And, the exercise of personal jurisdiction over PJSC, a foreign corporation, would impose a significant burden upon it. *See Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."). In these circumstances, subjecting PJSC to personal jurisdiction in this Court would "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463).

As an alternative to granting PJSC's motion, the State asks the Court for the opportunity to conduct limited jurisdictional discovery. ECF 367 at 30–31. Specifically, the State argues that jurisdictional discovery "into [PJSC]'s own contacts with Maryland, as well as its role in managing GPMI, would resolve any uncertainty about [PJSC]'s involvement in GPMI's blending and sale of MTBE gasoline in Maryland." *Id.* at 31.

"Discovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted." *Mylan Labs*, 2 F.3d at 64. However, district courts "'have broad discretion in [their] resolution of discovery problems that arise in cases pending before [them].'" *Carefirst of Md.*, 334 F.3d at 402 (quoting *Mylan Labs*, 2 F.3d at 64) (alterations in *Mylan Labs*). In some cases, where the record suggests some indicia of personal jurisdiction, limited jurisdictional discovery may be warranted to ascertain more facts. *See, e.g., Combs*, 886 F.2d at 676–77 (defendants'

solicitations to investors in the forum state were sufficient to establish a prima facie case for jurisdiction); *Androutsos v. Fairfax Hosp.*, 323 Md. 634, 649–50, 594 A.2d 574 (1991) (defendant's advertisement directed at forum state was indicia of personal jurisdiction). But, "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery." *Carefirst of Md.*, 334 F.3d at 402–03 (citing *McLaughlin v. McPhail*, 707 F.2d 800, 806 (4th Cir. 1983) (concluding that district court did not abuse its discretion in denying jurisdictional discovery when, "[a]gainst the defendants' affidavits," plaintiff "offered nothing beyond his bare allegations that the defendants had had significant contacts with the [forum] state of Maryland")).

Indeed, the Fourth Circuit has said that, "where a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the court need not permit even limited discovery confined to issues of personal jurisdiction should it conclude that such discovery will be a fishing expedition." *Carefirst of Md.*, 334 F.3d at 403 (citation omitted); *see Unspam Tech., Inc. v. Chernuk*, 716 F.3d 322, 330 n.1 (4th Cir. 2013) (suggesting that the court did not abuse its discretion in denying jurisdictional discovery based on conclusory allegations of personal jurisdiction); *ALS Scan*, 293 F.3d at 716 n.3 (upholding district court's refusal to allow plaintiff to engage in jurisdictional discovery where plaintiff's request was based on "conclusory assertions").

In my view, jurisdictional discovery is not warranted here. The record lacks any plausible indicia that PJSC had minimum contacts with Maryland or exerted so much control over its subsidiary, GPMI, such that GPMI's contacts may be imputed to PJSC. The State has not pointed to facts that contradict PJSC's declaration, (ECF 343-2), outlined earlier, nor has it suggested any reason to question its accuracy. Although this Court "must take all disputed facts and reasonable

inferences in favor of the plaintiff," *Carefirst of Md.*, 334 F.3d at 396, it is "not required to look solely to the plaintiff's proof in drawing those inferences," *Mylan Labs*, 2 F.3d at 62.

Accordingly, I will deny the State's request for jurisdictional discovery as an alternative to ruling on the issue of personal jurisdiction over PJSC. And, I shall grant PJSC's motion to dismiss for lack of personal jurisdiction.

### III.     Motions to Dismiss for Failure to State a Claim

As noted, sixty-two defendants filed a joint motion to dismiss the Complaint for failure to state a claim under Rule 12(b)(6). ECF 335. Several defendants also filed supplemental motions to dismiss. *See* ECF 334 (Duke Energy, Warren, Guttman Energy, TPRI); ECF 336 (7-Eleven); ECF 338 (Hartree); ECF 342 (LPA).

### A.     Legal Standard

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions'. . .'"); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346–47 (2014) (per curiam).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours*, 637 F.3d at 440 (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from

the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours*, 637 F.3d at 448). The court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*

*v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). But, in limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md.

2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). But, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

## B.    Choice of Law

The parties assume without discussion that Maryland law applies here. The case was removed to federal court pursuant to Section 1503 of the EPACT and Article III's "arising under" jurisdiction because the defendants raised a colorable federal defense of conflict preemption under the CAA. ECF 1; ECF 347 (Order Denying Motion to Remand of Oct. 24, 2018). However, the State asserts claims founded only on Maryland law. ECF 2. Accordingly, this Court applies the choice of law principles of Maryland, the forum state. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Walker v. Nat'l R.R. Passenger Corp.*, 703 F. Supp. 2d 495, 501 (D. Md. 2010); *see also In re MTBE*, No. SAS-14-6228, 2015 WL 1500181, at *2–3 (S.D.N.Y. Mar. 30, 2015) (holding that state substantive law applied in case for MTBE contamination that was removed to federal court pursuant to Section 1503 of the EPACT).

Under Maryland's choice-of-law principles, tort claims are governed by the law of the state where the alleged harm occurred ("*lex loci delicto*"). *See, e.g.*, *Lewis v. Waletzky*, 422 Md. 647, 657, 31 A.3d 123, 129 (2011); *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010). In this case, the alleged harms occurred in Maryland. *See* ECF 2, ¶¶ 3, 213–24. Accordingly, Maryland law applies to the State's common law tort claims in Counts I-VI of the Complaint. And, of course, Maryland law also governs the State's claims in Counts VII-XI under Maryland's Environment Article.

## C.     Discussion

I first address the arguments raised in the defendants' Joint Motion. I will then consider the supplemental motions.

### 1.     Causation

The first six counts of the Complaint allege common law tort claims under theories of both strict liability and negligence: strict product liability based on defective design (Count I); strict product liability based on failure to warn (Count II); strict liability for abnormally dangerous activity (Count III); public nuisance (Count IV); trespass (Count V); and negligence (Count VI).

Defendants argue that all of these claims must be dismissed because the State fails to plead causation. ECF 335-2 at 4–7. Specifically, defendants assert that the State admits it cannot prove traditional causation because it alleges in the Complaint that "MTBE gasoline is a fungible product and lacks traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular defendant." *Id*. at 4–5 (quoting ECF 2, ¶ 99). And, because Maryland courts have rejected alternative theories of liability, defendants argue that the State's tort claims should be dismissed for failure to plead this necessary element. *Id*. at 6–7.

Proximate cause is a necessary element in actions for negligence and strict liability. *Ford Motor Co. v. Gen. Accident Ins. Co.*, 365 Md. 321, 335, 779 A.2d 362, 369–70 (2001) (identifying the three "product litigation basics" as defect, attribution of defect to seller, and a causal relationship between the defect and the injury) (citing *Harrison v. Bill Cairns Pontiac*, 77 Md. App. 41, 50, 549 A.2d 385, 390 (1988)); *Arbogast v. A.W. Chesterton Co.*, 197 F. Supp. 3d 807, 811 (D. Md. 2016); *Pittway Corp. v. Collins*, 409 Md. 218, 255 n.17, 973 A.2d 771, 793 n.17 (2009) (noting that proximate cause is a necessary element of product liability claims based on theories of both strict liability and negligence). A defendant's conduct is the proximate cause of a plaintiff's injury when it is "1) a cause in fact, and 2) a legally cognizable cause." *Pittway*, 409 Md. at 243, 973 A.2d at 786; *see Copsey v. Park*, 453 Md. 141, 164, 160 A.3d 623, 636 (2017).

The Maryland Court of Appeals has explained, *Pittway*, 409 Md. at 243–44, 973 A.2d at 786:

> In other words, before liability may be imposed upon an actor, we require a certain relationship between the defendant's conduct and the plaintiff's injuries. The first step in the analysis to define that relationship is an examination of causation-in-fact to determine who or what caused an action. The second step is a legal analysis to determine who should pay for the harmful consequences of such an action.

The causation-in-fact inquiry asks "'whether defendant's conduct actually produced an injury.'" *Id.* at 244, 973 A.2d at 786 (quoting *Peterson v. Underwood*, 258 Md. 9, 16–17, 264 A.2d 851, 855 (1970)). Maryland courts have developed two tests to determine whether the requisite causation exists: the "but-for test" and the "substantial factor" test. *Id.*

Under the but-for test, the requisite causation exists when the injury would not have occurred but for the defendant's conduct. *Pittway*, 409 Md. at 244, 973 A.2d at 786–87 (citing *Peterson*, 258 Md. at 16, 264 A.2d at 855). The but for test applies in cases where only one negligent act is at issue. *Id.* at 244, 973 A.2d at 786.

The Maryland Court of Appeals has also adopted the substantial factor set forth in the Restatement (Second) of Torts (1965) ("Restatement"). *Pittway*, 409 Md. at 244, 973 A.2d at 787 (citing *Eagle-Picher Indus., Inc. v. Balbos*, 326 Md. 179, 208–09, 604 A.2d 445, 459 (1992)). Under the substantial factor test, the requisite causation may be found if it is "'more likely than not'" that the defendant's conduct was a substantial factor in producing the plaintiff's injuries. *Copsey*, 453 Md. at 164, 160 A.3d at 636 (quoting *Pittway*, 409 Md. at 244, 973 A.2d at 787); *accord Balbos*, 326 Md. at 209, 604 A.2d at 459. This test applies when two or more independent acts bring about an injury. *Pittway*, 409 Md. at 244, 973 A.2d at 787.

In determining whether the requisite connection exists under the substantial factor test, the following considerations are relevant:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces of which the actor is not responsible;
>
> (c) lapse of time.

*Pittway*, 409 Md. at 245, 973 A.2d at 787 (quoting Restatement, § 433).

If causation in fact is established under the appropriate test, the proximate cause analysis turns to whether the defendant's conduct was the legal cause of the plaintiff's injuries. *Copsey*, 453 Md. at 165, 160 A.3d at 637; *Pittway*, 409 Md. at 245, 973 A.2d at 787. This analysis focuses on foreseeability; the court asks whether the "actual harm to a litigant falls within a general field

of danger that the actor should have anticipated or expected." *Pittway*, 409 Md. at 245, 973 A.2d at 787.[11]

The parties' dispute centers on the traditional requirement that, in product liability cases, the plaintiff must "link the defendant to the product" to establish causation. *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 510, 16 A.3d 159, 167 (2011); *see Reiter v. Pneumo Abex, LLC*, 417 Md. 57, 69, 8 A.3d 725, 732 (2010); *see also Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986) ("To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked."); *Lee v. Baxter Healthcare Corp.*, 721 F. Supp. 89, 93 (D. Md. 1989) ("Maryland courts apply traditional products liability law which requires the plaintiff to prove that the defendant manufactured the product which allegedly caused the injury."); W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 103 at 713 (5th ed. 1984) ("It is quite clear that an essential element of the plaintiff's case has been the identification of the named defendant as the manufacturer or supplier of the defective product.").

The State's Complaint does not satisfy this element. It alleges that MTBE "lacks traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular defendant." ECF 2, ¶ 99. Therefore, defendants argue that the State's common law tort claims should be dismissed for failure to plausibly allege causation. ECF 335-2 at 4–5.

The State retorts that it adequately pleads causation under both traditional and alternative theories. ECF 359 at 4. First, as to traditional causation, the State argues that it plausibly alleges

---

[11] The defense of superseding cause "arises primarily when 'unusual' and 'extraordinary' independent intervening acts occur that could not have been anticipated by the original tortfeasor.'" *Pittway*, 409 Md. at 249, 973 A.2d at 789 (citation omitted).

that each defendant that contributed MTBE or MTBE gasoline to the commingled product that polluted its waters was a substantial factor in producing the injury. *Id*. at 4–5. And, the State says that it can "use market share evidence (as well as other evidence) to estimate what percentage of the leaked MTBE was manufactured or supplied by each defendant." *Id*. Second, the State contends that Maryland courts would endorse at least two of the alternative liability theories pleaded in its Complaint—market share liability and commingled product liability—as an alternative to the product identification requirement. *Id*. at 8.

Thus, the Court must determine whether the product identification requirement for causation bars recovery where, as here, the State alleges that its injury was caused by the commingled, fungible MTBE gasoline of several defendants. To my knowledge, however, Maryland courts have never addressed this question.

The role of a federal court when considering an issue of state law is to "interpret the law as it believes that state's highest court of appeals would rule." *Abadian v. Lee*, 117 F. Supp. 2d 481, 485 (D. Md. 2000) (citing *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir.), *cert. denied*, 506 U.S. 824 (1992); *accord Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002) (stating that federal court's task in considering an issue of state law is to "predict how [the state's highest] court would rule if presented with the issue"). Therefore, this Court must predict how the Maryland Court of Appeals would rule if presented with the issue. *Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005) (stating that federal court's task in considering an issue of state law is to "'predict how [the state's highest] court would rule if presented with the issue'") (quoting *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002)); *accord Abadian v. Lee*, 117 F. Supp. 2d 481, 485 (D. Md. 2000) (citing *Liberty*

*Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992), *cert. denied*, 506 U.S. 824 (1992)).[12]

I reject at the outset the State's argument that it plausibly alleges causation under the substantial factor test. As noted, the substantial factor is used when two or more independent acts bring about a single injury. *Pittway*, 409 Md. at 244, 973 A.2d at 787. Fatal to the State's argument, however, is that a cause must be sufficient before it can be substantial. *See Balbos*, 326 Md. at 208, 604 A.2d at 459 (stating that "'[i]f two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result,' some test of proximate causation, other than 'but-for' is needed") (quoting *Prosser & Keeton*, *supra*, § 41 at 266); *see also* Restatement, § 432(2) ("If . . . each [force] of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial contributing factor."); *Asphalt & Concrete Servs., Inc. v. Perry*, 221 Md. App. 235, 261, 108 A.3d 558, 574 (2015) ("The 'substantial factor' test appears when 'two independent causes concur to bring about an injury, and

_____

[12] Under the Maryland Uniform Certification of Questions of Law Act, Md. Code (2013 Repl. Vol., 2019 Supp.), C.J. § 12–601 *et seq.*, this Court may certify a question of law to the Maryland Court of Appeals "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling [Maryland] appellate decision, constitutional provision, or statute. . ." *See* C.J. § 12-603. Certification "ensur[es] the correct legal outcome, aid[s] in judicial economy, and manifest[s] proper respect for federalism." *Sartin v. Macik*, 535 F.3d 284, 291 n.6 (4th Cir. 2008).

When deciding whether certification of a question of law is appropriate, a federal court must undertake a two-part inquiry. First, the court must consider whether the answer "'may be determinative of an issue in pending litigation.'" *Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234 (4th Cir. 2014) (quoting C.J. § 12-603)). Second, it must "evaluate whether [the question may be answered] based on a 'controlling appellate decision, constitutional provision, or statute of [Maryland].'" *Antonio*, 749 F.3d at 234 (second alteration in original) (quoting C.J. § 12-603).

No request for certification has been made by any party in this case. In my view, certification is not necessary in order to resolve the issue. I am reasonably satisfied that I am able to anticipate the way in which the Maryland Court of Appeals would rule.

either cause, standing alone, would have wrought the identical harm.'") (quoting *Yonce v. SmithKline Beecham Clinical Lab*, 111 Md. App. 124, 138, 680 A.2d 569 (1996)).

Here, the State alleges that defendants are collectively responsible for the MTBE gasoline that was released into its waters, resulting in widespread contamination. ECF 2, ¶¶ 1, 220. But, the State does not allege that any single defendant's conduct was sufficient to cause its injury. Accordingly, it fails to plausibly allege causation under the substantial factor test.

I turn to consider whether, as the State argues, Maryland courts would allow it to proceed under the market share and/or commingled product theories of liability where product identification is necessary for relief. ECF 359 at 8. I begin by outlining those theories.

The theory of market share liability was fashioned by the California Supreme Court in *Sindell v. Abbott Labs*, 607 P.2d 924 (Cal. 1980). There, the plaintiff was injured as a result of her mother's ingestion of diethylstilbesterol ("DES") during pregnancy. *Id*. at 925. Because the plaintiff was unable to identify the manufacturer of the precise product that caused her injuries, she filed suit against several manufacturers of DES. *Id*. at 925–26. The court found that the defendants, taken together, constituted 90% of the DES market during the relevant period, and that they knew or should have known that DES was a carcinogenic substance but failed to warn the public of its potential danger. *Id*. at 937. Recognizing that "advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer," the *Sindell* Court shifted the burden to defendants to disprove causation. *Id*. at 936–37. It determined that if the defendants were unable to show that they did not manufacture the injury-causing product, and the plaintiff was able to prove the rest of her case, they would be liable for any judgment against them according to their share of the DES market at the time of injury. *Id*. at 937.

Thus, under the market share theory, the burden to disprove causation shifts to the defendants if they represent a "substantial share" of the relevant product market and the plaintiff establishes a prima facie case on the other elements of her claim. *Sindell*, 607 P.2d at 936–37. Liability is then apportioned among those defendants unable to disprove causation based on their respective shares of the market for the injury-causing product. *Wallace & Gale Asbestos Settlement Tr. v. Busch*, 464 Md. 474, 211 A.3d 166 (2019).

The theory of commingled product liability was developed by the court in *In re MTBE*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005), specifically for MTBE cases. In a consolidated, multi-district litigation case assigned to former Judge Shira A. Scheindlin, she described the theory as follows, *id*. at 377–78:

> When a plaintiff can prove that certain gaseous or liquid products (e.g., gasoline, liquid propane, alcohol) of many suppliers were present in a completely commingled or blended state at the time and place that the risk of harm occurred, and the commingled product caused a single indivisible injury, then each of the products should be deemed to have caused the harm . . . Because the petroleum products were commingled to form a new mixture, each of the ten refiners contributed to the injury in proportion to the amount of product that each supplied. Under this theory, each refiner actually caused the injury. Thus, if a defendant's indistinct product was present in the area of contamination and was commingled with the products of other suppliers, all of the suppliers can be held liable for any harm arising from an incident of contamination.

In other words, when a commingled product causes a single, indivisible injury, "each of the . . . refiners contributed to the injury in proportion to the amount of the product that each supplied." *Id*. at 378. Thus, each should be held proportionately liable. *Id*.

Under the commingled product theory, the plaintiff bears the burden of proving that each defendant actually contributed to the harm. *Id*. This requires a showing that the product of each supplier-defendant is known to be present in the commingled product. *Id*. at 378–79. If such a

showing is made, damages are "apportioned by proof of a defendant's share of the market at the time a risk of harm was created to a class of potential victims." *Id*. at 378.

Maryland courts have rejected market share liability in asbestos cases. *See Wallace & Gale*, 464 Md. at 489-91, 211 A.3d at 1174–76 (noting that Maryland rejects market share liability in asbestos cases); *Reiter*, 417 Md. at 65, 8 A.3d at 730 (stating that, in asbestos cases, market-share liability "is not recognized under Maryland law"). But, to my knowledge, Maryland's appellate courts have never considered the commingled product theory.

In *In re MTBE*, 379 F. Supp. 2d 348, Judge Scheindlin was assigned the difficult task of predicting whether the tort law of fifteen different states would recognize alternative theories of causation in cases alleging MTBE contamination. Some of those states, like Maryland, had not adopted alternative theories of liability to address the product identification requirement for causation in product liability cases. *See id.* at 379 (Connecticut); *id*. at 394 (Indiana); *id*. at 403 (Kansas); *id*. at 413 (New Hampshire); *id*. at 420 (New Jersey); *id*. at 437 (Pennsylvania); *id*. at 439 (Vermont, Virginia, and West Virginia). Judge Sheindlin conducted a thorough analysis of each state's tort law and concluded that all of them would apply either the commingled product or market share theories of liability where product identification was necessary for relief. *Id*. at 382 (Connecticut); *id*. at 396–97 (Indiana); *id*. at 405 (Kansas); *id*. at 416 (New Hampshire); *id*. at 421 (New Jersey); *id*. at 437 (Pennsylvania); *id*. at 440 (Vermont, Virginia, and West Virginia). Accordingly, she denied the defendants' motions to dismiss the claims asserted by plaintiffs in each of those states for failure to adequately plead causation.

Other courts have also found that plaintiffs in MTBE cases may prove causation using an alternative approach. *See Rhode Island MTBE*, 357 F. Supp. 3d at 141 (concluding that MTBE defendants had the burden of apportioning harm on plaintiff's tort claims); *State v. Exxon Mobil*

*Corp.* (*New Hampshire MTBE*), 126 A.3d 266, 297–98 (N.H. 2015) (finding that the trial court properly allowed the jury to determine that defendant could be held liable for its percentage of the supply market of MTBE gasoline, noting that "the State faced an impossible burden of proving which of several MTBE gasoline producers caused New Hampshire's groundwater contamination").

The Restatement (Second) of Torts—on which Maryland's appellate courts frequently rely—similarly endorses a modification of traditional causation principles under the circumstances presented here. Specifically, the Restatement provides: "Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor." *Id.* § 433B(2). The comments explain that the paradigmatic case is "the pollution of a stream by a number of factories which discharge impurities into it." *Id.* cmt. c.

Further, the Restatement provides, § 433B(2) cmt. d:

> The reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned. In such a case the defendant may justly be required to assume the burden of producing that evidence, or if he is not able to do so, of bearing the full responsibility. As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former.

The Maryland Court of Appeals has said that "'the common law is not static; its life and heart is its dynamism—its ability to keep pace with the world while constantly searching for just and fair solutions to pressing societal problems.'" *Kelley v. R.G. Indus., Inc.*, 304 Md. 124, 140, 497 A.2d 1143, 1150 (1985) (quoting *Harrison v. Mont. Cty. Bd. of Educ.*, 295 Md. 442, 460, 456

A.2d 894 (1983)).  The court has demonstrated a tendency to fashion the common law to allow plaintiffs to pursue recovery when the facts and circumstances of their actions presented obstacles to relief.  *See Phipps v. Gen. Motors Corp.*, 278 Md. 337, 352–53, 363 A.2d 955, 963 (1976) (adopting the theory of strict liability outlined in the Restatement, reasoning that "there is no reason why a party injured by a defective and unreasonably dangerous product, which when placed on the market is impliedly represented as safe, should bear the loss of that injury when the seller of that product is in a better position to take precautions and protect against the defect"); *see also Boblitz v. Boblitz*, 296 Md. 242, 273, 462 A.2d 506, 521 (1983) (abrogating the rule of interspousal immunity in negligence cases because it is "unsound in the circumstances of modern life"); *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977) (adopting the tort of intentional infliction of emotional distress).  The Court has also said that the question of proximate cause is "to be decided in a common sense fashion in the light of the attending facts and circumstances. . ." *Jubb v. Ford*, 221 Md. 507, 513, 157 A.2d 422, 425 (1960); *see Medina v. Meilhammer*, 62 Md. App. 239, 247, 489 A.2d 35, 39 (1985) ("The court should not indulge in refinements and subtleties as to causation which would defeat the ends of justice.") (citations omitted).

This case presents a compelling case for modification of the traditional product identification requirement.  The State alleges that MTBE has caused widespread contamination of its waters; that MTBE gasoline is a fungible product; that MTBE gasoline is routinely commingled between different manufacturers and suppliers; and that defendants together controlled substantially all of the market for MTBE gasoline in Maryland.  ECF 2, ¶¶ 98–102.  To shield defendants from liability merely because the nature of their product makes it impossible to establish the manufacturer, refiner, or supplier would be contrary to Maryland law and public policy.

I am satisfied that, rather than support the rigid application of traditional causation principles, Maryland courts would endorse the application of an alternative theory of liability in this case where product identification is a necessary element for relief. Therefore, I conclude that Maryland courts would allow the State to proceed on its claims under the commingled product theory, which is "closer to traditional causation than market share liability." *In re MTBE*, 591 F. Supp. 2d 259, 268 (S.D.N.Y. 2008). However, it applies only when: (1) the product of each defendant is present in the commingled product, and; (2) the commingled product caused the plaintiff's harm. *In re MTBE*, 379 F. Supp. 2d at 378–79. The application of this theory ensures fairness in apportioning liability and would provide compensation to innocent parties for the alleged contamination of their water supply.

Accordingly, the State's failure to link particular defendants to particular releases of MTBE gasoline into its waters does not mandate dismissal of its tort claims at this time.

Of course, this theory will be inapplicable if traditional proof of causation is possible after discovery. At this stage, however, the State may rely on this theory to survive dismissal.

### 2.    Design Defect (Count I)

Count I of the Complaint alleges strict liability based on defective design. ECF 2, ¶¶ 308–21. Defendants argue that this claim must be dismissed because the State fails to allege that MTBE gasoline was defective as a consumer product. ECF 335-2 at 12.

Maryland has adopted the theory of strict liability for product liability, as set forth in the Restatement (Second) of Torts, § 402A. *Phipps*, 278 Md. at 352, 363 A.2d at 963; *see May v. Air & Liquid Sys. Corp*., 446 Md. 1, 23, 129 A.3d 984, 997 (2015). Section 402A provides, in pertinent part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

> (a) the seller is engaged in the business of selling such a product, and

> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

> (a) the seller has exercised all possible care in the preparation and sale of his product, and

> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The "theory of strict liability is not a radical departure from traditional tort concepts." *Phipps*, 278 Md. at 351, 363 A.2d at 963. However, notwithstanding the terminology of the doctrine, "the seller is not an insurer, as absolute liability is not imposed on the seller for any injury resulting from the use of his product." *Id.* Rather, "[p]roof of a defect in the product at the time it leaves the control of the seller implies fault on the part of the seller . . . for injuries caused by the product." *Id.* Moreover, under § 402A, defenses are still available to the seller, such as "where injury results from abnormal handling or use of the product. . . ." *Id.* at 346, 363 A.2d at 960.

Nevertheless, the *Phipps* Court observed that "there are those kinds of conditions which, whether caused by design or manufacture, can never be said to involve a reasonable risk." *Id.* at 345, 363 A.2d at 959. Therefore, the court expressly "adopt[ed] 'the theory of strict liability as expressed in Section 402A of the Restatement (Second) of Torts," and as referred to today as the "consumer expectation" test. *Id.* at 353, 363 A.2d at 963. It reasoned: "In our view, there is no reason why a party injured by a defective and unreasonably dangerous product, which when placed on the market is impliedly represented as safe, should bear the loss of that injury when the seller

of the product is in a better position to take precautions and protect against the defect." *Id.* at 352–53, 363 A.2d at 963.

A plaintiff must establish the following elements to prevail in an action for strict product liability in Maryland: "(1) the product was in defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition." *Phipps*, 278 Md. at 344, 363 A.2d at 958 (citing Restatement, § 402A); *see Parker v. Allentown, Inc*., 891 F. Supp. 2d 773, 791 (D. Md. 2012). An action for strict liability focuses "not on the conduct of the manufacturer but rather on the product itself." *Phipps*, 278 Md. at 344, 363 A.2d at 958.

"A product defect may arise from the design of the product, a deficiency in its manufacture, or from the absence or inadequacy of instructions or warnings as to its safe and appropriate use." *Shreve v. Sears, Roebuck & Co*., 166 F. Supp. 2d 378, 407 (D. Md. 2001) (citing *Simpson v. Standard Container Co*., 72 Md. App. 199, 203, 527 A.2d 1337, 1339–40 (1987)); *see Phipps*, 278 Md. at 345, 363 A.2d at 960; *Kelley*, 304 Md. at 135, 497 A.2d at 1148; *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633, 639 (1992). In *Nissan Motor Co. v. Nave*, 129 Md. App. 90, 740 A.2d 102 (1999), the Maryland Court of Special Appeals explained, *id*. at 118, 740 A.2d at 117 (citations omitted):

> There are three situations in which a product is in a "defective condition": (1) there is a flaw in the product at the time of sale making it more dangerous than intended; (2) the manufacturer of the product fails to warn adequately of a risk or hazard related to the way the product was designed; or (3) the product has a defective design.

Maryland courts apply either the consumer expectation test or the risk-utility test to determine whether a product is "defective and unreasonably dangerous, for strict liability

purposes." *Halliday v. Sturm, Ruger & Co.*, 368 Md. 186, 193, 792 A.2d 1145, 1150 (2002); *see Kelley*, 304 Md. at 135–36, 497 A.2d at 1148–49; *Grinage v. Mylan Pharm., Inc.*, 840 F. Supp. 2d 862, 870 (D. Md. 2011). The consumer expectation test is derived from § 402A of the Restatement. *See Halliday*, 368 Md. at 193, 792 A.2d at 1150. Under that test, a "defective condition" is defined as a "'condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.'" *Id.* (quoting Restatement, § 402A cmt. g). And, a product is "unreasonably dangerous" if it is "'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics.'" *Id.* (quoting Restatement, § 402A cmt. i); *see also Prosser & Keeton*, *supra*, § 99 at 698.

Under the risk-utility test, a product is defective and unreasonably dangerous "if the danger presented by the product outweighs its utility." *Halliday*, 368 Md. at 194, 792 A.2d at 1150; *see Lloyd v. General Motors Corp.*, 275 F.R.D. 224, 226 (D. Md. 2011). Application of this test involves the consideration of several factors: "'(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product and (7) the ability to eliminate danger without seriously impairing the usefulness of the product.'" *Singleton v. Int'l Harvester Co.*, 685 F.2d 112, 115 (4th Cir. 1981) (quoting *Phipps*, 278 Md. at 345 n.4, 363 A.2d at 959 n.4); *see also Parker*, 891 F. Supp. 2d at 791; *Lloyd v. General Motors Corp.*, 266 F.R.D. 98, 108 (D. Md. 2010).

Where the risk-utility test is applied, "the issue usually becomes whether a safer alternative design was feasible. . ." *Halliday*, 368 Md. at 194, 792 A.2d at 1150. However, the Maryland

Court of Appeals has said that the risk-utility test applies only when the product "malfunctions in some way." *Id.* at 200, 792 A.2d at 1153; *see Kelley*, 304 Md. at 138, 497 A.2d at 1149 (stating that the risk-utility test is "only applied when something goes wrong with a product"); *Parker*, 891 F. Supp. 2d at 791 ("The risk/utility test applies 'when something goes wrong with the product,' such as here, where the rack tipped over.") (quoting *Halliday*, 368 Md. at 197, 792 A.2d at 1152); *Grinage*, 840 F. Supp. 2d at 870.

Indeed, the *Halliday* Court said, 368 Md. at 209, 792 A.2d at 1153: "Given the controversy that continues to surround the risk-utility standard articulated for design defect cases in § 2 of the Restatement (Third), we are reluctant . . . to cast aside our existing jurisprudence in favor of such an approach on any broad, general basis." Rather, said the court, the holding "in *Kelley*, that the risk-utility test does not apply to a design defect unless the product malfunctions in some way . . . remain[s] the law of Maryland." *Id.* at 200, 792 A.2d at 1153.

The State alleges that "Defendants manufactured and/or sold MTBE gasoline." ECF 2, ¶ 309. Further, it alleges that defendants' MTBE gasoline was defective and unreasonably dangerous in multiple ways not contemplated by consumers: "MTBE is released more readily from gasoline transportation, storage and delivery systems or facilities than are the other constituents of gasoline" (*id.* ¶ 310); "MTBE gasoline, when used in its intended manner, causes extensive groundwater contamination that is difficult, time consuming and expensive to respond to" (*id.*); "even at extremely low concentrations, MTBE renders groundwater putrid, foul, and unfit for use by humans" (*id.*); and "MTBE and MTBE gasoline pose significant threats to the public health, comfort, safety and welfare and the environment." *Id.* In addition, the State alleges that the defective design of MTBE gasoline caused its injures. *Id.* ¶¶ 315, 320.

Defendants maintain that the consumer expectation test applies to the State's claim for defective design and that, under that test, the State's claim fails because its alleged injury was not the result of its use of MTBE gasoline as a consumer product—*i.e.*, as fuel. ECF 335-2 at 14. The State argues, however, that it plausibly states a claim for defective design under both the consumer expectation test and the risk-utility test. ECF 359 at 19.

The State's allegations indicate that the consumer expectation test is the appropriate test for evaluating its strict liability claim for defective design. As noted, the risk-utility test applies only when the product at issue "malfunctions in some way." *Halliday*, 368 Md. at 200, 792 A.2d at 1153. The essence of the State's claim for defective design is not that defendants' MTBE gasoline malfunctioned. Rather, it posits that defendants' MTBE gasoline was defective and unreasonably dangerous when used in its ordinary and intended way. *See, e.g.*, ECF 2, ¶ 310 ("MTBE gasoline, when used in its intended manner, causes extensive groundwater contamination that is difficult, time consuming and expensive to respond to and remediate."). Accordingly, I proceed to consider defendants' argument that the State's claim fails under the consumer expectation test.

Defendants argue that the State fails to state a claim for defective design under the consumer expectation test because the State was not injured as a result of its use of defendants' MTBE gasoline. ECF 335-2 at 14. To be sure, the State does not allege that MTBE contaminated its waters through its use of MTBE gasoline to drive its motor vehicles. Rather, it alleges that its waters were contaminated when MTBE gasoline was released into the environment from hundreds of release sites in the State, primarily from storage and delivery systems. ECF 2, ¶¶ 1, 109, 220.

However, Maryland courts have never limited recovery in strict liability for design defect to ultimate users of the product, as defendants ask the Court to do here. Moreover, the Maryland

Court of Special Appeals has found that bystanders may recover in strict liability for foreseeable injuries caused by the defective design of a product. *See Valk Mfg. Co. v. Rangaswamy*, 74 Md. App. 304, 307–08, 323, 537 A.2d 622, 623–24, 631–32 (1988) (noting that "[t]he general consensus clearly favors 'bystander' recovery" and concluding that motorist struck by a snow plow device on a truck could recover against the manufacturer of the snow plow device), *rev'd on other grounds sub nom. Montgomery County v. Valk Mfg. Co*., 317 Md. 185, 562 A.2d 1246 (1989).

Although I have not identified any cases in which the Maryland Court of Appeals has addressed the issue of bystander recovery in strict liability for defective design, the Maryland Court of Appeals has upheld bystander recovery in strict liability for failure to warn upon a sufficient showing of causation. In *ACandS, Inc. v. Godwin*, 340 Md. 334, 667 A.2d 116 (1995), for instance, the plaintiffs asserted strict liability and negligence claims against various asbestos manufacturers for injuries caused by their exposure to block and pipe covering manufactured by defendants. *Id.* at 348, 667 A.2d at 122. The court observed that some of the plaintiffs "were bystanders, in the sense that they did not work directly with asbestos products." *Id.* at 349, 667 A.2d at 123. Nevertheless, the court upheld the jury's award of compensatory damages to the plaintiff bystanders where the evidence showed that exposure to defendants' asbestos was a substantial cause of their injuries—*i.e.*, that defendants' asbestos products were frequently used near plaintiffs, and plaintiffs were regularly exposed to them. *Id.* at 351–59, 667 A.2d at 124–27. *See also Georgia-Pacific Corp. v. Pransky*, 369 Md. 360, 363–67, 800 A.2d 722, 723–26 (2002) (upholding jury verdict for plaintiff who was exposed to defendant's product as a bystander where there was sufficient evidence that her exposure was a substantial factor in causing her mesothelioma).

And, to my knowledge, the majority of courts that have addressed the issue have allowed bystanders to recover in strict liability against sellers for foreseeable injuries caused by defective products. *See Berrier v. Simplicity Mfg., In*c., 563 F.3d 38, 54 & n.25 (3d Cir. 2009) (collecting cases); *Haumersen v. Ford Motor Co*., 257 N.W.2d 7, 16 (Iowa 1977) (plaintiff struck by defective car); *Embs v. Pepsi–Cola Bottling Co*., 528 S.W.2d 703, 706 (Ky. 1975) (plaintiff injured by exploding soda bottle at convenience store); *Howes v. Hansen*, 201 N.W.2d 825, 831–32 (Wis. 1972) (plaintiff injured when his foot came in contact with allegedly defective lawn mower).

This approach is supported by policy considerations. Allowing bystanders to recover in strict liability against manufacturers and/or sellers for foreseeable injuries caused by a defectively designed product places the risk of harm on the entity most capable of controlling the risk.

The State plausibly alleges that the contamination of its waters was a foreseeable risk of defendants' sale of MTBE gasoline. It asserts that "gasoline containing significant amounts of MTBE was sold on a virtually universal basis throughout Maryland beginning in the 1990s" (ECF 2, ¶ 214), and that defendants were responsible for all or substantially all of this market. *Id.* ¶ 98. The State also alleges that the release of MTBE gasoline into its waters was "inevitable" (*id.* ¶ 209) and, indeed, that "MTBE contamination is associated with all transportation, storage, and use of MTBE gasoline." *Id.* ¶ 215.

Based on these allegations, and the absence of any authority foreclosing recovery in strict liability to bystanders for foreseeable injuries caused by defective products, I reject defendants' argument that the State's design defect claim fails because its alleged injury was not the result of its use of MTBE gasoline as a consumer product.

### 3. Failure to Warn (Count II)

Count II of the Complaint alleges strict liability for failure to warn. ECF 2, ¶¶ 322–31. Defendants argue that this claim must be dismissed because the State fails plausibly to allege that defendants had a legal duty to warn the State or its citizens about the alleged hazards of MTBE, and, in any event, no such duty to "warn the world" exists under Maryland law. ECF 335-2 at 14.

A seller has a duty to warn of the dangers of a product "'if the item produced has an inherent and hidden danger that the producer knows or should know could be a substantial factor in causing an injury.'" *Shreve*, 166 F. Supp. 2d at 413 (quoting *Virgil v. Kash N' Karry Serv. Corp*., 61 Md. App. 23, 484 A.2d 652, 657 (1984)); *see Zenobia*, 325 Md. at 437, 601 A.2d at 641 (holding that a seller "is not strictly liable for failure to warn unless the seller has 'knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the . . . danger'") (quoting Restatement, § 402A cmt. j); *see also May*, 446 Md. at 9, 129 A.3d at 988; *Georgia Pac., LLC v. Farrar*, 432 Md. 523, 530–31, 69 A.3d 1028, 1033 (2013); *Moran v. Faberge, Inc*., 273 Md. 538, 544–45, 332 A.2d 11, 15–16 (1975). Conversely, a seller does not have a duty to warn of an open and obvious danger in its product. *Mazda Motor of Am., Inc. v. Rogowski*, 105 Md. App. 318, 326, 659 A.2d 391, 395 (1989); *Virgil*, 61 Md. App. at 33, 484 A.2d at 657.

"'Whether there is a duty to warn and the adequacy of warnings given must be evaluated in connection with the knowledge and expertise of those who may reasonably be expected to use or otherwise come into contact with the product. . .'" *Emory v. McDonnell Douglas Corp*., 148 F.3d 347, 350 (4th Cir. 1998) (quoting *Mazda Motor*, 105 Md. App. at 327, 659 A.2d at 395).

The State alleges that defendants manufactured, distributed, and sold MTBE gasoline in Maryland. ECF 2, ¶ 98. Further, it alleges that defendants knew of the environmental hazards associated with MTBE and its propensity to contaminate groundwater (*id*. ¶¶ 134, 178); defendants

knew that MTBE gasoline storage and delivery systems were prone to leaks and spills (*id.* ¶ 199); the dangers of MTBE gasoline were not obvious to ordinary users (*id.* ¶ 324); defendants had a duty to provide foreseeable users with adequate warnings of the dangers posed by MTBE and MTBE gasoline (*id.* ¶ 326); and, despite defendants' knowledge of the dangers of MTBE gasoline, they continued to manufacture, market, and sell MTBE gasoline without warning "retailers, customers, other Downstream Handlers, intended users and consumers, and the public" of its dangers. *Id.* ¶ 206.

Of course, there is no duty to "warn the world." *Gourdine v. Crews*, 405 Md. 722, 749, 955 A.2d 769, 786 (2008). However, the duty to warn extends "'not only to those for whose use the chattel is supplied but also to third persons whom the supplier should expect to be endangered by its use.'" *Farrar*, 432 Md. at 531, 69 A.3d at 1033 (quoting Restatement, § 388 cmt. d). And, the State plausibly alleges that the harm it suffered was a foreseeable result of defendants' placement of MTBE gasoline into the Maryland market. It avers that there was a large market for MTBE gasoline in Maryland in the 1990s (ECF 2, ¶ 214); that defendants were responsible for all or substantially all of this market (*id.* ¶ 98); and that "MTBE contamination is associated with all transportation, storage, and use of MTBE gasoline." *Id.* ¶ 215. These allegations plausibly establish that defendants had a duty to warn the State of the dangers associated with MTBE because they created and controlled a market for products in the State that posed unique, substantial harms to its resources. *See In re MTBE*, 175 F. Supp. 2d 593, 625–26 (S.D.N.Y. 2001) (finding that plaintiffs plausibly alleged that defendants owed them a duty to issue warnings for MTBE gasoline where, although the plaintiffs did not allege that the contamination of their wells was the result of their own use of MTBE gasoline, the allegations showed that their injuries were a foreseeable result of defendants' placement of MTBE gasoline in the marketplace).

In passing, defendants also suggest that the State fails plausibly to allege that the lack of any warning about the hazards of MTBE gasoline caused its injury. ECF 335-2 at 17. This is not so. The Complaint alleges that "[h]ad the Downstream Handlers and intended users and consumers of MTBE gasoline received adequate warnings or instructions concerning the safe use of MTBE gasoline, they would have, or were substantially likely to have, avoided the risks or dangers attendant to the use of MTBE gasoline, including avoiding MTBE gasoline altogether." ECF 2, ¶ 329.

Maryland law recognizes a presumption in failure to warn cases that, to avoid injury, "plaintiffs would have heeded a legally adequate warning had one been given." *U.S. Gypsum Co. v. Mayor & City Council of Balt.*, 336 Md. 145, 162, 647 A.2d 405, 413 (1994); *see Balbos*, 326 Md. at 228, 604 A.2d at 469; *Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.*, 109 F. Supp. 2d 424, 435 (D. Md. 2000) ("In some jurisdictions, including Maryland, there is a presumption in strict liability cases that a plaintiff would have read and heeded an adequate warning if it had been given."). Accordingly, I am satisfied that the State plausibly alleges that defendants' failure to warn caused its injury.

Defendants also argue that the State's failure to warn claim must be dismissed because, under the sophisticated user defense, they discharged any duty to warn when they sold MTBE gasoline to gasoline station owners and operators. ECF 335-2 at 17. The sophisticated user defense insulates suppliers of dangerous or defective products from liability for failing to warn ultimate users of the product if the supplier reasonably relied on an intermediary to provide a warning. *Balbos*, 326 Md. at 217–18, 604 A.2d at 463–64; *see Miller Metal Fabrication, Inc. v. Wall*, 415 Md. 210, 216 n.6, 999 A.2d 1006, 1010 n.6 (2010); *Kennedy v. Mobay Corp.*, 84 Md. App. 397, 403–13, 579 A.2d 1191, 1196 (1990), *aff'd*, 325 Md. 385 (1992) (per curiam); *O'Neal*

*v. Celanese Corp.*, 10 F.3d 249, 251 (4th Cir. 1993). The purpose of this defense is "to put some restraints on the expanding liability of manufacturers." *Balbos*, 326 Md. at 218, 604 A.2d at 464.

In determining whether a supplier reasonably relied on an intermediary to give warnings, courts consider several factors: (1) "the dangerous condition of the product"; (2) "the purpose for which the product is used"; (3) "the form of any warnings given"; (4) "the reliability for the third party as a conduit of necessary information about the product"; (5) "the magnitude of the risk involved"; and (6) "the burdens imposed on the supplier by requiring that he directly warn all users." *Balbos*, 326 Md. at 219, 604 A.2d at 464.

Defendants' assertion of the sophisticated user defense at this stage is premature. Courts may resolve the applicability of affirmative defenses when ruling on a motion to dismiss only when "all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*). Those circumstances do not exist here. The Court cannot determine from the record before it whether defendants reasonably relied on any particular gasoline station owners or operators to warn ultimate consumers of the risks associated with MTBE. Accordingly, I reject defendants' argument that the sophisticated user defense mandates dismissal of the State's failure to warn claim.

Finally, defendants argue that, to the extent the State's failure to warn claim is directed against defendants who owned, operated, or controlled gasoline storage equipment, it fails because any warnings about the risks associated with MTBE gasoline would have been given to defendants themselves and, hence, futile. ECF 335-2 at 19.

There is no duty to warn if the warning "cannot feasibly be implemented or have practical effect." *Sherin v. Crane-Houdaille, Inc.*, 47 F. Supp. 3d 280, 297 (D. Md. 2014); *Farrar*, 432 Md.

at 541, 69 A.3d at 1039 (holding that trial court erred in finding a duty to warn because "there was no practical way that any warning given by [the defendant] to any of the suggested intermediaries would or could have avoided that danger"). Put another way, if a warning would have been futile, then it cannot be said that the defendant's failure to relay the warning was the proximate cause of the plaintiff's injuries.

As indicated, defendants assert that any warnings about the hazards of MTBE contamination would have been futile to the extent that they themselves owned the gasoline storage equipment from which any discharges occurred. ECF 335-2 at 19. But, the Court cannot make this determination on the allegations before it. The defendants represent the supply chain of MTBE gasoline for the Maryland market; they include manufacturers, distributors, sellers, etc., many of which operated at multiple levels of that chain. And, the Court cannot glean from the Complaint whether any of those defendants had the requisite control over gasoline stations and storage equipment they owned such that any warnings given would have "effectively served" as warnings to themselves. *See In re MTBE*, No. SAS-07-10470, 2015 WL 3763645, at *6 (S.D.N.Y. June 16, 2015) (granting summary judgment on plaintiff's failure to warn claim against defendant whose "local retailers and operators needed [its] consent to make any changes or alterations to the [underground storage tanks]" because any such warnings "would have effectively served as warnings to [defendant] itself"); *cf. id.* (denying summary judgment on plaintiff's failure to warn claims against defendants whose local operators "had a greater ability to make changes").

Accordingly, I shall deny defendants' Joint Motion to dismiss the State's failure to warn claim.

### 4. Abnormally Dangerous Activity (Count III)

Count III of the Complaint alleges strict liability for abnormally dangerous activity. ECF 2, ¶¶ 332–37. Defendants assert that this claim must be dismissed because the Complaint does not identify the particular defendants against whom the claim is asserted, the locations at which the alleged abnormally dangerous activity occurred, or the particular resources that were allegedly injured. ECF 335-2 at 20–22.

Maryland has adopted the standard for strict liability for abnormally dangerous activities outlined in Section 519 of the Restatement. *See Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 69, 642 A.2d 180, 185 (1994) (citing *Yommer v. McKenzie*, 255 Md. 220, 257 A.2d 138 (1969)). Section 519 of the Restatement provides, in relevant part: "One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm."

In determining whether an activity is abnormally dangerous under this standard, courts consider the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Toms v. Calvary Assembly of God, Inc.*, 446 Md. 543, 553, 132 A.3d 866, 872 (2016) (citing Restatement, § 520); *see Kelley*, 304 Md. at 132–33, 497 A.2d at 1146–47.

The "most crucial" consideration is the "appropriateness of the activity in the particular place where it is being carried on." *Yommer*, 255 Md. at 225, 257 A.2d at 140; *see Rosenblatt*, 335 Md. at 70, 642 A.2d at 186; *Kelley*, 304 Md. at 133, 497 A.2d at 1147 ("The thrust of the doctrine is that the activity be abnormally dangerous in relation to the area where it occurs."). This cause of action is available for "claims by an occupier of land harmed by an activity abnormally dangerous in relation to the area, which is carried on by a contemporaneous occupier of neighboring land." *Rosenblatt*, 335 Md. at 72, 642 A.2d at 186.

Defendants contend that the State's strict liability claim for abnormally dangerous activity must be dismissed because the State does not identify which of the sixty-five defendants are the "Downstream Handler defendants" against whom the claim is brought, the locations at which the alleged abnormally dangerous activity occurred, or the particular resources that were allegedly injured as a result. ECF 335-2 at 20–22. None of these arguments carries the day.

The State asserts its strict liability claim for abnormally dangerous activity against the "Downstream Handler" defendants who stored "large quantities of MTBE gasoline in underground storage tanks in the vicinity of waters of the State used as drinking and/or irrigation water and/or near population centers with drinking water wells." ECF 2, ¶ 333. The State defines "Downstream Handlers" as "entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline and/or persons who own operate, or are in charge of oil storage facilities." *Id*. ¶ 186. According to the State, its "precious and limited drinking and irrigation water resources are located directly beneath and adjacent to these defendants' places of business" (*id*. ¶ 334), and the challenged activity "resulted in the release of MTBE gasoline into the waters of the State." *Id*. ¶ 333. And, the State identifies forty-one of the sites at which MTBE gasoline was released into its waters. *Id*. ¶ 220.

Maryland does not identify which of the sixty-five named defendants engaged in this activity. Nor does it pinpoint all of the contamination sites and injured resources. But, the allegations provide defendants with "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Fed. R. Civ. P. 8(a)(2) demands no more, particularly because defendants are in a better position to know some of the relevant facts—*e.g.*, the locations of MTBE gasoline spills that occurred on their own properties. *See Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) ("The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset.").

Moreover, the alleged conduct plausibly constitutes an abnormally dangerous activity. *See Yommer*, 255 Md. at 227, 257 A.2d at 141 (holding that "the storage of large quantities of gasoline immediately adjacent to a private residence" constituted an abnormally dangerous activity for which strict liability applied); *Kelley*, 304 Md. at 133, 497 A.2d at 1147 ("If a gasoline station owner has faulty tanks which leak gasoline into the underground water supply, that might be abnormally dangerous if the land in which the tanks are buried is located in a well populated area."); *see also In re MTBE*, 457 F. Supp. 2d 298, 316 (S.D.N.Y. 2006) ("Maryland courts allow strict liability claims for abnormally dangerous activities such as the pollution of percolating groundwater by gasoline and similar substance.").

Therefore, I shall deny defendants' Joint Motion to dismiss the State's claim for strict liability based on abnormally dangerous activity.

### 5. Public Nuisance (Count IV)

Count IV of the Complaint alleges public nuisance. ECF 2, ¶¶ 338–48. Defendants argue that this claim must be dismissed "to the extent it is premised on defendants' alleged manufacture,

marketing, or supply of gasoline MTBE" because courts have refused to impose nuisance liability on parties for merely manufacturing, marketing or distributing a product. ECF 335-2 at 24.

The Maryland Court of Appeals has relied on the definition of public nuisance set forth in Section 821B of the Restatement: "'A public nuisance is an unreasonable interference with a right common to the general public.'" *Tadjer v. Montgomery County*, 300 Md. 539, 552–53, 479 A.2d 1321, 1327 (1984) (quoting Restatement of Torts (Second), § 821B(1) (1979)); *see Gallagher v. H.V. Pierhomes, LLC*, 182 Md. App. 94, 114, 957 A.2d 628, 639–40 (2008); *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 251 (D. Md. 2000).

Section 821B of the Restatement goes on to state:

Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

"Widespread water pollution is indeed a quintessential public nuisance." *Rhode Island MTBE*, 357 F. Supp. 3d at 142; *see* Restatement, § 832 ("Pollution may also result in a public nuisance, as defined in § 821B, when there is interference with a right common to all members of the public-as, for example, when the pollution kills the fish in a public stream, or prevents the use of a public bathing beach."); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir. 1985) ("We have no doubt that the release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus is a public nuisance as a matter of New York law . . .").

Defendants argue that the State's public nuisance claim must be dismissed to the extent that it is premised on their manufacture, marketing, or supply of MTBE gasoline because, in those capacities, they did not have control over the MTBE gasoline when it was allegedly released into the State's waters. ECF 335-2 at 22–23. They cite a single District Court case from Maryland, *Cofield v. Lead Indus. Ass'n, Inc.*, No. MJG-99-3277, 2000 WL 34292681 (D. Md. Aug. 17, 2000), to support this argument. There, the court dismissed a public nuisance claim brought against lead paint manufacturers because "it [was] indisputable that the Defendants in the instant case lack[ed] control over the lead containing products that are alleged to constitute a nuisance." *Id*. at *7. The court reasoned that liability in nuisance requires "that the nuisance-causing instrumentality be within the exclusive control of the defendant." *Id*.

However, to my knowledge, Maryland courts have never adopted the "exclusive control" rule for public nuisance liability outlined by the court in *Cofield*. To the contrary, Maryland courts have found that a defendant who created or substantially participated in the creation of the nuisance may be held liable even though he (or it) no longer has control over the nuisance-causing instrumentality. *See Adams*, 193 F.R.D. at 256–57 ("It has been held that where the finished product of a third party constitutes a public nuisance, the third party may be held liable for creation of the public nuisance, even though it no longer has control of the product creating the public nuisance."); *E. Coast Freight Lines v. Consol. Gas, Elec. Light & Power Co. of Balt.*, 187 Md. 385, 397–98, 50 A.2d 246, 252 (1946) ("We may, therefore, conclude that the weight of authority is that a contractor, even after he has completed his work, may be held liable in damages if such work is inherently dangerous and constitutes a public nuisance."); *see also Gorman v. Sabo*, 210 Md. 155, 161, 122 A.2d 475, 478 (1956) ("One who does not create a nuisance may be liable for some active participation in the continuance of it or by the doing of some positive act evidencing

its adoption."); *Maenner v. Carroll*, 46 Md. 193, 215 (1877) ("Now, it is certainly true, that every person who does or directs the doing of an act that will of necessity constitute or create a nuisance, is personally responsible for all the consequences resulting therefrom, whether such person be employer or contractor.").

As noted, Maryland courts have followed the Restatement's definition of public nuisance. *See, e.g.*, *Tadjer*, 300 Md. at 552–53, 479 A.2d at 1327; *see Gallagher*, 182 Md. App. at 114, 957 A.2d at 639–40. And, under the Restatement, "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." Restatement, § 834.

Moreover, other courts have found that plaintiffs may recover in public nuisance from MTBE manufacturers and distributors that played a significant role in the creation of the nuisance where the governing state law had not foreclosed such liability. *See In re MTBE*, 725 F.3d 65, 121–23 (2d Cir. 2013) (upholding jury verdict against defendant for public nuisance under New York law where evidence showed that defendant manufactured MTBE gasoline, supplied that gasoline to service stations in plaintiffs' locale, and knew that its gasoline would be stored in underground tanks that leaked); *In re MTBE*, 175 F. Supp. 2d at 629 (finding that plaintiffs stated viable nuisance claims under the laws of California, Florida, Illinois, and New York where they alleged that defendants manufactured and distributed MTBE gasoline with knowledge of its dangers, failed to warn downstream handlers of those dangers, marketed and promoted the use of MTBE by misrepresenting its chemical properties, and actively conspired to conceal the threat posed by MTBE). *Cf. In re MTBE*, No. SAS-14-6228, 2015 WL 4092326, at *3–4 (S.D.N.Y. July 2, 2015) (dismissing public nuisance claim under Pennsylvania law where "Pennsylvania courts have repeatedly constrained liability for public nuisance specifically to an owner or operator of a

nuisance source" and do not impose liability for public nuisance "in the context of injuries caused by defective product design and distribution") (citations and internal quotation marks omitted).

The State plausibly alleges that defendants who manufactured and distributed MTBE gasoline substantially contributed to the creation of a public nuisance. It asserts that defendants had extensive knowledge of the environmental hazards associated with MTBE (ECF 2, ¶ 346); intentionally and deceptively promoted MTBE as an additive in gasoline despite this knowledge (*id.*); manufactured and distributed MTBE gasoline in Maryland even though they knew or reasonably should have known that it would be placed into leaking gasoline storage and delivery systems there (*id.* ¶¶ 161, 198, 346); and failed to warn downstream handlers, consumers, and the public of the dangers associated with the MTBE. *Id.* ¶ 206. The State also asserts that defendants controlled all or substantially all of the market for MTBE and MTBE gasoline in Maryland. *Id.* ¶ 26.

Because no case law forecloses this theory of public nuisance liability under Maryland law, I reject defendants' argument that the State's public nuisance claim must be dismissed to the extent it is premised on their manufacture, marketing, and supply of MTBE gasoline.

### 6. **Trespass (Count V)**

Count V of the Complaint alleges trespass. ECF 2, ¶¶ 349–57. A trespass occurs "'when a defendant interferes with a plaintiff's interest in the exclusive possession of the land by entering or causing something to enter the land.'" *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 408, 71 A.3d 30, 94 (2013) (quoting *Rosenblatt*, 335 Md. at 78, 642 A.2d at 189); *see Balt. Gas & Elec. Co. v. Flippo*, 348 Md. 680, 689, 705 A.2d 1144, 1148 (1998); *JBG/Twinbrook Metro Ltd. P'ship v. Wheeler*, 346 Md. 601, 618, 697 A.2d 898, 907 (1997); *Patapsco Loan Co. v. Hobbs*, 129 Md. 9, 98 A. 239, 241 (1916) ("Every unauthorized entry upon the property of another is a trespass.").

The State alleges that "defendants' intentional and/or negligent conduct caused MTBE to enter, invade, intrude upon, injure, trespass, and threaten to trespass upon the State's possessory interest in properties it owns, the possessory interest of its citizens in properties they own which the State asserts here on their behalf in its *parens patriae* capacity, and the State's possessory interest as the trustee of the State's natural water resources." ECF 2, ¶ 350.

Defendants maintain that the State cannot recover in trespass for the alleged MTBE contamination of properties that it does not exclusively possess—*i.e.*, the natural waters of the State and properties owned by its citizens. ECF 335-2 at 25–26. This seems like a straightforward application of law: a party cannot recover for trespass to properties that it does not exclusively possess. *See, e.g.*, *Albright*, 433 Md. at 408, 71 A.3d at 94.

But, the State insists otherwise. Although it does not dispute that it lacks exclusive possession of the natural waters of the State and properties owned by its citizens, the State asserts that it has the requisite possessory interest to recover for trespass to these properties, "both as a quasi-trustee of Maryland's water resources and as a *parens patriae* representative of its citizens' water ownership interests." ECF 359 at 33–34. It eschews mention of any controlling authority in support of this argument. *See id.*

*Parens patriae* means "parent of the country" and "refers traditionally to [the] role of state as sovereign and guardian of persons under legal disability." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 & n.8 (1982) (quoting Black's Law Dictionary 1003 (5th ed. 1979)). The doctrine of *parens patriae* that has developed in case law "establish[es] the right of a State to sue . . . to prevent or repair harm to its 'quasisovereign' interests." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258 (1972); *see United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997) ("At bottom, *parens patriae* is a standing doctrine under which a state may under proper

circumstances sue on behalf of its citizens when a separate quasi-sovereign interest also is at stake."); *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 773 (9th Cir. 1994) ("State governments may act in their *parens patriae* capacity as representatives for all their citizens in a suit to recover damages for injury to a sovereign interest.").  Quasi-sovereign interests include a state's interest "in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607.

When a state proceeds in its *parens patriae* capacity, it is "'deemed to represent all its citizens.'" *New Jersey v. New York*, 345 U.S. 369, 372–73 (1953) (quoting *Kentucky v. Indiana*, 281 U.S. 163, 173–74 (1930)); *see Envtl. Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979) ("Under the *parens patriae* concept, . . . a state that is a party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens.").  The Supreme Court explained that this doctrine "is a necessary recognition of sovereign dignity, as well as a working rule for good judicial administration." *New Jersey*, 345 U.S. at 373.

The State brings this suit for the widespread contamination of its waters.  This is an injury that is properly redressed in *parens patriae*.  *See State v. City of Dover*, 891 A.2d 524, 530 (N.H. 2006) (holding that state "has *parens patriae* standing to bring contamination suits against the MTBE defendants on behalf of [its] residents"); *see also South Carolina v. North Carolina*, 558 U.S. 256, 274 (2010) ("An interest in water is an interest shared with other citizens, and is properly pressed or defended by the State."); *New York v. New Jersey*, 256 U.S. 296, 301–02 (1921) (concluding that the state was the proper party to seek recovery for sewage dumping to its waters).

The more difficult question is how this affects the scope of the State's trespass claim.  That is, does proceeding in *parens patriae* give the State "exclusive possession" of contaminated properties within its borders—even those it does not own—such that it may recover for trespass to

those areas?  One court has answered this question in the affirmative.  *See Rhode Island MTBE*, 357 F. Supp. 3d at 144 (concluding that Rhode Island could "protect its pseudo-sovereign interest in the welfare of its citizens and integrity of its natural resources" by seeking relief in trespass for widespread MTBE contamination).

However, there is no support for this position under Maryland law.  As best I can determine, Maryland courts have never deviated from the rule that an action for trespass lies only "'when a defendant intrudes upon a plaintiff's interest in the *exclusive possession* of the land . . .'" *Albright*, 433 Md. at 408, 71 A.3d at 94 (quoting *Rosenblatt*, 335 Md. at 78, 642 A.2d at 189) (emphasis added); *accord Hanna v. ARE Acquisitions, LLC*, 400 Md. 650, 658, 929 A.2d 892, 896 (2007); *Grymes v. State*, 202 Md. App. 70, 94, 30 A.3d 1032, 1046 (2011).  And, although one court has found that the State's quasi-trustee interest in its natural waters could support recovery in *public nuisance* for an oil spill, *Maryland v. Amerada Hess Corp.*, 350 F. Supp. 1060, 1067 (D. Md. 1972), the State does not identify any cases in which Maryland courts have found that its quasi-trustee interest in its natural resources, or proceeding *parens patriae*, confers the requisite possessory interest to sustain a *trespass* claim.  Nor does the State explain why proceeding under a theory of public nuisance—which does not require exclusive possession—would be inadequate.

Accordingly, I shall grant the Joint Motion to dismiss the State's trespass claim to the extent it is based on properties outside of its exclusive possession—*i.e.*, its natural waters and the properties of its citizens.

Defendants make two additional arguments for dismissal of the State's trespass claim.  First, they assert that, even with respect to properties that the State *does* own directly, the claim nonetheless fails because the Complaint does not identify the properties upon which the State's trespass claim is based.  ECF 335-2 at 26.  I disagree.

The State brings this suit against defendants for the widespread MTBE contamination of its waters.  ECF 2, ¶ 216.  Federal Rule of Civil Procedure 8(a)(2) does not require the State to identify the precise locations of all the State properties that were contaminated by MTBE.  *See Rhode Island MTBE*, 357 F. Supp. 3d at 136 (rejecting the defendants' argument that the state failed to meet the notice pleading standard because the Complaint did not identify specific contamination sites).  It requires only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  I am satisfied that the State's allegations meet this standard.

In addition, defendants contend that the State's trespass claim fails to the extent it is premised on defendants' manufacture, distribution, or supply of MTBE gasoline that was subsequently released by another entity.  ECF 335-2 at 26–27.  They assert that defendants acting in those capacities lacked the requisite control of the underground storage tanks at the time the alleged trespasses occurred—when MTBE was released into the State's waters.  *Id*. at 27.

The Maryland Court of Appeals has said: "[W]hen an adjacent property is invaded by an inanimate or intangible object it is obvious that the defendant must have some connection with or some control over that object in order for an action in trespass to be successful against him."  *Rockland Bleach & Dye Works Co. v. H.J. Williams Corp.*, 242 Md. 375, 387, 219 A.2d 48, 54 (1966); *see JBG/Twinbrook*, 346 Md. at 626, 697 A.2d at 911.  But, viewing the allegations in the light most favorable to the State, the Court cannot say on the record before it that the defendants who manufactured and distributed MTBE gasoline lacked such control over the gasoline stations and storage equipment where MTBE releases occurred.  Accordingly, I reject this argument.

In sum, I shall grant the defendants' Joint Motion to dismiss the State's claim for trespass to properties outside of its exclusive possession.  I shall otherwise deny the Motion.

### 7.    Maryland Environment Article Claims (Counts VII-XI)

Counts VII through XI of the Complaint allege violations of Maryland's Environment Article.  ECF 2, ¶¶ 370–417.  Defendants assert that these claims fail as a matter of law as to those who acted as manufacturers, marketers, or suppliers of MTBE gasoline because such entities are not subject to liability under the relevant statutory provisions.  ECF 335-2 at 7–8. Defendants also argue that, even to the extent they are subject to liability under the statute, the State's claims must be dismissed because they are supported only by conclusory allegations.  *Id*. at 10.

A brief overview of the relevant statutory scheme is warranted.  Count VII is brought under Title 4, Subtitle 4 of the Environment Article ("Water Pollution Control and Abatement").  ECF 2, ¶¶ 370–90 (citing E.A. § 4–401 *et seq.*).  In relevant part, that provision makes it "unlawful for any person to discharge or permit the discharge of oil in any manner into or on waters of this State."  E.A. § 4–410.  "Oil" is defined to include petroleum, petroleum by-products, and gasoline.  E.A. § 4–401(h)(1).  "Discharge" is defined as "the addition, introduction, leaking, spilling, or emitting any oil to State waters or the placing of any oil in a location where it is likely to reach State waters."  E.A. § 4–401(d).

The Subtitle empowers the Department of the Environment to enforce its provisions.  *See* E.A. § 4–405(c).  It also contains a provision for enforcement by the Attorney General, *id*. § 4–416:

> Upon a showing by the Attorney General, in behalf of the Department, that any person is violating or is about to violate the provisions of this subtitle or is violating or is about to violate any valid order or permit issued by the Department, an injunction shall be granted without the necessity of showing a lack of adequate remedy at law. In circumstances of emergency creating conditions of imminent danger to the public health, welfare or the environment, the Attorney General, on

behalf of the Department, may institute a civil action for an immediate injunction to halt any pollution or other activity causing the danger.

Count VIII is brought under E.A. Title 4, Subtitle 7 ("Oil Contaminated Site Environmental Cleanup Fund"). ECF 2, ¶¶ 391–99 (citing E.A. § 4–701 *et seq.*). It establishes an "Oil Contaminated Site Environmental Cleanup Fund" to provide reimbursement for the costs associated with the cleanup of an oil spill involving an underground oil storage tank or heating oil tank. E.A. § 4–704; *see also* E.A. § 4–706(a). Section 4–706(a) states: "If the Department [of the Environment] has assumed control of an oil spill situation involving an underground oil storage tank or heating oil tank under this title, the Department may obtain from the Fund . . . [r]eimbursement for usual, customary, and reasonable costs incurred in performing site rehabilitation." Further, E.A. § 4–706(c) provides:

> In order to encourage that site rehabilitation activities be undertaken by an owner, operator, or other person responsible for a discharge from an underground oil storage tank or heating oil tank, any site rehabilitation costs including attorney's fees and litigation costs incurred by the Department or the Fund under this section shall be recoverable from the responsible party to the Fund.

Count IX is based on E.A. Title 9, Subtitle 3 ("Water Pollution Control"). ECF 2, ¶¶ 400–07 (citing E.A. § 9–301 *et seq.*). Section 9–322 prohibits the "discharge of any pollutant" into the waters of the State unless permitted by Title 4, Subtitle 4. And, E.A. § 9–342.2(a) provides: "A person who discharges a pollutant into the waters of the State . . . shall reimburse the Department for the reasonable costs incurred by the Department in conducting environmental health monitoring or testing . . ." The Department may recover such costs in a civil action. E.A. § 9–342.2(b). The Department may also "bring an action for an injunction against any person who violates any provision of this subtitle or any rule, regulation, order, or permit adopted or issued by the Department under this subtitle." E.A. § 9–339(a).

Count X is lodged pursuant to E.A. Title 9, Subtitle 4 ("Drinking Water"). ECF 2, ¶¶ 408–12 (citing E.A. § 9–401 *et seq.*). In relevant part, that Subtitle authorizes the Secretary of the Department of the Environment to take action, including "suing for injunctive or other appropriate relief," to protect the public health where "a dangerous contaminant is present in or likely to enter a public water system." E.A. § 9–405(b).

Count XI is brought under E.A. Title 7, Subtitle 2 ("Controlled Hazardous Substances"). ECF 2, ¶¶ 413–17 (citing E.A. § 7–201 *et seq.*). The purpose of that Subtitle "is to provide additional and cumulative remedies to prevent, abate, and control pollution of the waters of this State. . ." E.A. § 7–203. In relevant part, it authorizes the Department to take various actions when a hazardous substance is released into the environment. *See* E.A. § 7–222; E.A. § 7–207. It also establishes a "State Hazardous Substance Control Fund," E.A. § 7–218, and provides that all expenditures from the Fund made by the Department "in response to a release or a threatened release of a hazardous substance a particular site shall be reimbursed to the Department for the [Fund] by the responsible person for the release or the threatened release." E.A. § 7–221(a).

Further, E.A. § 7–221(f) states:

(f) Upon request by the Department, and after reasonable notice, a person shall provide to the Department any existing information or documents relating to:

(1) The identification, nature, and quantity of any hazardous substance which is or has been generated, treated, stored, or disposed of at a site or facility, or transported to a site or facility; and

(2) The nature or extent of a release of a hazardous substance at or from a site or facility.

I turn to defendants' first argument for dismissal. Defendants assert that the only parties that may be subjected to liability under the foregoing statutes are those that qualify as "person[s]

responsible for the discharge" within the meaning of Title 4, Subtitle 4. ECF 335-2 at 8–9 (citing E.A. § 4–401(j)(1)). That provision states that a "person responsible for the discharge" includes:

(i)     The owner of the discharged oil;

(ii)    The owner, operator, or person in charge of the oil storage facility, vessel, barge, or vehicle involved in the discharge at the time of or immediately before the discharge; and

(iii)   Any other person who through act or omission causes the discharge.

According to defendants, this definition does not reach those who manufacture, market, or supply gasoline. ECF 335-2 at 8–9. Therefore, defendants say, the State's statutory claims fail as a matter of law to the extent they are asserted against defendants in those capacities. *Id*. at 8.

The State does not disagree with defendants' assertion that the State's statutory claims may lie only against a "person responsible for the discharge," as defined in Title 4, Subtitle 4. ECF 359 at 11–12. However, it construes the scope of that definition differently. *Id*. It argues that defendants who manufactured, marketed, and supplied MTBE gasoline qualify as "person[s] responsible for the discharge" within the third subsection of the definition, because they "cause[d] the discharge." *Id*. at 12.

The E.A. does not define what it means to "cause" a discharge and, to my knowledge, no court has construed the definition of "person responsible for the discharge" under the statute. E.A. § 4–401(j)(1). The Fourth Circuit has said that, in interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007).

Maryland "follows the general principles of statutory interpretation." *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013). "'The cardinal rule of statutory

interpretation is to ascertain and effectuate the real and actual intent of the Legislature.'" *Bottini v. Dep't of Fin.*, 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (quoting *Wagner v. State*, 445 Md. 404, 417, 128 A.3d 1, 9 (2015)); *accord Bourgeois v. Live Nation Entm't, Inc.*, 430 Md. 14, 26, 59 A.3d 509, 516 (2013); *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18, 28 (2010).

To that end, the Maryland Court of Appeals follows a two-step approach, *Johnson,* 430 Md. at 377–78, 61 A.3d at 38:

> First, if the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end.  Second, when the meaning of the plain language is ambiguous or unclear, we seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.

(Internal citations and quotation marks omitted); *see Brutus 630, LLC v. Town of Bel Air*, 448 Md. 355, 367–68, 139 A.3d 957, 964 (2016); *Bourgeois*, 430 Md. at 27, 59 A.3d at 516; *Miller v. Mathias*, 428 Md. 419, 451, 52 A.3d 53, 72 (2012).

The provision at issue is found in E.A. Title 4, Subtitle 4.  As noted, that Subtitle makes it "unlawful for any person to discharge or permit the discharge of oil in any manner into or on the waters of this State."  E.A. § 4–410(a).  It states that "a person responsible for the discharge as defined in § 4–410(j) of this subtitle is liable for any containment, cleanup, and removal costs or damages. . ."  E.A. § 4–419(c).  And, as indicated, "Discharge" is defined as "the addition, introduction, leaking, spilling, or emitting any oil to State waters or the placing of any oil in a location where it is likely to reach State waters."  E.A. § 4–401(d).

E.A. § 4–401(j)(1) provides that the "person responsible for the discharge" includes:

(i)      The owner of the discharged oil;

(ii)     The owner, operator, or person in charge of the oil storage facility, vessel, barge, or vehicle involved in the discharge at the time of or immediately before the discharge; and

(iii)    Any other person who through act or omission causes the discharge.

The defendants' position is that the definition of "person responsible for the discharge" includes only "those entities that are directly responsible – by ownership or control of an oil product or a releasing apparatus (*e.g.*, a leaking [underground storage tank]) – for the actual discharge or spillage of gasoline." ECF 335-2 at 9. However, this construction is essentially a rephrasing of subsections (i) and (ii) of the statutory definition that entirely ignores the third subsection. That subsection plainly extends its reach to "[a]ny other person who through act or omission causes the discharge." E.A. § 4–401(j)(1). This alone is enough to rebut the defendants' argument.

That the definition of "person responsible for discharge" is more expansive than defendants assert is particularly clear when subsection (iii) is read in combination with the statutory definition of "Discharge." "Discharge" includes not only "the addition, introduction, leaking, spilling, or emitting any oil to State waters," but also "the placing of any oil in a location where it is likely to reach State waters." E.A. § 4–401(d). By the plain terms of the statute, then, liability can attach when an actor, not even through any direct action but solely by omission, "cause[s]," E.A. § 4–401(j)(1)(iii), oil to be placed "in a location where it is likely to reach State waters," E.A. § 4–401(d).

Viewing the allegations in the light most favorable to the State, it plausibly alleges that defendants who manufactured, marketed, and supplied MTBE gasoline fall within subsection (iii) of E.A. § 4–401(j)(1), *i.e.*, "person[s] responsible for the discharge." It alleges that defendants are collectively responsible for all or substantially all of the MTBE gasoline that was released in Maryland (ECF 2, ¶¶ 98, 220); placed MTBE gasoline into the Maryland market despite knowledge of its dangers and the likelihood of its release into the State's waters (*id.* ¶¶ 384); and

failed to warn downstream handlers, foreseeable users, and the public of the dangers associated with MTBE gasoline.  *Id.* ¶ 386.

The Court need not decide whether the phrase "causes the discharge" in E.A. § 4–401(j)(1)(iii) is broader than proximate causation in common law.  I am satisfied that, because the State sufficiently pleads proximate causation on its common law tort claims, *see supra*, Section III.C.1, it plausibly alleges that defendants who manufactured, marketed, and/or distributed MTBE are "person[s] responsible for the discharge" as "other person[s] who through act or omission cause[d] the discharge."  E.A. § 4–401(j)(1)(iii).  Thus, I reject defendants' argument that the State's statutory claims must be dismissed as a matter of law to the extent they are premised on defendants' manufacture, marketing, or supply of MTBE gasoline.

Defendants also argue that the State's statutory claims must be dismissed in their entirety because they are supported only by conclusory allegations and improper group pleading.  ECF 335-2 at 11.  They contend that the Complaint is deficient because it does not specify which defendants allegedly did what, where, when or how, but instead "lumps" them all together and broadly alleges they are all "responsible" for discharges of MTBE gasoline within the meaning of the E.A.  *Id.*  This argument also fails.

The pleading standard set by Rule 8(a)(2) of the Federal Rules of Civil Procedure is minimal.  It requires only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[D]etailed factual allegations" are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555.

The State's Complaint meets this standard.  It alleges that defendants together made up all or substantially all of the MTBE gasoline market in Maryland (ECF 2, ¶ 98); that defendants who

manufactured and supplied MTBE gasoline are responsible for putting MTBE gasoline into the stream of commerce despite their knowledge of its dangers (*id*. ¶¶ 384–87); that defendants who are downstream handlers are responsible for discharges that occurred at their storage facilities; (*id*. ¶ 387); and that defendants breached their duty to use due care in the manufacture, handling, storage, marketing, and sale of MTBE gasoline. *Id*. ¶ 388. The State also identifies forty-one of the sites at which MTBE gasoline was released into its waters. *Id*. ¶ 220. These allegations provide defendants with "fair notice" of the conduct underlying the State's claims. *Twombly*, 550 U.S. at 555.

Accordingly, I shall deny defendants' Joint Motion to dismiss the State's statutory claims.

## 8.      Additional Arguments for Dismissal

I turn to the supplemental motions to dismiss for failure to state a claim filed by several defendants. ECF 334 (Duke Energy, Warren, Guttman Energy, TPRI); ECF 338 (Hartree Joinder); ECF 336 (7-Eleven); ECF 342 (LPA). With the exception of certain arguments raised by 7-Eleven, the motions are largely repetitive. They argue that the Complaint fails to satisfy Rule 8 because it offers no factual allegations about their individual actions but instead relies on improper group pleading. ECF 334-1 at 3–7; ECF 336-1 at 13–20; ECF 342-1 at 3–5.

The Complaint, although quite long, could certainly be more detailed. It does not offer any allegations specific to these defendants apart from listing their names, places of incorporation, and places of business. ECF 2, ¶¶ 43, 48, 52, 73, 80, 85. However, as discussed, the Complaint satisfies the liberal pleading standard of Rule 8(a)(2).

In short, the Complaint alleges that defendants were in the chain of distribution that supplied MTBE gasoline to Maryland, knew or should have known of the environmental hazards associated with MTBE gasoline, failed to warn foreseeable users of those dangers, and that releases

of MTBE gasoline in the State have resulted in the widespread contamination of its waters. It asserts all claims against all defendants with the exception of Count III, its strict liability claim for abnormally dangerous activity, which is brought only against downstream handler defendants. ECF 2, ¶ 333. These allegations provide defendants with "fair notice" of the claims against them "and the grounds upon which [they] rest." *Twombly*, 550 U.S. at 555; *see Chevron U.S.A Inc. v. Apex Oil Co.*, 113 F. Supp. 3d 807, 815 n.1 (D. Md. 2015) ("Chevron's claims against Apex do not fail merely because Chevron grouped the defendants in order to bring identical claims against each of them.") (citing cases).

Accordingly, I reject defendants' argument that the Complaint must be dismissed because it fails to meet the notice pleading standard set by Federal Rule of Civil Procedure 8(a)(2).

I now consider the additional arguments for dismissal raised by 7-Eleven.

### a. Downstream Handlers

7-Eleven asserts that it is a downstream handler, and it insists that the suit must be dismissed because the Complaint is "inherently contradictory." ECF 336-1 at 3. Specifically, it points out that the Complaint defines "defendants" to include sellers of MTBE gasoline (ECF 2, ¶¶ 93, 309), and then defines "downstream handlers" as "entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline and/or persons who own operate, or are in charge of oil storage facilities." *Id*. ¶ 186. 7-Eleven argues that, as a result of these overlapping definitions, the State's allegations amount to claims against the downstream handler defendants "for selling defectively designed products to themselves and failing to warn themselves." ECF 336-1 at 8.

The Complaint reveals that, generally speaking, there are two categories of players in the supply chain for MTBE gasoline: "downstream handlers," meaning sellers and distributors (ECF

-79-

2, ¶¶ 186, 207, 333); and "upstream handlers," meaning manufacturers and refiners. *See id.* ¶¶ 309–10. The State's allegations indicate that these categories are not mutually exclusive, as some defendants operate as both upstream handlers and downstream handlers. *Id.* ¶¶ 207, 333.

Herein lies the problem, according to 7-Eleven. The State does not distinguish between the upstream handler defendants and the downstream handler defendants in its claims for strict product liability, Counts I and II. It alleges, in relevant part: "Defendants knew that Downstream Handlers and intended users and consumers did not have the wherewithal to inspect or test for defects" (ECF 2, ¶ 315); and "defendants did not adequately warn or instruct Downstream Handlers or the intended users or consumers as to the dangers of MTBE gasoline." *Id.* ¶ 327. According to 7-Eleven, these allegations amount to claims against the downstream handler defendants for failing to uphold legal duties and obligations to themselves and, therefore, must be dismissed. ECF 336-1 at 8.

7-Eleven ignores the applicable law and reads the Complaint too narrowly. Under Maryland law, both manufacturers and sellers may be held liable in strict liability for injuries caused by defective products. The Maryland Court of Appeals has stated:

> In a strict liability action, if a product is defective when it was sold by a manufacturer because it lacked a warning of its dangerous characteristics . . . and if the defective and dangerous product reaches the user plaintiff without substantial change, middlemen or intermediate sellers of the defective product are strictly liable to the plaintiff user just as the manufacturer is liable to the plaintiff.

*Zenobia*, 325 Md. at 441–42, 601 A.2d at 643 (citing Restatement, § 402A cmt. f); *see Phipps*, 278 Md. at 352–53.

In my view, the State's allegations are broad enough to assert claims for defective design and failure to warn against both upstream handler defendants and downstream handler defendants. As to design defect, it alleges that "[d]efendants manufactured and/or sold MTBE gasoline," (ECF

2, ¶ 309), and that "[a]t the time that it left the defendants' possession or control . . . MTBE gasoline was defective and unreasonably dangerous" in several ways. *Id.* ¶ 310. As to failure to warn, the State alleges that "[d]efendants did not adequately warn or instruct Downstream Handlers or the intended users or consumers as to the dangers of MTBE gasoline." *Id.* ¶ 327. This disjunctive allegation indicates that the alleged failure to warn occurred either because upstream handlers failed to warn downstream handlers, or because all defendants knew the risks of MTBE gasoline and failed to warn end users.

Rule 8(d)(3) of the Federal Rules of Civil Procedure permits a party to "state as many separate claims . . . as it has, regardless of consistency." Ultimately, if it is shown that upstream handler defendants failed to warn any downstream handler defendants of the latent dangers of MTBE gasoline—and the downstream handlers were indeed reasonably unaware of those dangers—it will not be able to proceed on its failure to warn claim against those downstream handlers. *See Zenobia*, 325 Md. at 437, 601 A.2d at 641 (holding that a seller "is not strictly liable for failure to warn unless the seller has 'knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the . . . danger'") (quoting Restatement, § 402A cmt. j). At this stage, however, dismissal is not warranted.

7-Eleven does not challenge any of the State's other claims as "inherently contradictory," (ECF 336-1 at 3), nor could it. The State sets forth the conduct of the downstream handler defendants underlying its remaining claims. *See, e.g.*, ECF 2, ¶ 334 (Count III) ("Downstream Handler defendants' storage of large quantities of MTBE gasoline in underground storage tanks in the vicinity of waters of the State used as drinking and/or irrigation water and/or near population centers with drinking water wells is an abnormally dangerous activity."); *id.* ¶ 367 (Count VI) ("Defendants that are Downstream Handlers and that handled and/or stored MTBE gasoline within

the State breached their duty of care to properly install, maintain and/or operate their underground storage tanks."); *id.* ¶ 387 (Count VII) ("[D]efendants that are Downstream Handlers at oil storage facilities at which there has been a discharge are persons responsible for the discharge.").

Accordingly, I reject 7-Eleven's argument that the Complaint must be dismissed as to downstream handler defendants on the grounds that it is "inherently contradictory." ECF 336-1 at 3.[13]

7-Eleven also purports to raise two arguments about causation. First, it asserts that the market share theory of liability does not apply to downstream handler defendants. ECF 336-1 at 9. Second, 7-Eleven argues that the State may not proceed on its claims of negligence, nuisance,

---

[13] In a footnote, 7-Eleven argues that the downstream handler defendants "are entitled to a statutory defense applicable to certain product retailers." ECF 336-1 at 2. The statute cited by 7-Eleven, C.J. § 5–405(b), provides nonmanufacturing sellers a defense if they establish the following:

(1) The product was acquired and then sold or leased by the seller in a sealed container or in an unaltered form;

(2) The seller had no knowledge of the defect;

(3) The seller in the performance of the duties he performed or while the product was in his possession could not have discovered the defect while exercising reasonable care;

(4) The seller did not manufacture, produce, design, or designate the specifications for the product which conduct was the proximate and substantial cause of the claimant's injury; and

(5) The seller did not alter, modify, assemble, or mishandle the product while in the seller's possession in a manner which was the proximate and substantial cause of the claimant's injury.

The Court cannot determine from the limited record before it whether any defendants are entitled to this defense. Accordingly, resolution of this issue is improper at this stage. *See Goodman*, 494 F.3d at 464 (citing *Forst*, 4 F.3d at 250).

and trespass under a commingled product theory against downstream handler defendants. *Id.* at 13.

I need not address 7-Eleven's concern about the scope of the market share theory of liability because, as explained in Section III.C.1, *supra*, I did not find that the State could in fact proceed under that theory. 7-Eleven's argument about the application of the commingled product theory also falls flat, but gives the Court the opportunity to outline the contours of its causation analysis.

In Section III.C.1, *supra*, I rejected the argument presented in defendants' Joint Motion that the State's common law tort claims fail because the alleged nature of MTBE gasoline makes it impossible to link particular defendants to the MTBE gasoline that allegedly contaminated the State's waters. I determined that the State could proceed on its tort claims under the commingled product theory of liability *where product identification is necessary for relief.* However, product identification is *not* a necessary element on the State's claims for public nuisance, trespass, and negligence against downstream handler defendants.

Judge Scheindlin explained this distinction as follows in *In re MTBE*, 415 F. Supp. 2d at 272–73:

> In my prior ruling, I predicted that fifteen states in this consolidated action would apply the commingled product theory of market share liability (if plaintiffs are unable to identify the offending product) to claims where product identification is essential for relief. But plaintiffs and defendants overlook the fact that this theory is not applicable where product identification is not at issue . . . [P]laintiffs may proceed on the basis of the commingled product theory against downstream handler defendants where they allege claims of products liability and failure to warn against those defendants because those claims also hinge on the identification of the product. However, where plaintiffs allege claims of negligence, nuisance, and trespass based on allegations of negligent handling and release of MTBE-containing gasoline, downstream handler defendants are liable for their actions regardless of the product's source. These claims do not hinge on the identification of the product and the commingled product theory of liability is irrelevant.

As Judge Scheindlin made clear, the commingled product theory of liability is irrelevant to the State's claims for negligence, nuisance, and trespass against downstream handler defendants. Those claims are based on their handling and release of MTBE gasoline, not the source of the product itself. *See* ECF 2, ¶¶ 345, 356, 367; *see also* ¶ 207. Therefore, 7-Eleven's argument about the scope of the commingled product theory of liability does not support dismissal of any claims.

### b. Motion for a More Definite Statement

In the alternative to its motion for dismissal pursuant to Rule 12(b)(6), 7-Eleven moves for a more definite statement, pursuant to Fed. R. Civ. P. 12(e). ECF 336 at 3–4. Rule 12(e) provides, in relevant part:

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

In particular, 7-Eleven seeks a more definite statement from the State that sets forth the following information: the capacity in which it sues 7-Eleven; when and where the alleged MTBE releases occurred; the conduct by 7-Eleven that subjects it to liability for any alleged release; and the type, location, and boundaries of the allegedly contaminated or threatened bodies of water. ECF 336-1 at 13–19.

The Fourth Circuit has stated that Fed. R. Civ. P. 12(e) "must be read in conjunction with Rule 8 . . ." *Hodgson v. Va. Baptist Hosp., Inc.*, 482 F.2d 821, 822 (4th Cir. 1973). Pursuant to Fed. R. Civ. P. 8(a), a complaint must contain three elements:

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Unlike a Rule 12(b)(6) motion, which tests the legal sufficiency of a complaint, a Rule 12(e) motion for a more definite statement focuses on whether "'a party has enough information to frame an adequate answer . . .'" *Streeter v. SSOE Sys.*, No. WMN-09-01022, 2009 WL 3211019, at *10 (D. Md. Sept. 29, 2009) (quoting *Doe v. Bayer Corp.*, 367 F. Supp. 2d 904, 917 (M.D.N.C. 2005)). Such motions are "designed to strike at unintelligibility rather than simple want of detail. . ." *Seneca One Fin., Inc. v. Structured Asset Funding, LLC*, No. DKC-10-1704, 2010 WL 4449444, at *2 (D. Md. Nov. 4, 2010) (citation and internal quotation marks omitted). And, they "are viewed with disfavor, and are rarely granted." *Cellars v. Pac. Coast Packaging, Inc.*, 189 F.R.D. 575, 578 (N.D. Cal. 1999).

As explained in *Federal Practice and Procedure* § 1376, 5C Charles Alan Wright, et al., (3d ed. 2004):

> As the cases make clear, [under Rule 12(e)] the pleading must be sufficiently intelligible for the district court to be able to make out one or more potentially viable legal theories on which the claimant might proceed; in other words the pleading must be sufficient to survive a Rule 12(b)(6) motion to dismiss. At the same time, the pleading also must be so vague or ambiguous that the opposing party cannot respond to it, even with a simple denial as permitted by Rule 8(b), with a pleading that can be interposed in good faith or without prejudice to himself.

Of relevance here, Wright adds: "The class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small." *Id.* When the information sought in connection with a Rule 12(e) motion "is available or properly sought through discovery, the motion should be denied." *Seneca One Fin., Inc.*, 2010 WL 4449444, at *2. In addition, if the court is satisfied that the complaint provides enough information to frame a responsive pleading, "a court should deny the Rule 12(e) motion and avoid delay in maturing the case." *Doe*, 367 F. Supp. 2d at 917.

I conclude that a more definite statement is not warranted in this case. Although the Complaint lacks abundant detail, it provides defendants with "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The information sought by 7-Eleven is available through discovery, and, in fact, defendants are likely in a better position to know many of the relevant facts, such as the timing and location of any releases of MTBE gasoline that occurred on their properties. Indeed, in other statewide MTBE cases, the parties have been directed to work together to identify specific sites and release dates during discovery. *See* ECF 355-1 (Case Management Orders from MDL).

Therefore, I deny 7-Eleven's motion for a more definite statement.

## IV.    Conclusion

For the reasons stated above, I shall grant the PJSC Motion. And, I will grant the Joint Motion in part, in that I will dismiss the State's trespass claim to the extent it is based on properties outside of the State's possession. The motions are otherwise denied.

An Order follows.


Date:   September 4, 2019                            _____/s/_____
                                                    Ellen Lipton Hollander
                                                    United States District Judge