**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Northern District)**

STATE OF MARYLAND,

                    Plaintiff,

         v.

EXXON MOBIL CORPORATION, et al.,

                    Defendants.

Civil Action No. 1:18-cv-00459-SAG

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR PARTIAL SUMMARY JUDGMENT AS TO "CLOSED SITES"**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION .......................................................................................................................1

MATERIAL FACTS ...................................................................................................................3

BACKGROUND ........................................................................................................................3

ARGUMENT ..............................................................................................................................8

      I.      BECAUSE PLAINTIFF HAS FAILED TO FOLLOW ITS OWN
             REGULATIONS FOR REOPENING ANY OF THE CLOSED
             FOCUS SITES, EACH OF ITS CLAIMS FOR THOSE SITES
             VIOLATES THE *ACCARDI/POLLOCK* DOCTRINE AND
             MUST BE DISMISSED. .........................................................................9

      II.     PLAINTIFF'S CLAIMS ALSO VIOLATE MARYLAND'S
             LONG-SETTLED "CHANGE OF MIND" DOCTRINE AND
             MUST BE DISMISSED. .......................................................................13

      III.    PLAINTIFF'S CLAIMS ARE A "CONVENIENT LITIGATING
             POSITION" THAT, BY CONTRADICTING ITS PRIOR
             DETERMINATIONS AND DECISIONS, VIOLATE DUE
             PROCESS, DENY FUNDAMENTAL FAIRNESS AND
             UNDERMINE THE GOAL OF PROVIDING CERTAINTY AND
             PREDICTABILITY FOR CLOSED GASOLINE RELEASE
             SITES. ................................................................................................19

CONCLUSION ...........................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)................................................................ *passim*

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)................................................................21

*Calvert Cty. Planning Comm'n v. Howlin Realty Mgmt.*,
    364 Md. 301 (2001) ................................................................ *passim*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)................................................................21

*Exxon Mobil Corp. v. Albright*,
    433 Md. 303 ................................................................24

*Haigley v. Dep't of Health & Mental Hygiene*,
    128 Md. App. 194 (1999) ................................................................ 22-23

*Kay Constr. Co. v. Cty. Council for Montgomery Cty.*,
    227 Md. 479 (1962) ................................................................13

*Miles v. McKinney*,
    174 Md. 551 (1938) ................................................................ *passim*

*Pollock v. Patuxent Inst. Bd. of Review*,
    374 Md. 463 (2003) ................................................................ *passim*

*Radford v. Colvin*,
    734 F.3d 288 (4th Cir. 2013) ................................................................ 21-22

*Schultze v. Montgomery Cty. Planning Bd.*,
    230 Md. 76 (1962) ................................................................ 8, 15-16

*Smith v. State*,
    140 Md. App. 445 (2001) ................................................................19

*United States v. Heffner*,
    420 F.2d 809 (4th Cir. 1969) ................................................................10

*Usery v. Bd. of Educ. of Baltimore Cty.*,
    462 F. Supp. 535 (D. Md. 1978)................................................................11

**Statutes**

Maryland Administrative Procedures Act ..................................................................11, 19

Maryland's Public Information Act ..................................................................................22

Md. Code, Envir. § 4-401, *et seq.* ..................................................................................3

Md. Code, Envir. § 4-401(b)............................................................................................4

Md. Code, Envir. § 4-403 ...............................................................................................23

Md. Code, Envir. § 4-405 ................................................................................................3

**Other Authorities**

23:25 Md. Reg. 1825 ....................................................................................................6, 23

Code of Maryland Regulations 26.10.01 *et. seq* .................................................. *passim*

MDE, "Maryland Environmental Assessment Technology for Leaking
   Underground Storage Tanks" (Feb. 2003)...........................................................3, 4, 6

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 56(a), Moving Defendants ("Defendants") move for partial summary judgment as to all 41 closed focus sites identified on the list attached as Exhibit A to the Declaration of James A. Pardo ("*Pardo Decl.*") that accompanies this Motion. (the "Closed Sites"). These Closed Sites are a subset of the "List of 50 Initial Focus Sites Selected Pursuant to Case Management Order No. 4" filed on December 18, 2020 (ECF No. 589-1).  As explained in the *Pardo Declaration*, the Maryland Department of the Environment ("MDE") has classified each of the sites on Exhibit A as "closed" and memorialized its decision on the public website maintained by MDE's Oil Control Program ("OCP").[1]  MDE's applicable regulations require that, before closing any gasoline discharge site, MDE must determine the discharge incident at the site was cleaned up "to the satisfaction of the [MDE]" so as to "adequately protect human health, safety and the environment" as required by Maryland's Environment Article ("EA") Title 4, Subtitle 4. COMAR 26.10.01.01, 26.10.01.05(E)(2), 26.10.09.07(B), (E).  Thus, in closing each of the Closed Sites, MDE necessarily made a determination that any MTBE-gasoline incident which had occurred at the site was adequately addressed to Plaintiff's satisfaction, required no further action or remediation, and posed no threat to human health, safety or the environment.

Despite MDE's prior determination and decision to close each of the Closed Sites, Plaintiff, "on behalf of the [MDE]" (Compl. (ECF No. 2), Opening Paragraph), now seeks to impose new common law and statutory liability on Defendants for damages and injunctive relief, including additional corrective action activities, at each Closed Site.  *See* Compl. at 163-166 (Prayer for

---

[1] MDE publicly tracks gasoline discharge incidents on its Oil Control Program website. *See* MDE Oil Control Program – Case Information, https://mes-mde.mde.state.md.us/caseinformation/ (last visited July 14, 2021).  A Case Information Report can be reviewed for each of the 50 focus sites.  For 41 of those sites, that Report identifies the site or incident status as "closed."  Copies of those Reports are attached at *Pardo Decl.,* Ex. A.  The Court may take judicial notice of factual information set forth in these Reports, which MDE maintains in the ordinary course. *See Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (court may take judicial notice of voting-age population statistics which are publicly available on the official redistricting website of the Virginia Division of Legislative Services).

Relief).  Each of Plaintiff's claims fails as a matter of law and fact because (1) Plaintiff has failed to comply with its own regulations for reopening closed sites, in violation of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) and *Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463 (2003); (2) Plaintiff cannot demonstrate that anything about the Closed Sites has changed since its closure decisions and, thus, its claims reflect a "mere change of mind" in violation of *Miles v. McKinney*, 174 Md. 551 (1938) and its progeny; and (3) Plaintiff's "convenient litigating position" contradicts its prior determinations and decisions and, therefore, violates due process, denies fundamental fairness and undermines the MDE's goal of providing certainty and predictability for closed gasoline discharge sites.  For each of these reasons, Defendants should be granted summary judgment as to each of the Closed Sites.[2]

---

[2] Consistent with the parties' and the Court's prior discussions about the "closed sites" legal issue, this Motion is brought to raise "sooner rather than later" **non**-site-specific, and **non**-Defendant-specific, arguments about the legal effect of a site having been closed by Plaintiff.  *See, e.g.*, *Apr. 27, 2021 Hearing Tr.* at 3, 13-15.  As the Court correctly observed at the April hearing, the issues briefed on this Motion are not site-specific.  *Id.* at 15:1 (COURT: "They're not specifically site-specific to me.")  Accordingly, Defendants have not attempted to present in this Motion, and specifically reserve the right to move on at a later date, any site-specific or fact-specific argument that a particular Defendant may have for its dismissal at a particular closed focus site.

## MATERIAL FACTS

One fact is dispositive of this motion:  Plaintiff, by and through MDE, has closed each of the MTBE-gasoline incidents that are now alleged to be the basis for Plaintiff's common law and statutory claims in connection with 41 of the 50 focus sites.  *Pardo Decl.*, Ex. A.

## BACKGROUND

To understand why that single material fact is dispositive (and preclusive) of Plaintiff's common law tort and statutory claims in this case, a brief explanation of Plaintiff's extensive involvement in, and sole decision-making authority over, the process for addressing gasoline discharges such as those that allegedly occurred at the Closed Sites, and what closure of an MTBE-gasoline discharge really means, is necessary.

Like most states, the Maryland General Assembly has enacted legislation to prevent, abate and control the unauthorized discharge of oil products such as gasoline:  *i.e.,* Environment Article ("EA") Title 4, Subtitle 4.  Md. Code, Envir. § 4-401, *et seq.*  Implementation and enforcement of Subtitle 4 has been delegated exclusively to MDE (Md. Code, Envir. § 4-405) which, in turn, has promulgated comprehensive regulations and technical guidance that govern both the agency and regulated parties.  For purposes of this motion, the relevant regulations are at Title 26 ("Department of Environment"), Subtitle 10 ("Oil Pollution and Tank Management"), Chapter 1 ("Oil Pollution").  Code of Maryland Regulations ("COMAR") 26.10.01 *et. seq.*

Plaintiff's COMAR regulations require MDE's involvement and control at every step of the corrective action process for a petroleum discharge, including the MTBE-gasoline discharges alleged in this case.  MDE's involvement begins immediately after a discharge is reported, when it receives from the responsible party(ies) a "timely and detailed report to place MDE on notice and to activate MDE oversight of the release site."  MDE, "Maryland Environmental Assessment Technology for Leaking Underground Storage Tanks" p. 5 (Feb. 2003) (hereinafter "M.E.A.T.

Manual") (*Pardo Decl.*, Ex. B);[3] COMAR 26.10.09.04.  The agency then supervises any soil or groundwater investigation (COMAR 26.10.09.06); must approve any "Corrective Action Plan" ("CAP") to address soil or groundwater impacts (COMAR 26.10.09.07); and has sole authority over what corrective actions will take place to address such impacts:

> [T]he final decision to perform remedial activity is made by MDE.  This is the realization that MDE is in the best position to address the concerns of all parties interested in any given site. …

M.E.A.T. Manual, p. 13.  Throughout the corrective action process, MDE's decision-making approach is site-specific:

> MDE has adopted a strategy that relies on site-specific decision making. We have found that this strategy best fits the needs of MDE and Maryland citizens.  **We believe this approach is protective of public health, safety and the environment.**

*Id.* (emphasis added).

The language emphasized above – *i.e.*, "protective of public health, safety and the environment" – is Plaintiff's standard not only for its own oversight and decision-making activities at a gasoline discharge site, but also for the corrective actions which take place at the site.[4]  Those corrective actions are detailed in the CAP, which MDE will not approve unless and until the agency has determined that the actions "will adequately protect human health, safety and the

---

[3] This official guidance document by MDE is publicly available on MDE's website and, for the reasons previously stated, the Court can take judicial notice of it.  *See supra* n.1.  It also was produced by Plaintiff in discovery (MARYLAND019425) and, therefore, is subject to the Stipulated Order Regarding Authenticity of Documents (ECF No. 613) (hereinafter "Authenticity Order").

[4] The terms "cleanup," "removal" and "corrective action" are used interchangeably in the statute and regulations governing gasoline discharges.  For example, MDE defines "removal" to mean "the act of abatement, containment, **cleanup**, response or … [any] other actions as may be necessary to minimize or mitigate damage to the public health or welfare …"  COMAR 26.10.01.01(24) (emphasis added).  Similarly, the Environment defines "cleanup" to mean "abatement, containment, **removal** and disposal of oil and restoration of the environment to its existing state prior to discharge."  Md. Code, Envir. § 4-401(b).  As detailed in this Memorandum, MDE's intentional use of these complementary terms makes clear that closure of a gasoline discharge site can only occur if the agency has determined that the site has been remediated "to the satisfaction of [MDE]" (COMAR 26.10.09.07) such that it adequately protects human health, safety and the environment, including the threat of damages to natural resources.

environment," and the agency can demand CAP modifications to ensure this standard is met. COMAR 26.10.09.07(A) ("owners, operators, and other responsible parties are responsible for submitting a plan that provides for adequate protection of human health and the environment as determined by [MDE], and shall modify their plan as necessary to meet this standard."); COMAR 26.10.09.07(B) ("The Department will approve the corrective action plan only after ensuring that implementation of the plan will adequately protect human health, safety, and the environment."). Once MDE has approved a CAP, the agency oversees every aspect of its implementation, including the schedule for activities and the reporting of results to MDE. COMAR 26.10.09.07(C). Only MDE can say when corrective actions "have been accomplished to the satisfaction of the Department." COMAR 26.10.09.07. Indeed, so all-encompassing is MDE's control of CAP implementation that the agency even has the authority to terminate corrective actions before all of the CAP's goals are met. COMAR 26.10.09.08(C).

When cleanup activities in response to a gasoline discharge incident have been completed "to the satisfaction of the Department [MDE]" (COMAR 26.10.01.04(A), 26.10.02.01(C), 26.10.09.07(E)), MDE's regulations require the agency to close the incident, an action that the agency effectuates, and communicates to the public, by changing the site's status to "closed" on the website maintained by MDE's Oil Control Program. Closure of a discharge site by MDE is "applicable to any transferee of title, successor or assign of the person responsible for the discharge of oil, or person who performed the cleanup." COMAR 26.10.01.05(E)(3). Notably, however, MDE's closure determination is not specific to the responsible person(s) for a site – it is a determination as to conditions at the site itself.[5]  *Compare* COMAR 26.10.01.05(E)(1) *with*

---

[5] Although each of MDE's closure determinations is site-specific, MDE's underlying determination that the site poses no threat to human health, safety or the environment also looks **beyond** the boundaries of the site. MDE will only approve a CAP after conducting a detailed, seven-factor risk analysis that considers, *inter alia*, current and future

COMAR 26.10.01.05(E)(2).  As reflected in the regulatory history of COMAR 26.10.01.05, the purpose of closure is to provide certainty and predictability to responsible parties, affected property owners, lenders, and the public at large that a site is safe and that no further corrective action is required.  Specifically, the Statement of Purpose for the regulation states:

> The purpose of the proposed action is to set forth the type of status letters available and the circumstances under which a person is entitled to request site status letters.  Property owners and developers need to have these letters to attract potential investors and purchasers to facilitate the redevelopment of oil contaminated sites. This regulation would establish the mechanism and conditions under which a property owner would receive a letter. The redevelopment of previously contaminated properties is beneficial to the environment and business and economic development of the State.

*See* 23:25 Md. Reg. 1825, 1825 (Dec. 6, 1996) (*Pardo Decl.*, Ex. C)

What, then, does "closure **mean** for an MTBE-gasoline discharge site?  Because MDE cannot approve any corrective action unless the agency first determines the action will protect public health, safety and the environment (COMAR 26.10.09.07(B)), the agency's determination that such actions have been "accomplished to the satisfaction of the Department" (COMAR 26.10.09.07(E)), such that a site is formally and publicly closed on MDE's website, is also MDE's determination that the MTBE-gasoline incident and site poses no threat to public health, safety or the environment.  Put another way:  MDE's regulations and the Environment Article preclude it from closing an MTBE-gasoline incident unless MDE has determined that any contamination at the site poses no threat to human health, safety or the environment.

Which is not to say that MDE cannot reopen a closed site.  It can but, like all of MDE's other actions with respect to gasoline discharge sites, the agency's own regulations enumerate the pre-conditions for such a reopening.  Specifically, to reopen a closed site, MDE must determine

---

ground water use within a half mile of the site, potential off-site migration of contaminants, possible human exposures, and impacts to nearby utilities and sensitive receptors.  M.E.A.T. Report, p. 10 (*Pardo Decl.*, Ex. B).

either that: (1) the site poses a threat to public health and welfare or the environment; (2) the gasoline discharge has recurred as free phase product; (3) the final closure letter was obtained through fraud or misrepresentation; or (4) a new or previously undiscovered discharge is found that requires corrective action. COMAR 26.10.01.05(F).[6] MDE has not reopened any of the Closed Sites in accordance with COMAR 26.10.01.05(F).

In sum, although the only material fact required on this Motion is that each of the 41 focus sites has been closed by Plaintiff, the important background facts are:

1. Plaintiff, by and through MDE, has sole decision-making authority at every stage of the corrective action process at an MTBE-gasoline discharge site;

2. Plaintiff, by and through MDE, has comprehensive regulations that govern the corrective action process at an MTBE-gasoline discharge site;

3. Plaintiff, by and through MDE, can only approve a corrective action plan if it determines that the plan will protect public health, safety and the environment;

4. MDE's regulations require closure of an MTBE-gasoline discharge incident if MDE, on behalf of Plaintiff, has determined that all corrective action activities have been performed to its satisfaction;

5. MDE's listing a site as closed means, and can only mean, that the agency, exercising the authority delegated to it by the Maryland General Assembly on behalf of Plaintiff, has determined that the MTBE-gasoline incident, and the site at which it occurred, poses no threat to public health, safety or the environment; and

6. Plaintiff, by and through MDE, can reopen a closed site only if it has determined that one of four things, as specified in its own regulations, has occurred in connection with the closed site.

As discussed below, these subsidiary points further support dismissal of each of the claims by which Plaintiff seeks to recover damages, and to compel additional abatement, cleanup and other corrective action activities, in connection with the Closed Sites.

---

[6] Subsection F does **not** contemplate that counsel for the State or the State's retained experts can make the requisite determination that further corrective action at a closed site is necessary. That decision has been delegated to, and is within the exclusive province of, MDE.

## ARGUMENT

---

"An agency . . . not otherwise constrained, may reconsider an action previously taken and come to a different conclusion upon a showing that the original action was the product of fraud, surprise, mistake, or inadvertence, or that some new or different factual situation exists that justifies the different conclusion. What is ***not*** permitted is a 'mere change of mind' on the part of the agency."[7]

---

Each of Plaintiff's common law and statutory claims seeks to impose additional corrective action requirements, and to recover for additional putative environmental threats or injuries, at 41 focus sites that Plaintiff already determined meet the strict environmental and corrective action requirements imposed by Maryland's Environment Article and MDE regulations to protect human health, safety and the environment, such that each site could be "closed" by Plaintiff in accordance with those authorities. *Compl.*, Prayer for Relief. Simply put: Plaintiff's claims seek to revisit its prior closure determinations and decisions and treat the 41 closed focus sites as having been reopened.

Maryland law makes clear Plaintiff cannot do this for three reasons. **First**, Plaintiff's own regulations explicitly state it can only reopen closed sites under specific circumstances Plaintiff has made no attempt to establish (and could not establish). In any event, Plaintiff has never invoked those regulations in connection with these Closed Sites. **Second**, even if Plaintiff were

---

[7] *Calvert Cty. Planning Comm'n v. Howlin Realty Mgmt.,* 364 Md. 301, 325 (2001) (emphasis in original) (quoting *Schultze v. Montgomery Cty. Planning Bd.*, 230 Md. 76, 81 (1962)).

"not otherwise constrained" by its own regulations for reopening the Closed Sites, its attempt to do so by this litigation violates Maryland's longstanding "Change of Mind" doctrine, which prohibits state agencies like MDE from arbitrarily reversing their prior determinations and decisions. **Third**, Plaintiff's "convenient litigating position" in contradiction to the determinations and decisions it already made for the Closed Sites violates Defendants' due process rights, ignores fundamental fairness, and undermines MDE's goal of providing certainty and predictability for gasoline release sites that have been investigated, remediated and closed in accordance with Maryland's Environment Article and MDE regulations. Partial summary judgment should be granted on the 41 closed focus sites.

I.    **BECAUSE PLAINTIFF HAS FAILED TO FOLLOW ITS OWN REGULATIONS FOR REOPENING ANY OF THE CLOSED FOCUS SITES, EACH OF ITS CLAIMS FOR THOSE SITES VIOLATES THE *ACCARDI/POLLOCK* DOCTRINE AND MUST BE DISMISSED.**

It is long settled that federal and state administrative agencies are bound to follow their own regulations. The U.S. Supreme Court first articulated this fundamental principle, known as the "*Accardi* Doctrine," in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). Maryland's highest and intermediate courts have recognized it many times. *See Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463 (2003) (collecting and reviewing federal and Maryland intermediate court decisions and adopting the *Accardi* doctrine for administrative proceedings, with requirement that complainant show prejudice).

Plaintiff in *Accardi* was a resident alien whose application to suspend deportation had been denied by the Board of Immigration Appeals ("Board"), an administrative agency within the Department of Justice whose members serve under the U.S. Attorney General. The Immigration Act of 1917 entrusted to the Attorney General responsibility for promulgating regulations to handle deportation appeals, and the Attorney General had put in place rules that conferred on the Board

all discretion and powers afforded to the Attorney General "as is appropriate and necessary for the disposition of the [appeal]." *Accardi*, 347 U.S. at 266. Just prior to plaintiff's appeal being heard by the Board, the Attorney General held a press conference where he disclosed a list of "unsavory characters" whom he wished to deport. *Id.* at 264. Plaintiff's name was on that list, which then was given to the Board. *Id.* Plaintiff argued that by preparing the "unsavory characters" list and giving it to the Board, the Attorney General had impermissibly dictated the Board's decision on plaintiff's appeal in violation of the regulations requiring the Board to exercise its own independent judgment and discretion. *Id.* at 264-65.

The U.S. Supreme Court agreed. Finding that the Attorney General's regulations required the Board "to exercise its own judgment when considering appeals" (*id.* at 266), the Court held that Plaintiff had presented sufficient evidence that the Board's independent judgment and discretion may have been compromised by the Attorney General's actions. *Id.* at 267. Articulating the principle now known as the "*Accardi* Doctrine," the Court held that "as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner" (*id.*) and that the Board, to the extent it had failed to exercise its independent discretion, had done so "contrary to existing valid regulations." *Id.* at 268.

Thus, *Accardi* establishes the fundamental principle that "an agency of the government must scrupulously observe rules, regulations, or procedures which it has established." *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969). The doctrine's purpose is "to prevent the arbitrariness which is inherently characteristic of an agency's violation of its own procedures…. [D]epartures from an agency's procedures 'cannot be reconciled with the fundamental principle that ours is a government of laws, not men.'" *Id*. at 812 (quoting *Hammond v. Lenfest*, 398 F.2d 705, 715 (2d Cir. 1968)). The Fourth Circuit has specified that the principles of *Accardi* and

*Heffner* apply "(1) when the agency's regulations are designed to protect the party dealing with the agency and (2) when the agency's departure from those regulations results in prejudice to that party." *Usery v. Bd. of Educ. of Baltimore Cty.*, 462 F. Supp. 535, 547 (D. Md. 1978).

The *Accardi* Doctrine has long been applied in Maryland.  The Court of Appeals definitively adopted it in *Pollock*, 374 Md. 463.  After conducting an exhaustive review of *Accardi* and its progeny, including Fourth Circuit and Maryland lower court decisions, the *Pollock* court adopted the doctrine with only one modification:  a complainant also must establish prejudice by the agency's failure to follow its own rules.[8]  In so deciding, the Court of Appeals acknowledged that the central premise of the *Accardi* Doctrine – *i.e.*, that agencies are bound to follow their own rules and regulations – had already been recognized, albeit in other contexts, in due process jurisprudence and in "Maryland public policy concerns as expressed by the Legislature in the [Maryland Administrative Procedures Act] for agencies that come under the APA's aegis." *Id.* at 495-96.

The *Accardi/Pollock* doctrine is fatal to the Plaintiff's claims in this case.  Each of Plaintiff's common law and statutory claims seeks to impose new corrective action requirements, or to recover for additional alleged environmental threats or injuries, at an MTBE-gasoline discharge site that Plaintiff, by and through MDE, closed because it determined the site met the strict requirements of Environment Article Title 4, Subtitle 4 and/or COMAR 26.10.09 and, therefore, posed no threat to human health, safety or the environment.  Each of Plaintiff's claims effectively seeks to treat a Closed Site as if Plaintiff has reopened it.  But Plaintiff's own

---

[8] That prejudice to Defendants already exists because we have to spend vast resources defending litigation involving MTBE-gasoline incidents at sites that were already addressed and resolved, to Plaintiff's satisfaction, through the Maryland regulatory process.

regulations – the rules it has written for itself – specifically dictate when and how such a reopener may take place:

> F.     The [MDE] may require a person responsible for the discharge to take further remedial action at a site subject to a letter issued under this regulation if it determines that:
>
> (1)  There is a threat to public health and welfare or the environment;
>
> (2)  The discharge recurs as free phase oil product;
>
> (3)  A letter issued under §§ D and E of this regulation was obtained through fraud or misrepresentation; or
>
> (4)  A new or previously undiscovered discharge of oil is found that would require a corrective action under Environment Article, Title 4, Subtitle 4, Annotated Code of Maryland, or this subtitle.

COMAR 26.10.01.05(F)(1)-(4).

The *Accardi/Pollock* doctrine is fatal to Plaintiff's claims because Plaintiff has made no attempt to comply with the reopener regulation it wrote for itself.  Plaintiff's Complaint does not allege, for example, that any focus site closure was obtained through fraud or misrepresentation; or that a new or previously undiscovered MTBE-gasoline discharge has been found at a Closed Site.  While Plaintiff's Complaint includes general allegations about MTBE's putative threat to public health and the environment, none of those allegations are specific to a Closed Site and, in fact, Plaintiff reached the opposite conclusion when it closed them.  Tellingly, Plaintiff has never "require[d] [the] person responsible for the discharge" at any of the Closed Sites to "take further remedial action" despite having the regulatory authority to do so if the Closed Site presents a "threat to public health and welfare or the environment."  COMAR 26.10.01.05(F)(1).  Plaintiff has neither commenced a regulatory proceeding to reopen any of the Closed Sites, nor given notice

of such a proceeding.  To this day, every one of the 41 Closed Sites remains just that:  closed.

Indeed, Plaintiff has decided to close some of the focus sites while this litigation is pending.[9]

The *Accardi/Pollock* doctrine holds that Plaintiff must follow the regulations that it adopted

for itself.  Because Plaintiff has failed to follow its own regulations for reopening any of the Closed

Sites, each of its common law and statutory claims for those sites violates the doctrine and must

be dismissed.

## II.   PLAINTIFF'S  CLAIMS  ALSO  VIOLATE  MARYLAND'S  LONG-SETTLED "CHANGE OF MIND" DOCTRINE AND MUST BE DISMISSED.

Just as the *Accardi/Pollock* Doctrine binds Plaintiff to its own regulations, Maryland law

binds Plaintiff to the determinations and decisions it reaches under those regulations.  For more

than 80 years, this fundamental principle has been known in Maryland as the "Change of Mind"

Doctrine.  Rooted in procedural and substantive due process, as well as fundamental fairness, the

doctrine holds that although a Maryland agency may reconsider or change a prior decision if it was

based on fraud, mistake or equivalent good cause, the agency may not reconsider or change its

prior decision simply because the agency has changed its mind.[10]

As a preliminary matter, the Change of Mind Doctrine applies only if an agency is "not

otherwise constrained" by existing regulations that dictate how the agency must reconsider its prior

decisions.  *Calvert Cty. Planning Comm'n,* 364 Md. at 324 ("These cases make clear that a statute

(or rule) expressly permitting a reconsideration … is not necessary, and that, in the absence of such

a statute, the *McKinney* analysis applies.")  As discussed in Argument I, such a regulation exists

---

[9] Most of MDE's closure decisions were made years ago, but three were issued **after** Plaintiff filed this case – proving that MDE not only knows how to follow its regulations for addressing MTBE-gasoline releases, but continues to do so despite the MTBE allegations made by the Attorney General in this case.

[10] *See, e.g., Kay Constr. Co. v. Cty. Council for Montgomery Cty.*, 227 Md. 479 (1962) (using *McKinney* as guide to interpret "good cause" requirement in local ordinance allowing zoning council to reconsider its prior decisions; absent evidence of fraud, surprise, mistake or inadvertence, council's self-professed "'plain and simple error of judgment' was in reality a mere change of mind and, therefore, not "good cause").

here:  COMAR 26.10.01.05(F) expressly permits MDE to reconsider its prior decision to close an MTBE-gasoline discharge site, but only if one of the four stated conditions is met.  Because MDE has failed to comply with that "otherwise constrain(ing)" regulation, all of the Plaintiff's claims for the Closed Sites must be dismissed on that basis alone.

But even if COMAR 26.10.01.05(F) did not apply here, each of Plaintiff's claims also fails under Maryland's Change of Mind Doctrine because the State does not allege (and cannot allege) that anything has changed at the Closed Sites in terms of the MTBE-gasoline discharges that were investigated, remediated and <u>closed</u> by MDE after the agency determined those incidents were addressed "to the satisfaction of the Department" and posed no threat to human health, safety and the environment.  Put simply:  Plaintiff's claims cannot be based on anything other than its mere opportunistic "change of mind" about the closure decisions previously made by MDE.

The Change of Mind Doctrine was first articulated by the Maryland Court of Appeals in *Miles v. McKinney*, 174 Md. 551 (1938).  Petitioner in *McKinney* was the Board of Zoning Appeals for Baltimore City ("Board").  The Board had denied a permit for a gasoline station on the basis that it would be located within 300' of a church run by respondent, the Reverend McKinney.  *Id.* at 554.  During the appeal from that denial, the church property was leased by the service station permit applicant, forcing McKinney to relocate his church to a different property that was still within 300' of the proposed station.  *Id.* at 554-55.  Based on these events, the Board reopened its decision denying the permit and, on reconsideration, granted it.  McKinney appealed the Board's new decision; the Baltimore City Court reversed; and the Board then appealed to the Court of Appeals.  *Id.* at 553-57.

14

The Court of Appeals held the Board lacked authority to bring its appeal, but elected to express its views on whether the Board had acted within its powers by reconsidering its initial permit decision. *Id.* at 564. The Court began its discussion by stating a general principle:

> It may be conceded without discussion that the Board has the right to correct errors in its decisions caused by fraud, surprise, mistake or inadvertence which any agency exercising judicial functions must have to adequately perform its duties.

*Id.* The Court then turned to whether the Board's reconsideration of its prior decision was proper "where there is no fraud, mistake, surprise or inadvertence …" *Id.* Drawing from Connecticut and New York decisions that had addressed the issue, the Court of Appeals explained that, absent mistake, the general rule was that reopening such final decisions was improper because:

> Otherwise there would be no finality to the proceeding; the result would be subject to change at the whim of members or due to the effect of influence exerted upon them, or other undesirable elements tending to uncertainty and impermanence.

*Id.* at 565-66 (quoting *Burr v. Rago*, 120 Conn. 287, 298 (1935), and citing additional Connecticut and New York cases). Recognizing that "the power to reconsider is not an arbitrary one and its exercise should be granted **only when there is justification and good cause**'," (*id.* at 566 (quoting *People ex rel. Brennan v. Walsh*, 195 N.Y.S. 264, 266 (N.Y. 1922) (emphasis added)), the Court of Appeals concluded that the Board's decision to reopen and reconsider its prior decision was improper because "there had been no change in [the] conditions" on which that decision was based: Reverend McKinney's new church also was within 300' of the proposed service station. *Id.* at 565 ("the reason for the refusal of the [original] application … remained unchanged.").

For more than eight decades, Maryland courts, including the Court of Appeals, have applied and extended the Change of Mind Doctrine adopted in *McKinney*. In *Schultze v. Montgomery Cty. Planning Bd.*, 230 Md. 76 (1962), another zoning board case, the defendant

planning board had originally denied plaintiff's zoning application based on information that was

subsequently shown to be mistaken.  When the mistake was pointed out, the board reversed its

initial denial – a decision that the Court of Appeals found proper because it came squarely under

the Change of Mind Doctrine's allowance for reconsideration on the basis of mistake.  *Id.* at 81.

But the board had then reversed its decision again, re-denying plaintiff's permit based on public

pressure from opponents of the proposed project.  *Id.* at 78-79.  That second reversal, the Court of

Appeals held, was an improper abuse of power under the Change of Mind Doctrine because:

> [T]he disapproval of the final plan amounted to a mere change of mind on
> the part of the board as it is apparent from the record that it was not founded
> upon fraud, surprise, mistake or inadvertence, or indeed upon any new or
> different factual situation.

*Id.* at 81.

The Court of Appeals' most comprehensive discussion of the Change of Mind Doctrine is

found in one of its most recent decisions on the issue:  *Calvert Cty. Planning Comm'n*, 364 Md.

301.  The facts in *Calvert* closely parallel *Schultze*:  plaintiff-respondent's zoning proposal was

initially approved by the defendant planning commission based on information that later turned

out to be mistaken; when the commission learned of the mistake it reversed its initial decision and

plaintiff-respondent appealed.  *Id.* at 305-13.  The Court of Appeals affirmed the commission's

reconsideration and reversal because, as in *Schultze*, it clearly fell within the Change of Mind

Doctrine as articulated by the Court in *McKinney* and *Schultze*.  *Id*. at 325 ("Upon a finding that

the earlier approval was, in fact, based on a mistaken belief … the Commission was fully justified,

under *McKinney* and its progeny, in rescinding that approval.").

In so holding, the Court of Appeals took the opportunity to review in detail *McKinney* and

its progeny, including what the Court described as the "due process" and "fundamental fairness"

16

principles underlying the Change of Mind Doctrine.  *Id.* at 322.  The Court first explained that written rules governing agency decision-making are preferred:

> Rules for the transaction of business by public agencies are intended to be the normative principles formally adopted by the agency in written form . . . . Only then can there be some assurance against arbitrary and capricious conduct on the part of the agency.

*Id*.  The Court then explained that, absent such preferred written rules, the Change of Mind Doctrine ensures against arbitrary and capricious behavior by prohibiting a Maryland agency from reopening or reconsidering its prior determination simply because the agency has changed its mind about that determination:

> An agency . . . not otherwise constrained, may reconsider an action previously taken and come to a different conclusion upon a showing that the original action was the product of fraud, surprise, mistake, or inadvertence, or that some new or different factual situation exists that justifies the different conclusion.  **What is not permitted is a "mere change of mind" on the part of the agency**.

*Id.* at 325 (emphasis added).  In short:  *Calvert* confirms that – absent fraud, surprise, mistake, inadvertence or a change of operative facts – a Maryland agency's decision to reconsider or change its prior determination is arbitrary, capricious, and void.

As the Court no doubt already has discerned, the "fraud, surprise, mistake, inadvertence, or some new or different factual situation" wording of Maryland's Change of Mind Doctrine tracks, to some extent, the language of COMAR 26.10.01.05(F) discussed in Argument I.  The Court's conclusion should as well.  Just as Plaintiff has made no attempt to comply with COMAR 26.10.01.05(F), Plaintiff has not even alleged that it meets the narrow criteria for reconsidering and reversing its closure determinations under Maryland's Change of Mind Doctrine.  Because Plaintiff's common law and statutory claims in this case are nothing more than a "mere change of

mind," the doctrine first articulated in *McKinney* more than 80 years ago is as fatal to those claims as are *Accardi* and *Pollock*.

Plaintiff, by and through MDE, determined that any environmental violation identified, or corrective action required, because of an MTBE-gasoline incident at the Closed Sites was corrected or completed to the Plaintiff's satisfaction as required by Environment Article Title 4, Subtitle 4 and the applicable provisions of MDE's regulations, including COMAR 26.10.09 (corrective action).  From that determination, Plaintiff, by and through MDE, concluded that each of the Closed Sites posed no threat to human health, safety or the environment.  Based on those determinations, Plaintiff, by and through MDE, made the final decision to close each MTBE-gasoline incident at the Closed Sites.

Plaintiff has not reopened those Closed Sites.  Plaintiff does not allege, and has never contended, that any of its prior determinations and conclusions were based on fraud, surprise, mistake or inadvertence.  Likewise, Plaintiff has never contended that its determinations and closure decisions must be reopened or reversed because of some "new or different factual situation" at the Closed Sites.  Nor could it.  Plaintiff has required MTBE testing and remediation since at least 1997.  And any focus site closed before 1997 was re-examined by MDE, specifically for MTBE, to assess the possibility of reopening years ago.[11]  Not a single focus site was ever reopened.

Just like the property in *McKinney*, there has been "no change in [the] conditions" at any of the 41 Closed Sites.  Just like the determinations made in *Calvert*, the State has never wavered

---

[11] *See Pardo Decl.*, Ex. D (MARYLAND001993; Correspondence from Oil Control Program Administrator dated February 2003 re: additional OCP investigation and potential reopening of sites that were closed before MTBE testing was required beginning in 1997, based on MTBE and its potential "threat to public health and welfare or the environment[.]").  This document was produced by Plaintiff in discovery and is authentic per the Authenticity Order (ECF No. 613).

from its prior determination that each of the Closed Sites poses no threat to human health, welfare or the environment, and has never reconsidered its decision to grant final closure for those sites. Plaintiff's attempt to reopen the Closed Sites via common law and statutory claims in this civil litigation is simply an arbitrary and capricious "change of mind" that violates long-settled Maryland law.  Accordingly, Defendants are entitled to summary judgment on those claims as to each of the 41 Closed Sites.

## III.    PLAINTIFF'S CLAIMS ARE A "CONVENIENT LITIGATING POSITION" THAT, BY CONTRADICTING ITS PRIOR DETERMINATIONS AND DECISIONS, VIOLATE DUE PROCESS, DENY FUNDAMENTAL FAIRNESS AND UNDERMINE THE GOAL OF PROVIDING CERTAINTY AND PREDICTABILITY FOR CLOSED GASOLINE RELEASE SITES.

As demonstrated above, Defendants are entitled to summary judgment on each of Plaintiff's claims for additional corrective action and other alleged actual or threatened environmental injuries at the 41 Closed Sites because (1) Plaintiff has failed to comply with its own regulations for reopening closed sites, in violation of *Accardi* and *Pollock*; and (2) nothing about the Closed Sites has changed and Plaintiff cannot demonstrate that its claims are anything but a "mere change of mind" in violation of *McKinney* and its progeny.  Beyond these reasons, Maryland law makes clear that Plaintiff cannot pursue claims that contradict its own prior determinations and decisions to the detriment of Defendants' rights and MDE's goals.

The *Pollock* Court's discussion of the Maryland Administrative Procedures Act ("APA") is instructive.  As explained in *Pollock*, the APA, like *Accardi*, makes clear that "if a covered agency's departure from requirements affects fundamental rights and prejudices a petitioner, its action is subject to be reversed or modified by the courts."  *Pollock*, 374 Md. at 468-69 n.3; *see also Smith v. State*, 140 Md. App. 445, 455 (2001) ("Properly promulgated regulations have the force of law, binding the agency as well as other affected persons .... [C]ourts have not allowed agencies to violate any rules and regulations that were promulgated to benefit a party ... by entitling

19

him to a substantive benefit") (quoting IV-13 *Administrative Law* § 13.03 (Matthew Bender 2000)).  Plaintiff's claims in this case plainly affect fundamental rights and, if allowed to proceed, would prejudice Defendants by denying them a substantive benefit.

The *Pollock* court's discussion of the APA is instructive for yet another reason:  "Maryland courts have recognized that the order of an administrative agency must be upheld on [judicial] review if it is not premised upon an error of law and if the agency's conclusions on questions of fact or on mixed questions of law and fact are supported by substantial evidence presented to it." *Pollock*, 374 Md. at 468 n.3 (citing *Kohli v. LOOC, Inc.,* 103 Md. App. 694 (1995), *rev'd in part on other grounds and remanded*, 347 Md. 258 (1997)).   The deference afforded to agency determinations when they are challenged in courts is well settled, and MDE's determinations that each of the Closed Sites poses no threat to human health, welfare or the environment were based on robust records – indeed, records that MDE itself largely developed.  As detailed in its own regulations and guidance documents, MDE is involved in, and has final decision-making authority over, every aspect of the investigation and corrective action process at an MTBE-gasoline discharge site.  MDE receives a written report of the initial investigation and response activities; it can demand, review, change and must approve the final CAP (COMAR 26.10.09.07(B)).  Once approved, MDE oversees every aspect of CAP implementation, including the schedule for completion of activities (COMAR 26.10.09.07(C)), and only MDE can say when those corrective actions "have been accomplished to the satisfaction of the Department" (COMAR 26.10.09.07(E)). Given MDE's extensive involvement and the substantial evidence it must review, assess and account for before making a closure determination, those determinations would be afforded considerable deference if they were challenged in court.  But if MDE's closure decisions would be afforded deference if the agency were required to **defend** them in a court of law, those same

decisions should be afforded deference when – as in this case – MDE or Plaintiff wants a court of law to disregard them.  Defendants simply ask the Court to afford MDE's prior final closure determinations the same deference they would receive if Defendants were challenging them.

Although the decisions in *Accardi*, *Pollock* and most of their federal and state progeny arise in the context of administrative proceedings where an agency is attempting to disregard, circumvent or contradict its own regulations or prior determinations, the doctrine established by those cases should apply with equal force in this litigation.  If an agency cannot disregard or contradict its own rules and determinations in administrative proceedings, it should not be permitted to do so in civil litigation before an entirely different branch of state or federal government.  Plaintiff, suing on behalf of MDE, cannot assert claims based on a "convenient litigating position" that contradicts the regulations MDE has promulgated for itself, and the decisions MDE has reached pursuant to those regulations, with respect to the Closed Sites.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

That Plaintiff cannot use civil litigation to bring claims that not only circumvent its own regulations, but directly **contradict** its own prior determinations, finds support in case law from across the country.  For example, in *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013), claimant brought an action against the Commissioner of Social Security challenging a denial of disability insurance benefits.  The district court reversed, and the Commissioner appealed.  On appeal, the Commissioner argued for an interpretation of the relevant regulation that was contrary to its text and structure and, in further support of that position, appealed to the deference afforded agency interpretations under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Id.* at 294.  The Fourth Circuit rejected the Commissioner's regulatory interpretation because it

21

had "no basis in text or structure," and refused *Chevron* deference because the Commissioner's position was without any authority and "reads more like a litigating position or a 'post hoc rationalization.'"  *Id.*

Plaintiff's position in this case is even more infirm than was the Commissioner's in *Radford*.  Unlike the Social Security Commissioner who had no authority for the "litigating position" it was arguing for in the federal district and circuit courts, the "convenient litigating position" Plaintiff is taking in this case directly conflicts with its own authority at each Closed Site:  *i.e.*, Plaintiff's own determination that the MTBE-gasoline incident at each Closed Site has been addressed "to the satisfaction of [MDE]" such that the site poses no threat to human health, safety and the environment.  Whereas the Commissioner in *Radford* simply wanted to create his own version of the operative authority, Plaintiff here wants the Court to ignore the authority that Plaintiff itself created – a legally indefensible ask given that the authority is from Plaintiff itself.

The Court of Special Appeals' decision in *Haigley v. Dep't of Health & Mental Hygiene*, 128 Md. App. 194 (1999), also is instructive.  In *Haigley*, Plaintiff sought information from the defendant agency pursuant to Maryland's Public Information Act ("PIA"), and the agency refused to disclose certain of that information on the grounds that it was "confidential" under the Health-General Article ("H.G.") and, therefore, not available to the public under the PIA.  Acknowledging that "[t]he consistent construction by [an] agency responsible for administering a statute is entitled to considerable weight," Judge Hollander, writing for the Court of Special Appeals, nevertheless rejected the construction urged by the agency because it would conflict with the Legislature's intentions in enacting both the H.G. and the PIA:

> As we see it, the Department's view is at odds with the purpose of the PIA and H.G. §§ 4-101 and 4-102. … The deference we would ordinarily accord to the agency's interpretation of its own regulations is tempered by our obligation to safeguard the objectives of the PIA …

22

128 Md. App. at 213-14.

Just as in *Radford*, the position taken by Plaintiff in this case is even more infirm than that taken by the agency, and rejected by the Court, in *Haigley*. Plaintiff's position here not only contradicts the determinations it already has made under its own operative statutes and regulations, it also contradicts the express language of those regulations because Plaintiff's common law tort and statutory claims seek to reopen the 41 Closed Sites via civil litigation instead of as provided for by the regulations, with which Plaintiff has not even attempted to comply. *See supra.*

Moreover, like the agency's rejected position in *Haigley*, Plaintiff's position in this case is wholly at odds with MDE's intent in promulgating COMAR 26.10.01.05 to allow for "final closure" of MTBE-gasoline discharge sites: *i.e.*, to provide property owners with the certainty required to "attract potential investors and purchasers to facilitate the redevelopment of oil contaminated sites." 23:25 Md. Reg. 1825 ("Statement of Purpose" for COMAR 26.10.01.05). If Plaintiff can grant "final closure" for a discharge site and then elect – years or decades later, with no notice to a "responsible party" and in violation of its own regulations – to file a civil action against that responsible party for damages and additional corrective action at that closed site, then there is nothing final about a "final closure" at all. The resulting lack of certainty about a discharge site's closure status is precisely what MDE sought to avoid when it promulgated COMAR 26.10.01.05.

In sum, Plaintiff cannot use civil litigation to assert claims that conflict with its own regulations and prior binding determinations.[12] Plaintiff, by and through its delegated agency and

---

[12] Plaintiff may argue that even if Defendants are entitled to dismissal of its statutory claims under the Environment Article, it may nonetheless pursue its common-law claims because that statute "may not be construed to abridge or alter rights of action or remedies in equity under existing common law…." Md. Code, Envir. § 4-403. For purposes of this Motion, Defendants do not contend that Plaintiff's common-law claims are abrogated by the Environment Article. What defeats Plaintiff's common-law claims – and all its other claims – at the Closed Sites are Plaintiff's

23

applying the rules and standards set by its own regulations, has already determined that the "removal," "cleanup" and other activities completed months or years ago as part of the corrective action process, with MDE's oversight and approval, were sufficient to minimize or mitigate any threat to public health, safety and the environment at each of the 41 Closed Sites.   COMAR 26.10.01.01(24).   Plaintiff has already determined that those abatement, containment, natural resource restoration and other corrective action activities were "accomplished to the satisfaction of [MDE]" (COMAR 26.10.09.07(E)) so as to "adequately protect human health, safety and the environment" at each Closed Site.   COMAR 26.10.09.07(B).   Because Plaintiff's common law and statutory claims[13] for additional abatement, additional natural resources restoration, and additional corrective action at each of these Closed Sites conflict with the determinations that it already made under its own regulations, each of those claims fails as a matter of law and undisputed fact and must be dismissed for those sites.

---

prior determinations that those sites do not present any threat to "human health, safety, and the environment" (COMAR 26.10.09.07(B)), meaning that no compensable injury exists according to Plaintiff's own administrative findings and conclusions, which it has never revisited.

[13] Although not necessary to resolve this Motion, Defendants note that Plaintiff's determination that each Closed Site was sufficiently addressed to assure adequate protection of public health, safety and the environment also undermines one or more of the elements that Plaintiff would have to prove on each of its claims.  For example, because Plaintiff can only close a discharge site if it has concluded that the requirements of Environment Article Title 4, Subtitle 4 have been met, Plaintiffs causes of action (Counts VII and X) for alleged noncompliance with that statute fail on their face. Likewise, the Maryland Court of Appeals has held that the mere existence of MTBE is insufficient to support the common law negligence, nuisance, strict liability and trespass claims that Plaintiff has brought in this case.  *Exxon Mobil Corp. v. Albright,* 433 Md. 303, reconsideration in part, 433 Md. 502 (2013).  Nuisance requires a showing of "unreasonable and substantial interference;" negligence, trespass and strict liability require a showing of objective harm and actual loss.  *Id.* at 409-411.  None of these elements can exist at a site that was cleaned up "to the satisfaction of [MDE]" and that, according to Plaintiff, poses no threat to public health, safety or the environment.

## CONCLUSION

Each of Plaintiff's common law and statutory claims for the Closed Sites that it previously determined pose no threat to human health, safety or the environment fails as a matter of law and fact because (1) Plaintiff has not complied with its own regulations for reopening closed sites, in violation of *Accardi/Pollock*; (2) Plaintiff cannot demonstrate that anything about the Closed Sites has changed since its closure decisions and, thus, its claims in this case reflect a "mere change of mind" in violation of *McKinney* and its progeny; and (3) Plaintiff's "convenient litigating position" in contradiction of its prior determinations and decisions violates due process, denies fundamental fairness and undermines Plaintiff's stated goal of providing certainty and predictability for closed MTBE-gasoline discharge sites.  For each of these reasons, alone or collectively, Defendants should be granted summary judgment as to each of the Closed Sites.


Dated:  July 15, 2021                                     Respectfully submitted,


James A. Pardo (*admitted pro hac vice*)
Lisa A. Gerson (*admitted pro hac vice*)
**McDERMOTT WILL & EMERY LLP**
340 Madison Avenue
New York, New York 10173
(212) 547-5353
(646) 383-6700 (Fax)
jpardo@mwe.com
lgerson@mwe.com

*Attorneys for Exxon Mobil Corporation,*
*Exxon Mobil Oil Corporation, and Mobil*
*Corporation*
                                                    *and*

*On Behalf of all Moving Defendants*

25