IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                                          |   |                               |
|------------------------------------------|---|-------------------------------|
| STATE OF MARYLAND,                       | * |                               |
|                                          | * |                               |
| Plaintiff,                               | * |                               |
|                                          | * |                               |
| v.                                       | * | Civil Case No. 1:18-cv-0459-SAG |
|                                          | * |                               |
| EXXON MOBIL CORPORATION, et al.,         | * |                               |
|                                          | * |                               |
| Defendants.                              | * |                               |
|                                          | * |                               |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

The State of Maryland ("State" or "Maryland") filed a Complaint against approximately sixty-five defendant manufacturers, marketers, and distributors of gasoline seeking to redress the alleged contamination of its waters with methyl tertiary butyl ether ("MTBE"), an oxygenate additive that was commonly blended into gasoline in the 1980s and 1990s.  Defendants filed a Motion for Summary Judgment, ECF 642, as to 41 of the 50 focus sites initially selected for discovery.  *See* ECF 589-1.  The issues have been fully briefed, ECF 643, 645, and presented at a hearing before this Court, *see* ECF 649.  For the reasons stated below, Defendants' Motion for Summary Judgment, ECF 642, will be granted as to Count VII and denied as to the State's remaining claims.

## I.    BACKGROUND

The alleged facts in this case are set forth in detail in this Court's earlier Memorandum Opinion, ECF 412, and will not be fully reiterated herein.  As relevant here, however, is a brief discussion of Maryland's Environment Article, Title 4, Subtitle 4—Water Pollution Control and Abatement ("EA Subtitle 4"), and its application to several sites at issue in the case.  *See* Md. Code., Enviro. § 4-401, *et. seq.*

1

### A. Maryland's Water Pollution Control and Abatement

EA Subtitle 4 was enacted "to provide additional and cumulative remedies to prevent, abate, and control the pollution of the waters of the State." § 4-403. Consistent with these goals, EA Subtitle 4 prohibits "the discharge of oil in any manner into or on waters of this State," § 4-410, and imposes financial liability upon violators for damages, cleanup, and removal costs, § 4-419(c). As defined in EA Subtitle 4, "'[c]leanup' means abatement, containment, removal, and disposal of oil and the restoration of the environment to its existing state prior to a discharge." § 4-401(b). Likewise, "[d]amages" is defined to include "injury to, destruction of, loss of, or loss of use of natural resources, including the reasonable costs of assessing the damage." § 4-401(c)(2)(ii). Liability imposed under EA Subtitle 4 "may not be construed to abridge or alter rights of action or remedies in equity under existing common law, statutory law, criminal or civil [laws]," nor may its provisions be "construed as estopping any person . . . in the exercise of his rights in equity, under the common law, or statutory law to suppress nuisances or abate pollution." § 4-403.

The Maryland Department of the Environment ("MDE") is charged with the "general supervision over the administration and enforcement of [EA] [S]ubtitle [4], and all rules, regulations, and orders promulgated pursuant to it." § 4-405(a)(1). EA Subtitle 4 further provides that the MDE shall investigate potential violations and require responsible parties to "immediately clean up and abate the effects of the spillage and restore the natural resources of the State." § 4-405(c). If the MDE "believes instituting suit is advisable," the Attorney General shall "file suit against the person causing the condition" for "the reasonable cost of rehabilitation and restoration of the resources damaged and the cost of eliminating the condition causing the damage, including the environmental monetary value of such resources as established by regulation." *Id.* In addition

to its oversight and investigatory functions, the MDE is also required, under EA Subtitle 4, to "develop comprehensive programs and plans for prevention, control, and abatement of pollution of the waters of the State by oil or sediment."  § 4-405(a)(2).  Pursuant to its statutory mandate, the MDE issued a series of regulations enumerated in Title 26, Subtitle 10 of the Code of Maryland Regulations (hereinafter referred to as "the Regulations" or "COMAR Subtitle 10").[1]

The Regulations specify the procedures that shall be instituted in response to an unauthorized discharge of oil.[2]  As part of this process, the MDE, if it deems necessary, may require responsible parties to "submit a corrective action plan for responding to contaminated soil and ground water."  COMAR 26.10.09.07.  The MDE "will approve the corrective action plan only after ensuring that implementation of the plan will adequately protect human health, safety, and the environment."  *Id.*  Upon approval, responsible parties are required to implement the corrective action plan as directed by the MDE, and "[r]emediation activities shall continue until removal of the released regulated substance has been accomplished to the satisfaction of the Department."  *Id.*  The MDE shall issue a final closure letter after it determines that a site has been brought into compliance with:

---

[1] In its opposition, the State refers to applicable regulatory procedures outlined herein as the MDE "Corrective Action Program."  *See, e.g.*, ECF 643 at 2.  As Defendants note, the Regulations do not use this term.  *See* ECF 645 at 4.  In the interest of clarity—and to avoid confusion with "corrective action plans" that are promulgated pursuant to the Regulations, *see* COMAR 26.10.09.07—this Court will refer to the applicable regulations more broadly as "COMAR Subtitle 10" or "the Regulations."

[2] Responsible parties are initially required to report unauthorized oil discharges to the MDE. COMAR 26.10.09.02.  The parties must then undertake a specified series of initial abatement measures, COMAR 26.10.09.03, assemble information about the nature of the unauthorized discharge, and provide initial site information to the MDE in a written report.  COMAR 26.10.09.04.  If there is evidence that groundwater may be contaminated by the discharge, MDE requires that responsible parties conduct further investigation into the release, the release site, and the surrounding area, and submit the information to MDE within 60 days after confirmation of the discharge.  COMAR 26.10.09.06.

(1) EA Subtitle 4;
(2) COMAR 26.10.01.04, which provides that prompt removal shall be conducted by responsible persons, and specifies the means that may be used to do so; or
(3) COMAR 26.10.09, which details the procedures taken in response to an unauthorized discharge, including the submission and approval of corrective action plans.

COMAR 26.10.01.05(E)(1).   A final closure letter states that "the person responsible for the discharge of oil or the person performing the cleanup is released from any additional corrective action under this subtitle regarding the discharge." *Id.* at E(2).   Notwithstanding a final closure letter, the MDE "may require a [responsible] person . . . to take further remedial action at a site" if it determines that: "(1) There is a threat to public health and welfare or the environment; (2) The discharge recurs as free phase oil product; (3) A [final closure] letter . . . was obtained through fraud or misrepresentation; or (4) A new or previously undiscovered discharge of oil is found that would require a corrective action under Environment Article, Title 4, Subtitle 4, Annotated Code of Maryland, or this subtitle."[3]   COMAR 26.10.01.05(F).

On its website, the MDE maintains information regarding sites under its purview.[4]   This website also features a "case information" database, by which users can query information regarding a site's current status according to the Regulations.[5]   Sites for which final closure letters have been issued are classified as "closed" in the MDE case information database.

---

[3] The MDE's determination that the above-specified circumstances justify further corrective action at a site that was previously issued a final closure letter is referred to by the parties as the "reopening" of a closed site.

[4] Maryland Department of the Environment—Oil Control Program Remediation Sites, available at:   https://mde.maryland.gov/programs/LAND/OilControl/Pages/remediationsites.aspx   (last visited Sep. 23, 2021).

[5] Maryland Department of the Environment—Case Information Database, available at: https://mes-mde.mde.state.md.us/caseinformation/ (last visited Sep. 23, 2021).

### B.  Closed Sites

On December 18, 2020, the parties submitted a joint status report, ECF 589, including a list of 50 initial focus sites for discovery, ECF 589-1, which were selected pursuant to this Court's case management order, ECF 585.  Forty-one of the sites initially selected for discovery were issued a final closure letter under the Regulations and are classified as "closed" by the MDE on its case information database (hereinafter referred to as "Closed Sites").  MDE has not reopened any of the Closed Sites in accordance with procedures outlined in COMAR 26.10.01.05(F).  *See* ECF 642-1.  In light of this fact, Defendants moved for partial summary judgment on all claims as to the Closed Sites.

## II.   LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a "scintilla of evidence" in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere

speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  DISCUSSION

Defendants argue that all of Maryland's claims fail as a matter of law with regards to the Closed Sites. For its part, the State contends that its regulatory classifications of the Closed Sites are inapplicable to its current claims, and do not displace the State's inherent authority as trustee and *parens patriae* to pursue full restoration of, and damages for, injury to the State's natural resources. *See* ECF 643 at 4. At the motions hearing, both parties declined this Court's invitation to analyze individually, on a count-by-count basis, the viability of each of the State's claims with regards to the Closed Sites. *See* ECF 649 at 17:5, 48:14. Rather, both parties assert that their arguments apply with equal force to all of the State's statutory and common law claims. This Court does not agree. For the reasons detailed below, the State's current claim under EA Subtitle

4 is an impermissible change of mind from its earlier decision to close the Closed Sites. Defendants are accordingly entitled to summary judgment on Count VII.  Defendants' arguments fail, however, with regards to the State's remaining claims (Counts I-VI; VIII-XI).

### A. Common Law (Counts I-VI); Environment Article Title 4 Subtitle 7, Title 7, and Title 9 (Counts VIII-XI)

In Counts I-VI, the State alleges various state law claims: strict liability based on defective design (Count I); strict liability based on a failure to warn (Count II); strict liability for abnormally dangerous activities (Count III); public nuisance (Count IV); trespass (Count V); and negligence (Count VI).  *See* ECF 2.  In Counts VIII-XI, the State alleges several additional claims under Title 4 Subtitle 7, and Titles 7 and 9 of the State's Environment Article ("EA").  Count VIII alleges that Defendants are liable for monies reimbursed to the MDE from the Oil Contaminated Site Environmental Cleanup Fund ("Reimbursement Fund"), ECF 2 ¶ 395 (citing § 4-706).  Count IX alleges violations of the State's prohibition against the "discharge [of] any pollutant into the Waters of this State," ECF 2 ¶ 402 (quoting § 9-322).  Count X seeks injunctive relief pursuant to the State's authority to take necessary action to prevent or halt MTBE gasoline or MTBE from entering public water systems, ECF 2 ¶ 411-12 (citing § 9-405(b)).  Finally, Count XI seeks injunctive or monetary relief pursuant to its authority to exercise "every incidental power necessary to carry out the purposes" of EA Title 7, Subtitle 2.  ECF ¶ 415-17 (citing §§ 7-203, 7-207).

Defendants assert that all of the State's claims, including those detailed above, fail as a matter of law with regards to the Closed Sites.  In support of this position, Defendants argue that the claims: (1) run afoul of the *Accardi/Pollock* doctrine, which requires agencies to scrupulously observe their own rules and regulations; (2) are an impermissible, arbitrary departure from the State's prior conclusions; and (3) are barred by principles of fundamental fairness and due process.

Having examined the structure and scope of EA Subtitle 4 and the Regulations, this Court finds the Defendants' arguments unpersuasive as applied to the State's common law claims (Counts I-VI), and its statutory claims under EA Title 4 Subtitle 7, and EA Titles 7 and 9 (Counts VIII-XI).

### i. *Accardi/Pollock* Doctrine

The *Accardi* doctrine refers to the long-settled principle that government agencies are bound to follow their own rules and regulations. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954). Maryland courts have adopted a modified *Accardi* doctrine, which holds that "an agency of the government generally must observe rules, regulations or procedures which it has established and under certain circumstances when it fails to do so, its actions will be vacated." *Pollock v. Patuxent Inst. Bd. of Rev.*, 374 Md. 463, 503 (2003) (citing *Accardi*, 347 U.S. at 260). Under Maryland law, the *Accardi* doctrine only applies to regulations that affect individual rights or afford important procedural benefits; it "does not apply to an agency's departure from purely procedural rules that do not invade fundamental constitutional rights or are not mandated by statute." *Id*. Moreover, Maryland law requires that, even where an agency violates a regulation subject to the *Accardi* doctrine, the complainant must show "prejudice[] by the failure of the agency to follow its procedures or regulations." *Id.* at 503-04.

Defendants argue that the *Accardi* doctrine bars the State's current action as to the Closed Sites because "[e]ach of Plaintiff's claims effectively seeks to treat a Closed Site as if Plaintiff has reopened it. But Plaintiff's own regulations—the rules it has written for itself—specifically dictate when and how such a reopener [*sic*] may take place." ECF 642-1 at 11-12. Defendants' argument, however, is not supported by the text of the Regulations. The Regulations specify that, unless the State follows procedures to "reopen" a site, a final closure letter shall release responsible persons "from any additional corrective action *under this subtitle* regarding the discharge." COMAR

8

26.10.01.05(E)-(F) (emphasis added).  This Court agrees with the State that the phrase "under this subtitle" refers to the subtitle in which the provision appears: COMAR Subtitle 10.  *See* ECF 643 at 25.  Accordingly, the rule requiring the State to "reopen" a Closed Site before pursuing further action only applies to the pursuit of further corrective action under the Regulations themselves.

The *Accardi* doctrine requires the State to adhere to regulatory procedures that govern its proposed conduct; it does not require the State to "reopen" sites if their closure  had no effect on the State's ability to file this suit.  Contrary to Defendants' assertions, the State is not, through this suit, seeking to treat Closed Sites as if they are "reopened," for example, by requesting Defendants to perform further corrective action at a particular site.  Rather, the State is requesting damages for statewide contamination caused by Defendants' alleged statutory and common law violations.  *See* ECF 649 at 30:9-7; 32:5-12.  Simply put, the "reopening" of a site is not a precondition to the State's filing of this suit.  COMAR 26.10.01.05(E).  Because the "rule" in question is inapplicable to the State's conduct here, the *Accardi/Pollock* doctrine presents no barriers to the State's current claims.[6]

### ii.    Change of Mind Doctrine

Under Maryland law, the State may not revisit or reverse its prior determinations without good cause or justification.  *See Calvert Cty. Plan. Comm'n v. Howlin Realty Mgmt., Inc.*, 364 Md. 301, 325 (2001).  This precept, sometimes referred to as the "change of mind doctrine," applies

---

[6] Having determined that the Regulations' processes for reopening a site are inapplicable, this Court need not analyze whether the Regulations afford individual rights or important procedural benefits to implicate *Accardi*.  *Pollock*, 374 Md. 463 at 503.  Similarly, in light of this conclusion, the Court need not assess the merits of Defendants' cursory argument that they were prejudiced by the State's conduct, as is required to apply the *Accardi* doctrine under Maryland law.  ECF 642-1 at 11 n.8.

where there is no statute or rule permitting, or setting the standards for, reconsideration of a state agency's prior decision. The doctrine provides that:

> [a]n agency . . . may reconsider an action previously taken and come to a different conclusion upon a showing that the original action was the product of fraud, surprise, mistake, or inadvertence, or that some new or different factual situation exists that justifies the different conclusion. What is not permitted is a "mere change of mind" on the part of the agency.

*Calvert Cty. Plan. Comm'n*, 364 Md. at 325. The doctrine has been interpreted "as essentially requiring a showing of 'good cause' to justify" revisiting or reversing prior agency determinations. *Id.* at 324 (citing *Kay Const. Co. v. County Council*, 227 Md. 479, 485 (1962)).

Defendants insist that even if the *Accardi/Pollock* doctrine is inapplicable, the State's current claims are barred by the change of mind doctrine. ECF 642-1 at 17 ("Plaintiff has not even alleged that it meets the narrow criteria for reconsidering and reversing its closure determinations under Maryland's Change of Mind Doctrine . . . Plaintiff's common law and statutory claims in this case are nothing more than a 'mere change of mind.'"). The State, for its part, contends that because "[n]o State entity has ever suggested that the 'closed' sites have been restored to pre-discharge conditions . . . [t]he State's current lawsuit, therefore, in no way reflects a changed opinion about the conditions at the closed sites." ECF 643 at 27. To resolve whether the change of mind doctrine forecloses the State's claims, the Court must assess: (1) what determination or decision is reflected in the State's issuance of a final closure letter; and (2) whether any of the State's current claims contradict this initial determination.

By issuing a final closure letter, the State certified that a site had been brought into compliance with EA Subtitle 4 or either of two relevant provisions in the Regulations. *See* COMAR 26.10.01.05(E)(1) ("[A] final closure letter shall be issued after the [MDE] determines that a site at which a discharge of oil occurred is in compliance with Environment Article, Title 4, Subtitle 4, Annotated Code of Maryland, Regulation .04 of this chapter, or COMAR 26.10.09.").

Put differently, a final closure represents the State's satisfaction that a site complies with: (1) the full scope of EA Subtitle 4 itself, or (2) with relevant provisions of the regulatory scheme created to administer and enforce EA Subtitle 4.  Contrary to Defendants' assertions, a final closure letter does not necessarily indicate that a site "posed no threat" or had been restored to its pre-discharge state.  ECF 642-1 at 14.  It does represent, however, the State's judgment that responsible parties had satisfactorily completed corrective action necessary to bring a site into compliance with "the relevant 'cleanup' standard that the law imposes on polluters," enumerated in EA Subtitle 4 or its implementing Regulations.  ECF 643 at 25.

The State's claims under the common law, EA Title 4 Subtitle 7, and EA Titles 7 and 9, do not conflict its prior determination not to pursue further action on the Closed Sites under EA Subtitle 4 or the Regulations.  On this point, *Rhode Island v. Atl. Richfield Co.*, 2021 WL 2077931 (D.R.I. May 24, 2021), is instructive.  In that case, like this one, Rhode Island sued a variety of gasoline distributors for alleged contamination arising from the manufacture and distribution of MTBE gasoline.  *Id.* at * 1.  Rhode Island sought to establish liability at approximately 616 sites, despite the fact that cleanup had been completed at approximately 523 of the sites.  *Id.*  The court initially dismissed Rhode Island's claim under its Underground Storage Tank Financial Responsibility Act because it did not have an actionable right to be reimbursed by defendants for the depletion of its underground storage tank ("UST") Fund caused by cleanup costs at the sites. *Id.* at * 2.  The court rejected, however, defendants' attempt to "multiply the effect of that dismissal" by seeking summary judgment as to the State's common law claims for damages, which would be measured by the depletion of the UST Fund on sites at which cleanup was completed. *Id.*  The court dismissed defendants' motion as an attempt to conflate injury and damages, explaining that "[t]he injury alleged in the State's surviving counts . . . is not the diminution of the

[UST] Fund.  Rather, the injury is the pollution of the groundwater of the Ocean State." *Id.*  The fact that Rhode Island planned to use the diminution of the UST Fund as "one of the footings on which the State will attempt to quantify that injury in dollars and cents," did not render its claims subject to dismissal.  *Id.*

Here, too, Defendants conflate injury and damages.  Contrary to Defendant's assertions, the State did not decide that "no compensable injury exists" on the Closed Sites.  ECF 642-1 at 24 n. 12.  Rather, as described above, the State initially determined that the Closed Sites were compliant with EA Subtitle 4 or the Regulations, such that responsible parties owed no further damages under those laws.  Now, the State alleges that Defendants are liable for a distinct injury— the statewide contamination of its ground water—caused by the widespread movements of MTBE contaminants over long periods of time, which may preclude future uses of land.[7]  *See* ECF 649 at 35-36.  The State pursues a variety of common law (Counts I-VI) and statutory (VIII-XI) theories to prove Defendants' liability for such injuries.  The State's authority to seek restoration for its alleged statewide injury does not contradict—and is not displaced by—its earlier findings that the Closed Sites had fully complied with particular, specified statutory or regulatory standards.  *See* § 4-403.  This conclusion does not change merely because several of the State's common law and statutory claims seek damages on the Closed Sites measured by the costs of "cleanup" as defined in EA Subtitle 4.  Here, as in *Atl. Richfield Co.*, "the injury is the pollution of the groundwater of

---

[7] Notably, in Count VIII, the State alleges that Defendants are liable for an injury that is unique from the other claims discussed in this section, namely, monies expended from the State's Reimbursement Fund, and related attorneys' fees and litigation costs.  *See* ECF 2 ¶ 395 (citing § 4-706).  The State avers that it has not, or has no record of, previously recovering any such funds as to any of the Closed Sites.  ECF 650, 650-1.  Like the other claims discussed in this section, the State's allegations under EA Title 4, Subtitle 7 do not conflict with its prior determinations under EA Subtitle 4 or the Regulations.  The State will, of course, be required to prove that its claims fulfill the requisite elements for recovery from Defendants into the Reimbursement Fund.  *See* § 4-706(c)-(d).

. . . the State;" whereas the costs of cleanup as defined under EA Subtitle 4 are "merely one of the footings on which the State will attempt to quantify that injury in dollars and cents."[8]  2021 WL 2077931 at *2.  The State's current claims under Counts I-VI and VIII-XI do not represent a reversal of its conclusions as to the Closed Sites and are not barred by the change of mind doctrine.

### iii.    Due Process

Defendants also argue that allowing the State to proceed on its claims despite prior site closure would "violate due process, [and] deny fundamental fairness."  ECF 642-1 at 18. Defendants contend that "Plaintiff, suing on behalf of MDE, cannot assert claims based on a 'convenient litigating position' that contradicts the regulations MDE has promulgated for itself, and the decisions MDE has reached pursuant to those regulations, with respect to the Closed Sites." ECF 642-1 at 21 (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988); *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013)).

In contrast to Defendants' position, the State's authority to bring suit for additional common law and statutory causes of action is not "wholly unsupported by regulations, rulings, or administrative practice."  *Bowen*, 488 U.S. at 212.  The Regulations under which the sites were closed expressly state that final closure only releases parties from further corrective action brought under the Regulations.  COMAR 26.10.01.05(E)(2).  Defendants' due process arguments are further undermined by language in the final closure letters themselves, which stipulate that they "should not be construed as a waiver of the [MDE's] right to take other enforcement action."  ECF 643-4.  Defendants cannot persuasively argue that they relied on the finality of a closure letter when the letter itself reserved the State's right to pursue further claims.  Finally, the State's

---

[8] The Court expresses no view regarding whether the State will ultimately prove successful in attempting to measure its damages this way.

subsequent filing of this litigation on the Closed Sites is consistent with EA Subtitle 4's savings clause, which provides that it "may not be construed to abridge or alter rights of action or remedies in equity under existing common law, statutory law." [9]  § 4-403.

To rebut this conclusion, Defendants argue that the savings clause, § 4-403, is primarily intended for third-parties, ECF 649 at 14:1-8, and does not preserve claims that offer similar remedies as are already provided for by the statute, ECF 645 at 13-14.  Defendants' interpretation is not supported by the text of the provision itself and would effectively render EA Subtitle 4 "the exclusive remedy for harms caused by violations of the statute."  *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1246-48 (10th Cir. 2006).

There is no indication that—with regards to Counts I-VI, and VIII-XI—the State is attempting to "use civil litigation to bring claims that not only circumvent its own regulations, but directly contradict its own prior determinations."  ECF 642-1 at 21.  The State's filing of this action for assorted common law and statutory claims on the Closed Sites, is consistent with Maryland's statutory and regulatory scheme, and with due process.  Defendants' motion for partial summary judgment on the State's common law claims (Counts I-VI), and on its statutory claims under EA Title 4 Subtitle 7, and Titles 7 and 9 (Counts VIII-XI) will be denied.

---

[9] Defendants also claim that the State's attempt to file suit after a final closure determination "is wholly at odds with MDE's intent in promulgating COMAR 26.10.01.05 to allow for 'final closure' of MTBE-gasoline discharge sites: *i.e.*, to provide property owners with the certainty required to 'attract potential investors and purchasers to facilitate the redevelopment of oil contaminated sites.'"  ECF 642-1 at 23 (quoting 23:25 Md. Reg. 1825).  Defendants' argument is undermined by evidence that closed sites are reopened with some regularity, *see* ECF 642-3; ECF 649 at 25, and is unavailing insofar as it conflicts with the text of the Regulations, which expressly limit the closing letters' release to further corrective action under COMAR Subtitle 10.

**B. EA Subtitle 4 (Count VII)**

In Count VII, the State alleges that Defendants bear liability under EA Subtitle 4 directly. Specifically, the State alleges that Defendants are "jointly and severally liable for the reasonable cost of rehabilitation and restoration of the resources damaged and the cost of eliminating the condition causing the damage, including the environmental monetary value of such resources as established by regulation." ECF ¶ 379 (quoting § 4-405). Defendants contend that the State's current allegations violate the change of mind doctrine insofar as they conflict with its prior determination that the Closed Sites had been adequately remediated under the Regulations. The Court agrees.

The State's claim under EA Subtitle 4 (Count VII) as to Closed Sites cannot be reconciled with its decisions under the Regulations to close the sites in the first instance. The State, through the MDE, acted to close each site upon a finding of "compliance with [1] Environment Article, Title 4, Subtitle 4, [2] Annotated Code of Maryland, Regulation .04 of this chapter, or [3] COMAR 26.10.09." COMAR 26.10.01.05. These final closure letters reflect the State's decision not to pursue further action to bring Closed Sites into compliance with EA Subtitle 4 or the Regulations.[10] The State now reverses its position, alleging violations of EA Subtitle 4 at Closed Sites, such that Defendants are liable for the "reasonable cost of rehabilitation and restoration of the resources damaged and the cost of eliminating the condition causing the damage." ECF 2 ¶ 379 (quoting § 4-405(c)). Absent good cause or justification, the State may not use this litigation to revisit its

---

[10] This remains true even assuming that every final closure letter issued by the MDE was based not on compliance with EA Subtitle 4, but, as the State urges, merely on risk-based remediation standards. Even in that scenario, a final closure letter would still signify the State's decision not to seek further cleanup under EA Subtitle 4 as a precondition to site closure, despite its inherent authority to enforce a higher standard. *See* COMAR 26.10.01.05(E)(1). The decision to enforce a higher standard belatedly, then, represents a change of mind.

prior determinations as to the Closed Sites.  *See Calvert Cty. Plan. Comm'n v. Howlin Realty Mgmt., Inc.*, 364 Md. 301, 325 (2001).

In opposition, the State argues that: (1) the scope of the Regulations is more limited than EA Subtitle 4, such that a determination under the Regulations does not affect the viability of claim under EA Subtitle 4; (2) EA Subtitle 4 is intended to provide additional and cumulative remedies; and (3) its statutory enactment cannot displace its *parens patriae* authority for full restoration. This Court will address each argument in turn.

### i. Scope

The State argues that its current lawsuit for violations of EA Subtitle 4 "in no way reflects a changed opinion about the conditions" at sites it closed pursuant to the Regulations.  ECF 643 at 27.  To support its argument, the State characterizes remediation and restoration as two discrete, unique concepts.  Remediation, the State argues, is the modest goal of the Regulations, whereas restoration is the separate and loftier remedy it now seeks for alleged violations of EA Subtitle 4 in Count VII.  *See* ECF 643 at 13.  As such, the State reasons, its own prior conclusion that removal was satisfactorily achieved at the Closed Sites is irrelevant to its current action for full restoration under EA Subtitle 4.   The State's insistence that the Regulations are confined merely to remediation, however, is not reflected in the text of EA Subtitle 4 or the Regulations themselves.[11]

---

[11] The State emphasizes that restoration damages are "a specific, well-defined form of relief with origins in both federal law and common law."  ECF 643 at 9 (citing U.S.C. §§ 9607(a)(4)(C), 9601(6)), and cites caselaw defining "primary restoration," *id.* at 14 (quoting *New Jersey Dep't of Env't Prot. v. Amerada Hess Corp.*, 323 F.R.D. 213, 223 (D.N.J. 2017)).  This Court does not dispute that there is a legal distinction between remediation and restoration, which is recognized in EA Subtitle 4 and the Regulations.  The State's argument that the Regulations "treat cleanup and removal as two different things," however, does not establish that the Regulations were confined merely to the latter objective.  ECF 649 at 43.  Put differently, the State's observations are irrelevant to the question of whether the MDE, in implementing the Regulations pursuant to EA Subtitle 4, was limited to the pursuit of remediation, such that its closure of a site does not foreclose its current claims under EA Subtitle 4.

The State argues that closure determinations under the Regulations are only probative of remediation to a risk-based standard and are not reflective of compliance with EA Subtitle 4.  ECF 643 at 13.  The State supports its position primarily by highlighting the various instances in which the term "remediate" is used throughout the Regulations.  *See id.* at 16 ("Maryland's Corrective Action Program deals only with remediation . . . [t]hat much is clear by the Program's very terms: the regulations provide that '[r]*emediation* activities shall continue until removal of the released regulated substance has been accomplished to the satisfaction of the Department.'") (citing COMAR 26.10.09.07(E) (emphasis added)).  The Regulation's use of the term "remediate"—a word that is not defined in either EA Subtitle 4 or the Regulations—is not particularly probative of the State's argument, particularly in light of substantial evidence suggesting that the scope of the Regulations is coextensive with that of EA Subtitle 4.  First, EA Subtitle 4 specifically tasked MDE with its enforcement, and required the agency to promulgate comprehensive regulations to carry the statute into effect.  § 4-405(a)(1)-(2)  (stating that the MDE shall have "[g]eneral supervision over the administration and enforcement of this subtitle," and that it must "[d]evelop comprehensive programs and plans for prevention, control, and abatement of pollution of the waters of the State by oil or sediment."); *see also* § 4-405(c) (providing that the MDE shall "require repair of any damage done and restoration of water resources to a degree necessary to protect the best interest of the people of the State.").  The Regulations are undisputely the product of this legislative mandate.  *See* References and Annotation, COMAR 26.10.01, COMAR 26.10.09.  Second, the language in EA Subtitle 4 that the State cites as evidence of the statute's expansive scope also appears throughout the Regulations.  Indeed, the term "cleanup," which the State cites as its statutory basis for restoration damages, is used throughout the Regulations, including in the Regulation's definition of "removal."  *See* COMAR 26.10.01.01(B)(24) ("'Removal' means the

act of abatement, containment, *cleanup*, response, or the taking of other actions as may be necessary . . .) (emphasis added); *see also* COMAR 26.10.01.05. And lest there be any contention that the term "cleanup" was somehow stripped of its restorative denotation when it was included the Regulations, the definitions section further specifies that undefined terms in the Regulations shall have the same meaning as given to them in statute. Third, provisions in the Regulations demonstrate that the MDE was authorized to condition its closure determinations on full compliance with EA Subtitle 4. *See* COMAR 26.10.01.05(E) ("[A] final closure letter shall be issued after the Department determines that a site at which a discharge of oil occurred is in compliance with *Environment Article, Title 4, Subtitle 4*, Annotated Code of Maryland, Regulation .04 of this chapter, or COMAR 26.10.09.") (emphasis added). For its part, the State counters that although "cleanup" is included in the Regulations, it is "only to illustrate one of several 'actions' that may 'minimize or mitigate damages to the public health or welfare.'" ECF 643 at 18 n.5 (quoting COMAR 26.10.01(B)(24)). The State then asserts, somewhat bewilderingly, that although the Regulations may result in "a site [being] cleaned up to the more exacting statutory standard (full restoration to the pre-discharge state)," that the "MDE has never said or suggested that the Closed Sites have been restored to their pre-discharge state." *Id.* As the State implicitly acknowledges, however, "full restoration to the pre-discharge state" is among the potential outcomes that the State may, in its discretion, seek under the Regulations prior to site closure. *See id.*; *see also* ECF 649 at 40. Against this backdrop, the State's argument that site closure is not indicative of compliance with EA Subtitle 4 is unpersuasive.

The State argues that, in practice, the MDE utilizes a risk-based remediation standard for its closure determinations under the Regulations. According to the State, these standards, as well as practical constraints on the MDE's resources and finances, resulted in the closure of sites with

MTBE levels at rates above the "levels of concern" specified in COMAR 26.10.02.03(B)(3)(e). *See, e.g.*, ECF 643-4 (closing site with MTBE at 280 parts per billion ("PPB")). This evidence, however, is only probative of whether the MDE *did* require full compliance with EA Subtitle 4 as a precondition of site closure, and not whether the MDE was *empowered* to do so. The fact that the State may have—for myriad practical reasons—declined to seek full compliance with EA Subtitle 4 prior to site closure does not give the State license to reverse its initial determination by bringing its current Count VII claim.

Simply put, the State initially decided, for whatever reasons, that it was satisfied that responsible parties had brought the Closed Sites into compliance with EA Subtitle 4 or its coextensive Regulations. Now, in this action, the State alleges that Defendants are liable for violations of EA Subtitle 4 on the Closed Sites. Thus, Count VII represents an impermissible contradiction of its earlier determinations, for which the State has offered no justification.

### ii.   Savings Clause

The State also opposes summary judgment because the Maryland Legislature "has expressly stated that the regulatory programs cited by Defendants do *not* preclude damage claims." ECF 643 at 1. To support its position, the State points to the savings clause provided in EA Subtitle 4, which states that:

> It is the purpose of this subtitle to provide additional and cumulative remedies to prevent, abate, and control the pollution of the waters of the State. This subtitle may not be construed to abridge or alter rights of action or remedies in equity under existing common law, statutory law, criminal or civil, nor may any provision of this subtitle, or any act done pursuant to it, be construed as estopping any person, as riparian owner or otherwise, in the exercise of his rights in equity, under the common law, or statutory law to suppress nuisances or abate pollution.

§ 4-403.

The State argues that EA Subtitle 4's savings clause applies to COMAR Subtitle 10, such that site closure determinations under the Regulations cannot be construed to limit subsequent

claims under EA Subtitle 4.  As applied to its claim under EA Subtitle 4 (Count VII), this argument

does not win the day.  Assuming the savings clause in EA Subtitle 4 applies to the Regulations,[12]

it does not authorize the State to pursue duplicative remedies, or to contravene its prior

determinations that no further remedy under EA Subtitle 4 was required.  The State, through the

MDE, determined that it was satisfied that the Closed Sites were compliant with EA Subtitle 4, or

its coextensive Regulations.  EA Subtitle 4's savings clause does not permit it to subvert its prior

determination without sufficient justification, of which the State offers none.

### iii.    *Parens Patriae* Authority

Finally, the State asserts that all its claims remain viable because its prior determinations

under the Regulations cannot and "does not displace the State's inherent authority to sue for

restoration as *parens patriae* and as trustee of the State's natural resources."  ECF 643 at 24.  This

Court acknowledges the State's power to protect, preserve, and seek restoration of, the State's

natural resources.  This inherent authority, however, is not an unlimited license to revisit and

reverse its own prior conclusions.  The cases cited by the State do not alter this analysis.  *See* ECF

643 at 4-5 (quoting *Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 452 (1892) for the

proposition that the State holds its natural resources in "trust for the people of the state."); *see also*

*id.* at 22 (citing *Maryland v. Amerada Hess Corp.*, 350 F. Supp. 1060, 1066 (D. Md. 1972) (holding

that the State may bring a common law claim for damages to its waters, where it had not enacted

legislation on the subject.)).  This Court does not dispute the State's authority to initiate litigation

to protect its natural resources, nor does it contend that the State lost its power to do so merely

---

[12] The savings clause applies, by its terms, to "this subtitle," namely, EA Subtitle 4.  § 4-403.  The State conclusorily asserts that the savings clause also applies to its conduct pursuant to COMAR Subtitle 10.  ECF 643 at 1, 23.  The State's position is inherently inconsistent with its own argument that "this subtitle" when it appears in COMAR Subtitle 10 applies only to COMAR Subtitle 10.  ECF 643 at 25.

because its surviving claims bear some similarity to the statutory rights enumerated in EA Subtitle

4.  *See Atlantic Richfield Co*., 2021 WL 2077931, at *3.  Rather, it merely concludes that the State

cannot prevail on claims for alleged violations of EA Subtitle 4 on the same sites that it had

previously found to be in compliance with EA Subtitle 4 or the Regulations.  Thus, Defendants are

entitled to summary judgment on Count VII as to the Closed Sites.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF 642, is

granted as to Count VII and denied as to Counts I-VI and VIII-XI.  A separate Order follows.


Dated:  November 3, 2021                          _____/s/_____

                                                                    Stephanie A. Gallagher
                                                                    United States District Judge